IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| BUCCANEER RESOURCES, LLC, *et al.*,[1] | § § | Case No. 14-60041 (DRJ) |
| Debtors. | § § § | Joint Administration Pending |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING CONTINUED USE OF BUSINESS FORMS, BANK ACCOUNTS, AND CASH MANAGEMENT SYSTEM PURSUANT TO BANKRUPTCY CODE SECTIONS 105(a), 345(b) AND 363(c)**

**NOTICE UNDER BLR 9013(B) AND 9013(I)**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU.  IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.  YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU.  YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU.  IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED.  IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED; YOU SHOULD FILE AN IMMEDIATE RESPONSE.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: (i) Buccaneer Energy Ltd. (0107); (ii) Buccaneer Energy Holdings, Inc. (7170); (iii) Buccaneer Alaska Operations, LLC (7562); (iv) Buccaneer Resources, LLC (8320); (v) Buccaneer Alaska, LLC (4082); (vi) Kenai Land Ventures, LLC (2661); (vii) Buccaneer Alaska Drilling, LLC (7781); (viii) Buccaneer Royalties, LLC (5015); and (ix) Kenai Drilling, LLC (6370).

53582916.5

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY

THE DEBTORS HAVE REQUESTED THAT THIS MOTION BE CONSIDERED AT THE DEBTORS' FIRST DAY HEARINGS

---

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Buccaneer Resources, LLC ("BUC") and the above-captioned affiliated debtors (collectively, the "Debtors") file this *Emergency Motion for Entry of an Order Authorizing Continued Use of Business Forms, Bank Accounts, and Cash Management System Pursuant to Bankruptcy Code Sections 105(a), 345(b) and 363(c)* (the "Motion"). In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND PROCEDURAL STATUS

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of the Debtors' cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Bankruptcy Code sections 105, 345, 363, 503(b)(1), 549, and Federal Rule of Bankruptcy Procedure 2002 provide the statutory predicates for the requested relief.

## FACTUAL BACKGROUND

2. Founded in 2006, Buccaneer Energy, Ltd. is a publicly traded independent oil and gas company listed on the Australian Securities Exchange (the "ASX") under the symbol "BCC".[2] Although BCC is an Australian listed entity, the company operates exclusively through its eight U.S. subsidiary Debtors, each of which are headquartered in the U.S. and which maintain offices in Houston and Dallas, Texas, and Kenai and Anchorage, Alaska.

---

[2] An initial public offering ("IPO") was successfully completed and BCC was listed on the ASX on November 19, 2007. On February 19, 2014, BCC requested and was granted a voluntary suspension of all trading of its securities.

3.  The Debtors' primary business is the exploration for and production of oil and natural gas in North America. Operations have historically focused on both onshore and offshore opportunities in the Cook Inlet of Alaska as well as the development of offshore projects in the Gulf of Mexico and onshore oil opportunities in Texas and Louisiana.

4.  The Debtors have made a business strategy of identifying undervalued assets that can be quickly monetized through the use of leading edge, but proven technologies. Nevertheless, various economic and financial events have impaired the Debtors' liquidity and ability to perform in the future as described in the *Declaration of John T. Young, Jr., Chief Restructuring Officer of the Debtors, in Support of Emergency First Day Motions* (the "Young Declaration") filed in this case and incorporated herein by reference. As a result, on the date of this Motion (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee, examiner, or creditors' committee has been appointed.

5.  The Debtors' immediate objectives in commencing these chapter 11 cases are to minimize any loss in the value of their assets, preserve on-going business operations, and maximize creditor recoveries. To accomplish these ends, the Debtors intend to sell substantially all of their assets under a chapter 11 plan.

**RELIEF REQUESTED**

6.  Pursuant to Bankruptcy Code sections 105(a), 345(b), 363(c), 503(b)(1), and 549, the Debtors request (i) authority to maintain existing business forms and records; (ii) authority to continue to maintain their Banks Accounts (defined below); (iii) authority to maintain their Cash

Management System (defined below); and (iv) waiver of Bankruptcy Code section 345(b)'s requirements.

