**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| Buccaneer Resources, LLC, *et al.*,[1] | § | Case No. 14-60041 (DRJ) |
| | § | |
| Debtors. | § | Joint Administration Pending |
| | § | |

**DECLARATION OF JOHN T. YOUNG, JR., CHIEF RESTRUCTURING OFFICER OF
THE DEBTORS, IN SUPPORT OF EMERGENCY FIRST-DAY MOTIONS**

I, John T. Young, Jr. state as follows:

**INTRODUCTION**

1.      I am a Senior Managing Director in the financial advisory firm of Conway MacKenzie, Inc. ("Conway MacKenzie" or "Firm"), where I manage the Firm's Los Angeles, Dallas and Houston offices as well as the Firm's Energy Advisory Services practice.  I also serve as a member of the Firm's Board of Directors.

2.      Conway MacKenzie Management Services, LLC ("CMS"), an affiliate of Conway MacKenzie, was retained prepetition by Buccaneer Energy Limited ("BCC") to provide certain temporary employees to BCC and its above-referenced subsidiaries (collectively, "Buccaneer" or the "Debtors") to assist in their financial management and restructuring. Specifically, I was retained on March 4, 2014 to serve as the Debtors' Chief Restructuring Officer ("CRO") and an officer of the Debtors.  In this capacity, I became familiar with the Debtors' day-to-day operations, business affairs, and books and records.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: (i) Buccaneer Energy Ltd. (0107); (ii) Buccaneer Energy Holdings, Inc. (7170); (iii) Buccaneer Alaska Operations, LLC (7562); (iv) Buccaneer Resources, LLC (8320); (v) Buccaneer Alaska, LLC (4082); (vi) Kenai Land Ventures, LLC (2661); (vii) Buccaneer Alaska Drilling, LLC (7781); (viii) Buccaneer Royalties, LLC (5015); and (ix) Kenai Drilling, LLC (6370).

3.      I submit this declaration (the "Declaration") to assist the Court and other parties-in-interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on May 31, 2014 (the "Petition Date") and (ii) the relief, in the form of motions, that the Debtors have requested of the Court (the "First Day Motions").

4.      Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

5.      Except as otherwise indicated, all facts set forth in this Declaration are either based on my personal knowledge, information supplied to me by others employed by the Debtors, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtors' operations and financial condition, or any combination thereof.  If called upon to testify, I could and would testify competently to the facts set forth herein.  I am duly authorized to submit this Declaration.

6.      This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases.  This Declaration also describes the Debtors' business, capital structure and material obligations, the events which precipitated these chapter 11 cases, and summarizes the First Day Motions supported by this Declaration.

## BACKGROUND AND OVERVIEW OF CIRCUMSTANCES LEADING TO THE FILING OF THESE CHAPTER 11 CASES

**A.      Historical Background and Overview.**

7.      Founded in 2006, BCC is a publicly traded independent oil and gas company

listed on the Australian Securities Exchange (the "ASX") under the symbol "BCC".[2]  Although BCC is an Australian listed entity, the company operates exclusively through its eight U.S. subsidiaries, each of which are headquartered in the U.S. and which maintain office, warehouse and a corporate apartment lease for properties located in Houston, Texas, and Kenai, Anchorage, and Soldotna, Alaska.

8.     The Debtors' business is the exploration for and production of oil and natural gas in North America.  Current operations are principally focused on both onshore and offshore opportunities in the Cook Inlet of Alaska as well as the development of offshore projects in the Gulf of Mexico and onshore oil opportunities in Texas and Louisiana.

9.     The Debtors have pursued a business strategy of attempting to identify undervalued assets that can be quickly monetized through the use of leading edge, proven technologies.  For example, in 2008 when natural gas prices reached over $10 per MCF in the U.S., the Debtors, through Houston-based Buccaneer Resources, LLC ("BUC"), accumulated several offshore opportunities in the shallow Gulf of Mexico stretching between Texas and Louisiana.  BUC increased its reserves by over 180% in a matter of months.  At the same time, BUC also acquired acreage in the coveted Eagle Ford Shale under the Austin Chalk in Lee County, Texas, one of the oldest producing regions in the U.S.  As the price of natural gas fell in the lower 48 states of the U.S., the Debtors repositioned themselves to take advantage of opportunities in Alaska.

10.     A more detailed description of the Debtors' corporate structure and business is discussed below.

---

[2] An initial public offering ("IPO") was successfully completed and BCC was listed on the ASX on November 19, 2007.  On February 19, 2014, BCC requested and was granted a voluntary suspension of all trading of its securities, as discussed below.

**B.      Description of the Debtors' Corporate Structure.**

11.      The Debtors' corporate structure is as follows:



12.      As stated above, BCC is a publically listed Australian holding company that operates in the U.S. entirely through its wholly-owned subsidiaries—primarily BUC and Buccaneer Alaska, LLC ("BAK").  While BCC has an office in Australia, it has no employees; rather, BCC's operations are limited to (a) ensuring compliance with the ASX and related reporting requirements; and (b) other administrative functions.   These limited functions are performed through two independent contractors, Messrs. Dean Gallegos and Bruce Burrell.

13.      BUC, also formed in 2006, is a Texas limited liability company based in Houston, Texas.  BUC operates as an upstream oil and gas company specializing in the development and expansion of behind-pipe proved and probable reserves, and low-risk exploration plays with growth potential.  BUC owns all of the Debtors' interests in oil and gas leaseholds in Texas which—with the exception of the Alexander unit discussed below—are currently non-producing.

As of May 30, 2014, BUC employed 33 salaried and hourly employees.  Ten of those employees were terminated as part of a reduction in BUC's work force effective May 31, 2014 in anticipation of these bankruptcy proceedings, and three additional employees were terminated effective June 2, 2014.  All of the Debtors' personnel are employees of BUC; thus, all of the Debtors' managers are located in the U.S. and all of the Debtors' day-to-day operations are conducted within the U.S.  Indeed, no other Debtor entity has any employees.

14.     BAK is a Texas limited liability company also based in Houston, Texas.  BAK owns all of the Debtors' interests in oil and gas leaseholds in Alaska, including oil and gas wells in the Alaskan Cook Inlet.

15.     Kenai Drilling, LLC ("Kenai Drilling") is an Alaska limited liability company established in 2012 to manage drilling operations for Buccaneer in the Cook Inlet.  Kenai Drilling is also the charterer of an offshore jack-up drilling rig named the Endeavour—Spirit of Independence (the "Endeavour") pursuant to a certain bareboat charter agreement.

16.     Buccaneer Alaska Drilling, LLC ("BAD"), formed in 2010, is an Alaska limited liability company and is the sole member of Kenai Drilling.

17.     Buccaneer Alaska Operations, LLC ("BAO"), also formed in 2010, is an Alaska limited liability company that operates on behalf of Buccaneer Alaska.

18.     Buccaneer Royalties, LLC ("Buccaneer Royalties") is a Texas limited liability company formed in October 2011 that owns certain overriding royalty interests ("ORRIs")[3] created by BAK and BUC against certain of the Buccaneer leaseholds.  Buccaneer Royalties was formed for the express purpose to hold these contingent ORRIs to secure the repayment of

---

[3] An "overriding royalty interest" means fractional, undivided interests or rights of participation in the oil or gas, or in the proceeds from the sale of the oil or gas, produced from a specified tract or tracts, which are limited in duration to the terms of an existing lease and which are not subject to any portion of the expense of development, operation or maintenance.

certain obligations owed to the Alaska Industrial Development and Export Authority ("AIDEA") pursuant to a certain LLC Agreement relating to Kenai Offshore Ventures, LLC ("KOV"), an entity originally organized by BAD.  The Debtors' relationship with KOV and AIDEA is discussed more fully below.

19.     Buccaneer Energy Holdings, Inc. ("BEH") is a Delaware company formed in November 2012 to hold certain permits for BAO.  Specifically, in order to commence drilling in Alaska, various permits were required to be held in the name of the parent company who, at the time, was BCC.  Because the State of Alaska required that such permits be held by a U.S. corporation, BEH was established.

20.     Kenai Land Ventures, LLC ("Kenai Land") f/k/a Buccaneer Offshore Operations, LLC is an Alaska limited liability company formed in 2011 to acquire rights in a certain onshore drilling rig named the Glacier Drilling Rig # 1 (the "Glacier Rig").

**C.     Description of the Debtors' Business.**

> **(1)     The Debtors' Acquisition of Leasehold Interests and Related Operations in the Gulf Coast.**

21.     When BCC was formed in 2006, BCC's strategy was to concentrate on acquiring small prospects in the Gulf of Mexico and onshore coastal areas which, because of their size, were not appealing to major oil companies but presented potential economic opportunity favorable to smaller, more aggressive firms like BCC.  In keeping with this strategy, BCC, through its wholly owned subsidiary, BUC, acquired working interests in two producing projects in Texas—one onshore and one offshore.

22.     As to the onshore prospect, over time BUC acquired a 52.5% working interest in the Lee County Project located approximately 120 miles northwest of Houston, Texas.  Lee County is an onshore oil project whose main target reservoirs are the Austin Chalk, Eagle Ford

shale, Buda, Edwards and Sligo formations.   BUC first acquired approximately 1,900 acres under lease from Sandstone Energy in 2007 just prior to BCC's IPO.  The majority of the leases had three year paid in full terms.  BUC both renewed certain of the leases and added new leases in 2009 and 2010, most of which also had three year paid in full terms.  This increased BUC's Lee County lease holdings from 1,900 to approximately 2,500 acres.  Of these leases, only the Vick lease and the Alexander unit were extended by production and the remaining undrilled, non-unit participating leases began expiring.  The Vick lease terminated post-production by non-operations.  The Alexander unit is currently the only remaining active unit (approximately 175 acres) including all or portions of four to six leases.  However, even this unit well is not currently producing in paying quantities.  Development options are being assessed through either farm-out or a sale of BUC's working interest.   Given the size and scope of the Debtors' Alaskan operations (discussed below), the development of Lee County has become lower priority.

