

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

**ENTERED
10/17/2014**

| | | |
|---|---|---|
| In re | § § § | Chapter 11 |
| Buccaneer Resources, LLC, *et al.*,[1] | § § | Case No. 14-60041 (DRJ) |
| Debtors. | § § § | Jointly Administered |

**ORDER (A) APPROVING BID AND SALE PROCEDURES IN CONNECTION
WITH SALE OF CERTAIN OF THE DEBTORS' ASSETS; (B) SCHEDULING A SALE
HEARING; AND (C) GRANTING RELATED RELIEF**
[RELATES TO DKT. NO. 424]

Upon the motion dated October 7, 2014 (the "Motion")[2] of the above-captioned debtors

and debtors-in-possession (the "Debtors"), seeking, in part, entry of an order (the "Bid

Procedures Order") in connection with the sale of certain of the Debtors' assets; (B) scheduling a

sale hearing; and (C) granting related relief, all as more fully set forth in the Motion; and the

Court having reviewed the Motion, considered any evidence at the hearing on the Motion, and

heard the statements in support of the relief requested therein at the hearing before the Court (the

"Hearing"); and the Court having determined that the legal and factual bases set forth in the

Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the

proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor,

THE COURT HEREBY FINDS THAT:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: (i) Buccaneer Energy Limited (0107); (ii) Buccaneer Energy Holdings, Inc. (7170); (iii) Buccaneer Alaska Operations, LLC (7562); (iv) Buccaneer Resources, LLC (8320); (v) Buccaneer Alaska, LLC (4082); (vi) Kenai Land Ventures, LLC (2661); (vii) Buccaneer Alaska Drilling, LLC (7781); (viii) Buccaneer Royalties, LLC (5015); and (ix) Kenai Drilling, LLC (6370).

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      Notice of the Motion and proposed entry of this Bid Procedures Order has been provided to all parties on the Debtors' Amended Master Service List [Dkt. No. 411].

C.      Under the circumstances, requisite notice of the Motion and the relief requested thereby and in this Bid Procedures Order has been provided in accordance with Bankruptcy Rules 2002, 6004 and 9014, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, section 102(1) of the Bankruptcy Code, and no further notice of, or hearing on, the Motion with respect to this Bid Procedures Order is necessary or required.

D.      The Debtors have articulated good and sufficient reasons for this Court to (i) approve the Bid Procedures and form of the Purchase and Sale Agreement; and (ii) schedule a sale hearing.

E.      The entry of this Bid Procedures Order is in the best interests of the Debtors, their estates, creditors, and other parties-in-interest.

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted to the extent provided herein.

2.      All objections, if any, to the Motion that have not been withdrawn, waived or settled as announced to the Court at, or prior to, the Hearing or by stipulation are hereby overruled.

3.      The form of the Purchase and Sale Agreement, substantially in the form attached hereto as **Exhibit 1**, is hereby approved to be used at the Auction and is appropriate and

reasonably calculated to enable the Debtors and other parties in interest to easily compare and contrast the differing terms of the bids presented at the Auction.

4.    The Bid Procedures, substantially in the form attached hereto as **Exhibit 2**, are hereby approved.  The failure to specifically include or reference any particular provision, section or article of the Bid Procedures in this Bid Procedures Order shall not diminish or impair the effectiveness of such procedure, it being the Court's intent that the Bid Procedures be authorized and approved in their entirety unless otherwise modified by this Order.

5.    The Auction, if one is required, shall be conducted at the offices of Fulbright & Jaworski LLP, 1301 McKinney Street, Suite 5100, Houston, Texas 77010, commencing on **October 27, 2014 at 9:00 a.m. (prevailing Central Time)**.  In the event the Debtors do not receive any Qualified Bids except for the Qualified Bid of AIX Energy, LLC by the Bid Deadline, the Debtors will not hold the Auction and instead shall seek approval of the Purchase and Sale Agreement with AIX acquiring the Assets via a credit bid.

6.    If the Auction occurs, then on or before October 27, 2014, the Debtors shall file with this Court the Notice of Successful Bid, which shall report to the Court the results of the Auction.  The Notice of Successful Bid shall identify, among other things:  (a) the bidder that presented the highest or otherwise best offer (the "Successful Bidder"); (b) the bidder that presented the second highest or otherwise best offer (the "Back-Up Bidder"); (c) the consideration to be paid for the Assets; and (d) the executory contracts or leases to be assumed and assigned to the Successful Bidder in connection with the sale of the Assets.

7.    The Debtors will annex to the Notice of Successful Bid, as exhibits, (a) a copy of the respective asset Purchase Agreements entered into by the Successful Bidder and the Back-Up

Bidder, and (b) a copy of the Sale Order.  The Debtors will serve the Notice of Successful Bid on the Notice Parties.

8.      The Debtors shall file with the Court and serve on all parties to Contracts (as defined in the Purchase and Sale Agreement) subject to assumption and/or assignment (the "Contract Counterparties") notice of proposed cure amounts (the "Cure Notice") by **5:00 p.m. (Central Time), October 22, 2014**.  The inclusion of Contracts on the Cure Notice shall not constitute or be deemed to be a determination or admission by the Debtors or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

9.      The Court will hold a hearing on **October 31, 2014, at 10:00 a.m. (Central Time)** before the Honorable David R. Jones, United States Bankruptcy Judge, at 515 Rusk, Courtroom 400, Houston, Texas 77002, to consider entry of a final order authorizing and approving (i) the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances and interests (the "Sale Hearing"); and (ii) authorizing the assumption and assignment of certain executory contracts (the "Assigned Contracts") in connection therewith. The Sale Hearing may be adjourned from time to time by announcement at the Sale Hearing without further notice.

10.     Objections, if any, that relate to either (a) the proposed Assigned Contracts (including, but not limited to, any objections relating to the validity of the cure amount as determined by Debtors or to otherwise assert that any amounts, defaults, conditions, or pecuniary losses must be cured or satisfied under any of the Assigned Contracts at the Sale Hearing) (a "Cure Objection") or (b) any other aspect of the proposed sale of the Assets (a "Sale Objection") shall be filed and served so as to be actually received by Debtors' counsel, Fulbright & Jaworski

LLP (Attn: William R. Greendyke, Esq. and Jason L. Boland, Esq.), 1301 McKinney, Suite 5100, Houston, Texas 77010; counsel for AIX Energy LLC, Porter Hedges LLP (Attn: Joshua Wolfshohl); counsel for the Committee, Greenberg Traurig, LLP (Attn:  Shari L. Heyen and David B. Kurzweil); and all other parties entitled to notice, by **11:59 p.m. (Central Time) on or before October 29, 2014** (the "Objection Deadline").  Any objection shall set forth in writing and with particularity the factual and legal basis being asserted as the basis of such objection and be filed by a party with standing.

11.     Unless a Cure Objection is filed and served by a party to an Assigned Contract or a party interested in an Assigned Contract by the Objection Deadline, all interested parties who have received actual or constructive notice hereof shall be deemed to have waived and released any right to assert a Cure Objection and to have otherwise consented to the assignment of the Assigned Contract and shall be forever barred and estopped from asserting or claiming that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such assigned contract for the period prior to the Sale Hearing, against the Debtors, the Purchaser, or any other assignee of the relevant Assigned Contract.

12.     To the extent that any chapter 11 plan is confirmed in this case or any order confirming any such plan or any other order in this case (including any order entered after any conversion of this case(s) to a case(s) under chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bid Procedures Order, the provisions of this Bid Procedures Order shall control.  The Debtors' obligations under this Bid Procedures Order, the provision of this Bid Procedures Order and the portions of the Purchase and Sale Agreement pertaining to the Bid Procedures shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtors, and the reorganized or

reconstituted debtors, as the case may, after the effective date of a confirmed plan in the Debtors' cases.

13.      Notwithstanding anything in this Order or the proposed form of Purchase and Sale Agreement to the contrary, Macquarie Bank Limited's rights to and interests in the funds on deposit in the cash cover account of Buccaneer Resources, LLC at Macquarie Bank Limited with account number ending in xxxx3425 and any interest earned thereon shall be preserved.  Further, in the event that any term or provision of this Bid Procedures Order contradicts any term or provision of the *Order Approving Joint Emergency Motion to Compromise Controversy under Rule 9019 of the Federal Rule of Bankruptcy Procedure* (the "Compromise Order") [Dkt No. 346], the terms and provisions of the Compromise Order shall govern and control.

14.      As provided by Bankruptcy Rule 6004(h), this Bid Procedures Order shall not be stayed for fourteen days after the entry thereof and shall be effective and enforceable immediately upon entry of this Court's docket.

15.      This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Bid Procedures Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Bid Procedures and the implementation of this Bid Procedures Order.

     **Signed:  October 17, 2014.**

_____

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

PURCHASE AND SALE AGREEMENT

BETWEEN

BUCCANEER RESOURCES, LLC, BUCCANEER ENERGY LIMITED, BUCCANEER
ENERGY HOLDINGS, INC., BUCCANEER ALASKA OPERATIONS, LLC, BUCCANEER
ALASKA, LLC, KENAI LAND VENTURES, LLC, BUCCANEER ALASKA DRILLING,
LLC, BUCCANEER ROYALTIES, LLC AND KENAI DRILLING, LLC

Debtors-in-Possession,

AS SELLERS

AND

[_____]

AS PURCHASER

Executed on [_____], 2014

Exhibit 1

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (the "**Agreement**") is executed on [___], 2014, by and among Buccaneer Resources, LLC, a Texas limited liability company, Buccaneer Energy Limited, an Australian public limited company, Buccaneer Energy Holdings, Inc., a Delaware corporation, Buccaneer Alaska Operations, LLC, an Alaska limited liability company, Buccaneer Alaska, LLC, a Texas limited liability company, Kenai Land Ventures, LLC, an Alaska limited liability company, Buccaneer Alaska Drilling, LLC, an Alaska limited liability company, Buccaneer Royalties, LLC, an Alaska limited liability company and Kenai Drilling, LLC, an Alaska limited liability company (each a "**Seller**" and collectively, the "**Sellers**"), and [_____] ("**Purchaser**"). Each Seller and Purchaser may hereinafter be referred to as a "**Party**" or collectively as the "**Parties**."