**A.     The U.S. Trustee Guidelines and Bankruptcy Code Section 345(b).**

7.     The Office of the U.S. Trustee for the Southern District of Texas has established guidelines (the "Guidelines") to supervise the administration of chapter 11 cases and prevent post-petition payments for prepetition claims.  The Guidelines require a chapter 11 debtor to, among other things:

(a)    close their books and records and open new books and record as of the petition date;

(b)    close all existing bank accounts;

(c)    open new bank accounts in depositories, approved by the U.S. Trustee, and that are designated as debtor-in-possession accounts ("DIP Accounts"), with separate DIP Accounts established for an operating account, a tax account (to the extent that payroll or other taxes are an issue for the debtor), cash collateral, and a payroll account (to the extent that the debtor had a separate payroll account prepetition);

(d)    obtain and utilize new checks for all DIP Accounts that bear the designation "Debtor-in-Possession" and contain other information about the debtors' chapter 11 case, and insure that the signature cards for all DIP Accounts clearly indicate that the debtor is a "Debtor-in-Possession";

(e)    deposit all receipts and make all disbursements only through the approved DIP Accounts, with any funds in excess of those required for current operations being maintained in an interest-bearing account;

(f)    deposit to the tax DIP Account sufficient funds to pay any tax liability (when incurred) associated with the Debtors' payroll; and

(g)    deposit all estate funds into DIP Accounts with a financial institution that agrees to comply with the requirements of the United States Trustee (which will be monitored by the U.S. Trustee), with no DIP Account exceeding the insured or collateralized limits of that approved depository.

*See* Guidelines for Debtors-in-Possession, Bank Accounts and Money of Estates, at §§ A-F. Additionally, Bankruptcy Code section 345(b) requires the holders of deposits that are not

insured by the United States or backed by the full faith and credit of the United States to obtain a bond or other security. 11 U.S.C. § 345(b).

8. As set forth below, the Debtors request a waiver of certain requirements of the Guidelines and Bankruptcy Code section 345(b) as such requirements would needlessly disrupt the Debtors' businesses and impair the Debtors' reorganization efforts.

**B.      Existing Business Forms and Records.**

9. The Debtors use many invoices and other business forms in the ordinary course of their business. The Debtors' personnel and the parties the Debtors' transact business with are accustomed to the Debtors' forms and records. Requiring the Debtors to open new books and records would create unnecessary expense, confusion, diversion of scarce time and personnel, and delay that would impair the Debtors' operations and reorganization. Moreover, the Debtors have retained professional financial and legal advisors that will work with the Debtors to ensure that pre and post-petition obligations are demarcated. Accordingly, the Debtors respectfully request authorization to continue to use their existing business forms and records. Additionally, the Debtors seek to continue to use existing correspondence and processes for producing checks and business forms without the designation "Debtor-in-Possession" imprinted upon them.

**C.      Bank Accounts and Cash Management System.**

10. The Debtors maintain twenty-five (25) non-restricted bank accounts (the "Bank Accounts"). Twenty (20) of the Bank Accounts are checking accounts, two (2) are savings accounts, two (2) are business CD accounts, and one (1) is an investment account. The Debtors also have five (5) restricted bank accounts securing standby letters of credit or surety bonds (the "Restricted Accounts").