23.    As to the offshore prospects, in 2008, BUC acquired a 65% working interest in the Pompano field which is located approximately seven miles offshore in the Gulf of Mexico and approximately 28 miles east of Port O'Connor, Texas and approximately 94 miles southwest of Houston, Texas.  Port O'Conner is located in Calhoun County, Texas, part of the Victoria Division of the Southern District of Texas.  The Pompano field includes the Swordfish prospect as it adjoins the Pompano leases and has similar target formations.   While the project has existing production facilities in place, all wells in this field are currently shut in,[4] and all of BUC's leases in the Pompano field have since expired.  All that remains of the expired leases is surface access that would be required in the event the project is not developed further and the wells are plugged and abandoned and production facilities are removed.

---

[4] BUC spudded its first well in the Pompano field on January 12, 2008, and its second well on February 24, 2008.

(2)    **The Debtors' Expansion into Alaska.**

24.    In 2008, the meltdown in financial markets significantly and negatively impacted the Debtors and their ability to raise funds to develop its Gulf Coast assets.  Emerging from that, the Debtors began looking at new industry trends, including shale oil, and turned their focus to Alaska—and specifically, the Cook Inlet basin which the Debtors viewed as one of the most underdeveloped hydrocarbon basins in North America.

25.    The Cook Inlet, pictured below, stretches 180 miles from the Gulf of Alaska to Anchorage in south-central Alaska, and is rich in natural resources, including oil, gas and coal. Today, the Cook Inlet is the second largest production area for oil and gas in the State of Alaska.



26.     In addition to its rich natural resources, Alaska posed other unique opportunities for investors due to Alaska's Clear and Equitable Share ("ACES") program, which was passed by Alaska's legislature in November 2007.   ACES is unique to Alaska, and was designed specifically to develop and promote drilling activity in many of Alaska's undeveloped or underdeveloped locations, such as the Cook Inlet.   The program essentially de-risks the process of drilling in Alaska by providing companies with generous incentives to develop existing resources in the area to ease the increasingly high energy demand curves.   Stated simply, the ACES program offers a cash rebate of up to 65% of all monies spent on exploration, drilling, and building production facilities, and up to 45% of facilities related capital expenditures, such as on platforms, flow-lines and pipelines.   Importantly, these incentives apply irrespective of the success of any well or development program.[5]

**(3)     The Debtors' Acquisition of Leasehold Interests and Commencement of Drilling Operations in the Cook Inlet.**

27.     Recognizing these and other benefits of exploration in Alaska, the Debtors, through BAK, began their Alaskan program in March 2010, when BAK acquired 70,000 acres and onshore and offshore leases in the Cook Inlet from Stellar Oil & Gas, LLC ("Stellar"), a private U.S. based company.   The purchase from Stellar included interests in the North Middle Ground Shoal a/k/a the Southern Cross Unit project (offshore),[6] the North West Cook Inlet project (offshore), and the West Eagle project (onshore).

---

[5] After applying for ACES credits, it typically takes up to 120 days for the State of Alaska to issue the credit, and then another 30 days to convert the credit into cash.  To date, the Debtors have recovered a total of $30.5 million in ACES rebates since commencing operations in Alaska, and the Debtors expect to receive an additional $22.4 million in 2014.

[6] Subsequent to acquiring the North Middle Ground Shoal project and as part of a unit application lodged with the Alaska Department of Natural Resources ("DNR"), the project was renamed the Southern Cross Unit.  BAK retains a 50% working interest in the northern and southern leases in the Southern Cross Project, and a 100% working interest in the remaining northern lease, which expires on September 30, 2014.

28.     The acquisition signaled the commencement of an expansion by the Debtors into a region that they identified as significantly underexplored, and a region that had been identified by numerous independent studies as having the potential to contain additional world class reserves.  With this acquisition, BAK became the 6th largest lease holder in the Cook Inlet.  Since that time, BAK has gone through a process of adding to its initial lease portfolio as well as de-risking the projects to a drill ready stage.  In this respect, BAK implemented an aggressive exploration and development program with both onshore and offshore components, beginning with the acquisition of 9,308 acres at the Kenai Loop Project[7] through leasing agreements with the Alaska Mental Health Land Trust ("MHLT"), the State of Alaska, and the Cook Inlet Region Inc. ("CIRI").

29.     Upon acquiring an interest in the Kenai Loop Project, BAK, through use of the Glacier Rig,[8] drilled the Kenai Loop No. 1-1 discovery well in April 2011, and began first commercial production in January 2012.[9]  After testing Kenai Loop No. 1-1, BAK secured a contract with ENSTAR Natural Gas Co.—Alaska's largest gas utility—in August 2011 to provide firm commitments for the Cook Inlet Natural Gas Storage Alaska facility on the Kenai Peninsula, then under construction and now in operation.  Gas sales commenced in early 2012 once pipeline and facilities construction were completed.  Under the contract, BAK is required to deliver 5 mmcf per day to the facility, up to 12 mmcf per day by 2018.  The contract allows BAK to sell as much as 15 mmcf per day and 31.5 billion cubic feet by 2018 should Kenai Loop

---

[7] The Kenai Loop is an onshore gas field near Kenai, Alaska located in the Cook Inlet.

[8] The Glacier Rig is a Mesa 1000 carrier mounted land drilling rig that was built in 2000 for Marathon Oil Company ("Marathon") and can drill to depths of approximately 15,000 feet.  The rig is unique in that it was designed and built with the input of the drillers that would operate the rig on the Kenai Peninsula, Alaska.  It is designed to operate close to neighborhoods on Alaska's Kenai Peninsula, and its small size is ideal for pad drilling, minimizing the drilling footprint and impact to its surroundings.

[9] The permitting process to drill in the Cook Inlet takes approximately 6-9 months.

production increase.  The contract is tied to the New York Mercantile Exchange gas futures with a ceiling of $10 per thousand cubic feet and a seasonally adjusted floor between $5.75 and $6.85 per mcf, with the floor and ceiling regularly adjusted for inflation.

30.    Because BAK expected the field to come online four months before the storage facility, BAK also signed a short-term contract with ConocoPhillips in late 2011.  This unique contract gave BAK the option to sell up to 2.5 bcf to the ConocoPhillips-operated liquefied natural gas terminal on the Kenai Peninsula.  The contract came after ConocoPhillips idled the plant, but delayed the closing to accommodate four summer shipments and delayed it again for a shipment in October.

31.    BAK subsequently drilled three additional wells in the Kenai Loop field. Specifically, in August 2011, BAK used the Glacier Rig to spud its second well at Kenai Loop, designated the Kenai Loop No. 1-2, which was a dry hole as a result of encountering a fault.  In September 2012, BAK spud its third well—Kenai Loop No. 1-3—to expand its existing gas production at the project.  BAK successfully completed the well and production began in February 2013.  BAK drilled a fourth well in the field—the Kenai Loop No. 1-4—in the summer of 2013 with the well completed and tested but shut-in pending the resolution of a land dispute to produce. The State of Alaska requested geologic and pressure data to establish the producing horizon and determined the well would drain the existing producing reservoir.  The State also determined the reservoir would drain from under a contested lease held by CIRI.  The status of the lease and ultimate sharing of revenues is still subject to negotiation and State administrative approvals.  The Kenai Loop No. 1-4 well added no new reserves and cost approximately $12 million to drill and complete.  BAK subsequently obtained permits to commence drilling on a fifth well in Kenai Loop; however, drilling operations with respect to that well have not yet

commenced.  The four wells referenced above (Kenai Loop Nos. 1-1, 1-2, 1-3 and 1-4) were drilled from the same pad.  BAK has a second pad approximately one mile to the east of the first pad but has not drilled a well from that pad.

32.     In May 2012, the Debtors facilitated an agreement with Glacier Drilling Co., a subsidiary of Marathon, to secure exclusive leasing rights for the Glacier Rig for a period of three (3) years through May 2015, with the option to purchase the rig after six (6) months for $7.3 million, thereby giving the company a rig for all its near-term onshore operations.  The bare rig agreement—executed by Kenai Land, an entity specifically established for this transaction— enabled the Debtors to control their costs and timing of development drilling, and included a lease rate negotiated at a discount to the rates charged when BAK utilized the rig to drill its two previous wells at Kenai Loop.[10]  In addition to these cost benefits, the agreement ensured access in a supply constrained onshore rig market.

33.     As with the Glacier Rig and as part of the Debtors' plan to acquire enabling assets to ensure the success of their strategy, the Debtors sought to bring a jack-up rig onsite to execute on the Debtors' offshore program.  As a result, on November 3, 2010, BAD organized KOV to acquire and own the Endeavour—a world-class offshore jack-up rig capable of drilling to 20,000 feet in 18-300 foot water depths (the rig is capable of drilling in all areas of the Cook Inlet or other Alaskan Outer Continental Shelf waters) and able to canti-lever 60 feet to work on platforms.  There had not been a jack-up rig with the operational capabilities of the Endeavour in the Cook Inlet since the early 1990's.

---

[10] On May 8, 2014, Kenai Land received a demand from Teras Oilfield Support Limited requesting payment of $1,243,917.35 allegedly owed under the bare rig lease agreement.  Kenai Drilling has not made any payments in response to this notice.

34.     To obtain the necessary capital to acquire the Endeavour, Singapore based Ezion Holdings Limited ("Ezion")[11] was added as a member to KOV on April 14, 2011, and AIDEA[12] was added as a preferred member on November 8, 2011.  Pursuant to the joint venture, KOV would own the Endeavour while Kenai Drilling, a wholly owned subsidiary of BCC, would serve as operator and maintain control of the Endeavour through a Bareboat Charter Agreement (the "Charter") entered on November 3, 2011.[13]  The initial term of the Charter was for 5 years, during which time Kenai Drilling was required to pay KOV monthly pursuant to a specified day rate of approximately $70,000 for exclusive access of the rig.

35.     Upon acquiring the Endeavour in November 2011, and because the Endeavour had been idle for several years, BAD and its venture partners, AIDEA and Ezion, deemed it necessary to complete extensive upgrades and repairs to ensure that the rig was ready for safe, long-term operations in Alaska. As such, the rig was dry docked at the Keppel Fels yard in Singapore for six (6) months undergoing repairs and upgrades.  Those repairs and upgrades continued at the Homer Deep Water Dock in Homer, Alaska when the rig arrived in the Cook Inlet in August of 2012.