## RECITALS:

On May 31, 2014 (the "**Petition Date**"), Sellers filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "**Bankruptcy Court**") captioned In re: *BUCCANEER RESOURCES, LLC, et al.*, Chapter 11, Case No. 14-60041 (DRJ) (Jointly Administered) (the "**Bankruptcy Case**");

Each Seller, as debtor and debtor-in-possession, has continued in the possession of such Seller's Assets (defined below) and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

Each Seller, subject to Bankruptcy Court approval and the terms and conditions within this Agreement, desires to sell to Purchaser the Assets pursuant to the terms and conditions of this Agreement and Purchaser desires to so purchase and acquire such Assets from Sellers in accordance with Section 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations, warranties, covenants, conditions and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound by the terms hereof, agree as follows:

## ARTICLE 1
## PURCHASE AND SALE

**Section 1.1      Purchase and Sale.**

At the Closing, and upon the terms and subject to the conditions of this Agreement, each Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase, accept and pay for the Assets. Capitalized terms used herein shall have the meanings ascribed to them in this Agreement as such terms are identified and/or defined in Appendix I attached hereto and made part hereof.

**Section 1.2      Assets.**

1

As used herein, the term "**Assets**" means all of Sellers' right, title, interest and estate, real or personal, recorded or unrecorded, movable or immovable, tangible or intangible, in and to the following, excluding, however, the Excluded Assets:

(a)     All of the oil and gas leases; oil, gas and mineral leases; subleases and other leaseholds; carried interests; mineral fee interests; overriding royalty interests; reversionary rights, farmout rights; options; convertible interests, net profit interests and other properties and interests described on Exhibit A, subject to such depth limitations and other limitations and restrictions set forth on Exhibit A or referenced in the instruments that constitute (or are in the chain of title to) the foregoing properties and interests (collectively, the "**Leases**"), together with each and every kind and character of right, title and interest that Sellers have in and to the Leases, the lands covered by the Leases, or the lands pooled, unitized, communitized or consolidated therewith (such lands covered by the Leases or pooled, unitized, communitized or consolidated therewith being hereinafter referred to as the "**Lands**");

(b)     All oil, gas, water, or injection wells and salt water disposal wells located on the Lands, whether producing, shut-in, plugged, or abandoned, and including the wells shown on Exhibit A-1 attached hereto (the "**Wells**");

(c)     Any pools or units which include any portion of the Lands, Leases or Wells, including those pools or units shown on Exhibit A-1 (the "**Units**"), and including all interest of Sellers in Hydrocarbon production from any such Unit, whether such Unit Hydrocarbon production comes from Wells located on or off of a Lease, and all tenements, hereditaments and appurtenances belonging to the Leases, Wells, Lands and Units (such Units together with the pooled Leases, Lands and Wells, or in cases when there is no Unit, the Leases together with the Lands and Wells, being hereinafter referred to collectively as the "**Properties**" and individually as a "**Property**");

(d)     All contracts, leases, agreements, instruments, easements, permits, licenses, servitudes, rights-of-way, surface leases and other surface rights appurtenant to the Properties identified on Schedule 1.2(d), which may be supplemented and/or amended no less than five (5) days prior to the entry of the Sale Order (hereinafter collectively referred to as the "**Contracts**"), it being contemplated that any such contracts not identified on Schedule 1.2(d) may be rejected as part of the Sellers' Bankruptcy Case;

(e)     All equipment, machinery, fixtures and other tangible personal property and improvements located on the Properties and used or held for use in connection with the operation of the Properties, including any wells, tanks, boilers, buildings, fixtures, injection facilities, saltwater disposal facilities, compression facilities, pumping units and engines, flow lines, pipelines, gathering systems, gas and oil treating facilities, metering and flow equipment, power lines, telephone lines, cellular and telecommunications equipment, on site computer and monitoring equipment, fences, winterization equipment, all equipment, furniture and associated with operating the Wells or the Property, and other appurtenances, improvements and facilities, but excluding the items expressly identified on Exhibit A-2 (subject to such exclusions, the "**Equipment**");

2

(f)     All Hydrocarbons produced from or attributable to the Properties prior to, on or after the Effective Time; and all inventories of Hydrocarbons produced from or attributable to the Properties that are in storage in tanks or pipelines for any period prior to, on or after the Effective Time; provided that nothing herein shall alter or amend (i) the rights and interests of Cook Inlet Region, Inc. ("CIRI") with respect to any production from the KL 1-1 and KL 1-3 wells or the proceeds of such production, (ii) the rights or obligations of the Sellers, Purchaser, or CIRI with respect to the Alaska Oil and Gas Conservation Commission Conservation Order 691 dated May 22, 2014, and (iii) the rights and interests of AIX under the Bankruptcy Court's *Order Approving Joint Emergency Motion to Compromise Controversy Under Rule 9019 of the Federal Rules of Bankruptcy Procedure* [Dkt. No. 346];

(g)     All Imbalances;

(h)     All lease files; land files; right-of-way files; well files; well tests; gas and oil sales contract files; gas processing files; division order files; abstracts; title records; title opinions; land surveys; non-confidential logs; customer lists; supplier lists; sales materials; maps; engineering data and reports; health, environmental and safety information and records; accounting and financial records; operational records; promotional materials; technical records; reserve estimates and economic estimates; production and processing records; Tax records (other than Income Tax); contract files; and all other books, records, data, files, maps and accounting records, in each case, to the extent related to the Assets, or used or held for use primarily in connection with the maintenance or operation thereof, including (i) all seismic and geophysical data (to the extent assignable) either in raw or interpreted form related to the Properties, related technical data and information, and related interpretive worksheets and analyses, and (ii) related licenses to software and related work stations to process the data, files, maps and accounting records related to the Properties (the "**Records**");

(i)     To the extent assignable without the payment of fees (unless Purchaser agrees to and does pay such fees), all geologic, geophysical, engineering field studies and other seismic and related technical data and information (including related work product);

(j)     All right, title and interest of Sellers in and to vehicles owned by Sellers and primarily used in connection with the operation of Properties or Equipment;

(k)     Investment property, instruments, chattel paper, patents, copyrights, trademarks, causes of action (only to the extent that such cause of action relates to an Asset acquired by Purchaser under this Agreement, and specifically excluding those causes of action identified in Section 1.3(h)), and other general intangibles, and all products and proceeds thereof.

(l)     To the extent transferable and other than the Statewide Oil and Gas Bond of the State of Alaska, the bonds, letters of credit and guarantees posted by Sellers with Governmental Bodies or other Persons and relating to the Assets and Sellers' insurance policies related to the Assets;

(m)     The NCI Farmout; and

(n)     All overriding royalties, production payments, or other similar interests in production of Hydrocarbons in which any Seller owns an interest, including those set forth on <u>Exhibit A</u>.

### Section 1.3     <u>Excluded Assets.</u>

Notwithstanding the foregoing, the Assets shall not include, and there is excepted, reserved and excluded from the purchase and sale contemplated hereby (collectively, the "**Excluded Assets**"):

(a)     (i) all corporate, partnership, limited liability company, financial, income and franchise tax and legal records of Sellers that relate to Sellers' business generally, (ii) all books, records and files that relate to the Excluded Assets, (iii) those records, files and contracts retained by Sellers pursuant to Section 1.2 and (iv) copies of any other records retained by Sellers pursuant to Section 1.5;

(b)     bonds, letters of credit and guarantees retained by Sellers pursuant to Section 12.6;

(c)     the items expressly identified on Exhibit A-2;

(d)     any asset (whether real or personal) not expressly identified as an Asset pursuant to Section 1.2, including, without, limitation, any contract not specifically included on Schedule 1.2(d);

(e)     All owned computers, phones, office supplies, furniture and related personal effects not related to operation of the Properties;

(f)     all correspondence, reports, analyses and other documents relating to the transaction contemplated hereby prior to the Effective Time, whether internal, with or produced by other prospective purchasers or third parties in respect of such transaction;

(g)     all documents and instruments of Sellers that may be protected by an attorney-client privilege;

(h)     except for those causes of action which relate to an Asset acquired by Purchaser under this Agreement, all other causes of action of Sellers, including without limitation: (i) actions under Chapter 5 of the Bankruptcy Code, (ii) commercial tort claims, (iii) the Archer Litigation and (iv) claims against Directors and Officers of the Sellers;

(i)     Accounts, cash, cash collateral, certificates of deposits, restricted cash, credits (including the ACES credits and credits resulting from losses or deductions being converted to cash refunds under state or federal law), tax refunds, refunds of deposits,

consents, bonds, transferrable insurance policies related to the Properties and transferrable bonds, letters of credit and guarantees; and

**Section 1.4    Effective Time; Proration of Costs and Revenues.**

(a)    Possession of the Assets shall be transferred from Sellers to Purchaser at the Closing, but certain financial benefits and obligations of the Assets shall be transferred effective as of 7:00 A.M., local time, where the respective Assets are located, on September 30, 2014 (the "**Effective Time**").

(b)    Purchaser shall be entitled to all production from or attributable to the Properties arising on and after the Effective Time (and all products and proceeds attributable thereto), and to all other income, proceeds, receipts and credits earned with respect to the Assets arising on and after the Effective Time, including, without limitation, any proceeds of production currently held in suspense.