11. Of the non-restricted accounts, twenty-three are maintained at Wells Fargo (one of which is the investment account), one is maintained at BBVA Compass, and one is maintained at Macquarie Bank. Of the Restricted Accounts, four are maintained at Wells Fargo and the other is maintained at Macquarie Bank. Wells Fargo is FDIC insured and is on the U.S. Trustee's list of approved banks. BBVA Compass is not on the U.S. Trustee's list of approved banks; however, BBVA Compass is headquartered in the U.S., is one of the U.S.'s 25 largest banks, and is FDIC insured. The Macquaire Bank account is the Debtors' only foreign bank account and is used to pay expenses of Buccaneer Energy Limited, the sole Australian debtor.[3] The Bank Accounts are listed on the attached **Exhibit A.**

12. The Debtors maintain a cash management system (the "Cash Management System") designed to collect and transfer funds generated by their operations and disburse those funds to satisfy operating expenses. The Cash Management System generally operates as other sophisticated cash management systems operate. A detailed diagram of the Cash Management System structure is attached as **Exhibit B**. The Cash Management System allows the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer cash as needed to respond to these requirements, (c) track all intercompany transfers; (d) forecast cash needs; (e) and maintain accounting records. In the ordinary course of business, the Debtors accurately record such collections, transfers, and disbursements as they are made.

13. The Buccaneer Alaska, LLC checking account (account number 2 on Exhibit A) is the Debtors' primary operating account (the "Operating Account"). The majority of the Debtors' funds reside in the Operating Account and the majority of the Debtors' receivables are

---

[3] In the past, the Debtors have deposited capital funds into the Buccaneer Energy Limited Macquarie account and transferred such funds to the U.S. entities. However, more recently, the Macquarie account has had only a nominal balance and funds have passed through the Macquarie account from the U.S. entities as needed to pay expenditures of Buccaneer Energy Limited.

deposited in the Operating Account.[4] Funds are transferred manually ("pushed") from the Operating Account to the other Debtor Bank Accounts[5] as needed for expenditures of the Debtors.[6] Most disbursements from the Bank Accounts are made by wire/ACH although each account also has manual check writing capacity and some disbursements are made by check. The Cash Management System is centralized in the Debtors' Houston, Texas offices and controlled primarily by the Debtors' Treasurer.

14.  Other than certain independent contractors employed by BCC, BUC employs all the Debtors' employees. Accordingly, the Buccaneer Resources account (account number 12 on Exhibit A) is the Debtors' payroll account (the "Payroll Account"). The Payroll Account is used to pay all payroll and employment taxes and 401(k)[7] contributions. Each payroll cycle (semi-monthly) the account is manually funded by a "push" of funds from the Operating Account. The Debtors have a second BUC account (account number 6 on Exhibit A) from which child support ACH debits and insurance benefits are paid.[8]

**D.  Proposed Post-Petition Cash Management System.**

15.  The Debtors' current Cash Management System allows the Debtors to efficiently administer payroll obligations and disburse funds for vendors and other operating expenses. The Debtors invested significant expense into the implementation and maintenance of their Cash Management System. Requiring the Debtors to adopt a new cash management system and open

---

[4] Not all receivables are paid directly into the Operating Account. Reimbursements from the State of Alaska under the Alaska Clear and Equitable Share Act ("ACES") are deposited in the bank account held by the debtor owning the lease that qualified for the reimbursement. Additionally, Buccaneer Energy Limited is entitled to a tax refund that will be paid into the Buccaneer Energy Holdings' account. All such receivables will be transferred to the Operating Account before being redistributed as needed for the Debtors' expenditures.

[5] The Debtors also pay some creditors directly from the Operating Account.

[6] The Debtors have and will continue to maintain complete and accurate records of all transfers of funds in and out of the Bank Accounts for each of the Debtors.

[7] The Debtors' 401(k) provider is ePlan Services, Inc., a Paychex company.

[8] The Debtors' primary benefits vendors are Aflac, Blue Cross Blue Shield, Dearborn, Guardian, and Legal Shield.

new bank accounts at this critical stage of the Debtors' cases would impose needless administrative burdens, costs, and disruption.

16. Accordingly, the Debtors propose to maintain their existing Cash Management System, with the following modifications designed to accomplish the purposes of the Guidelines. The Debtors propose to freeze the prepetition intercompany accounts between each Debtor (*i.e.*, the books will be closed) as of the Petition Date. The Debtors will account for post-petition intercompany movement of cash and collection/disbursement activity in the same manner as it did prepetition. Further, any Debtor that obtains post-petition intercompany receivables from another Debtor will be entitled to an administrative expense claim under section 503(b)(1) in the same manner as other creditors that extend post-petition credit.