---

[11] Ezion is a Singapore-based company that owns and operates a large fleet of support and drilling vessels for the oil and gas business.  Ezion currently has operations in Australia and the North Sea; this was Ezion's first investment in Alaska.  Overseas Chinese Banking Corporation ("OCBC"), Ltd., a Singapore-based bank that has a long-term relationship with Ezion, provided a long-term, low interest loan for the rig purchase and refurbishment.

[12] AIDEA is a public corporation of the State of Alaska, created in 1967 by the Alaska Legislature in the interest of promoting the health, security, and general welfare of the people of the State of Alaska.  AIDEA invested $23.6 million in the LLC for the purchase of the rig, which amounts were to be paid back through six annual payments made by Kenai Drilling for use of the rig.  Additionally, as the preferred member in the LLC, over the five years of ownership payments, AIDEA was entitled to collect dividend payments of 8% based on the outstanding balance of the investment.  AIDEA also received a 3.5% ORRI in the Debtors' Texas and Alaskan properties, including the onshore Kenai peninsula leases.  Under the agreement and pursuant to a separate Exclusive Use Agreement (the "Exclusive Use Agreement") and Four Well Commitment Agreement, as amended and restated (the "Four Well Commitment Agreement"), KOV was required to drill a minimum of four exploration wells in the Cook Inlet and, as long as AIDEA remained a preferred owner, the rig was to operate exclusively in Alaskan waters.

[13] On March 28, 2013, Kenai Drilling entered into a Crew & Management Services Agreement (the "Spartan Agreement") with Spartan Offshore Drilling, LLC ("Spartan") to manage, on its behalf, the operation and maintenance of the Endeavour.  A further discussion of the Spartan Agreement and Kenai Drilling's outstanding obligations under that agreement is discussed below.

36. Upon the Endeavour's arrival in Homer in August 2012, KOV worked with local contractors through the Endeavour's project manager, Archer Drilling, LLC ("Archer"), to complete various rig upgrades and repairs ahead of the final vessel inspection and certification. This included rectification of work that had been completed in Keppel Fels shipyard in Singapore.[14]

37. Around the same time that the Endeavour arrived in Homer, Alaska, the Debtors acquired a 25% working interest in the Cosmopolitan field located in the southern Cook Inlet from Pioneer Natural Resources ("Pioneer"). The Debtors acquired this 25% working interest through Buccaneer Cosmopolitan, LLC ("Buccaneer Cosmopolitan"), a Texas limited liability company formed in 2012 as part of this acquisition. The remaining 75% working interest was sold from Pioneer to BlueCrest Energy, Inc. ("BlueCrest"). All required permits were in place by February 2013, and the Endeavour was mobilized to the Cosmopolitan field in April 2013 (specifically to the Cosmopolitan State No. 1). Buccaneer Cosmopolitan completed its drilling of the Cosmopolitan field and the Endeavour rig was released from Cosmopolitan in August 2013. BCC later sold its interest in Buccaneer Cosmopolitan to BlueCrest on January 24, 2014, as discussed more fully below.

**(4) The Debtors' Portfolio Review and Recapitalization Process.**

38. Beginning in mid-2013 and continuing in 2014, the Board and management team of the Debtors undertook multiple initiatives to reduce debt and improve the Debtors' balance sheet. As part of these initiatives, the Debtors completed a portfolio review and determined that they should refocus their exploration and development efforts on their most prospective

---

[14] As discussed below, KOV and several of the Debtors are currently in litigation with Archer in connection with work performed in connection with the Endeavour.

projects—Kenai Loop, Tyonek Deep and West Eagle.[15]  This decision was driven by three primary factors:  (i) balancing the Debtors' available capital resources with the cost involved in exploiting all opportunities;  (ii) timing of drilling commitments to retain leases;  and (iii) scheduling of the Endeavour rig for completing projects.  The Endeavour rig was moved on the Southern Cross location in the Cook Inlet in August of 2013 and began operations but had to suspend operations after the tidal action in the Inlet began to erode the sea bed around the jack-up legs.  The joint venture partner that was to put up the money for the project failed to remit the necessary funding, and the time available in the 2013 drilling season was closed.

39.    In September of that year, the Endeavour plugged and abandoned the location and the rig returned to Port Graham for winter stacking after approximately $16 million in capital was expended. The Glacier onshore rig was transported from the Kenai Loop location to the West Eagle location at the southern end of the Kenai Peninsula in November of 2013 in order to drill a required well to earn the leases.  The well was spudded in December, and reached target depth in January of 2014.  The well was determined to be a dry hole, and approximately $10 million was written off.  As a result of this activity, the North West Cook Inlet[16] and Southern Cross[17] projects were removed from the Debtors' priority list for drilling in 2014, and the Alaska

---

[15] The West Eagle project is located on the southern Kenai Peninsula, and is BAK's largest acreage position at over 50,000 acres (including nine (9) State leases).  At West Eagle, BAK is targeting both oil and gas.

[16] As to the North West Cook Inlet Unit, the Debtors were required to drill a well under a certain Plan of Exploration agreed to with the DNR prior to October 31, 2013, so as to retain the leases within the Unit and prevent their automatic expiration.  The Debtors did not meet this condition and have been having regular discussions with the DNR to seek an extension of this deadline.  Following the reprioritization of the Debtors' projects (discussed below), however, the Debtors were not in a position to drill this project in 2014.  Accordingly, the Debtors have decided not to seek an extension to the Plan of Exploration.  Accordingly, five of the six leases that make up the North West Cook Inlet Unit will automatically terminate as they are beyond their primary term, and the remaining lease will terminate on February 1, 2018.

[17] Four leases made up the Southern Cross Unit.  Three of the leases were acquired by the Company in 2010 though the execution of farm-out agreements with Cook Inlet Energy, Inc. (50%) and Chevron, now Hilcorp (50%).  The fourth lease was separately acquired in March 2010 and is 100% owned by BAK.  Per the Southern Cross Unit Plan of Exploration, the Debtors were required to drill a well prior to October 31, 2013.  Given the delays experienced with the commissioning of the Endeavour rig after it arrived in Alaska, the additional time taken at the

Department of Natural Resources was notified that the Debtors would not be continuing with these two projects at this time.

40.    As part of its recapitalization initiative, the Debtors sought to refinance their existing debt facilities with Victory Park Capital ("Victory Park").  That refinancing was ultimately achieved in January 2014, with the assignment of the $100 million Victory Park Facility (defined below) to Meridian Capital CIS Fund, an affiliate of Meridian Capital International Fund (collectively, "Meridian"), on amended terms.  The Victory Park Facility and Meridian Facility (as well as the recent assignment of the Meridian Facility to AIX Energy LLC ("AIX")), are discussed in more detail below.

41.    In addition to this refinancing, the Debtors embarked on a series of asset sales designed to generate additional working capital for the Debtors' three most prospective projects referenced above.  Specifically, on January 24, 2014, the Debtors completed a transaction with BlueCrest for the sale of their 25% working interest in the Cosmopolitan project for a total consideration of $40.6 million.  As part of the transaction, the Debtors retained all rights to approximately $10 million in ACES credits associated with their investment in the project, which are anticipated to be recovered in 2014.  The Debtors agreed to assist BlueCrest in the transition of operatorship in exchange for a monthly reimbursement fee of $250,000.  In addition, $4,062,500 was placed into escrow until final tax submissions to and determinations by the Internal Revenue Service ("IRS") were made.  The Debtors estimate $762,500 will be remitted to

---

Cosmopolitan location and the problems with seabed conditions on location that prevented spudding of the Southern Cross #1 well in September 2013, the Debtors were unable to meet this condition.  Accordingly, while the Debtors' inability to drill a well by the agreed date resulted in the Unit expiring, not all of the underlying four leases have expired; rather, each lease reverted to their original terms.  Three of the underlying leases remain in effect.  BAK maintains that it retains a 50% working interest in the northern and southern leases, and also its 100% working interest in the remaining northern lease, which expires on September 30, 2014.  The fourth lease is beyond its primary term of seven years and has automatically expired.   The Debtors had been in discussions with the DNR regarding a further extension for the Southern Cross Unit drilling requirement.  However, as a result of the reprioritization, the Debtors decided to cease discussions regarding an extension.

the IRS to satisfy Alternative Minimum Tax obligations on the gain resulting from the transaction, with the remaining $3.3 million of gain sheltered by Net Operating Loss Carryforwards expected to be released from escrow to the Debtors in June 2014.

42.     Further, due to the various issues associated with the mobilization of the Endeavour rig and related issues tied to the Archer litigation described below, the Endeavour has not been fully utilized, and day rate charges have continued to accrue while the Rig remains idle at Port Graham in the Kenai Peninsula.  Recognizing these significant and increasing obligations under the Charter, on December 31, 2013, pursuant to a Membership Interest Purchase Agreement ("MIPA"), BAD sold its membership interest in KOV to Teras Investments Pte Ltd. ("Teras")—a company organized under the laws of Singapore and a wholly owned subsidiary of Ezion—for $23,950,000.  Proceeds from the sale were used to repay certain related unsecured loans of $11.2 million that were due on January 25, 2014, and to pay unpaid bareboat charter fees for the period of October 2013 to December 2013.  No net cash proceeds flowed to the Debtors from this transaction.  Further, pursuant to the MIPA, KOV agreed to defer $10.7 million in unpaid charter fees for the period of October 29, 2012 to March 30, 2013, plus estimated interest of $1.3 million, to October 1, 2014.  Kenai Drilling remains financially obligated to KOV under the Charter for bareboat charter fees that continue to accrue at over $70,000 per day (payable monthly) escalating annually through 2017, and $10.7 million for the deferred unpaid charter fees and related interest referenced above.  BCC and BAD have guaranteed these obligations.[18]

43.     The Meridian assumption of the Victory Park Facility (and subsequent assignment to and assumption by AIX), the sale of the Debtors' 25% interest in the Cosmopolitan project,

---

[18] Notably, Section 12.04 of the Charter provides that U.S. / Texas law governs any dispute thereunder, and that jurisdiction and venue for any such disputes shall be in the United States District Court for the Southern District of Texas.  BCC's and BAD's related guaranty provides that U.S. law (i.e., Alaskan law) governs.

and the sale of BAD's 50% equity interest in KOV resulted in approximately $120 million in cash, debt repayments and debt reduction, including repayment of approximately $22.1 million to KOV, repayment of $10.8 million of the Meridian debt, and settlement of approximately $20.0 million of accounts payable.  Of the remaining proceeds, $4,062,500 million is currently in escrow with respect to the tax withholding issues referenced above for which the Debtors expect to receive a refund of approximately $3.3 million in May 2014, and $5 million was used for capital purposes in relation to West Eagle Unit #1 well, which was spudded in February 2014.