(c)    All Property Costs incurred in the operation of the Properties after the Petition Date and before the Effective Time shall be borne and paid by Purchaser to the extent that such costs have not been previously paid by Sellers, and all Property Costs incurred in the operation of such Properties from and after the Effective Time shall be borne and paid by the Purchaser.  As used herein, "**Property Costs**" means (i) all costs attributable to the ownership or operation of the Assets (including costs of insurance and ad valorem, property, severance, production and similar Taxes based upon or measured by the ownership or operation of the Assets or the production of Hydrocarbons therefrom, but excluding any other Taxes), (ii) capital expenditures incurred in the ownership or operation of the Assets in the ordinary course of business, (iii) where applicable, such costs and capital expenditures charged in accordance with the relevant operating agreement, unit agreement, pooling agreement, pre-pooling agreement, pooling order or similar instrument, or if none, charged to the Assets on the same basis as charged on the date of this Agreement, and (iv) overhead costs charged to the Assets under the relevant operating agreement, unit agreement, pooling agreement, pre-pooling agreement, pooling order or similar instrument by unaffiliated third parties, or if none, charged to the Assets on the same basis as charged on the date of this Agreement.

**Section 1.5    Delivery and Maintenance of Records**.

(a)    Sellers shall deliver the Records in Sellers' possession or control to Purchaser within ten (10) days following Closing, in the format in which those Records are maintained in the ordinary course of business.  Sellers may retain copies of any Records.

(b)    Purchaser, its successors or assigns shall preserve the Records for a period of three years after the Closing, or for such longer period (a) as is required by any applicable Law, (b) as is ordered by any Court of competent jurisdiction, or (c) during which there is an ongoing audit or investigation of Sellers, their respective estates, or any successor thereto (collectively, the "Debtor Parties" and each, a "Debtor Party") with respect to such periods.  During such three-year period (as may be extended), Purchaser,

its successors or assigns shall (x) keep such Records reasonably accessible, including maintaining all computer hardware, software, and applications necessary to access such Records in a usable form, (y) not destroy or dispose of any Records without the prior written consent of the Debtor Parties, who shall include, but not be limited to, any Debtor Party, a chapter 11 trustee, a chapter 7 trustee, or a liquidating trustee, each acting on behalf of any Debtor Party (each, "Control Person"), and (z) permit any Control Person reasonable access to any Record upon request, including making any paper or electronic copies thereof at the respective Debtor Party's expense.  Records may be sought under this Section 1.5(b) for any reasonable purpose, including, without limitation, to the extent reasonably required in connection with the administration of the bankruptcy cases of any Debtor Party, any audit, accounting, tax matter, litigation matter, disclosure required by Law, or any other similar needs of any Control Person.

### ARTICLE 2
### PURCHASE PRICE

**Section 2.1    Purchase Price**.    The purchase price for the Assets shall be (a) $[_____] in the form of cash consideration; (b) and any cure costs associated with Contracts to be assumed by Purchaser as an Asset (the "**Purchase Price**").

**Section 2.2    Adjustments to Purchase Price**.  The Purchase Price for the Assets shall not be subject to adjustment.  All Imbalances existing as of the Effective Time shall be assigned to Purchaser.  Sellers estimate that the amount of such Imbalances as of the Effective Time is [$_____], as more particularly set forth in Schedule 2.2.

### ARTICLE 3
### SELLERS' TITLE

**Section 3.1    Conveyance**.  The conveyance of the Assets to be delivered by Sellers to Purchaser shall be substantially in the form of Exhibit B (the "**Conveyance**") and shall convey such Assets free and clear of all liens and encumbrances pursuant to Section 363 of the Bankruptcy Code.

**Section 3.2    Consents**.  Sellers shall use commercially reasonable efforts to identify, with respect to the Assets, holders of any required consents to assignment of any Assets, in addition to those certain required consents set forth on Schedule 3.2.  Sellers shall use commercially reasonable efforts to cause such consents to be obtained and delivered prior to Closing; provided, however, to the extent that such consents are not obtained and delivered prior to Closing, the Assets shall be transferred subject to such consents.  Purchaser shall cooperate with Sellers in seeking to obtain such consents.

### ARTICLE 4
### INTENTIONALLY OMITTED

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES

**Section 5.1    Disclaimers.**

(a)     WITH RESPECT TO THE ASSETS AND THE TRANSACTIONS CONTEMPLATED HEREBY (i) SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, STATUTORY, EXPRESS OR IMPLIED, AND (ii) PURCHASER HAS NOT RELIED UPON, AND SELLERS EXPRESSLY DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR, ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO PURCHASER OR ANY OF ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, MEMBERS, MANAGERS, EQUITY OWNERS, CONSULTANTS, REPRESENTATIVES OR ADVISORS (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO PURCHASER BY ANY EMPLOYEE, AGENT, OFFICER, DIRECTOR, MEMBER, MANAGER, EQUITY OWNER, CONSULTANT, REPRESENTATIVE OR ADVISOR OF ANY SELLER OR ANY OF ITS AFFILIATES).    PURCHASER ACKNOWLEDGES AND AGREES THAT IN MAKING ITS DECISION TO ENTER INTO THIS AGREEMENT AND TO CONSUMMATE THE TRANSACTIONS CONTEMPLATED HEREBY, PURCHASER HAS RELIED SOLELY UPON ITS OWN INVESTIGATION AND HAS INSPECTED, OR WAIVED ITS RIGHT TO INSPECT PRIOR TO THE DATE HEREOF, THE PROPERTIES FOR ALL PURPOSES AND SATISFIED ITSELF AS TO THEIR PHYSICAL AND ENVIRONMENTAL CONDITION, BOTH SURFACE AND SUBSURFACE, INCLUDING CONDITIONS SPECIFICALLY RELATED TO THE PRESENCE, RELEASE OR DISPOSAL OF HAZARDOUS MATERIALS, ASBESTOS AND OTHER MAN MADE FIBERS, OR NATURALLY OCCURRING RADIOACTIVE MATERIALS.

(b)     WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS EXPRESSLY DISCLAIM, AND PURCHASER ACKNOWLEDGES AND AGREES THAT IT HAS NOT RELIED UPON, ANY REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, AS TO (i) TITLE TO ANY OF THE ASSETS, (ii) THE CONTENTS, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (iii) THE QUANTITY, QUALITY OR  RECOVERABILITY OF PETROLEUM SUBSTANCES IN OR FROM THE ASSETS, (iv) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (v) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM THE ASSETS, (vi) ANY ESTIMATES OF OPERATING COSTS AND CAPITAL REQUIREMENTS FOR ANY WELL, OPERATION, OR PROJECT, (vii) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (viii) THE CONTENT, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (ix) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT, OR (x) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO PURCHASER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, MEMBERS,

MANAGERS, EQUITY OWNERS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO (AND NO REPRESENTATION OR WARRANTY IS MADE AS TO THE ACCURACY OR COMPLETENESS OF ANY OF THE FOREGOING AND PURCHASER IS NOT RELYING ON ANY SUCH INFORMATION OR OMISSIONS RELATED THERETO). SELLERS FURTHER DISCLAIM ANY REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY EQUIPMENT, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT PURCHASER SHALL BE DEEMED TO BE OBTAINING THE ASSETS, INCLUDING THE EQUIPMENT, IN ITS PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT PURCHASER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS PURCHASER DEEMS APPROPRIATE.

**Section 5.2**    **Purchaser Representations and Warranties.**

Purchaser represents and warrants to Sellers as of the date hereof and as of the Closing Date as follows:

(a)    *Organization/Good Standing*.   Purchaser is a [_____] duly organized, validly existing, and in good standing under the Laws of [_____] and is qualified to conduct business and is in good standing in all jurisdictions where it conducts business.

(b)    *Power and Authorization*.   Purchaser has all requisite limited liability company power and authority to enter into and perform this Agreement and the transactions contemplated hereby. The execution, delivery and performance of this Agreement and the transactions contemplated hereby have been duly and validly authorized by all requisite action on the part of Purchaser. This Agreement has been duly executed and delivered on behalf of Purchaser, and at the Closing all documents and instruments required hereunder to be executed and delivered by Purchaser shall be duly executed and delivered. This Agreement constitutes, and such Closing documents and instruments shall constitute, legal, valid, and binding obligations of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium, and similar laws from time to time in effect relating to the rights and remedies of creditors, as well as by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)    *No Breach or Violation*.   The execution, delivery and performance of this Agreement by Purchaser, and the transactions contemplated hereby, will not (i) violate, conflict with or result in any breach of any provision of Purchaser's certificate of formation or other governing documents, (ii) conflict with, result in a material breach of, constitute a default (or an event that with the lapse of time or notice, or both, would

constitute a default) under any agreement or instrument to which Purchaser is a party or by which Purchaser is bound, (iii) violate any material Order applicable to Purchaser, or (iv) materially violate any applicable Law.

(d) *Brokers*. Purchaser has incurred no liability for brokers' or finders' fees in respect of the matters provided for in this Agreement for which Sellers will have any responsibility whatsoever, and any such obligation that might exist shall be the sole obligation of Purchaser.

(e) *Litigation*. There are no legal actions or proceedings pending or, to Purchaser's knowledge, threatened against Purchaser or any of its Affiliates which relate to the transactions contemplated by this Agreement. To Purchaser's knowledge, there is no investigation, inquiry or review pending or threatened by any Governmental Body with respect to Purchaser or any of its Affiliates seeking to prevent the consummation of this Agreement or any other action taken or to be taken in connection herewith.