17. The Debtors further request authorization to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the Bank Accounts or opening any additional bank accounts following the Petition Date (the "New Accounts") pursuant to the Debtors' reasonable business judgment. Notwithstanding the foregoing, any New Account that the Debtors open will be (a) with a bank that is organized under the laws of the United States of America or any state therein, and that is insured by the FDIC or the Federal Savings and Loan Insurance Corporation and (b) designated a "Debtor-in-Possession" account. The Debtors request that any Order approving this Motion provide that the New Accounts are deemed to be Bank Accounts and are similarly subject to the rights, obligations, and relief granted in the Order. The Debtors will provide the U.S. Trustee and its pre-petition secured lender with notice of any New Accounts that are opened. In furtherance of the foregoing, the Debtors also request that the relevant banks

be authorized to honor the Debtors' requests to open or close (as the case may be) such Bank Account(s).

18. The Debtors also seek a waiver of the UST requirement to establish specific DIP Accounts for tax payments and to hold deposits of funds sufficient to pay any tax liabilities (when incurred) associated with the Debtors' payroll. The Debtors can pay their tax obligations most efficiently from their existing Bank Accounts in accordance with their existing practices and the U.S. Trustee can adequately monitor the flow of funds into, among, and out of such accounts. The Debtors have remained current on all payroll tax obligations and anticipate that they will remain current on such obligations through their existing arrangements. Accordingly, requiring the Debtors to create new DIP Accounts designated solely for tax obligations and deposit funds to pay any tax liability associated with the Debtors' payroll would be unnecessary and inefficient.

**E.     Payment of Banking Fees.**

19. Certain banks charge monthly fees for maintaining the Bank Accounts. The Debtors respectfully request authority to continue paying the fees in the ordinary course of business, including any fees attributable to prepetition services.

## BASIS FOR RELIEF

20. Courts within and outside this District repeatedly modify requirements of the UST Guidelines and Bankruptcy Code section 345 in similar complex chapter 11 cases to avoid undue disruptions in the Debtors' business operations and reorganization efforts. *See, e.g., In re TMT,* Case No. 13-33763 (Bankr. S.D. Tex. June 27, 2013); *In re ATP Oil & Gas Corp*, Case No. 12-36187, Dkt. No. 135 (Bankr. S.D. Tex. Aug. 21, 2012); *In re Lack's Stores, Inc.*, Case No. 10-60149 (Bankr. S.D. Tex. Jan. 26, 2011): *In re Seahawk Drilling, Inc.,* Case No. 11-20089

(Bankr. S.D. Tex. Feb. 14, 2012); *In re Energy Partners, LTD.*, Case No. 09-32957 (Bankr. S.D. Tex. May 8, 2009); *In re CDX Gas, LLC*, Case No. 08-37922 (Bankr. S.D. Tex. Jan. 13, 2009). *See also In re Reddy ice Holdings, Inc.*, Case No. 12-32349 (Bankr. N.D. Tex. Apr. 13, 2012): *In re LSP Energy Ltd. P'Ship*, Case No. 12-10460 (Bankr. D. Del. Mar. 12, 2012).[9]

21.     Additionally, Bankruptcy Code section 363(c)(1) authorizes a debtor-in-possession to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Bankruptcy Code section 363(c)(1) extends to a debtor-in-possession's continued use of its customary cash management system and, thus, supports the relief requested herein. *See*, *e.g.*, *Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996); *Charter Co. v. Prudential Ins. Co. Am.* (*In re Charter Co.*), 778 F.2d 617, 621 (11th Cir. 1985) (indicating that an order authorizing the debtor to employ a cash management system that was "usual and customary in the past" was "entirely consistent" with section 363(c)(1)). *See also* 11 U.S.C. § 105(a) (granting the Court power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]").