44.     In sum, while the Debtors have, to date, spent over $100 million to develop their Alaskan program and offshore and onshore projects and have a total independently assessed Proven and Probable Reserves (2P) of 32.2 MMBOE, Contingent Resources (2C) of 18.7 MMBOE and Prospective Resources (P50) of 6.3 MMBOE as of January 31, 2014,[19] the Debtors nonetheless need access to additional working capital in the short term in order to repay the AIX Facility which matures in June 2014, and to meet its existing contractual obligations.

**D.     The Debtors' Capital Structure.**

**(1)     The AIX Facility.**

45.     On January 25, 2013, the Debtors entered into a credit facility totaling $100 million with Chicago-based Victory Park.  The credit facilities were broken into a Delayed Draw Senior Secured Term Note (the "Term Note") with a maximum issue amount of $75 million, and a Senior Secured Revolver (the "Revolver," and collectively, the "Victory Park Facility") with a maximum limit of $25 million.  The amount that could be drawn by the Debtors (the "Borrowing Base") under the Term Note was predominately determined by the value of the Proved

---

[19] The Company's reserves have been independently verified by Ralph E. Davis Associates, Inc., an independent third party consulting firm.  Ralph E. Davis is a respected consulting firm providing independent reservoir engineering, geological, technical and financial services to the domestic and international energy industry since 1924.

Developed Producing ("PDP") reserves of the Debtors' 100%-owned Kenai Loop project. Additional capacity could be added by the value of the Debtors' Kenai Loop Proved Undeveloped ("PUD") reserves, appraised value of 2D and 3D seismic and appraised value of the Kenai Loop acreage.  The Debtors initially drew on the Facility to refinance its previous lender and to pay fees and expenses associated with that transaction.  The Victory Park Facility was to expire on June 30, 2016, and was secured by the Debtors' U.S. assets.

46.     In early 2014, as part of the Debtors' recapitalization process discussed above, the Debtors executed an Amended and Restated Financing Agreement with Meridian, dated as of January 24, 2014, under which Meridian took assignment of the Victory Park Facility on amended terms (the "Meridian Facility").  The Meridian Facility was on similar commercial terms to the prior Victory Park Facility and encompassed (a) the existing Term Note that was held by Victory Park, drawn to $43.5 million; (b) the existing Revolver that was held by Victory Park drawn to $6.3 million; (c) funds provided to the Debtors to enable a $3.0 million purchase of an existing Production Payment Agreement with respect to a 3% ORRI on Kenai Loop production and subject to a put option under the Victory Park Facility which was exercised by Victory Park; and (d) funds provided to the Debtors to pay $3.8 million for costs and expenses associated with the assignment from Victory Park.  Thus, the total principal amount initially owed under the Meridian Facility was $56.6 million, with no further amounts available for draw down.

47.     On April 30, 2014, AIX, a recently formed Delaware limited liability company affiliated with The Woodlands-based Branta II, LLC, took assignment of the Meridian Facility (the "AIX Facility").  As was the case under the Meridian Facility, each of BAO, BUC, BAK, Kenai Land, BAD and Kenai Drilling are Borrowers under the AIX Facility, which continues to

be guaranteed by BEH and BCC.  On information and belief, Meridian provided the funding to AIX to purchase the existing Meridian debt.  As of May 31, 2014, the aggregate unpaid principal balance of the AIX Facility, including all accrued, unpaid interest, fees, expenses and other amounts owing under the financing agreement and credit documents, was $57,465,825.83.  The maturity date of the AIX Facility remains June 30, 2014.

      **(2)   Outstanding Letters of Credit.**

48.    In addition to the AIX Facility, there is a $1.495 million letter of credit with Macquarie Bank Limited to satisfy the Debtors' share of certain bonding obligations for the Debtors' Pompano production facilities.  The letter of credit is for the benefit of the prior owner, PetroQuest, and only satisfies the plugging and abandonment obligations if the parties to the Joint Operating Agreement are unable to fund the plugging and abandonment obligations themselves.  The letter of credit is cash secured by deposits held by Macquarie Bank Limited to an amount of $1.5 million.

49.    There is also another $2.472 million letter of credit with Wells Fargo Bank, N.A. to back Kenai Drilling's obligations to Spartan under the Spartan Agreement.  On March 13th and March 24th 2014, April 24th and 30th 2014, and again on May 9th 2014, Kenai Drilling received Notices of Late Payment from Spartan, alleging that $941,249.94 was past due and owing to Spartan under the Spartan Agreement.  The letters informed Kenai Drilling that Spartan reserved its rights to draw upon the letter of credit within fifteen (15) business days from the date of each letter as provided for under the Spartan Agreement.  As of the date of this Declaration, Spartan has drawn on the letter of credit on May 14 for $561,737.97, on May 16 for $147,446.94 and on May 23 for $111,461.00 plus total fees of $2,162.96.  The Spartan Agreement contains a requirement that if funds are drawn by Spartan on the letter of credit, Kenai Drilling must

replenish the funds drawn within five (5) business days.  Kenai Drilling has not replenished that letter of credit.

**E.      Events Leading Up to the Commencement of these Chapter 11 Cases.**

      **(1)      The Debtors' Involvement in Significant and Ongoing Litigation.**

            **(a)      The Archer Litigation.**

50.      In October 2011, KOV entered into, among other things, a Master Services Agreement ("MSA") with Archer under which Archer was to provide project management services for modifications and repairs to the Endeavour rig such that it would meet the certification requirements and standards to operate in the Cook Inlet.  Under this MSA, Archer had sole responsibility to manage the modifications and repairs on the Endeavour both in Singapore and on arrival of the Endeavour in Alaska.  Under Archer's direction, a detailed budget was prepared based upon engineering scopes of work completed both by Archer and contractors under its guidance.  The budget also included project management fees to be paid to Archer.

51.      KOV found that Archer's work was not satisfactory, would have to be recompleted (sometimes by third parties after Archer's attempts to cure failed), and took far longer than Archer originally projected.  Moreover, Archer submitted invoices substantially in excess of its budget.  All work under the project management supervision of Archer ceased in December 2012, and KOV is currently withholding payments to Archer for billings which it has disputed with Archer.

52.      In December 2012, Archer filed a lawsuit in Harris County, Texas against several Debtor entities and KOV for approximately $6 million in unpaid invoices.  Archer has also filed discovery responses claiming additional damages. The Debtors and KOV filed general denials, denying liability.  The Debtor entities have also lodged a counterclaim against Archer for

damages, including for loss of income, of $30.0 million.  The case is set for trial in October 2014.

(b)    The CIRI Litigation.

53.    As described above, the Debtors leased 9,308 acres at the Kenai Loop field through leasing agreements with the MHLT, the State of Alaska, and CIRI.  To date, the Debtors have drilled four wells on the MHLT lease and placed two of these wells onto commercial production.  All of the Debtors' activities have been properly permitted and approved by the appropriate regulatory agencies.

54.    Notwithstanding such permitting and approval, CIRI has alleged that its lease with the Debtors totaling 1,275 acres terminated in January 2013.  CIRI's allegations are based on an assertion that the Debtors failed to meet various lease commitments.  Based on this rationale, CIRI has alleged that the Debtors, in drilling the Kenai Loop No. 1-4 well, drilled to a bottom hole location within 300 feet of CIRI's property line even though CIRI's oil and gas lease for that property had been terminated.  Thus, CIRI asserts that because the Kenai Loop No. 1-4 well was drilled close to a property boundary, the Debtors were required to file for a spacing exception from the Alaska Oil and Gas Conservation Commission ("AOGCC").  CIRI asserts that the Kenai Loop No. 1-4 targeted natural gas resources on CIRI land, and thus CIRI filed an opposition with the AOGCC and requested a hearing on the spacing exception to protect its property rights.

55.    The AOGCC conducted a spacing exception hearing in August 2013 and partly granted and partly denied the Debtors' spacing exception.  CIRI appealed that order in an administrative appeal that is pending before the Alaska Superior Court, alleging that the AOGCC erred in authorizing the Debtors to begin and continue drilling the Kenai Loop No. 1-4 well.

56.    In October 2013, CIRI filed two additional related actions against the Debtors.

First, CIRI filed a lawsuit in Alaska Superior Court against the Debtors to recover alleged losses from uncompensated gas production purportedly attributable from its land.  Second, CIRI filed an administrative action with the AOGCC asking for the establishment of an escrow account funded out of Kenai Loop production to protect all of the landowners—MHLT, the State of Alaska and CIRI—until the precise geological allocation of gas attributable to each of the landowners could be sorted out.  The AOGCC held public hearings on the matter in January and April 2014, and on May 22, 2014 the AOGCC issued a decision (a conservation order), ordering, in part, as follows:

- By June 1, 2014, the Debtors must establish and maintain at the Debtors' expense an interest-bearing escrow account with a state-regulated bank in Alaska, and no funds may be distributed from such account except upon written order from the AOGCC.

- By the 10th day of each month, beginning in June 2014, the Debtors must deposit in the escrow account an amount equal to 100% of the production from the Kenai Loop No. 1-1 and Kenai Loop No. 1-3 wells in the preceding month multiplied by the current "prevailing value" of Cook Inlet gas published quarterly by the Alaska Department of Revenue, less operating expenses.