## ARTICLE 6
## INTENTIONALLY OMITTED


## ARTICLE 7
## COVENANTS OF THE PARTIES

**Section 7.1    Access.**

Between the date of execution of this Agreement and continuing until the earlier of the Closing or the termination of this Agreement, Sellers will give Purchaser and its representatives, at Purchaser's expense and sole risk, reasonable access to Sellers' offices and the Records, including the right to copy the Records at Purchaser's expense, for the sole purpose of conducting an investigation of the Assets, but only to the extent that Sellers may do so without violating any applicable Law or obligations to any third party and to the extent that Sellers have authority to grant such access without breaching any restriction binding on Sellers or Sellers' Affiliates. Such access by Purchaser shall be limited to Sellers' normal business hours, and any weekends and after hours requested by Purchaser that can be reasonably accommodated by Sellers, and Purchaser's investigation shall be conducted in a manner that minimizes interference with the operation of the Assets.

**Section 7.2    Government Reviews.**

Sellers and Purchaser shall in a timely manner and at Purchaser's expense (a) make all required filings, if any, with and prepare applications to and conduct negotiations with, each governmental agency as to which such filings, applications or negotiations are necessary or appropriate in the consummation of the transactions contemplated hereby, and (b) provide such information as each may reasonably request to make such filings, prepare such applications and conduct such negotiations. Sellers and Purchaser shall cooperate with and use all commercially reasonable efforts to assist the other with respect to such filings, applications and negotiations.

**Section 7.3    Operatorship.**

Sellers will assist Purchaser in its efforts to succeed as operator of any Wells included in the Assets. Purchaser shall promptly, following Closing (or earlier to the extent provided under Section 12.6), file all appropriate or required forms, permit transfers and declarations or bonds with Governmental Bodies relative to its assumption of operatorship. For all Seller Operated Assets, Sellers shall execute and deliver to Purchaser at the Closing, on forms to be prepared by Purchaser and acceptable to Sellers, and Purchaser shall promptly file after the Closing, the applicable governmental forms and required bonds transferring operatorship of such Assets to Purchaser or its designee.

### Section 7.4    Operation of Business.

Except as otherwise consented to in writing by Purchaser, which consent shall not be unreasonably withheld or delayed, until the Closing, Sellers will in compliance with the Bankruptcy Code and orders of the Bankruptcy Court and of the applicable operating agreements and other applicable agreements: (i) operate the Assets in the ordinary course consistent with past practices, (ii) not commit to any single operation, or series of related operations, reasonably anticipated by Sellers to require future capital expenditures by the owner of the Assets in excess of Fifty Thousand Dollars ($50,000) (net to Sellers' interest), (iii) not terminate, materially amend, execute or extend any material agreements affecting the Assets, (iv) will maintain their current insurance coverage on the Assets presently furnished by nonaffiliated third parties in the amounts and of the types presently in force, (v) use commercially reasonable efforts to maintain in full force and effect all Leases, (vi) maintain all material Governmental Authorizations necessary for the ownership or operation of the Assets, (vii) not transfer, farmout, sell, hypothecate, encumber or otherwise dispose of any material Assets except for sales and dispositions of Hydrocarbon production and Equipment made in the ordinary course of business consistent with past practices and (viii) not commit to do any of the foregoing. Purchaser's approval of any action restricted by this Section 7.4 shall be considered granted within ten (10) days (unless a shorter time is reasonably required by the circumstances and such shorter time is specified in Sellers' written notice) of Sellers' notice to Purchaser requesting such consent unless Purchaser notifies Sellers to the contrary during that period. In the event of an emergency, Sellers may take such action as a prudent operator would take and shall notify Purchaser of such action promptly thereafter.

### Section 7.5    Tax Matters.

(a)    Purchaser shall be responsible for all Taxes affecting the ownership or operation of the Assets that are attributable to any period of time after the Petition Date and before the Effective Time to the extent that such Taxes have not been previously paid by Sellers. As of the Effective Time, Sellers estimate that the amount of such outstanding and unpaid Taxes is [$_____], as more particularly set forth in Schedule 7.5(a). Purchaser shall further be responsible for all Taxes affecting the ownership or operation of the Assets that are attributable to any period of time after the Effective Time. Sellers shall handle payment to the appropriate Governmental Body of all Taxes affecting the ownership or operation of the Assets which are required to be paid prior to Closing (and shall file all Tax Returns with respect to such Taxes), and Purchaser shall handle payment to the appropriate Governmental Body of all Taxes affecting the ownership or operation of the Assets which are required to be paid after Closing (and

10

shall file all Tax Returns with respect to such Taxes. Notwithstanding the foregoing, this Section 7.5(a) shall not apply to income, franchise, corporate, business and occupation, business license and similar Taxes, and Tax returns therefor, which shall be borne, paid and filed by the Party responsible for such Taxes under applicable Law. If requested by Purchaser, Sellers shall, to the extent practicable, assist Purchaser with preparation of all ad valorem and property Tax Returns due on or before thirty (30) days after Closing (including any extensions requested).

(b)     If Sellers (or an Affiliate, agent, or successor in interest of Sellers) receives a refund of any Taxes (whether by payment, credit offset or otherwise, with any interest thereon, refunds from net operating losses, carry-forward or carry-back losses, the release or refund of withholdings or other taxes returned by a taxing authority or escrow account related to Taxes) covered by Section 7.5(a), such refund shall promptly (but no later than thirty (30) days after receipt) be remitted to Purchaser, including all relevant documentation. Each Party shall cooperate with the other and its Affiliates and agents in order to take all commercially reasonable necessary steps to claim any refund to which it is entitled. Purchaser agrees to notify Sellers within ten (10) days following the discovery of a right to claim and secure receipt of any refund to which Sellers are entitled and upon receipt of any such refund.

(c)     Control of any legal or administrative proceedings concerning any Taxes affecting the Assets shall rest with the Party responsible for paying such Taxes, or the Party that is the beneficiary of a refund, under this Section 7.5.

### Section 7.6     Suspended Proceeds.

Sellers shall transfer and remit to Purchaser, all monies representing the value or proceeds of production removed or sold from the Properties and held by Sellers at the time of the Closing for accounts from which payment has been suspended, such monies, net of applicable rights of set off or recoupment, being hereinafter called "**Suspended Proceeds**". Purchaser shall be solely responsible for the proper distribution of such Suspended Proceeds to the Person or Persons which or who are entitled to receive payment of the same, all in accordance with the directives and/or orders of the Alaska Oil and Gas Conservation Commission and/or the orders of the Superior Court for the State of Alaska, Third Judicial District at Anchorage, in connection with Case No.: 3AN-13-09911C1, styled *Cook Inlet Region Inc., v. Buccaneer Alaska LLC et al.* Suspended Proceeds specifically include any proceeds from the KL 1-1 and KL 1-3 wells that are subject to Alaska Oil and Gas Conservation Commission Conservation Order 691 dated May 22, 2014.

### Section 7.7     Further Assurances.

After Closing, subject to approval of the Bankruptcy Court, to the extent required, Sellers and Purchaser each agree to take such further actions and to execute, acknowledge and deliver all such further documents as are reasonably requested by the other Party for carrying out the purposes of this Agreement or of any document delivered pursuant to this Agreement.

## ARTICLE 8
## CONDITIONS TO CLOSING

**Section 8.1    Conditions of Sellers to Closing.**

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject, at the option of Sellers, to the satisfaction on or prior to Closing of each of the following conditions:

(a)    <u>Performance</u>.    Purchaser shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by it under this Agreement prior to or on the Closing Date;

(b)    <u>Deliveries</u>.    Purchaser shall have delivered to Sellers duly executed counterparts of the Conveyance and the other documents to be delivered by Purchaser under Section 9.3;

(c)    <u>Payment</u>.    Purchaser shall be ready, willing and able to pay the Closing Payment.

(d)    <u>Orders</u>.    The Bankruptcy Court shall have entered a Sale Order, and such Order shall be final and non-appealable.

**Section 8.2    Conditions of Purchaser to Closing.**

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject, at the option of Purchaser, to the satisfaction on or prior to Closing of each of the following conditions:

(a)    <u>Performance</u>.    Sellers shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by them under this Agreement prior to or on the Closing Date;

(b)    <u>Deliveries</u>.    Sellers shall be ready, willing and able to deliver to Purchaser duly executed counterparts of the Conveyance and the other documents and certificates to be delivered by Sellers under Section 9.2; and

(c)    <u>Bankruptcy Conditions</u>.

(i)    The Sale Order, in form and substance reasonably satisfactory to the Purchaser, incorporating the terms of this Agreement, shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser (which consent may be withheld in its sole discretion) (i) authorizing and approving the transactions contemplated by this Agreement, including (X) the sale of the Assets free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code other than any liens, claims or encumbrances permitted by this Agreement, and (Y) the

12

assumption and assignment to the Purchaser pursuant to section 365 of the Bankruptcy Code all of the Contracts, (ii) finding that the Purchaser is entitled to the protections afforded under section 363(m) of the Bankruptcy Code and granting such protection to the fullest extent under section 363(m) of the Bankruptcy Code, and (iii) enjoining all persons from asserting any claims which they have, or may have, against any of the Sellers, against the Purchaser (other than any such claims expressly assumed by the Purchaser) based upon successor liability or any other legal theories; and

(ii)     There shall exist no default or event of default under this Agreement, unless any such defaults and/or events of default are waived by Seller, agreed to by the parties, or abrogated by the Court.

## ARTICLE 9
## CLOSING

**Section 9.1     Time and Place of Closing.**

(a)     Consummation of the purchase and sale transaction as contemplated by this Agreement (the "**Closing**"), shall, unless otherwise agreed to in writing by Purchaser and Sellers or agreed to in writing or directed by the Bankruptcy Court, and subject to the conditions stated in this Agreement, take place at offices of Norton Rose Fulbright, Fulbright Tower, 1301 McKinney, Suite 5100, Houston, Texas 77010-3095 at 9:00 A.M. local time, on (i) October [], 2014 (the "**Scheduled Closing Date**") or (ii) if all conditions in Article 8 to be satisfied prior to Closing have not yet been satisfied or waived, as soon as thereafter as such conditions have been satisfied or waived, subject to the rights of the Parties under Article 10.