22.     Finally, cause exists to modify the provision of section 345 as modifying the Debtors' deposits and other procedures would cause substantial delay and disruptions in the Debtors' business operations and reorganization efforts. *See* 11 U.S. § 345(b); *In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

23.     In *Service Merchandise* case, the court identified the following factors as a guide for determining whether cause exists to waive the requirements of section 345(b):

---

[9] Courts have also frequently authorized debtor to use existing deposit accounts even when the deposit accounts are located with foreign banks. *In re Aerovias, Nacionales de Colombia S.A.*, Case No. 03-11678 (Bankr. S.D.N.Y. June 4, 2003); *In re Global Crossing Ltd.*, Case No. 02-40188 (Bankr. S.D.N.Y. May 20, 2002); *In re TBS Int'l Ltd.*, Case No. 00-41696 (Bankr. S.D.N.Y. July 7, 2000).

   (i)  the sophistication of the debtor's business;

   (ii)  the size of the debtor's business operations;

   (iii)  the amount of investments involved;

   (iv)  the bank ratings of the financial institutions where the debtor's funds are held;

   (v)  the complexity of the case;

   (vi)  the safeguards in place within the debtor's own business for insuring the safety of the funds;

   (vii)  the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

   (viii)  the benefit to the debtor of current practices;

   (ix)  the harm, if any, to the estate; and

   (x)  the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case.

*Serv. Merch.*, 240 B.R. at 896.

  24.  Examining these factors, the *Service Merchandise* court concluded that "cause" existed in that case because the debtors were "large, sophisticated [companies] with a complex cash management system," with the ability to shift money as needed to insure the safety of their funds. *Id.* Moreover, the benefits to the debtor of waiving the section 345(b) requirements far outweighed any potential harm to the estate, and the failure to waive the requirements "would needlessly handcuff this debtor's reorganization efforts." *Id.* at 896-97.

  25.  As in *Service Merchandise*, the Debtors are large, sophisticated companies with a complex Cash Management System that provides Debtors with the ability to safely transfer funds rapidly to ensure the efficient operation of the Debtors' businesses. In light of these factors and the safety of the institutions that the Debtors propose to utilize, sufficient cause exists to allow the Debtors to deviate from the investment guidelines set forth in section 345(b).

**NOTICE**

26.     Notice of this Motion will be provided by overnight delivery and/or e-mail or facsimile to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) all known or alleged secured creditors; (c) the 30 largest unsecured creditors of the Debtors on a consolidated basis; (d) AIX Energy, LLC; (e) all known shareholders holding over 5% of a class of equity interests in any of the Debtors; (f) the United States Attorney's Office for the Southern District of Texas; (g) the Australian Securities and Investments Commission; and (h) the Internal Revenue Service. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request entry of an order, substantially in the form attached hereto, (i) authorizing the Debtors to maintain their existing Bank Accounts and business forms without reference to their debtor-in-possession status; (ii) authorizing the Debtors to continue to employ their existing Cash Management System; (iii) authorizing the Debtors to maintain existing investments policies; and (iv) granting such other and further relief as is just and proper.

Dated:  May 31, 2014.

>    Respectfully submitted,
>
>    **FULBRIGHT & JAWORSKI LLP**
>
>    By: */s/ William R. Greendyke*
>    William R. Greendyke
>    State Bar No. 08390450
>    Jason L. Boland
>    State Bar No. 24040542
>    1301 McKinney Street, Suite 5100
>    Houston, Texas 77010-3095
>    Telephone:  (713) 651-5151
>    Facsimile:  (713) 651-5246
>    william.greendyke@nortonrosefulbright.com
>    jason.boland@nortonrosefulbright.com

-and-

Toby L. Gerber
State Bar No. 07813700
Mark A. Platt
State Bar No. 00791453
FULBRIGHT & JAWORSKI LLP
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200
toby.gerber@nortonrosefulbright.com
mark.platt@nortonrosefulbright.com

**PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS-IN-POSSESSION**

53582916.5

- 13 -