By requiring the Debtors to escrow 100% of their production revenue beginning June 10, 2014 until such time that an allocation of gas attributable to each of the adjacent landowners is made or upon further order by the AOGCC (a process that could take months), the May 22nd AOGCC ruling had a significant and profound negative impact on the Debtors' operations, their cash flow, and, therefore, their ability to survive as a going concern.

57.     The next hearing before the AOGCC is set for July 7, 2014, at which time the AOGCC is set to address (i) the proper allocation of production from Kenai Loop amongst the mineral owners in the vicinity (the State, Trust and CIRI); and (ii) whether CIRI, as a working interest owner, should be accountable for the drilling expenses incurred by the Debtors at Kenai Loop.  Thus, absent these bankruptcy filings, the July 7th hearing would have been the start of

contentious, complicated and costly proceeding (all while the Debtors would have been prohibited from accessing any of their production revenues).

(c)      **The Chrystal Statutory Demand.**

58.      Formed in 2010, Chrystal Capital Partners LLP ("<u>Chrystal</u>") is a corporate finance firm based in London that provides alternative sources of funding for select private and public companies globally.

59.      On or around November 1, 2012, BCC engaged Chrystal (the "<u>Chrystal Engagement</u>") to serve as its financial advisor to examine a variety of strategic options, including potential refinancing(s), fundraising(s), acquisitions and/or asset disposals.  In consideration of these services, Chrystal was to be paid an advisory fee of GBP £10,000 per month.  In addition, Chrystal was entitled to various success fees upon completion of successive closings of various fund raisings.

60.      Chrystal has asserted that it is entitled to certain success fees based on its introduction to BCC of several potential prospects.  BCC has asserted that such prospects were clearly unsuitable parties unable to complete the transactions proposed, and thus BCC has incurred considerable out of pocket expenses and lost opportunity costs by not pursuing other, more viable options.  Because these prospects never resulted in a transaction, BCC has maintained that Chrystal is not entitled to any success fee, which was solely dependent upon the completion of a successful funding.

61.      On March 18, 2014, Chrystal filed in the Supreme Court of New South Wales a Creditor's Statutory Demand for Payment of Debt (the "<u>Statutory Demand</u>").  A statutory demand is a demand for payment of a debt in a prescribed form made under section 459E of the Australia Corporations Act 2001.  Per the Statutory Demand, Chrystal asserts that BCC is indebted to Chrystal in the sum of $2,660,000 arising out of the Chrystal Engagement for unpaid

-24-

fees.

62.     On April 15, 2014, BCC filed an application seeking to set aside the Statutory Demand.  An initial hearing was held before the Supreme Court of New South Wales on May 21, 2014.  At the conclusion of that hearing, the New South Wales Court set May 29, 2014 as the deadline for BCC to serve any additional affidavit(s) in support of its application to set aside the demand, which has occurred.  The court further set June 12, 2014 as the deadline for Chrystal to serve its evidence, and for BCC to serve any evidence in reply.  The matter is next set for hearing on June 23, 2014.

### (d)     The Burton Litigation.

63.     Until recently, BCC was also involved in litigation with its recently terminated Chief Executive Officer, Mr. Curtis Burton ("Burton").  Additional details regarding BCC's relationship with Mr. Burton, and a description of the litigation with Mr. Burton is discussed below.

### (2)     BCC Requests and is Granted a Voluntary Suspension from Trading.

64.     As discussed above, BCC is a publicly traded independent oil and gas company listed on the ASX.  On February 17, 2014, BCC requested and was granted a trading halt pursuant to ASX Listing Rule 17.1 due to BCC's ongoing discussions with its secured financier at the time (Meridian) regarding the impact of BCC's unsuccessful drilling of West Eagle #1 through its operating subsidiary.

65.     Under ASX Listing Rule 17.1, a trading halt is a temporary break in trading which does not involve a formal suspension from quotation.  When ASX agrees to a trading halt in an entity's securities under Listing Rule 17.1, those securities are placed into the "trading halt session state" on the ASX market platform.  In that state, ASX market participants are able to place orders for, but are not able to trade in, the securities.  Existing orders for the securities in

the ASX trading platform are not automatically purged, as they are in the case of a voluntary suspension, but instead remain in the trading platform with the same price/time priority and are available for execution when trading resumes after the halt has been lifted.  ASX market participants are also able to amend or cancel their existing orders.  This treatment reflects the fundamentally short-term nature of a trading halt compared to a voluntary suspension.

66.     As to BCC, the trading halt was in place until the earlier of the commencement of normal trading on February 19, 2014,[20] or upon an announcement to the market by BCC.

67.     On February 19, 2014, pursuant to ASX Listing Rule 17.2, BCC requested and was granted a voluntary suspension (the "Voluntary Suspension") of all trading of BCC's securities pending resolution or further disclosure as to the impact of the unsuccessful drilling referenced above.[21]  With a voluntary suspension, the securities are placed into the "suspend state" on the ASX market platform.  In that state, ASX market participants are not able to place orders for, or trade in, the securities.  Any existing orders for the securities in the ASX trading platform are automatically purged.  This treatment reflects the longer term nature of a suspension compared to a trading halt.

68.     As of the date of this Declaration, the Voluntary Suspension remains in place.

**(3)     The Debtors' Mounting Charter Obligations and Related Liabilities.**

69.     As described above, Kenai Drilling is a party to the Charter wherein Kenai Drilling agreed to charter the Endeavour rig for oil and gas drilling operations offshore in Alaska.  The initial term of the of the Charter is for 5 years, during which time Kenai Drilling is

---

[20] Under the ASX trading rules, a trading halt can be applied only for a period not exceeding the commencement of normal trading on the second trading day following the day on which a trading halt is requested.  *See* ASX Listing Rule 17.1.1.

[21] The general principle applied by ASX in considering requests for a trading halt or a voluntary suspension is that interruptions to trading should be kept to a minimum and, therefore, a trading halt or a voluntary suspension should only be permitted where there is a material risk that trading in a particular security might occur while the market as a whole is not reasonably informed; or where it is needed to correct or prevent a false or disorderly market.

required to pay KOV monthly pursuant to a specified day rate of approximately $70,000.

70.     Due to various issues associated with the mobilization of the rig and related issued tied to the Archer matters discussed above, the Endeavour has not been fully utilized, and day rate charges have continued to accrue while the rig remains docked.  As a result, on May 8, 2014, Kenai Drilling received notice from KOV of its payment default, demanding that $6,520,289.05 be paid immediately.  Kenai Drilling is unable to pay this amount, and is unable to pay the day rate charges on a go-forward basis without ongoing drilling operations to utilize the rig.  Indeed, the total amount due under the Charter for the duration of the contract term exceeds $90 million (excluding over $6 million past due and owing and the $12 million due October 1, 2014).  This obligation represents the single largest liability of Kenai Drilling and all of the Debtor entities given that these obligations have been guaranteed by both BCC and BAD under a Guaranty, dated November 3, 2011.

71.     The inability of Kenai Drilling to place into operation the Endeavour rig has led to additional defaults and accruing obligations.  As discussed under the letter of credit section above, in the weeks leading up to the commencement of these bankruptcy cases, Kenai Drilling received multiple Notices of Late Payment from Spartan, alleging that $941,249.94 was past due and owing to Spartan under the Spartan Agreement.  The letters informed Kenai Drilling that Spartan reserved it's rights to draw upon the letter of credit within fifteen (15) business days from the dates of the respective letters as provided for under the Spartan Agreement.

**(4)     The Suspension and Termination of BCC's Chief Executive Officer and Resulting Litigation.**

72.     Mr. Curtis Burton served as the Managing Director and Chief Executive Officer of BCC since its founding in 2006.  Mr. Burton has also been a member of BCC's Board of Directors since 2006.

73.     On March 4, 2014, BCC temporarily suspended Mr. Burton from his role as Chief Executive Officer with pay while BCC investigated the state of the business, as well as other serious concerns regarding Mr. Burton's leadership of BCC during his tenure.

74.     On March 6, 2014, and while BCC was only in the initial stages of its internal investigation, Mr. Burton pre-emptively filed a lawsuit in Harris County District Court alleging that BCC wrongfully terminated Mr. Burton without cause from his employment in violation of his Employment Agreement, dated July 1, 2012.  Mr. Burton has sought damages against BCC for approximately $2.4 million.

75.     On March 26, 2014, BCC sent Mr. Burton a letter outlining several significant issues that BCC believed established cause for termination.  Mr. Burton was provided until April 28, 2014 to provide a response to BCC's letter, at which time a special board meeting was to be held to determine whether the Board concluded that cause existed to terminate Mr. Burton's employment.

76.     BCC filed an Answer to Mr. Burton's Original Petition in the form of a general denial on March 28, 2014, and thereafter filed a Motion to Compel Arbitration (the "Arbitration Motion").  The State Court granted BCC's Arbitration Motion on May 5, 2014.  As a result, on May 29, 2014, Mr.Burton filed a Notice of Non-Suit, dismissing the state court action against BCC without prejudice.   Mr. Burton thereafter initiated an arbitration proceeding with the American Arbitration Association.  The day following the commencement of these bankruptcy cases, Mr. Burton filed a notice of withdrawal of the arbitration proceeding.

77.     In anticipation of BCC's special board meeting which was called for May 12, 2014, on May 7, 2014, Mr. Burton sent a letter to BCC's shareholders purportedly announcing his resignation from BCC's Board of Directors.  The Board subsequently accepted Mr. Burton's

resignation from the Board from BCC and from all other companies within the Debtors' corporate structure effective May 12, 2014.

78.     Notwithstanding Mr. Burton's resignation from the Board, the Board of Directors convened a Special Purposes Meeting on May 12, 2014 to consider whether cause existed to terminate Mr. Burton's employment contract as Chief Executive Officer of BCC.  Upon the conclusion of the meeting, the Board (excluding Mr. Burton), unanimously concluded that cause existed, and thus Mr. Burton's employment contract was terminated effective May 12, 2014.