(b)     The date on which the Closing occurs is herein referred to as the "**Closing Date**."

**Section 9.2     Obligations of Sellers at Closing.**

At the Closing, upon the terms and subject to the conditions of this Agreement, Sellers shall deliver or cause to be delivered to Purchaser, among other things, the following:

(a)     the Conveyance, in sufficient duplicate originals to allow recording in all appropriate jurisdictions and offices, duly executed by Sellers;

(b)     assignments, on appropriate forms, of state and of federal leases comprising portions of the Assets, duly executed by Sellers;

(c)     letters-in-lieu of division or transfer orders covering the Assets that are prepared and provided by Purchaser and reasonably satisfactory to Sellers to reflect the transactions contemplated hereby, duly executed by Sellers;

(d)     change of operator forms naming Purchaser or its designee as operator, duly executed by Sellers;

13

(e)   executed statements described in Treasury Regulation §1.1445-2(b)(2) certifying that each Seller is not a foreign person within the meaning of the Code and the Treasury Regulations promulgated thereunder; and

(f)   the delivery by Sellers of the Suspended Proceeds (pursuant to Section 7.6).

### Section 9.3   **Obligations of Purchaser at Closing.**

At the Closing, upon the terms and subject to the conditions of this Agreement, Purchaser shall deliver or cause to be delivered to Sellers, among other things, the following:

(a)   a wire transfer of the Closing Payment in immediately available funds;

(b)   the Conveyance, duly executed by Purchaser;

(c)   assignments, on appropriate forms, of state and of federal leases comprising portions of the Assets, duly executed by Purchaser;

(d)   letters-in-lieu of division or transfer orders covering the Assets duly executed by Purchaser; and

(e)   change of operator forms naming Purchaser as operator, duly executed by Purchaser.

### Section 9.4   **Closing Payment.**

(a)   The [$_____] cash portion of the Purchase Price shall constitute the dollar amount to be paid by Purchaser to Sellers at the Closing (the "**Closing Payment**").

(b)   All payments made or to be made hereunder to Sellers shall be by electronic transfer of immediately available funds to the account of Sellers pursuant to the wiring instructions separately provided in writing.

### ARTICLE 10
### TERMINATION

### Section 10.1   **Termination.**

Subject to Section 10.2, this Agreement shall be terminated:  (i) at any time prior to Closing by the mutual prior written consent of Sellers and Purchaser; (ii) by Sellers or Purchaser if Closing has not occurred on or before October [], 2014 (the "**Termination Date**") *provided* that the failure to Close is not due, *inter alia*, to any breach by the Party attempting to terminate this Agreement of any of its representations, warranties, covenants or other obligations contained in this Agreement; (iii) by Purchaser if any condition set forth in Section 8.2 has not been satisfied or waived on the Scheduled Closing Date; (iv) by Sellers if any condition set forth in Section 8.1 has not been satisfied or waived on the Scheduled Closing Date; (v) by Sellers or

Purchaser if, incident to the Bidding Procedures Order, Sellers accept and close on a competing bid for the purchase of all or part of the Assets; (vi) by Sellers or Purchaser if the Sale Order is not entered by the Bankruptcy Court by October [], 2014; (vii) by Purchaser if any of the Sellers' chapter 11 cases are dismissed or converted to chapter 7; (viii) by Purchaser if a chapter 11 trustee or examiner with expanded powers or other person with expanded powers is appointed in any of Sellers' chapter 11 cases; or (ix) by Purchaser if the Bankruptcy Court grants relief from the automatic stay to permit foreclosure or the exercise of other remedies on the Assets of any Seller; provided, however, that termination under this Section 10.1 shall not be effective until the Party electing to terminate has delivered written notice to the other Party of its election to so terminate; nor shall termination under Section 10.1 (ix) be effective with respect to any relief from automatic stay sought or obtained by or in conjunction with CIRI or the CIRI litigation.

### Section 10.2  Effect of Termination.

If this Agreement is terminated pursuant to Section 10.1, except as set forth in this Section 10.2, this Agreement shall become void and of no further force or effect (except for the provisions of Sections 12.2, 12.4, 12.7, 12.8, 12.9, 12.11, 12.12, 12.13, 12.14, 12.15, 12.16, 12.17, 12.18 and 12.19).

### ARTICLE 11
### POST-CLOSING OBLIGATIONS;
### DISCLAIMERS AND WAIVERS

### Section 11.1  Receipts.

Except as otherwise provided in this Agreement, any production from or attributable to the Assets (and all products and proceeds attributable thereto) and all other income, proceeds, receipts and credits earned with respect to the Assets to which Purchaser is entitled under Section 1.4 shall be the sole property and entitlement of Purchaser, and, to the extent received by Sellers, Sellers shall fully disclose, account for and remit the same to Purchaser within thirty (30) days.

### Section 11.2  Recording.

As soon as practicable after Closing, Purchaser shall record the Conveyances in the appropriate counties as well as the appropriate Governmental Bodies and file change of operator notices with the appropriate Governmental Bodies and provide Sellers with copies of all recorded or approved instruments.

### Section 11.3  Assumption of Contracts.

The sale of the Assets is and will be made subject to the Contracts and any applicable governmental rules and regulations related to the ownership and operation of the Properties and to which the Properties are presently subject.  Purchaser shall assume and be responsible for all obligations accruing under the Contracts arising prior to, on or after the Effective Time.

# ARTICLE 12
# MISCELLANEOUS

### Section 12.1   Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed an original instrument, but all such counterparts together shall constitute but one agreement. Delivery of an executed counterpart signature page by facsimile or electronic transmittal (e.g., in PDF format) is as effective as executing and delivering this Agreement in the presence of other parties to this Agreement.

### Section 12.2   Notice.

Any notice provided or permitted to be given under this Agreement shall be in writing, and may be served by personal delivery, by registered or certified U.S. mail, addressed to the Party to be notified, postage prepaid, return receipt requested, by facsimile, or by overnight air courier sent, in each case, to the appropriate address or number as follows:

| | |
|---|---|
| If to Sellers: | c/o Conway MacKenzie, Inc. |
| | 1301 McKinney, Suite 2025 |
| | Houston, Texas 77010 |
| | Attention:  John T. Young, Jr. |
| | Chief Restructuring Officer for |
| | Buccaneer Resources, LLC et al. |
| | Fax:  713-650-0502 |

With a copy to (which shall not constitute notice):

Norton Rose Fulbright
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Attention:  William R. Greendyke
Fax:    713-651-5246

| | |
|---|---|
| If to Purchaser: | [_____] |
| | [_____] |
| | [_____] |
| | Attention:  [_____] |
| | Fax:  [_____] |

With a copy to (which shall not constitute notice):

[_____]
Attn:  [_____]
[_____]
[_____]

16

Fax:     [_____]

If to AIX:          AIX Energy, LLC
                    2441 High Timbers, Ste. 120
                    The Woodlands, TX 77380
                    Attention: Fred Tresca
                    Fax: 832-585-0133

With a copy to (which shall not constitute notice):

                    Porter Hedges LLP
                    Attn: Joshua Wolfshohl
                    1000 Main Street, 36th Floor
                    Houston, Texas 77002
                    Fax: 713-226-6231

Either Party may change its address for notice by notice to the other in the manner set forth above.  All such notices and communications shall be deemed to have been received: if personally delivered, at the time delivered by hand; if so mailed, three (3) Business Days after being deposited in the mail; if faxed, upon confirmation of receipt if the confirmation is between 9:00 a.m. and 5:00 p.m. local time of the recipient on a Business Day, otherwise on the first Business Day following confirmation of receipt, and, if sent by overnight air courier, on the next Business Day after timely delivery to the courier.

**Section 12.3     Sales or Use Tax Recording Fees and Similar Taxes and Fees.**

Purchaser shall bear and pay any sales, use, excise, real property transfer, gross receipts, goods and services, registration, capital, documentary, stamp or transfer Taxes, recording fees and similar Taxes and fees incurred and imposed upon, or with respect to, the property transfers or other transactions contemplated hereby.  If such transfers or transactions are exempt from any such Taxes or fees upon the filing of an appropriate certificate or other evidence of exemption, Purchaser will timely furnish to Sellers such certificate or evidence.

**Section 12.4     Expenses.**

Except as provided in Section 12.3, all expenses incurred by Sellers in connection with or related to the authorization, preparation or execution of this Agreement, the Conveyance delivered hereunder and the Exhibits and Schedules hereto and thereto, and all other matters related to the Closing, including all fees and expenses of counsel, accountants and financial advisers employed by Sellers, shall be borne solely and entirely by Sellers, and all such expenses incurred by Purchaser shall be borne solely and entirely by Purchaser.

**Section 12.5     Change of Name.**

Unless otherwise authorized by Sellers in writing, as promptly as practicable, but in any case within thirty (30) days after the Closing Date, Purchaser shall eliminate the names ["_____"], and any derivatives or variants thereof from the Assets acquired pursuant to this Agreement and, except with respect to such grace period for eliminating existing

17

usage, shall have no right to use any logos, trademarks or trade names belonging to Sellers or any of its Affiliates.

**Section 12.6** **Replacement of Bonds, Letters of Credit and Guarantees.**

To the extent transferable, the bonds, letters of credit and guarantees, if any, posted by Sellers with Governmental Bodies or other parties and relating to the Assets are to be transferred to Purchaser. To the extent that such bonds, letters of credit and guarantees are not transferable, on, before or after Closing, Purchaser shall obtain, or cause to be obtained in the name of Purchaser, replacements for such bonds, letters of credit and guarantees to consummate the transactions contemplated by this Agreement. Purchaser may also provide evidence that such replacements are not necessary as a result of existing bonds, letters of credit or guarantees that Purchaser has previously posted as long as such existing bonds, letters of credit or guarantees are adequate to secure the release of those posted by Sellers.