79.     The Board has no current intention to appoint a new chief executive officer and managing director in place of Mr. Burton.  However, in accordance with BCC's announcement on March 6, 2014, I was appointed as Chief Restructuring Officer for BCC and its various subsidiaries and continue to work with, and report to, the Board on the Debtors' ongoing operations and their options relating to a financial restructuring.

**(5)     The Debtors Seek Chapter 11 Bankruptcy Relief.**

80.     In light of the above economic and financial events that have impaired the Debtors' liquidity and ability to perform in the future, on May 31, 2014 (the "Petition Date"), the above-captioned Debtors each filed a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division.

81.     The Debtors have undertaken extensive efforts pre-petition to reach out to parties-in-interest in order to minimize the disruption of their operations and cash flow, as well as the time in which they hope to achieve confirmation of a plan of reorganization.  In that regard, the Debtors have met with representatives of its principal secured lender, AIX.  Negotiations with AIX have been positive, and have resulted in the exchange of a draft term sheet outlining a potential chapter 11 plan structure.  The Debtors are optimistic that an agreement will ultimately

-29-

be reached with AIX concerning an agreed path forward in these cases that will maximize value for all of the Debtors' estates.

## FACTS IN SUPPORT OF CERTAIN FIRST-DAY EMERGENCY MOTIONS AND APPLICATIONS

82.     Prior to and contemporaneously with the filing of this Declaration, the Debtors filed various emergency First Day Motions which the Debtors believe are necessary to effectively continue their operations with a minimum of disruption in order to protect the value of their assets until completion of a 363 sale and/or a plan of reorganization, thereby maximizing the recovery for the Debtors' estates and creditors.  The Debtors request that orders approving each of the First Day Motions be entered as critical elements in stabilizing and facilitating their operations during the pendency of the chapter 11 cases.  I submit that the relief requested in each of the below described motions is in the best interests of the Debtors' estates and consistent with the Debtors' reasonable business judgment.

83.     A description of the relief requested and the facts supporting each of the First Day Motion follows below.

**A.      Request for Emergency Consideration of Certain "First Day" Motions.**

84.     The Debtors will suffer immediate and irreparable harm if the First Day Motions are not granted on an emergency basis.  As set forth above, because of numerous creditor demands and increasing impairments to cash flows, continued operation of the Debtors' business without chapter 11 relief is not an option.  Accordingly, the Debtors exercised their business judgment in seeking the relief requested in the motions described below on an emergency basis on the first day of their chapter 11 cases in order to protect and preserve their going concern value for the benefit of all stakeholders.

**B.     Debtors' Emergency Motion for Entry of an Order (1) Directing Joint Administration Pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1; and (2) Waiving Requirement of Bankruptcy Code Section 342(c)(1) and Bankruptcy Rules 1004 and 2002(n)**

85.     This motion seeks entry of an order directing the joint administration of the Debtors' chapter 11 cases for procedural purposes only.  Joint administration of these cases is warranted because:  (a) the Debtors' financial affairs and business operations are closely-related, and (b) joint administration will ease the administrative burden on the Court, the Debtors, creditors, and all parties-in-interest.

86.     Joint administration will save the Debtors' estates considerable time and expense. The Debtors share employees, premises, operating methods, and financial obligations. Accordingly, numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors.  The failure to administer these cases jointly would result in numerous duplicative pleadings filed and served upon separate service lists.  Such duplication would be wasteful and unnecessarily overburden the Clerk of Court and interested parties with the volume of paper.

87.     Joint administration will permit the Clerk of Court to use a single docket for the Debtors' chapter 11 cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates.  Joint administration will also protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in all of these cases.  The Court will be relieved of the burden of entering duplicative orders and keeping duplicative files.  Supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will also be simplified.

88.     The rights of the creditors of each of the Debtors will not be adversely affected by joint administration as the relief sought is purely procedural and is in no way intended to affect substantive rights.  Each creditor and party-in-interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right.  Indeed, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.

89.     The motion further requests wavier of the need to include the Debtors' full tax identification numbers in pleading captions.  The tax identification numbers are listed on the docket sheet for the Debtors and the Debtors have disclosed the tax identification numbers within the petitions and the body of each of the first day motions.  Further disclosure of tax identification would pose an unnecessary cost.

**C.     Debtors' Emergency Motion for Authority to Implement Certain Notice Procedures Under Bankruptcy Code Sections 105(a) and Bankruptcy Rules 1015(c) and 9007**

90.     This motion seeks to limit notice sent to creditors and other parties-in-interest in these cases.  The mailing of notices of all pleadings and other documents in these cases to each of the over 2,500 creditors and parties-in-interest, and the mailing of notices of all pleadings and other documents to insured depository institutions in contested matters and adversary proceedings via certified mail, would be both impractical and impose an administrative and economic burden upon the Debtors' estates.  Limiting service as called for in the motion to establish notice procedures will make the administration of these cases more efficient and cost-effective.  Furthermore, the notice procedures requested in the motion will not prejudice the rights of any creditor or other party-in-interest.  All creditors and other parties-in-interest will have the right to request notice of all proceedings in these cases and to be included on the Master Service List at any time.  Any party directly affected by the relief requested in a motion will be served.  Finally, all documents will be available free of charge through a publicly accessible

website maintained by the Debtors' proposed claims and noticing agent.

**D.      Debtors' Emergency Motion for Entry of an Order Authorizing Payment of Certain Prepetition (A) Wages, Salaries, and Other Compensation; (B) Reimbursable Employee Expenses; (C) Employee Benefits; and (D) Related Costs**

91.      This motion requests the entry of an order under Bankruptcy Code sections 105(a) and 363(b)(1) authorizing, but not directing, the Debtors to pay, continue, or otherwise honor prepetition obligations (collectively, the "Prepetition Employee Obligations") to or for the benefit of their current employees (collectively, the "Employees") for compensation, benefits and expense reimbursements under all plans, programs and policies implemented by the Debtors prior to the Petition Date (the "Employee Programs").

92.      As of the Petition Date, to the best of my knowledge and belief, the Debtors are current on all wages earned prepetition.  Nevertheless, the Debtors may owe certain employees nominal amounts on account of reimbursable expenses or other benefits.  Accordingly, the Debtors seek authority to pay any petition employee obligation up to $11,725.00 per employee. The Debtors further seek authority to continue the Employee Programs pursuant to section 363(c) of the  Bankruptcy Code.

93.      The Employees are essential to the continued operation of the Debtors' business and successful reorganization, and the Employees' morale directly affects their effectiveness and productivity.  If the Debtors do not pay the Obligations, a material portion of the Debtors' workforce will face significant financial hardship and other risks, *e.g.*, regarding the receipt of healthcare coverage and insurances, and likely will seek alternative employment opportunities or will be demoralized and less productive.  Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date to the extent requested in the Motion.  If the checks issued and electronic fund transfers requested in payment of any of the Employee obligations have been or are

dishonored, or if such obligations are not timely paid postpetition, the Employees will suffer extreme personal hardship and may be unable to pay their daily living expenses. These circumstances undoubtedly will adversely affect their performance and similarly impact the Debtors' reorganization effort to the detriment of all parties-in-interest.

94. The Prepetition Employee Obligations and Employee Programs are described below.

      a.    <u>Employee Salaries, Wages, Commissions, Deductions, and Reimbursable Expense</u>

95. As of May 30, 2014, the Debtors collectively employed 33 salaried and hourly employees. Due to the impending bankruptcy filing, ten employees were terminated as part of a reduction in work force effective May 31, 2014. Three additional employees have been terminated effective June 2, 2014. One current employee is suspended without pay and another current employee is on personal paid leave. All personnel are employees of BUC. These employees perform a variety of critical functions for the Debtors. No Employees are represented by unions.

96. The Debtors pay Employees on a semi-monthly basis. In aggregate for all Employees, the Debtors have historically paid wages and salaries (inclusive of taxes) of approximately $245,000 for each semi-monthly pay period. The Debtors routinely deduct certain amounts from Employees' compensation that represent earnings that judicial authorities or the Employees have designated for deduction, including, for example, garnishments, child support, and similar deductions, and other pre-tax and after-tax deductions payable pursuant to certain employee benefit plans. On a semi-monthly basis, the Debtors have historically deducted approximately $9,000.00 in the aggregate from Employees' pay.

97.     Further, as of the Petition Date, the Debtors have (a) made deductions from Employees' paychecks on behalf of Employees for payment of various federal, state, and local income, Federal Insurance Contribution Act ("FICA") and other taxes, support payments and tax levies, savings programs, benefit plans insurance programs, and other similar programs (collectively, the "Deductions") and (b) paid such deducted amounts to a third party.  The Debtors estimate that, as of the Petition Date, they have accrued $4,000.00 in employer payroll tax payments pursuant to the FICA and federal and state laws regarding unemployment and disability taxes.

98.     In addition, the Debtors are required by law to withhold from an Employee's wages amounts related to federal, state, and local income taxes, social security taxes, and Medicare taxes (collectively, the "Employee Taxes").  The Debtors are required to (i) match the social security and Medicare taxes; (ii) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance; and (iii) remit these payroll taxes to various taxing authorities.

99.     The Debtors seek authorization to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to the Prepetition Employee Obligations including, but not limited to, all withholding taxes, social security taxes and Medicare taxes.  In addition, the Debtors seek confirmation that they are permitted to pay to third parties any and all amounts deducted from Employee paychecks for payments on behalf of Employees, including, without limitation, garnishments, charitable contributions, support payments, tax levies, benefit plans, insurance programs, and other similar programs.

100.    Prior to the Petition Date and in the ordinary course of business, certain Employees incurred business expenses including, but not limited to, travel, car allowances,

lodging, and meals. It would be inequitable and would cause harm to employee morale to deny reimbursement of such expenses. All such expenses were incurred on behalf of the Debtors in the ordinary course of business with the expectation that such expenses would be reimbursed in accordance with past practice. It is essential to the continued operation of the Debtors' businesses that the Debtors continue to reimburse Employees for such business-related expenses.