**Section 12.7** **GOVERNING LAW AND VENUE.**

THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW THAT WOULD DIRECT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION. THE VENUE FOR ANY ACTION BROUGHT UNDER THIS AGREEMENT SHALL BE HARRIS COUNTY, TEXAS. ALL ACTIONS OR PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO, OR FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE EXCLUSIVELY LITIGATED IN THE BANKRUPTCY COURT.

**Section 12.8** **JURISDICTION; WAIVER OF JURY TRIAL.**

EACH PARTY CONSENTS TO PERSONAL JURISDICTION IN ANY ACTION BROUGHT IN THE UNITED STATES FEDERAL COURTS AND BANKRUPTCY COURT LOCATED WITHIN HARRIS COUNTY, TEXAS WITH RESPECT TO ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR IN RELATION TO OR IN CONNECTION WITH THIS AGREEMENT, AND EACH OF THE PARTIES AGREES THAT ANY ACTION INSTITUTED BY IT AGAINST THE OTHER WITH RESPECT TO ANY SUCH DISPUTE, CONTROVERSY OR CLAIM WILL BE INSTITUTED EXCLUSIVELY IN THE UNITED STATES BANKRUPTCY OR DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, VICTORIA DIVISION. THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANOTHER IN ANY MATTER WHATSOEVER ARISING OUT OF OR IN RELATION TO OR IN CONNECTION WITH THIS AGREEMENT.

**Section 12.9** **Captions.**

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

**Section 12.10  Waivers.**

Any failure by any Party or Parties to comply with any of its or their obligations, agreements or conditions herein contained may be waived in writing, but not in any other manner, by the Party or Parties to whom such compliance is owed.  No waiver of, or consent to a change in, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in, other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 12.11  Assignment.**

No Party shall assign all or any part of this Agreement, nor shall any Party assign or delegate any of its rights or duties hereunder, without the prior written consent of the other Party and any assignment or delegation made without such consent shall be void.

**Section 12.12  Entire Agreement.**

This Agreement and the documents to be executed hereunder and the Exhibits and Schedules attached hereto, constitute the entire agreement between the Parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof.

**Section 12.13  Amendment.**

(a)    This Agreement may be amended or modified only by an agreement in writing executed by Sellers, on the one hand, and the Purchaser, on the other hand.

(b)    No waiver of any right under this Agreement shall be binding unless executed in writing by the party to be bound thereby.

**Section 12.14  No Third-Party Beneficiaries.**

Nothing in this Agreement shall entitle any Person other than Purchaser and Sellers to any claims, cause of action, remedy or right of any kind.

**Section 12.15  Invalid Provisions.**

If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws effective during the term hereof, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be effected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

**Section 12.16  References.**

In this Agreement:

(a)     References to any gender includes a reference to all other genders;

(b)     References to the singular includes the plural, and vice versa;

(c)     Reference to any Article or Section means an Article or Section of this Agreement;

(d)     Reference to any Exhibit or Schedule means an Exhibit or Schedule to this Agreement, all of which are incorporated into and made a part of this Agreement;

(e)     Unless expressly provided to the contrary, "hereunder," "hereof," "herein" and words of similar import are references to this Agreement as a whole and not any particular Section or other provision of this Agreement;

(f)     "Include" and "including" shall mean include or including without limiting the generality of the description preceding such term;

(g)     If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa;

(h)     The term "cost" includes expense and the term "expense" includes cost. All references to "dollars" or "$" shall be deemed references to United States dollars;

(i)     The words "shall" and "will" are used interchangeably and have the same meaning. The word "or" will have the inclusive meaning represented by the phrase "and/or" unless the context requires otherwise;

(j)     The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement;

(k)     Any event hereunder requiring the payment of cash or cash equivalents and any action to be taken hereunder on a day that is not a Business Day shall be deferred until the first Business Day occurring after such day;

(l)     Each exhibit and schedule to this Agreement is a part of this Agreement, but if there is any conflict or inconsistency between the main body of this Agreement and any exhibit or schedule, the provisions of the main body of this Agreement shall prevail; and

(m)     Time periods within or following which any payment is to be made or an act is to be done shall be calculated by excluding the day on which the time period commences and including the day on which the time period ends and by extending the period to the next Business Day following if the last day of the time period is not a Business Day.

**Section 12.17  Construction.**

Sellers and Purchaser has had substantial input into the drafting and preparation of this Agreement and has had the opportunity to exercise business discretion in relation to the negotiation of the details of the transaction contemplated hereby.  This Agreement is the result of arm's-length negotiations from equal bargaining positions.

**Section 12.18  Limitation on Damages.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NONE OF PURCHASER, SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES SHALL BE ENTITLED TO EITHER PUNITIVE, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND EACH OF PURCHASER AND EACH SELLERS, FOR THEMSELVES AND ON BEHALF OF THEIR AFFILIATES, HEREBY EXPRESSLY WAIVES ANY RIGHT TO PUNITIVE, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSS OF PROFITS IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, EXCEPT TO THE EXTENT SELLERS OR PURCHASER IS REQUIRED TO PAY PUNITIVE, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES TO A THIRD PARTY.

**Section 12.19  DTPA Waiver.**

To the extent applicable to the Assets or any portion thereof, Purchaser hereby waives the provisions of the Texas Deceptive Trade Practices Act, Chapter 17, Subchapter E, Sections 17.41 through 17.63 inclusive (other than Section 17.555 which is not waived), Tex. Bus. & Com. Code. In order to evidence its ability to grant such waiver, Purchaser hereby expressly recognizes and represents to Sellers that Purchaser is not in a significantly disparate bargaining position and (i) Purchaser is represented by legal counsel in this transaction or (ii) Purchaser is in the business of seeking or acquiring, by purchase or lease, goods or services for commercial or business use, will have as of the Closing assets of Twenty Million Dollars or more according to its most recent financial statement prepared in accordance with generally accepted accounting principles, and has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of the transaction contemplated hereby.

**Section 12.20  Binding Effect.**

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and their respective successors and assigns, subject only to approval of the Bankruptcy Court.

*[Signature Page Follows]*

IN WITNESS WHEREOF, this Purchase and Sale Agreement has been signed by each of the parties hereto on the date first above written.

## **SELLERS**

BUCCANEER RESOURCES, LLC

By: _____
Name: _____
Title: _____


BUCCANEER ENERGY, LIMITED

By: _____
Name: _____
Title: _____


BUCCANEER ENERGY HOLDINGS, INC.

By: _____
Name: _____
Title: _____


BUCCANEER ALASKA OPERATIONS, LLC

By: _____
Name: _____
Title: _____


BUCCANEER ALASKA, LLC,

By: _____
Name: _____
Title: _____


KENAI LAND VENTURES, LLC

By: _____
Name: _____
Title: _____

BUCCANEER ALASKA DRILLING, LLC

By: _____

Name: _____

Title: _____


KENAI DRILLING, LLC

By: _____

Name: _____

Title: _____


BUCCANEER ROYALTIES, LLC

By: _____

Name: _____

Title: _____

**<u>PURCHASER</u>**

[_____]

By: _____

Name: _____

Title: _____

Signature Pages to PSA

APPENDICES, EXHIBITS AND SCHEDULES

| Appendix I | Definitions |
|---|---|
| Exhibit A | Leases |
| Exhibit A-1 | Units, Wells and Personal Property |
| Exhibit A-2 | Excluded Equipment |
| Exhibit B | Conveyance |
| Schedule 1.2(d) | Contracts |
| Schedule 2.2 | Estimate of Imbalances |
| Schedule 3.2 | Consents |
| Schedule 7.5(a) | Estimate of Taxes |

## APPENDIX I

### Definitions

"**Affiliates**" with respect to any Person, means any Person that directly or indirectly controls, is controlled by or is under common control with such Person.

"**Agreement**" has the meaning set forth in the first paragraph of this Agreement.

"**AIX**" has the meaning set forth in Section 2.1.

"**Archer Litigation**" means that certain case styled *Archer Drilling, LLC and Rig Inspection Services (US), LLC v. Buccaneer Energy, Ltd, Buccaneer Alaska Drilling, LLC, Buccaneer Resources, LLC, Kenai Drilling, LLC and Kenai Offshore Ventures, LLC*, Cause No. 2012-74323, 165th Judicial District, Harris County, Texas.

"**Assets**" has the meaning set forth in Section 1.2.

"**Bankruptcy Case**" has the meaning set forth in the Recital.

"**Bankruptcy Code**" has the meaning set forth in the Recital.

"**Bankruptcy Court**" has the meaning set forth in the Recital.

"**Business Day**" means each calendar day except Saturdays, Sundays, and any other day on which commercial banks in Houston, Texas are authorized or required by Law to close.

"**Closing**" has the meaning set forth in Section 9.1(a).

"**Closing Date**" has the meaning set forth in Section 9.1(b).

"**Closing Payment**" has the meaning set forth in Section 9.4(a).

"**Contracts**" has the meaning set forth in Section 1.2(d).

"**Conveyance**" has the meaning set forth in Section 3.1.

"**COPAS**" has the meaning set forth in Section 1.4(b).

"**Effective Time**" has the meaning set forth in Section 1.4

"**Equipment**" has the meaning set forth in Section 1.2(f).

"**Excluded Assets**" has the meaning set forth in Section 1.3.