101. Under the Debtors' reimbursement policy, once reimbursement requests are submitted, reviewed and approved, payment is typically processed within approximately one week. Because Employees do not always submit claims for reimbursement promptly, it is difficult to determine the exact amount outstanding at any particular time. The Debtors have found that, on average, it takes between two and four weeks for an employee to submit his/her expense report. Taking into account this two-to-four week lag period, the Debtors estimate that the prepetition expense reimbursements will include reimbursable business expenses of approximately as much as $25,000.00 as of the Petition Date.

b.     Prepetition Employee Benefit Claims

102. Prior to the Petition Date, the Debtors offered full-time Employees various standard employee benefits including, but not limited to (a) medical, dental, vision and prescription drug coverage, (b) basic life and voluntary life insurance, (c) basic and voluntary accidental death and dismemberment insurance, (d) disability insurance, (e) flexible spending accounts, (f) 401(k), and (g) miscellaneous other benefits in the ordinary course of business (collectively, the "Employee Benefits").

103. The Debtors offer Employees medical insurance (including prescription drug coverage), dental insurance, vision insurance, and flexible spending accounts. Enrollment in the medical, dental, vision, and/or flexible spending account plans is optional for the Employee. Employees may enroll in any of the health plans for which they are eligible, or, alternatively,

they may waive enrollment.

104.    Generally, health and welfare benefits sponsored by the Debtors continue until the end of the day in which employment ends.  Coverage may continue for a longer period of time in certain circumstances, such as retirement or an involuntary separation under one of the severance plans.

105.    The Debtors pay on average $55,000.00 per month for Employees' health care coverage.  The Debtors request authorization to pay these amounts to providers of the Employee Benefits and to continue to fund all post-petition claims relating to the Employee Benefits in the ordinary course of business as they become due and payable.

106.    The Debtors provide and/or offer a number of different types of additional insurance benefits to their Employees, including basic life and accidental death and dismemberment, short-term disability, leave administration and a predecessor long term disability plan.  The company contribution is approximately $100,000.00 per year for these benefits.  The Debtors request authorization to continue to provide life, disability and accident insurance to Employees in the ordinary course of business.

107.    The Debtors maintain a 401(k) plan (the "401(k) Plan"), administered by E-Plan Services through which participating employees may defer a portion of their salary, and/or may make post-tax contributions, to help meet their financial goals and accumulate savings for their future.

108.    Under the 401(k) Plan, a range of investment funds are available, including the major asset classes – stocks, bonds and short-term investments – as well as balanced portfolios.  Additionally, the Debtors provide employer "matching" contributions in connection with the amounts that their Employees contribute to the 401(k) Plan.  For all eligible Employees, the

employer match is an amount equal to 3% of an Employee's eligible compensation.

109.    Approximately fifteen (15)  Employees currently participate in the savings plans. During 2013, the Debtors contributed approximately $150,000.00 to the 401(k) Plan.

110.    The employee contribution and the Debtors' matching contribution that will need to be remitted to the 401(k) Plan on account of the next bi-weekly payroll is estimated to be approximately $5,000.00.

c.      <u>Vacation Days and Paid Leave Days</u>

111.    As part of their overall compensation, Employees are also entitled to receive a certain number of vacation days and sick leave each year generally at their regular daily rate of base pay.  Employees earn vacation days each year depending upon the Employee's length of service with the Debtors.  Accrued but unused vacation days are paid out to all Employees in each business unit upon termination of their employment with the Debtors.   The Debtors estimate that, as of the Petition Date, total accrued but unpaid vacation liability is approximately $106,000.00.

112.    Additionally,  most  Employees  are  provided  paid  sick  days,  and  holidays (collectively, the "<u>Paid Leave</u>") each calendar year, all of which must be used within that year, or lost.  Generally, if unused, Paid Leave may not be cashed out upon termination or retirement and may not be carried over to the following year.

d.      <u>Other Programs</u>

113.    Under  the  laws  of  various  states  in  which  the  Debtors  have  operations,  the Debtors must maintain workers' compensation insurance.  American Interstate is the Debtors' workers  compensation  carrier.   The  annual  premium  in  respect  of  workers'  compensation insurance is approximately $29,242.00.

E.     **Debtors' Emergency Motion for Entry of an Order Authorizing Continued Use of Business Forms, Bank Accounts, and Cash Management System Pursuant to Bankruptcy Code Section 105(a), 345(b) and 363(c)**

114.     This motion seeks an order pursuant to Bankruptcy Code sections 105(a), 345(b), and 363(c) (i) authorizing the Debtors to maintain existing bank accounts and business forms, and (ii) authorizing the Debtors to continue to operate the Cash Management System, including to fund the operations of the Debtors and non-debtor subsidiaries in the ordinary course of business, consistent with their pre-petition practices.

115.     The United States Trustee has established certain operating guidelines for debtors in possession in order to supervise the administration of chapter 11 cases.  One such provision requires a chapter 11 debtor-in-possession to open new bank accounts and close all existing accounts. The Debtors seek a waiver of, among other things, the United States Trustee's requirement that the Bank Accounts be closed and new post-petition bank accounts be opened.

116.     The Debtors maintain twenty-five (25) non-restricted bank accounts (the "Bank Accounts").  Twenty (20) of the Bank Accounts are checking accounts, two (2) are savings accounts, two (2) are business CD accounts, and one (1) is an investment account.  The Debtors also have five (5) restricted bank accounts securing standby letters of credit or surety bonds (the "Restricted Accounts").

117.     Of the non-restricted accounts, twenty-three are maintained at Wells Fargo (one of which is the investment account), one is maintained at BBVA Compass, and one is maintained at Macquarie Bank.  Of the Restricted Accounts, four are maintained at Wells Fargo and the other is maintained at Macquarie Bank.  Wells Fargo is FDIC insured and is on the U.S. Trustee's list of approved banks.  BBVA Compass is not on the U.S. Trustee's list of approved banks; however, BBVA Compass is headquartered in the U.S., is one of the U.S.'s 25 largest banks, and is FDIC insured.  The Macquaire Bank account is the Debtors' only foreign bank

account and is used to pay expenses of Buccaneer Energy Limited, the sole Australian debtor.[22]
The Bank Accounts are listed on the attached Exhibit A to the motion.

118.    The Debtors maintain a cash management system (the "Cash Management
System") designed to collect and transfer funds generated by their operations and disburse those
funds to satisfy operating expenses.  The Cash Management System generally operates as other
sophisticated cash management systems operate.  A detailed diagram of the Cash Management
System structure is attached as Exhibit B to the motion.   The Cash Management System allows
the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer cash as needed
to respond to these requirements, (c) track all intercompany transfers; (d) forecast cash needs; (e)
and maintain accounting records.  In the ordinary course of business, the Debtors accurately
record such collections, transfers, and disbursements as they are made.

119.    The Buccaneer Alaska, LLC checking account (account number 2 on Exhibit A)
is the Debtors' primary operating account (the "Operating Account").  The majority of the
Debtors' funds reside in the Operating Account and the majority of the Debtors' receivables are
deposited in the Operating Account.[23]  Funds are transferred manually ("pushed") from the
Operating Account to the other Debtor Bank Accounts[24] as needed for expenditures of the
Debtors.[25]  Most disbursements from the Bank Accounts are made by wire/ACH although each

---

[22] In the past, the Debtors have deposited capital funds into the Buccaneer Energy Limited Macquarie account and transferred such funds to the U.S. entities.  However, more recently, the Macquarie account has had only a nominal balance and funds have passed through the Macquarie account from the U.S. entities as needed to pay expenditures of Buccaneer Energy Limited.

[23] Not all receivables are paid directly into the Operating Account.  Reimbursements from the State of Alaska under the Alaska Clear and Equitable Share Act ("ACES") are deposited in the bank account held by the debtor owning the lease that qualified for the reimbursement.  Additionally, Buccaneer Energy Limited is entitled to a tax refund that will be paid into the Buccaneer Energy Holdings' account.  All such receivables will be transferred to the Operating Account before being redistributed as needed for the Debtors' expenditures.

[24] The Debtors also pay some creditors directly from the Operating Account.

[25] The Debtors have and will continue to maintain complete and accurate records of all transfers of funds in and out of the Bank Accounts for each of the Debtors.

account also has manual check writing capacity and some disbursements are made by check. The Cash Management System is centralized in the Debtors' Houston, Texas offices and controlled primarily by the Debtors' Treasurer.

120.     Other than certain independent contractors employed by BCC, BUC employs all the Debtors' employees.  Accordingly, the Buccaneer Resources account (account number 12 on Exhibit A) is the Debtors' payroll account (the "Payroll Account").  The Payroll Account is used to pay all payroll and employment taxes and 401(k)[26] contributions.  Each payroll cycle (semi-monthly) the account is manually funded by a "push" of funds from the Operating Account.  The Debtors have a second BUC account (account number 6 on Exhibit A) from which child support ACH debits and insurance benefits are paid.[27]

121.     The continued use of the Cash Management System and the Bank Accounts during these cases is essential to the Debtors' business operations.  Requiring the Debtors to adopt new cash management systems and open new bank accounts at this early and critical stage would be expensive, impose needless administrative burdens, and cause undue disruption.  Any such disruption would adversely (and perhaps irreparably) affect the Debtors' ability to reorganize and/or maximize estate values for the benefit of creditors and other parties-in-interest. Moreover, such a disruption would be wholly unnecessary insofar as the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the Bank Accounts are insured by the Federal Deposit Insurance Corporation.  Consequently, maintaining the existing Cash Management System and Bank Accounts without disruption is both essential to the Debtors' ongoing operations and in the best interests of the Debtors, their estates, and all

---

[26] The Debtors' 401(k) provider is ePlan Services, Inc., a Paychex company.

[27] The Debtors' primary benefits vendors are Aflac, Blue Cross Blue Shield, Dearborn, Guardian, and Legal Shield.

interested parties.