"**Existing Credit Agreements**" means that certain Amended and Restated Financing Agreement dated January 24, 2014 by and among Buccaneer Alaska, LLC, Buccaneer Resources, LLC, Buccaneer Alaska Operations, LLC, Buccaneer Cosmopolitan, LLC, Kenai Drilling, LLC, Buccaneer Alaska Drilling, LLC, and Kenai Land Ventures, LLC, as Borrowers,

Buccaneer Energy Limited and Buccaneer Energy Holdings, Inc., as Guarantors, the Lenders and Holder identified therein, and Meridian Capital CIS Fund, as Administrative Agent and Collateral Agent for the Lenders and the Holders, and all related documents, including by not limited to, the Senior Secured Term Note dated January 24, 2014 in the principal amount of $60,719,497.98 and the Senior Secured Revolver Note date January 24, 2014 in the principal amount of $6,713,242.74, as assigned to Purchaser by Meridian Capital CIS Fund pursuant to, among other documents, that certain Assignment of Financing Agreement, Notes, Liens, and Security Interests, and Other Rights and that certain Assignment of Overriding Royalty Interests and Production Payments.

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Authorization**" means any federal, state, local, municipal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority or power; and any court or governmental tribunal having or asserting jurisdiction.

"**Governmental Body**" means any federal, state, local, municipal, or other governments; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; and any court or governmental tribunal.

"**Hydrocarbons**" means oil, gas, condensate and other gaseous and liquid hydrocarbons or any combination thereof, including scrubber liquid inventory and ethane, propane, isobutene, nor-butane and gasoline inventories (including tank bottoms), and sulphur and other minerals extracted from or produced from the foregoing hydrocarbons.

"**Imbalance**" means any over-production, under-production, over-delivery, under-delivery or similar imbalance of Hydrocarbons produced from or allocated to the Assets, regardless of whether such imbalance arises at the platform, wellhead, pipeline, gathering system, transportation system, processing plant or other location.

"**Lands**" has the meaning set forth in Section 1.2(a).

"**Laws**" means all applicable statutes, rules, regulations, ordinances, orders, and codes of Governmental Bodies.

"**Leases**" has the meaning set forth in Section 1.2(a).

"**NCI Farmout**" means that certain North Cook Inlet Deep Farmout Agreement and First Amendment thereto, both dated effective April 15, 2013, among ConocoPhillips Alaska, Inc. and ConocoPhillips Company, as Farmors, and Buccaneer Alaska, LLC, as Farmee.

"**ORRI Conveyance**" has the meaning set forth in Section 3.3.

"**Party**" and "**Parties**" have the meanings set forth in the first paragraph of this Agreement.

"**Person**" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, government or agency or subdivision thereof or any other entity.

"**Production Payment Agreement**" has the meaning set forth in Section 3.3.

"**Properties**" and "**Property**" have the meanings set forth in Section 1.2(c).

"**Property Costs**" has the meaning set forth in Section 1.4(c).

"**Purchase Price**" has the meaning set forth in Section 2.1.

"**Purchaser**" has the meaning set forth in the first paragraph of this Agreement.

"**Records**" has the meaning set forth in Section 1.2(i).

"**Sale Order**" is an order of the Bankruptcy Court, acceptable to Sellers and Purchaser, entered pursuant to sections 105, 363, and 365 of the Bankruptcy Code (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale and transfer of the Assets to Purchaser free and clear of all liens, claims and interests, pursuant to section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to Purchaser of the assigned Contracts; (iv) finding that Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (v) finding that due and adequate notice of the Sale Motion and an opportunity to be heard were provided to all Persons entitled thereto, including but not limited to federal, state and local taxing and regulatory authorities; (vi) confirming that Purchaser is acquiring the Assets free and clear of all liabilities, other than the Assumed Liabilities; and (vii) providing that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure.

"**Scheduled Closing Date**" has the meaning set forth in Section 9.1(a).

"**Seller**" and "**Sellers**" has the meaning set forth in the first paragraph of this Agreement.

"**Seller Operated Assets**" shall mean Assets operated by any Seller or its Affiliates.

"**Suspended Proceeds**" has the meaning set forth in Section 7.6.

"**Tax Returns**" means all reports, returns, statements (including estimated reports, returns, or statements), and other similar filings.

"**Taxes**" means all federal, state, local, and foreign income, profits, franchise, sales, use, ad valorem, property, severance, production, excise, stamp, documentary, real property transfer or gain, gross receipts, goods and services, registration, capital, transfer, or withholding Taxes or other governmental fees or charges imposed by any taxing authority, including any interest, penalties or additional amounts which may be imposed with respect thereto.

"**Termination Date**" has the meaning set forth in Section 10.1.

"**Units**" has the meaning set forth in Section 1.2(c).

"**Wells**" has the meaning set forth in Section 1.2(b).

**EXHIBIT A**

**<u>LEASES</u>**

**EXHIBIT A-1**

**UNITS, WELLS AND PERSONAL PROPERTY**

**EXHIBIT A-2**

**EXCLUDED EQUIPMENT**

**EXHIBIT B**

**CONVEYANCE**

**SCHEDULE 1.2(d)**

**CONTRACTS**

**SCHEDULE 1.2(k)**

**ACCOUNTS, CREDITS AND BONDS**

# SCHEDULE 1.4(b)

# ESTIMATE OF REVENUES

**<u>SCHEDULE 1.4(c)</u>**

**<u>ESTIMATE OF PROPERTY COSTS</u>**

**SCHEDULE 2.2**

**ESTIMATE OF IMBALANCES**

**SCHEDULE 3.2**

**CONSENTS**

# SCHEDULE 7.5(a)

# ESTIMATE OF TAXES

**Buccaneer Resources, LLC,** *et al.*

**Bid Procedures**

Set forth below are the bid procedures (the "Bid Procedures") to be employed with respect to the proposed sale (the "Proposed Sale") of certain assets of Buccaneer Resources, LLC, *et al.*, as debtors-in-possession (the "Debtors" or "Sellers") in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court," jointly administered under Case No. 14-60041 (the "Bankruptcy Case")).  The Debtors will seek entry of an order from the Bankruptcy Court authorizing and approving the proposed sale to the Successful Bidder (defined below) that is determined to have made the highest or otherwise best offer (the "Sale Transaction").  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase and Sale Agreement (defined below).

**Purchase and Sale Agreement**

The Debtors intend to enter into a purchase and sale agreement (the "Purchase and Sale Agreement") with a prospective purchaser (the "Successful Bidder").  Pursuant to the Purchase and Sale Agreement, the Successful Bidder will acquire free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests therein or thereon to the maximum extent permitted by the Bankruptcy Code (collectively, the "Interests"), the "Assets" as set forth in the Purchase and Sale Agreement attached hereto as **Exhibit 1**.

**Bidding Procedures Motion and Order**

On October 7, 2014, the Debtors filed their Emergency Motion for Entry of an Order (A) Approving  Bid and Sale Procedures in Connection with the Sale of Certain of the Debtors' Assets, (B) Scheduling a Sale Hearing; and (C) Granting Related Relief (the "Bid Procedures Motion").  The relief requested in the Bid Procedures Motion and as provided in the Purchase and Sale Agreement, was approved and authorized by the Bankruptcy Court by an order entered by the Court on October 15, 2014 (the "Bid Procedures Order").

**The Bidding Process**

The Debtors and their advisors, in consultation with AIX Energy, LLC ("AIX"), shall (i) determine whether any bid for the Assets is a Qualified Bid (defined below), (ii) coordinate efforts of Interested Parties (as defined below) in conducting their due diligence investigations, (iii) receive offers from Potential Bidders, and (iv) negotiate in good faith any offers made to purchase the Assets (collectively, the "Bidding Process").

**Participation Requirements**

Any party interested in receiving confidential information from the Debtors in connection with the Bidding Process (an "Interested Party") must sign a confidentiality agreement, complete with a non-compete provision, reasonably satisfactory to the Debtors.  An Interested Party that the Debtors and AIX determine is reasonably likely (based on the financial information submitted by the Interested Party, the availability of financing, experience and other considerations deemed relevant by the Debtors) to submit a bona fide offer and to be able to

Exhibit 2

consummate a sale if selected as a Successful Bidder (defined below) shall be allowed to conduct further due diligence including access to the online data room and shall be deemed a potential bidder (a "Potential Bidder").

### Due Diligence

The Debtors shall afford each Potential Bidder the opportunity to conduct reasonable due diligence; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below).  The Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.  Except as may be provided by an order of the Bankruptcy Court, neither the Debtors nor any representative is obligated to furnish any information to any person other than a Potential Bidder.  Notwithstanding anything herein to the contrary, the Debtors reserve the right to withhold information or restrict access to certain materials in any data room if providing such information or materials to a Potential Bidder will, in the Debtors' business judgment, place the Debtors at a competitive disadvantage.

### Proposed Cure Amounts

The Debtors shall file with the Court and serve on all parties to Contracts (as defined in the Purchase and Sale Agreement) subject to assumption and/or assignment (the "Contract Counterparties") notice of proposed cure amounts (the "Cure Notice") by **5:00 p.m. (Central Time), October 22, 2014**.  The inclusion of Contracts on the Cure Notice shall not constitute or be deemed to be a determination or admission by the Debtors or any other party in interest that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

### Bid Deadline

Unless otherwise agreed to in writing in advance by the Debtors, any Potential Bidder that desires to make a bid shall email or deliver written copies of its bid not later than **3:00 p.m. (Central Time) on October 24, 2014** (the "Bid Deadline") to each of the following notice parties: (i) the Office of the United States Trustee for the Southern District of Texas (Attn: Hector Duran); (ii) Fulbright & Jaworski LLP (Attn: William R. Greendyke and Jason L. Boland); (iii)  Porter Hedges LLP (Attn:  Joshua Wolfshohl), attorney for AIX; (iv) Greenberg Traurig, LLP (Attn:  Shari L. Heyen and David B. Kurzweil), attorneys for the Committee; and (v) Global Hunter Securities LLC (Attn: Michael Schmidt and Ryan Sheppard).