122.     Additionally, to minimize expense to their estates, the Debtors request authority to implement such reasonable changes to the Cash Management System as the Debtors may deem necessary or appropriate, including, without limitation, closing any of the Bank Accounts or opening any additional bank accounts following the Petition Date, pursuant to the Debtors' reasonable business judgment, and continue to use all existing correspondence and processes for producing business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.), without reference to their status as debtors-in-possession.  Parties doing business with the Debtors undoubtedly will be aware of their status as chapter 11 debtors-in-possession and changing correspondence and business forms will be unnecessary and burdensome to the estates, as well as disruptive to the Debtors' business operations.  For this reason, the Debtors request that they be authorized to use their existing processes for printing checks and other business forms without placing the label "Debtors-In-Possession" on each such check or form.

**F.     Debtors' Emergency Motion for Entry of an Order Authorizing the Debtors to Prepare and File (I) a Consolidated List of Creditors and (II) a Consolidated List of the Debtors' 30 Largest General Unsecured Creditors**

123.     Bankruptcy Code section 521(a)(1) and Federal Rule of Bankruptcy Procedure 1007(a)(1) require a debtor to file a list of creditors with a petition for relief.  Additionally, Federal Rule of Bankruptcy Procedure 1007(d) requires a debtor to file a list of the debtor's 20 largest unsecured creditors.  FED. R. BANKR. P. 1007(d).  However, as set forth in the motion requesting authority to file a consolidated list of creditors and a consolidated list of the Debtors' 30 largest general unsecured creditors, the Federal and Local Rules of Bankruptcy Procedure, Exhibit G to General Order 2006-02 afford the Court substantial authority over the manner in which notice is provided.

124.     A flexible approach to the list of creditors requirement is particularly applicable in this case, involving nine (9) separate entities with over 2,500 parties-in-interest, based both in the United States and abroad.  Competing demands upon the Debtors' professionals and recently reduced workforce to assist in efforts to stabilize business operations during the initial post-petition period and the substantial time and cost that will be saved by filing a consolidated creditor matrix and consolidated top 30 unsecured creditor list provides sufficient "cause" to grant the requested relief.

125.     The Debtors further request waiver of the local formatting rules for creditor matrixes.  The Debtors' proposed claims and noticing agent will provide all notices and service in this case and accordingly requiring the Debtors to comply with the local formatting rules would impose an unnecessary administrative burden on the Debtors' estates.

**G.     Debtors' Emergency Motion for Interim and Final Orders Authorizing the Debtors' Use of Cash Collateral.**

126.     This motion seeks entry of a cash collateral order, which among other things, provides (a) authority to use the Prepetition Collateral (including cash collateral, as that term is defined in section 363(a) of the Bankruptcy Code) on an interim basis; (b) approval of the form of adequate protection provided to the Lender pursuant to sections 361, 362 and 363 of the Bankruptcy Code; (c) scheduling a Final Hearing on this Motion to consider entry of the Final Order; and (d) granting related relief.

127.     The Debtors use the Prepetition Collateral, including Cash Collateral, in the ordinary course for working capital, general corporate purposes, maintaining and generating the confidence of their customers and vendors and preserving the going concern value of the Debtors.  Absent approval of the Interim Order, the Debtors will not be able to continue operating their business, and will suffer immediate and irreparable harm to the detriment of all

creditors and other parties in interest.  The Debtors need the immediate use of Cash Collateral to meet payroll, procure goods and services from vendors and suppliers, maintain operations and fund their cash management system.  Thus, to assure that the Debtors can use the Cash Collateral to preserve the value of their estates, the Debtors respectfully submit that the Interim Order should be approved.  The Lender participated in the negotiation of the Interim Order, and support its entry.

**H.    Debtors' First Omnibus Motion Pursuant to 11 U.S.C. § 365 and Federal Rule of Bankruptcy Procedure 6006 and 9014 to Reject Certain Executory Contracts and Unexpired Leases of Nonresidential Real Property**

128.    This motion requests authority to reject, *nunc pro tunc* as of the petition date, certain executory contracts and unexpired leases of nonresidential real property that are no longer beneficial to the estates.  The motion further requests the Court to impose a deadline of 5PM (CST) on the 30th day after entry of an order approving the motion as a deadline to file a proof of claim asserting damages arising from a rejected contract or lease.

129.    The Debtors are parties to several Executory Contracts and Leases concerning the Glacier Drilling and the Endeavour.  There are four primary categories of costs related to the rig contracts.  The first category is the direct lease payment obligations owed to the contract counter parties in the estimated amount of $2.4 million per month.  The second category is crew costs.[28] The Glacier is crewed by All American Oilfield services.  Total monthly aggregated crew costs are variable, but based on the current operating structure, rig locations, and status, current crew costs for the Glacier approximate $250 thousand per month.  All American bills the Debtors approximately every two weeks on 10-day credit terms.  The third category is insurance and property taxes.  Total annual rig costs incurred by the Debtors related to insurance and property

---

[28] Though the rig is inactive, the Debtors are required to maintain a crew to comply with regulatory and contractual obligations.

taxes exceed $2 million.  The timing associated with payments relating to insurance varies from monthly to quarterly, while payment for property tax obligations is annual.

130.     The fourth category is ancillary support services for miscellaneous repairs, maintenance and services.  These services are more sporadic, variable and less predictable than the other categories of costs.  Moreover, given the nature of these services and complications resulting from the Debtors' financial distress, payment for these services can be required on a weekly or even daily basis (especially as to the Endeavour rig).  Examples of these services involving daily and weekly payment include: removal of gray water generated by rig crews, diesel fuel, and vessel transportation services.  Lastly, the Debtors also incur various general administrative expenses as a result of these rig contracts.  Absent immediate rejection of the rig contracts, the burden on the Debtors for these category four ancillary services during a twenty-one (21) day notice period is estimated to range between $30,000 to $75,000.

131.     The contracts and leases subject to the motion are described below.

      a.     <u>The Drilling Rig Lease Agreement</u>

132.     In May of 2012, the Debtors entered into an agreement with Teras to secure exclusive leasing rights for the Glacier Rig for a period of three (3) years through May 2015. This Bare Rig Agreement was executed by Kenai Land, an entity specifically established by Buccaneer for this transaction.  In light of various operational issues, mounting liabilities, and ongoing litigation described herein, Kenai Land has been unable to perform under the Bare Rig Agreement, and $9,000 continues to accrue on a daily basis under the Bare Rig Agreement.  In this respect, on May 8, 2014, Kenai Land received a demand from Teras requesting payment of $1,243,917.35 for amounts past due under the Bare Rig Agreement.  Kenai Drilling has not made any payments in response to this notice, and is unable to make such payments.

b.    The Contract for Services

133.    In connection with the Glacier Rig, on March 1, 2011, Buccaneer Alaska Operations, LLC entered into a Contract for Services (the "Services Contract") with All American Oilfield Associates, LLC ("All American") to provide certain rig support, drilling, maintenance, work over and well testing crews and related consulting services.  The Services Contract may be terminated by either party upon thirty (30) days prior written notice.  Because the Debtors intend to reject the Bare Rig Agreement, there is no need for All American's services, and such services provide no benefit to the estates.

c.    The Bareboat Charter Agreement

134.    On November 3, 2010, BAD organized KOV to acquire and own the Endeavour. To obtain the necessary capital to acquire the Endeavour, Singapore based Ezion was added as a member to KOV on April 14, 2011, and AIDEA was added as a preferred member on November 8, 2011.  Pursuant to the joint venture, KOV would own the Endeavour while Kenai Drilling would serve as operator and maintain control of the Endeavour through the Charter entered on November 3, 2011.  The initial term of the Charter was for 5 years, during which time Kenai Drilling was required to pay KOV monthly pursuant to a specified day rate of approximately $70,000 for exclusive access to the rig.

135.    However, the rig was dry docked at the Keppel Fels yard in Singapore for six (6) months undergoing repairs and upgrades.  Those repairs and upgrades continued at the Homer Deep Water Dock in Homer, Alaska when the rig arrived in the Cook Inlet in August of 2012.  Along with various other issues associated with the mobilization of the Endeavour rig, the Endeavour has not been fully utilized, and day rate charges have continued to accrue while the rig remains docked.

-46-

136.    On December 31, 2013, pursuant to a Membership Interest Purchase Agreement, BAD sold its membership interest in KOV to Teras for $23,950,000.  Proceeds from the sale were used in part to repay certain unpaid bareboat charter fees for the period of October 2013 to December 2013.  No net cash proceeds flowed to the Debtors from this transaction.  Further, pursuant to the MIPA, KOV agreed to defer an additional $10.7 million in unpaid charter fees for the period of October 29, 2012 to March 30, 2013, plus estimated interest of $1.3 million, to October 1, 2014.

137.    Kenai Drilling remains obligated to KOV under the Charter for bareboat charter fees that continue to accrue at over $70,000 per day (payable monthly) escalating annually through 2017, and $10.7 million for the deferred unpaid charter fees and related interest referenced above.  Kenai Drilling's total exposure under the Charter thus exceeds $90 million (excluding over $6 million past due and owing and the $12 million due October 1, 2014), and Buccaneer and BAD have guaranteed these obligations.

138.    As set forth in the motion, the executory contracts and leases subject to the motion have no value to the estate.  The Debtors are incurring substantial liabilities under the executory contracts and leases and are unable to profitably utilize the rigs associated with the execuctory contracts and leases.  The Debtors have substantial defaults under the contracts and leases that the Debtors have no ability to cure.  Moreover, AIX, the prospective purchaser of substantially all of the Debtors' assets, has expressed no interest in acquiring the subject executory contracts or leases.  Accordingly, it is in the best interest of the Debtors' estates to reject the subject contracts and leases.  It is specifically noted to the Court that "First Day" relief is not being sought with regard to the motion to reject but the Debtors nevertheless ask that the court set the motion for hearing on an expedited basis as soon as practicable.

**CONCLUSION**

139.    The Company's immediate objectives in commencing these chapter 11 cases are to minimize any loss in the value of their assets, preserve on-going business operations thereby maximizing value, and propose a plan of reorganization to maximize the recovery to creditors and ensure a successful conclusion to these chapter 11 cases.  I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives will be substantially enhanced.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated this 3rd day of June, 2014 at Houston, Texas.


*s/ John T. Young, Jr.*
John T. Young, Jr.
Chief Restructuring Officer for the Debtors