### Bid Requirements

All bids must include, unless such requirement is waived by the Debtors, the following documents and requirements (the "Bid Requirements"):

- an offer to purchase substantially all of the Assets (or an offer to purchase less than substantially all of the Assets or such other assets on terms that are acceptable to the Debtors and AIX)  upon the terms and conditions that are acceptable to the Debtors and AIX, including without limitation, with respect to certainty and timing of closing;

- for the avoidance of doubt, a Potential Bidder's offer may consist of cash and/or other forms of consideration, including, but not limited to, notes or other securities, which other consideration shall be valued for purposes of determining a higher and better offer by the Debtors and AIX;

- a letter stating that the Potential Bidder's offer is irrevocable until two (2) business days after the Assets have been sold pursuant to the closing of the sale or sales approved by the Bankruptcy Court;

- a redline comparing the Potential Bidder's proposed purchase agreement against that of the Purchase and Sale Agreement;

- a good faith deposit in the amount of $3,000,000 (the "Good Faith Deposit") and a letter stating that the Debtors may retain the Good Faith Deposit if the Potential Bidder is selected by the Bankruptcy Court as the Successful Bidder or Back Up Bidder and thereafter occurs an event of default thereunder based on the Potential Bidder's breach of its purchase agreement;

- does not request or entitle the Potential Bidder to a break-up fee, termination fee, expense reimbursement or similar type of payment;

- must not be conditioned on financing contingencies or the outcome of due diligence by the Potential Bidder and must include an acknowledgement and representation as described herein that the Potential Bidder had an opportunity to conduct any and all required due diligence prior to making its bid;

- fully discloses the identity of each entity that will be bidding for all or any portion of the Assets or otherwise sponsoring or participating in connection with such bid, and the complete terms of any such participation, including the identification of the Potential Bidder's principal advisors;

- evidence, in form and substance reasonably satisfactory to the Debtors, of compliance or anticipated compliance with all antitrust and other regulatory approvals, the anticipated time frame for such compliance and any anticipated impediments for obtaining such approvals;

- a list of the Debtors' executory contracts and unexpired leases with respect to which the Potential Bidder seeks assignment from the Debtors; and

- a list of the liabilities the bidder proposes to assume under the Sale Transaction.

A bid received from a Potential Bidder by the Bid Deadline that satisfies all of the Bid Requirements or which Bid Requirements have been waived by the Debtors shall be a "Qualified Bid," and at such time the Debtors and their advisors, shall designate the Potential Bidder a qualified bidder ("Qualified Bidder").  AIX is deemed a Qualified Bidder and has reserved its credit bid rights.

**"As Is, Where Is"**

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, its agents or its estates except to the extent set forth in the Purchase and Sale Agreement or the purchase agreement of the Successful Bidder.  By submitting a bid, each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bid Procedures.  By submitting a bid, each Qualified Bidder shall be deemed to acknowledge that it is bound by these procedures and has consented to the core jurisdiction of the Bankruptcy Court in connection with any disputes related to the sale process described herein and the construction and enforcement of any transaction documents relating to its bid.

**Free of Any And All Interests**

Except as otherwise provided in the Successful Bidder's purchase agreement, all of the Debtors' right, title and interest in the Assets shall be sold free and clear of all Interests thereon and there against to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets with the same validity and priority as such Interests applied against the Assets.

**Auction, Bidding Increments and Bids Remaining Open**

If no Qualified Bid is timely received other than from AIX, the Debtors will not conduct an Auction and will instead request that the Court approve the sale of the Assets to AIX via a credit bid.

If more than one Qualified Bid has been received by the Debtors (including a credit bid by AIX), the Debtors shall conduct an auction (the "Auction") with respect to the Assets.  The Auction shall commence at **9:00 a.m. (Central Time) on October 27, 2014** at the offices of Fulbright & Jaworski LLP, 1301 McKinney St., Suite 5100, Houston TX 77010.  The Debtors shall notify all Qualified Bidders that have submitted Qualified Bids of the time of the Auction.

At least one (1) day prior to the Auction, the Debtors shall provide all Qualified Bidders with complete copies of all Qualified Bids.  The Auction shall be conducted in accordance with the following procedures:

> Only the Debtors, the Committee, and Qualified Bidders (and the advisors to each of the foregoing) shall be entitled to attend the Auction and only Qualified Bidders shall be entitled to make any subsequent Qualified Bids at the Auction.

> At the Auction, all Qualified Bidders shall be permitted to improve their Qualified Bids in accordance with the procedures set forth herein (each, a "Subsequent

Bid"). All Subsequent Bids presented during the Auction shall be made and received in one room on an open basis. All participating Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each participating Qualified Bidder shall be fully disclosed to all other Qualified Bidders and that all material terms of each Subsequent Bid presented during the Auction will be fully disclosed to all other participating Qualified Bidders and other parties in attendance throughout the entire Auction.

All Qualified Bidders at the Auction must have at least one individual representative with authority to bind such Qualified Bidder present in person at the Auction.

All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

At least one (1) day prior to the Auction, the Debtors will advise all Qualified Bidders which Qualified Bid the Debtors have determined in their reasonable business judgment constitutes the then highest or otherwise best offer for the Assets (the "Starting Bid").

Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round (a) at least one Subsequent Bid is submitted by a Qualified Bidder that improves upon such Qualified Bidder's immediately prior Qualified Bid and meets the Overbid (defined below), and (b) the Debtors determine, in their reasonable business judgment that a Subsequent Bid is a higher or otherwise better offer than the then current leading Qualified Bid.

Bidding at the Auction shall be in increments of $100,000 (the "Overbid") and shall continue until such time as the highest and best bid is determined by the Debtors and AIX in their reasonable business judgment. For the purpose of evaluating the value of the consideration provided by each bid (including any credit bid by AIX) presented at the Auction, the Debtors and AIX may take into consideration, among other things, the mix of cash payable at closing verses other forms of consideration, whether the consideration is payable at the closing or over time, the financial and contractual terms as well as factors relevant to the sale process, including any issues affecting the speed and certainty of consummating the proposed sale or antitrust or unfair competition issues, and any other factors which the Board of Directors may consider in the exercise of their fiduciary duties.

After each round of bidding, the Debtors shall announce the Qualified Bid or Subsequent Bid, as the case may be, that the Debtors and AIX have determined to be in their reasonable business judgment, to be the then highest or otherwise best bid (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has an opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid.

At the conclusion of the Auction, the Debtors will announce the Qualified or Subsequent Bid which they have determined in the Debtors' and AIX's reasonable business judgment to be the highest or otherwise best bid (the "Successful Bid" and the entity or entities submitting such Successful Bid, the "Successful Bidder") and such Successful Bid will be submitted to the Court for approval at the Sale Hearing (defined below), along with the second highest and best Qualified Bid (the "Back-Up Bid").

The Debtors shall file with the Court and serve on the Contract Counterparties and the Notice Parties a notice of the Successful Bid (the "Supplement") via email or fax and Federal Express overnight delivery by **6:00 p.m. (Central Time), October 27, 2014.** The Supplement may be obtained from counsel of the Debtors upon written request to Fulbright & Jaworski, LLP, 1301 McKinney St., Suite 5100, Houston TX 77010 (Attn: William R. Greendyke, R. Andy Black, Jason L. Boland and Robert Bruner), counsel for the Debtors. The Supplement shall identify, among other things: (a) the Successful Bidder; (b) the bidder that presented the Back-Up Bid; (c) the consideration to be paid for the Assets; (d) the executory contracts or leases to be assumed and assigned to the Successful Bidder in connection with the sale of the Assets; (e) the liabilities to be assumed by the Successful Bidder in connection with the sale of the Assets; and (f) copies of the respective purchase agreement entered into by the Successful Bidder and the Back-Up Bidder.

### Acceptance of Qualified Bids

The Debtors shall sell the Assets to a Qualified Bidder only upon the approval of the sale by the Bankruptcy Court after a hearing (the "Sale Hearing"). The Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtors' acceptance of the Qualified Bid. The Debtors will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing. All rights of interested parties to object to the Debtors' selection of the Successful Bidder and/or Back Up Bidder at the Sale Hearing are reserved. For the avoidance of doubt, reserved objections also include the assignment of any of such objector's executory contract or unexpired lease, provided, however, that objection to such assignment on the basis of the cure amount must be made and/or reserved as set forth in any order of the Bankruptcy Court.

### Objection Deadline

Objections to any aspect of the proposed Sale Transaction, including the proposed assumption or assignment of any contract or lease or the proposed cure amounts for any such contract or lease, must be filed with the Court and served on the attorneys for the Debtors, attorneys for the Successful Bidder, attorneys for AIX and attorneys for the Committee by **11:59 p.m. (Central Time), October 29, 2014**.

### Sale Hearing

The Sale Hearing shall be conducted by the Bankruptcy Court at **10:00 a.m. (Central Time), October 31, 2014**.  Following the approval of the sale of the Assets to the party designated the Successful Bidder by the Court at the Sale Hearing, if such Successful Bidder fails to consummate an approved sale within five (5) business days, the Debtors shall be authorized, but not required, to deem the Back-Up Bid, as designated by the Court at the Sale Hearing, the Successful Bid, the Debtors shall be authorized, but not required, to consummate the sale with the Qualified Bidder submitting the Back-Up Bid without further order of the Bankruptcy Court, and the Debtors shall have reserved all rights to seek damages against any Successful Bidder that defaults under its purchase agreement and/or otherwise fails to consummate an approved sale.

### Modifications

The Debtors and AIX may (i) determine, which Qualified Bid, if any, is the highest or otherwise best offer; and (ii) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the terms and conditions of sale, or (c) contrary to the best interests of the Debtors, their estates and creditors. Notwithstanding any other provision of these procedures, the Debtors, in consultation with AIX, shall have the right to modify any bidding or objection deadline described herein and the procedures to be used in any auction as set forth in these procedures.