

ENTERED
10/31/2014

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| | § | |
| BUCCANEER RESOURCES  LLC, *et al.*,[1] | § § | Case No. 14-60041 (DRJ) |
| | § | |
| Debtors. | § § | Jointly Administered |

---

**ORDER (A) AUTHORIZING AND APPROVING THE SALE OF ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND
OTHER INTERESTS, (B) APPROVING THE ASSET PURCHASE AGREEMENT,
(C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED
CONTRACTS AND (D) GRANTING RELATED RELIEF**
(Docket No. 424)

This matter is before the Court on the notice of successful bidder and motion (the "***Sale***

***Motion***") filed on October 27, 2014 by Buccaneer Resources, LLC and its above-captioned

affiliated debtors and debtors-in-possession (collectively, the "***Debtors***") for entry of an order

(this "***Order***") (a) authorizing and approving the sale (the "***Sale***") of the Assets[2] free and clear of

all liens, claims, Encumbrances and other interests of any kind or nature whatsoever (excluding

the Assumed Liabilities) pursuant to that certain Purchase and Sale Agreement (the

"***Agreement***"), in substantially the form attached as Exhibit A to this Order, by and among the

Debtors ("***Sellers***") and AIX Energy, LLC (together with any of its affiliates that are assignees

under the Agreement, the "***Purchaser***"); (b) approving the Agreement; (c) approving the

assumption and assignment of the Assumed Contracts; and (d) granting certain related relief; and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are:  (i) Buccaneer Energy Limited (0107); (ii) Buccaneer Energy Holdings, Inc. (7170); (iii) Buccaneer Alaska Operations, LLC (7562); (iv) Buccaneer Resources, LLC (8320); (v) Buccaneer Alaska, LLC (4082); (vi) Kenai Land Ventures, LLC (2661); (vii) Buccaneer Alaska Drilling, LLC (7781); (viii) Buccaneer Royalties, LLC (5015); and (ix) Kenai Drilling, LLC (6370).

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed in the Agreement and the Sale Motion, as applicable.  To the extent of any inconsistency, the Agreement shall govern.

the Court having entered the *Order (A) Approving Bid and Sale Procedures in Connection with Sale of Certain of the Debtors' Assets; (B) Scheduling a Sale Hearing; and (C) Granting Related Relief* on October 17, 2014 [Dkt. No. 442] (the "**Bid Procedures Order**"); and the Debtors having determined, after an extensive marketing process, that the Purchaser has submitted the highest or otherwise best bid for the Assets; and upon adequate and sufficient notice of the Sale Motion, the hearing before the Court on October 31, 2014 (the "**Sale Hearing**") and any other related transactions having been given in the manner directed by the Court pursuant to the Bid Procedures Order; and the Court having reviewed and considered (x) the Sale Motion and all relief related thereto, (y) the objections thereto, if any, and (z) the statements of counsel and evidence presented in support of the relief requested by the Debtors at the Sale Hearing; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates and creditors and other parties-in-interest; and upon the record of the Sale Hearing and all other pleadings and proceedings in these chapter 11 cases, including the Sale Motion; and after due deliberation thereon and good and sufficient cause appearing therefor, the Court hereby FINDS AND DETERMINES THAT:[3]

### Jurisdiction, Final Order and Statutory Predicates

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are incorporated herein to the extent not inconsistent herewith.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

4402311v2

Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

B.     The statutory predicates for the relief requested in the Sale Motion are sections 105(a), 363 and 365 of title 11 of the United States Code (the "***Bankruptcy Code***") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").

C.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable to this proceeding by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

**Notice of the Sale**

D.     Notice of the Sale Motion was provided to all known parties in interest, including (i) the Office of the United States Trustee for the Southern District of Texas; (ii) all known or alleged secured creditors; (iii) the Official Committee of Unsecured Creditors; (iv) AIX Energy, LLC; (v) all known shareholders of the Debtors; (vi) the Debtors and the Debtors' professionals; (vii) the United States Attorney's Office for the Southern District of Texas; (viii) the Australian Securities and Investments Commission; and (ix) the Internal Revenue Service; and (x) all persons or entities filing notices of appearance or requests for notice of the proceedings in these chapter 11 cases.

E.     Notice of the sale of the Debtors' assets and the Sale Hearing was reasonably calculated to provide all interested parties with timely and proper notice of the Sale and Sale Hearing.

3

4402311v2

F.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Sale Hearing, Sale and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assumed Contracts to the Purchaser, was provided in accordance with the orders previously entered by this Court, sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008.  The notices described herein were good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, Sale Hearing, Sale or the assumption and assignment of the Assumed Contracts to the Purchaser is or shall be required.

G.      The disclosures made by the Debtors concerning the Agreement, Sale Motion, Sale, assumption and assignment of the Assumed Contracts to the Purchaser and Sale Hearing were good, complete and adequate.

H.      A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion and the relief requested therein (including the assumption and assignment of the Assumed Contracts to the Purchaser and any Cure Costs related thereto), has been afforded to all interested persons and entities, including the Notice Parties.

**Good Faith of the Purchaser**

I.      The Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arms'-length bargaining positions.

J.      The Purchaser is not an "insider" or "affiliate" of the Debtors as those terms are defined in the Bankruptcy Code.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code.  Specifically, the Purchaser has not acted in a collusive manner with any person, and the aggregate price paid by the Purchaser for the Assets (the "***Purchase Price***") was not controlled by any agreement among the bidders.

4

K.      The Purchaser is purchasing the Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  The Purchaser proceeded in good faith in connection with all aspects of the Sale, including: (i) complying in all respects with the Bid Procedures Order; (ii) agreeing to subject its bid to the competitive bidding procedures set forth in the Bid Procedures Order; (iii) neither inducing nor causing the Debtors' chapter 11 filings; and (iv) disclosing all payments to be made by the Purchaser in connection with the Sale. Accordingly, the Purchaser is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

L.      With respect to any discussions or agreements entered into between the Purchaser and the Debtors' management or key personnel regarding compensation or future employment, the Purchaser has disclosed the material terms of any such agreements and the measures taken to ensure the fairness of the Sale in light of any such agreements.

**Highest or Otherwise Best Offer**

M.      The Purchaser submitted the highest and best offer for the Assets.  The Bidding Procedures obtained the highest value for the Assets for the Debtors and their estates.  No other entity or group of entities has offered to purchase the Assets for greater economic value to the Debtors' estates than the Purchaser.  The Debtors' determination that the Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.

**No Fraudulent Transfer**

N.      The consideration provided by the Purchaser pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Assets, (iii) will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative and (iv) constitutes reasonably equivalent value (as those terms are defined in each of the Uniform

4402311v2

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  No other person, entity or group of entities has offered to purchase the Assets for greater economic value to the Debtors' estates than the Purchaser.  The Debtors' determination that the Agreement constitutes the highest or otherwise best offer for the Assets constitutes a valid and sound exercise of the Debtors' business judgment.  Approval of the Sale Motion and the Agreement, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtors, their estates, creditors and other parties-in-interest.

O.     The Purchaser is not a mere continuation of any of the Debtors or their estates and there is no continuity of enterprise between the Purchaser and any of the Debtors.  The Purchaser is not holding itself out to the public as a continuation of any of the Debtors.  The Purchaser is not a successor to any of the Debtors or their estates and the Sale does not amount to a consolidation, merger or de facto merger of Purchaser and any of the Debtors.

## Purchase Price Allocation

P.     Other than with respect to the Sale, neither the payment of the Purchase Price nor the allocation thereof are binding on the Court or creditors.

## Validity of Transfer

Q.     The Debtors have (i) full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (ii) all corporate authority necessary to consummate the transactions contemplated by the Agreement and (iii) taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in

the Agreement, are required for the Debtors to consummate the Sale, Agreement or transactions contemplated thereby.

R.      The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtors nor the Purchaser are fraudulently entering into the transaction contemplated by the Agreement.

S.      The Debtors have good and marketable title to the Assets and are lawful owners of the Assets.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Assets to the Purchaser will be, as of the closing of the transactions contemplated by the Agreement (the "*Closing Date*"), a legal, valid and effective transfer of the Assets, which transfer vests or will vest the Purchaser with all right, title, and interest of the Sellers to the Assets free and clear of (i) all liens, claims and encumbrances (including any right of first offer or refusal regarding or option to purchase any real property) relating to, accruing or arising any time prior to the Closing Date (collectively, the "*Liens*") and (ii) all debts arising under, relating to or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims (defined below) and Liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, the Debtors' or the Purchaser's interests in the Assets, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal,

7

charges of interests of any kind or nature, if any, including, without limitation, any restriction of use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, as defined in this clause (ii), "*Claims*"), relating to, accruing or arising any time prior to the Closing Date, with the exception of Assumed Liabilities or as expressly provided in this Order.

### Section 363(f) Is Satisfied

T.      The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Assets free and clear of any interest in the Assets.

U.      The Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby if the Sale and the assumption of liabilities and obligations as set forth in the Agreement by the Purchaser were not free and clear of all Liens, Claims and other interests of any kind or nature whatsoever (other than the Assumed Liabilities or as otherwise provided in this Order).  Unless otherwise expressly included in the Assumed Liabilities (or as otherwise provided in this Order), the Purchaser shall not be responsible for any Liens or Claims, including in respect of the following: (i) any labor or employment agreements; (ii) all mortgages, deeds of trust and security interests; (iii) intercompany loans and receivables between any of the Debtors and any non-debtor subsidiary; (iv) any pension, health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor to which the Debtor has at any time contributed to or had any liability or potential liability; (v) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the

4402311v2

Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state law (collectively, "*COBRA*"), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (vi) Claims or Liens arising under any Environmental Laws with respect to any assets owned or operated by any Debtor or any corporate predecessor of any Debtor at any time prior to the Closing Date and any of the Debtors' liabilities other than the Assumed Liabilities; (vii) any bulk sales or similar law; (viii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (ix) any Excluded Liabilities.

V.      Not selling the Assets free and clear of all Liens, Claims and other interests of any kind or nature whatsoever against the Debtors (except the Assumed Liabilities and except as otherwise provided in this Order) would adversely impact the Debtors' estates, and the sale of the Assets other than one free and clear of all Liens, Claims and other interests of any kind or nature whatsoever against the Debtors (except the Assumed Liabilities and except as otherwise provided in this Order) would be of substantially less value to the Debtors' estates.

W.      The Debtors may sell the Assets free and clear of all Liens, Claims and other interests of any kind or nature whatsoever against the Debtors, their estates or any of the Assets (except the Assumed Liabilities and except as otherwise provided in this Order) because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has

4402311v2

been satisfied.  Those holders of Liens or Claims against the Debtors, their estates or any of the Assets who did not object or who withdrew their objections to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

**Compelling Circumstances for an Immediate Sale**

X.      Good and sufficient reasons for approval of the Agreement and the Sale have been articulated.  The relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest.  The Debtors have demonstrated (i) good, sufficient and sound business purposes and justifications for approving the Agreement and (ii) compelling circumstances for the Sale outside of (a) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates and the Sale will provide the means for the Debtors to maximize distributions to their creditors.

Y.      Given all of the circumstances of these chapter 11 cases and the adequacy and fair value of the Purchase Price under the Agreement, the proposed Sale constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

Z.      The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford.  The Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtors.

AA.     The Debtors, in connection with offering products or services, did not disclose any policy prohibiting the transfer of personally identifiable information and, therefore, the sale of the Assets may be approved pursuant to section 363(b)(1)(A) of the Bankruptcy Code without

10

the appointment of a consumer privacy ombudsman as defined in Bankruptcy Code section 363(b)(1).

BB.    The consummation of the Sale and the assumption and assignment of the Assumed Contracts is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), and 365 thereof.

<b>Adequate Assurance of Future Performance</b>

CC.    The Purchaser has demonstrated adequate assurance of future performance with respect to the Assumed Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

<b>General Provisions</b>

1.    The relief requested in the Sale Motion, including the Sale, is granted and approved to the extent set forth in this Order.

2.    Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise (except the reservations of right and objections expressly preserved in this Order), are hereby denied and overruled with prejudice.  Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

<b>Approval of the Agreement</b>

3.    The Agreement as modified by this Order and all of the terms and conditions thereof are hereby approved.

11

4402311v2

4.      The sale of the Assets and the consideration provided by the Purchaser under the Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (i) consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement, (ii) close the Sale as contemplated in the Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement and fully close the Agreement, including the assumption and assignment of the Assumed Contracts to the Purchaser, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale.  The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other Sale-related document.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

6.      This Order shall be binding in all respects upon (a) the Debtors, (b) their estates, (c) all creditors of, and holders of equity interests in, the Debtors, (d) all holders of Liens, Claims or other interests (whether known or unknown) in, against or on all or any portion of the Assets, (e) the Purchaser and all successors and assigns of the Purchaser, (f) the Assets and (g) any trustees, if any, subsequently appointed in the Debtors' chapter 11 cases or upon a conversion of these cases to cases under chapter 7 under the Bankruptcy Code.  This Order and the Agreement

12

shall inure to the benefit of the Debtors, their estates and creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

**Transfer of the Assets**

7.        Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer the Assets to the Purchaser on the Closing Date and such transfer shall (a) constitute a legal, valid, binding and effective transfer of the Assets, (b) vest the Purchaser with title to the Assets and (c) upon the Debtors' receipt of the Purchase Price, be free and clear of all Liens, Claims and other interests of any kind or nature whatsoever (other than Assumed Liabilities and as otherwise provided in this Order), including but not limited to, successor or successor-in-interest liability and Claims, with such Liens, including mechanics, materialmen and subcontractor Liens and rights to receive payment of trust funds, Claims and other interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Assets.  Upon the closing of the Sale (the "***Closing***"), the Purchaser shall take title to and possession of the Assets subject only to the Assumed Liabilities and any interests expressly provided for in this Order.

8.        Except with respect to Assumed Liabilities and any interests expressly provided for in this Order, all persons and entities that are in possession of some or all of the Assets on the Closing Date are directed to surrender possession of such Assets to the Purchaser or its assignee at the Closing.  The provisions of this Order authorizing the sale of the Assets free and clear of Liens, Claims and other interests of any kind or nature whatsoever (other than the Assumed Liabilities and any interests expressly provided for in this Order) shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order.

4402311v2

9.      The Debtors are hereby authorized to take any and all actions necessary to consummate the Agreement, including any actions that otherwise would require further approval by shareholders or any of the Debtors' boards of directors or boards of managers, as the case may be, without the need of obtaining such approvals.

10.      A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any liens and other encumbrances of record except with respect to Assumed Liabilities or any interests expressly provided for in this Order.

11.      If any person or entity which has filed statements or other documents or agreements evidencing Liens on, or interests in, all or any portion of the Assets (other than statements or documents with respect to any Assumed Liabilities or interests expressly provided for in this Order) shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements and any other documents necessary for the purpose of documenting the release of all liens or interests which the person or entity has or may assert with respect to all or any portion of the Assets, the Debtors are hereby authorized and directed, and the Purchaser is hereby authorized, on behalf of the Debtors and each of the Debtors' creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets.

12.      On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Sellers' interests in the Assets.  This Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims and other interest of any kind or nature whatsoever existing as to the Assets prior to the Closing Date, other than Assumed Liabilities or as otherwise provided in

4402311v2

this Order, shall have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement.

13.     Notwithstanding anything to the contrary contained herein, the Sale shall be subject to any overriding royalties related to the Assets (collectively, the "ORRIs"), unless such ORRI was not previously and properly recorded of record and/or approved by the State of Alaska, Department of Natural Resources, the Mental Health Trust or any other Alaskan state agency. Any of the Debtors and Sellers claims, rights, causes of action or defenses related to the ORRIs shall be transferred to the Purchaser pursuant to the Agreement and any claims, rights, causes of action or defenses of ER Alaska, LLC regarding asserted ORRIs are preserved.

14.     To the greatest extent available under applicable law, the Purchaser shall be authorized, as of the Closing Date, to operate under any (i) federal, state, or local governmental or regulatory license, permit, registration, and (ii) governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations and governmental

4402311v2

authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Purchaser as of the Closing Date.

15.     To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of the Debtors' chapter 11 cases or the consummation of the transactions contemplated by the Agreement.  Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order.

16.     The Sale shall not alter or amend the rights of the State of Alaska Department of Natural Resources ("***DNR***") with respect to (a) any production from the KL 1-1 and KL 1-3 wells or the proceeds of such production, or (b) the rights of DNR with respect to the Alaska Oil and Gas Conservation Commission Order 691 dated May 22, 2014.  Without further order of this Court, the automatic stay of the "DNR Dispute," as defined in Section 3.3 of the Agreement, shall terminate 30 days following the entry of this Order.

17.     The Sale shall not include any credits owed by the State of Alaska under the Alaska Clear and Equitable Share Act which are subject to the liens and security interests of the Alaska Industrial Development and Export Authority ("AIDEA").

18.     Notwithstanding anything in this Order or the Purchase and Sale Agreement to the contrary, Macquarie Bank Limited's rights to and interests in the funds on deposit in the cash cover account of Buccaneer Resources, LLC at Macquarie Bank Limited with account number ending in xxxx3425 and any interest earned thereon shall be preserved. Further, regarding Macquarie Bank Limited, in the event that any term or provision of this Order contradicts any

16

term or provision of the Order Approving Joint Emergency Motion to Compromise Controversy under Rule 9019 of the Federal Rule of Bankruptcy Procedure (the "Compromise Order") [Dkt No. 346], the terms and provisions of the Compromise Order shall govern and control.

### Terms Relating to CIRI

19.    In approving the Agreement and the Sale Motion, the Court specifically notes (i) the provisos in Section 1.2(f) of the Agreement with respect to (A) the rights and interests of Cook Inlet Region Inc. ("**CIRI**") with respect to any production  from the KL 1-1 and KL 1-3 Wells and the proceeds of such production, and (B) the rights or obligations of the Sellers, Purchaser, or CIRI with respect to the Alaska Oil and Gas Conservation Commission Conservation (the "**AOGCC**") Order 691 dated May 22, 2014 (the "**Escrow Order**"), and (ii) the Purchaser's acknowledgment of certain disputes in Section 3.3 of the Agreement relating to the "Alaska Litigation and Administrative Proceedings." Nothing in this Order is intended to or shall contradict or supersede such terms of the Agreement.

20.    As between Purchaser and CIRI, notwithstanding any other provision of this Order to the contrary and  notwithstanding the free and clear language of 363(f), Purchaser and CIRI shall retain all of their respective rights, obligations, claims and defenses with respect to (i) the Lease identified as Alaska Department of Land Number C-061667 (the "**CIRI Lease**"); (ii) the lands covered thereby or pooled, unitized communitized or consolidated therewith (the "**CIRI Lands**"); (iii) any other lands owned by CIRI included in any other lease descriptions (including but not limited to the property described as "T. 6N, R. 11 W., Seward Meridian, Alaska, Section 33 W1/2SW1/4SE1/4, 20.00 acres" (the "**CIRI Exception**")); (iv) any Hydrocarbons or inventories of Hydrocarbons produced from or attributable to, the CIRI Lands, the CIRI Exception, or the KL-1 and KL-3 Wells or any proceeds of such production; (v) any

17

restricted cash and any right in such cash which has been set aside, reserved or placed in escrow by the Sellers in connection with the CIRI Litigation; and (vi) the Seismic Land Use Permit dated as of March 5, 2012 by and between CIRI and Buccaneer Alaska, LLC, and any data, documents, information, or related material (the "**CIRI Seismic Permit**").   Nothing herein effects the validity, priority, or extent of the proofs of claim filed by CIRI in the Debtors' Bankruptcy Cases.

21.     Additionally, notwithstanding any other provisions to the contrary, nothing in this Order shall constitute a finding by the Court under Section 365 of the Bankruptcy Code or otherwise with respect to: (i) whether the CIRI Lease and CIRI Seismic Permit are "executory contracts or unexpired leases;" (ii) whether the CIRI Lease and CIRI Seismic Permit are amenable to assumption or rejection or assumption and assignment; (iii) the "cure amount" due and owing to CIRI, if any, under the CIRI Lease and CIRI Seismic Permit; and (iv) whether the Debtors and AIX have or have not provided CIRI with "adequate assurance of future performance" of the obligations due to CIRI under the CIRI Lease and CIRI Seismic Permit. Notwithstanding the foregoing, Seller's rights related to the CIRI Lease, the CIRI Lands, the CIRI Exception, the related hydrocarbons and the CIRI Seismic Permit, which rights CIRI disputes, are being assigned to the Purchaser pursuant to the Agreement.

**Prohibition of Actions Against the Purchaser**

22.     Except for the Assumed Liabilities, or as otherwise expressly provided for in this Order or the Agreement, the Purchaser shall not have any liability or other obligation of any of the Debtors arising under or related to any of the Assets, and the Purchaser is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates under any theory of law or equity.  Without limiting the

4402311v2

generality of the foregoing, and except as otherwise specifically provided herein or in the Agreement, the Purchaser shall not be liable for any Claims against any of the Debtors or any of their respective predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, successor or successor employer liability (including any obligations pursuant to COBRA) with respect to any employee benefit plan as defined in Section 3(3) of ERISA, de facto merger or joint venture, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, intercompany loans and receivables between any of the Debtors and any non-debtor subsidiary, liabilities relating to or arising from any environmental laws, and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing.

23.     Except for the Assumed Liabilities, or as otherwise expressly provided for in this Order or the Agreement, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Liens, Claims or other interests of any kind or nature whatsoever against or in all or any portion of the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to any of the Debtors, the Assets, the operation of any of the Debtors' businesses prior to the Closing Date or the transfer of the Assets to the Purchaser, hereby are forever barred,

4402311v2

estopped and permanently enjoined from asserting against the Purchaser, any of its affiliates, any of the foregoing's successors, assigns, assets or properties or the Assets, such persons' or entities' Liens, Claims or interests in and to the Assets, including, without limitation, the following actions:  (a) commencing or continuing in any manner any action or other proceeding against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, assets or properties; (c) creating, perfecting or enforcing any Lien or other Claim against the Purchaser, any of its affiliates or any of the foregoing's successors, assigns, assets or properties; (d) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser, any of its affiliates or any of the foregoing's successors or assigns; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order, other orders of the Court or the Agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Assets or conduct any of the businesses operated with the Assets.

24.     On the Closing Date, or as soon as possible thereafter, each creditor is authorized and directed, and the Purchaser is hereby authorized, on behalf of each of the Debtors' creditors, to execute such documents and take all other actions as may be necessary to release Liens, Claims and other interests  in or on the Assets (except Assumed Liabilities or as otherwise provided in this Order), if any, as provided for herein, as such Liens, Claims and interests may have been recorded or may otherwise exist.

4402311v2

25.     The Debtors are authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by the applicable business corporation, trust and other laws of the applicable governmental units, including for the change of the Debtors' corporate names, with respect to the implementation and consummation of the Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

26.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of any of the Debtors to sell and transfer the Assets to the Purchaser in accordance with the terms of the Agreement and this Order.

27.     The Purchaser has given substantial consideration under the Agreement for the benefit of the Debtors, their estates and creditors.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential Claims and Liens pursuant to the Order, which releases shall be deemed to have been given in favor of the

4402311v2

Purchaser by all holders of Liens against, interests in or Claims against any of the Debtors or any of the Assets other than holders of Liens or Claims relating to Assumed Liabilities or as otherwise provided in this Order.  The consideration provided by the Purchaser for the Assets under the Agreement is fair and reasonable and accordingly the purchase may not be avoided under section 363(n) of the Bankruptcy Code.

28.     Effective as of the Closing, the Purchaser, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf of and for the benefit of the Purchaser, its successors and assigns, for any purpose as provided in the Agreement as amended by this Order, including for the following purposes:  to demand and receive any and all of the Assets and to give receipts and releases for and in respect of the Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Purchaser, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Assets, and to do all acts and things with respect to the Assets which the Purchaser, its successors and assigns, shall deem desirable.  The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

### Assumption and Assignment of Assumed Contracts

29.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Sale, the applicable Debtor's assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Agreement as modified by this Order, of the Assumed Contracts is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

22

30.     The Debtors are hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date, the Assumed Contracts free and clear of all Claims, Liens or other interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts to the Purchaser.

31.     The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such assignment to and assumption by the Purchaser, except as provided in the Agreement.

32.     Nothing in this Order or the Agreement releases the Purchaser from compliance with any applicable license, permit, registration, authorization, or approval, in each case, of or with respect to a governmental unit.  The Purchaser shall continue to honor and comply with the terms and requirements of any such applicable license, permit, registration, authorization, or approval.

33.     All defaults or other obligations of any of the Debtors under the Assumed Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured pursuant to the terms of the Agreement on the Closing Date or as soon thereafter as reasonably practicable.

4402311v2

34.     With respect to objections to any Cure Amounts that remain unresolved as of the Sale Hearing, such objections shall be resolved by a future Court hearing to be set at the request of the Debtors, the Purchaser and/or the respective counterparty, provided that, the Purchaser may remove any Assumed Contract in its sole discretion within 10 days of any Court resolution regarding disputed Cure Amounts.

35.     Nothing in this Order, the Sale Motion or in any notice or any other document is or shall be deemed an admission by the Debtors that any contract is an executory contract and/or unexpired lease or must be assumed and assigned pursuant to the Agreement or in order to consummate the Sale.

36.     The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such term(s) or condition(s) or of the Debtors' and Purchaser's rights to enforce every term and condition of such Assumed Contract.

37.     All parties to the Assumed Contracts are forever barred and enjoined from raising or asserting against the Purchaser any assignment fee, default, breach, Claim, pecuniary loss or condition to assignment arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing, except for any amounts that are Assumed Liabilities or as otherwise provided in this Order.

**Other Provisions**

38.     This Order, the Agreement shall be binding in all respects upon all creditors and equity-holders of any of the Debtors, all non-debtor parties to the Assumed Contracts, all successors and assigns of any of the Debtors and any of their respective affiliates and subsidiaries and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Debtors' bankruptcy cases or upon a conversion of such cases to cases under chapter 7 of the

4402311v2

Bankruptcy Code in accordance with the Bankruptcy Code and other applicable law.   The Agreement shall not be subject to rejection or avoidance under any circumstances.

39.     The Agreement may be modified, amended, or supplemented by the parties thereto in a writing signed by the parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

40.     Except to the extent expressly included in the Assumed Liabilities, the Purchaser and its affiliates shall have no liability, obligation or responsibility under the Comprehensive Environmental Response Compensation and Liability Act, or any foreign, federal, state or local labor, employment or Environmental Law by virtue of the Purchaser's purchase of the Assets or assumption of the Assumed Liabilities.

41.     The consideration provided by the Purchaser to the Debtors pursuant to the Agreement for the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

42.     Except for the Assumed Liabilities, or as otherwise expressly provided for in this Order or the Agreement, the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates, including, but not limited to, any bulk sales or similar law, successor liability, antitrust law, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter raised, which may be asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors, or any of their predecessors or affiliates or any

4402311v2

obligations of the Debtors or their predecessors or affiliates arising prior to the Closing Date, for any liabilities, debts, commitments or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise) in any way whatsoever relating to or arising from the Assets or the Debtors' operation of their businesses or use of the Assets on or prior to the Closing Date including, but not limited to, any liabilities, debts, commitments or obligations arising on or prior to the Closing and under or in connection with:   (a) any employment or labor agreements (including any collective bargaining agreements), consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtors are a party; (b) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors; (c) the cessation of the Debtors' operations, dismissal of employees or termination (including rejection) of employment or labor agreements (including any collective bargaining agreements) or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to applicable law; (d) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims; (e) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing; (f) any liabilities, debts, commitments or obligations of, or required to be paid by, the Debtors for any taxes of any kind for any period; (g) any liabilities, debts, commitments or obligations for any taxes relating to the business of the Debtors or the Assets for or applicable to the pre-closing period; (h) any litigation; (i) any products liability, other tort or similar claims, whether pursuant to any state or any federal law; and (j) any excluded liabilities, if any, in the Agreement.   The Purchaser has given substantial consideration under the Agreement for the benefit of the holders of any Liens.   The consideration

4402311v2

given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of Liens against or interests in the Debtors or any of the Assets.

43.     Nothing in this Order or the Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order, and the Purchaser reserves all rights and defenses other than asserting that it is free of such liability on account of this Order with respect to any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Order.  Notwithstanding the foregoing sentence, nothing in this Order shall be interpreted to impose liability on the Purchaser for penalties or other costs for days of violation prior to entry of this Order under environmental laws or regulations or otherwise or shall constitute an admission of liability by the Purchaser under environmental laws or regulations.

44.     The transactions contemplated by the Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and such Sale are duly stayed pending such appeal.  The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

45.     In accordance with the Bid Procedures Order, the Purchaser is the Successful Bidder and Cook Inlet Energy, LLC submitted the Back-Up Bid.  In the event that the Purchaser fails to close pursuant to the Agreement, the Debtors shall file a new sale motion – which hearing may be sought on an expedited basis – seeking to approve the sale to the Back-Up Bidder..

46.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 cases into which these chapter 11 cases may be converted or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Agreement (as modified by this Order) or the terms of this Order.

47.     Nothing contained in this Order is intended to alter, amend or modify this Court's prior Order Approving Joint Emergency Motion to Compromise Controversy under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "***Compromise Order***") [Dkt. No. 346] entered on September 2, 2014, and in the event that any term or provision of this Order contradicts any term or provision of the Compromise Order, the terms and provisions of the Compromise Order shall govern and control.

48.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

49.     The failure to specifically include any particular provision of the Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Agreement be authorized and approved in its entirety; *provided*, *however*, that this Order shall govern if there is any inconsistency between the Agreement (including all Ancillary Agreements) and this Order.  Likewise, all of the provisions of this Order are non-severable and mutually dependent.

4402311v2

50.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which any Debtor is a party or which has been assigned by any Debtor to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Purchaser, (b) interpret, implement and enforce the provisions of this Order, (c) protect the Purchaser against any Liens, Claims or other interest in or against any of the Debtors or the Assets of any kind or nature whatsoever attaching to the proceeds of the Sale and (d) enter any orders under section 363 or 365 of the Bankruptcy Code with respect to the Assumed Contracts.

51.     Any amounts payable by any of the Debtors under the Agreement, the Bid Procedures Order or any of the documents delivered by any of the Debtors in connection with the Agreement or the Bid Procedures Order shall be paid in the manner provided in the Agreement or the Bid Procedures Order, without further order of this Court, shall be allowed administrative claims in an amount equal to such payments in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections provided in the Bid Procedures Order, and shall not be discharged, modified or otherwise affected by any reorganization plan for any of the Debtors, except by an express written agreement of the Purchaser or its successors or assigns. For purposes of clarification, this Order authorizes payment of claims by the Debtors only as expressly set forth in this Order, under the Agreement, or under the Bid Procedures Order.

52.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

4402311v2

53.     This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(g), 6004(h), 6006(d), 7062, 9014 or otherwise.  The Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Order.

54.     Other than the Compromise Order referenced above, to the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in these chapter 11 cases, the terms of this Order shall govern.

55.     The Court shall conduct a status conference on November 17, 2014 at 3:30 p.m.

56.     In the event that AIX fails to close the Sale as contemplated in the Agreement and this Order, the Court shall hold a hearing on December 2, 2014 at 2:00 p.m.


        **Signed:  October 31, 2014.**


                                                  _____

                                                  **DAVID R. JONES**
                                                  **UNITED STATES BANKRUPTCY JUDGE**

Exhibit A

PURCHASE AND SALE AGREEMENT

BETWEEN

BUCCANEER RESOURCES, LLC, , BUCCANEER ENERGY HOLDINGS, INC.,
BUCCANEER ALASKA OPERATIONS, LLC, BUCCANEER ALASKA, LLC, KENAI
LAND VENTURES, LLC, BUCCANEER ALASKA DRILLING, LLC, , AND KENAI
DRILLING, LLC

Debtors-in-Possession,

AS SELLERS

AND

AIX ENERGY, LLC

AS PURCHASER

Executed on October 27, 2014

<u>**PURCHASE AND SALE AGREEMENT**</u>

This Purchase and Sale Agreement (the "**Agreement**"), is executed on October 27, 2014, by and among Buccaneer Resources, LLC, a Texas limited liability company, , Buccaneer Energy Holdings, Inc., a Delaware corporation, Buccaneer Alaska Operations, LLC, an Alaska limited liability company, Buccaneer Alaska, LLC, a Texas limited liability company, Kenai Land Ventures, LLC, an Alaska limited liability company, Buccaneer Alaska Drilling, LLC, an Alaska limited liability company, , and Kenai Drilling, LLC, an Alaska limited liability company (each a "**Seller**" and collectively, the "**Sellers**"), and AIX Energy LLC, a Delaware limited liability company ("**Purchaser**").  Each Seller and Purchaser may hereinafter be referred to as a "**Party**" or collectively as the "**Parties**."

**RECITALS:**

On May 31, 2014 (the "**Petition Date**"), Sellers filed voluntary petitions for relief under Chapter 11 of the U.S. Bankruptcy Code ("**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division (the "**Bankruptcy Court**") captioned In re: *BUCCANEER RESOURCES, LLC, et al.*, Chapter 11, Case No. 14-60041 (DRJ) (Jointly Administered) (the "**Bankruptcy Case**");

Each Seller, as debtor and debtor-in-possession, has continued in the possession of such Seller's Assets (defined below) and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code; and

Each Seller, subject to Bankruptcy Court approval and the terms and conditions within this Agreement, desires to sell to Purchaser the Assets pursuant to the terms and conditions of this Agreement and Purchaser desires to so purchase and acquire such Assets from Sellers in accordance with Section 105, 363 and 365 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the premises and of the mutual promises, representations, warranties, covenants, conditions and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound by the terms hereof, agree as follows:

<u>**ARTICLE 1**</u>
<u>**PURCHASE AND SALE**</u>

**Section 1.1**     <u>**Purchase and Sale.**</u>

At the Closing, and upon the terms and subject to the conditions of this Agreement, each Seller agrees to sell and convey to Purchaser and Purchaser agrees to purchase, accept and pay for the Assets.  Capitalized terms used herein shall have the meanings ascribed to them in this Agreement as such terms are identified and/or defined in Appendix I attached hereto and made part hereof.

**Section 1.2**     <u>**Assets.**</u>

As used herein, the term "**Assets**" means, all of Sellers' right, title, interest and estate,

1

real or personal, recorded or unrecorded, movable or immovable, tangible or intangible, in and to the following, excluding, however, the Excluded Assets:

(a)      All of the oil and gas leases; oil, gas and mineral leases; subleases and other leaseholds; carried interests; mineral fee interests; overriding royalty interests; reversionary rights, farmout rights (excluding the NCI Farmout); options; and other properties and interests described on Exhibit A, subject to such depth limitations and other limitations and restrictions set forth on Exhibit A or referenced in the instruments that constitute (or are in the chain of title to) the foregoing properties and interests (collectively, the "**Leases**"), together with each and every kind and character of right, title, claim, and interest that Sellers have in and to the Leases, the lands covered by the Leases or the lands pooled, unitized, communitized or consolidated therewith (such lands covered by the Leases or pooled, unitized, communitized or consolidated therewith being hereinafter referred to as the "**Lands**");

(b)      All oil, gas, water, or injection wells and salt water disposal wells located on the Lands, whether producing, shut-in, plugged, or abandoned, and including the wells shown on Exhibit A-1 attached hereto (the "**Wells**");

(c)      Any pools or units which include any portion of the Lands, Leases or Wells, including those pools or units shown on Exhibit A-1 (the "**Units**"), and including all interest of Sellers in Hydrocarbon production from any such Unit, whether such Unit Hydrocarbon production comes from Wells located on or off of a Lease, and all tenements, hereditaments and appurtenances belonging to the Leases, Lands and Units, such Units together with the pooled Leases, Lands and Wells, or in cases when there is no Unit, the Leases together with the Lands and Wells, being hereinafter referred to collectively as the "**Properties**" and individually as a "**Property**");

(d)      All contracts, leases, agreements, instruments, easements, permits, licenses, servitudes, rights-of-way, surface leases and other surface rights appurtenant to the Properties identified on Schedule 1.2(d), which may be supplemented and/or amended no less than five (5) days after the entry of the Sale Order (hereinafter collectively referred to as the "**Contracts**"), it being contemplated that any such contracts not identified on Schedule 1.2(d) may be rejected as part of the Sellers' Bankruptcy Case;

(e)      All equipment, machinery, fixtures and other tangible personal property and improvements located on the Properties and used or held for use in connection with the operation of the Properties, including any wells, tanks, boilers, buildings, fixtures, injection facilities, saltwater disposal facilities, compression facilities, pumping units and engines, flow lines, pipelines, gathering systems, gas and oil treating facilities, metering and flow equipment, power lines, telephone lines, cellular and telecommunications equipment, on site computer and monitoring equipment, fences, winterization equipment, all equipment, furniture and fixtures in the Kenai field office associated with operating the Wells or the Property, and other appurtenances, improvements and facilities, but excluding the items expressly identified on Exhibit A-2 (subject to such exclusions, the "**Equipment**");

(f)      All Hydrocarbons produced from or attributable to the Properties prior to, on or after the Effective Time; and all inventories of Hydrocarbons produced from or attributable to the Properties that are in storage in tanks or pipelines for any period prior to, on or after the Effective Time; provided that nothing herein shall alter or amend (i) the rights and interests of Cook Inlet Region, Inc. ("**CIRI**") with respect to any production from the KL 1-1 and KL 1-3 wells or the proceeds of such production, and (ii) the rights or obligations of the Sellers, Purchaser, or CIRI with respect to the Alaska Oil and Gas Conservation Commission Conservation (the "**AOGCC**") Order 691 dated May 22, 2014;

(g)      All restricted cash and any rights in such cash which has been set aside, reserved or placed in escrow by the Sellers in connection with the CIRI Litigation (or to the State of Alaska in connection with the claims made by CIRI, DNR and/or TLO) (the "**CIRI Reserves**");

(h)      All Imbalances;

(i)      All lease files; land files; personnel and employment files; well files; gas and oil sales contract files; gas processing files; division order files; abstracts; title opinions; land surveys; non-confidential logs; maps; engineering data and reports; and files and all other books, records, data, files, maps and accounting records to the extent related to the Assets, or used or held for use primarily in connection with the maintenance or operation thereof, including any books, records, data, including seismic and geophysical data either in raw or interpreted form and related licenses to software and related work stations to process the data, files, maps and accounting records related to the Properties (the "**Records**");

(j)      To the extent assignable without the payment of fees, unless Purchaser agrees to, and does pay such fees, all geologic, geophysical, engineering field studies and other seismic and related technical data and information;

(k)      All right, title and interest of Sellers in and to vehicles owned by Sellers and primarily used in connection with the operation of Properties or Equipment;

(l)      Certificates of deposits, cash on hand, cash in banks or investment accounts, restricted cash, credits, tax refunds, refunds of deposits, refunds of bond premiums and the unused portion of any cash cover accounts, certificates of deposit or collateral securing a surety bond or letter of credit, consents, bonds, transferable insurance policies related to the Properties and transferrable bonds, letters of credit and guarantees, including but not limited to, those listed on Schedule 1.2(l), and any and all other amounts not included as Available Cash Collateral (as defined in the Settlement Order); and

(m)      Investment property, instruments, chattel paper, patents, copyrights, trademarks, causes of action (only to the extent that such cause of action relates to an Asset acquired by Purchaser under this Agreement, and specifically excluding those causes of action being transferred to the Liquidating Trust pursuant to the Order

Approving Joint Emergency Motion to Compromise Controversy Under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Settlement Order**"), and other general intangibles, and all products and proceeds thereof.

**Section 1.3     Excluded Assets.**

Notwithstanding the foregoing, the Assets shall not include, and there is excepted, reserved and excluded from the purchase and sale contemplated hereby (collectively, the "**Excluded Assets**"):

(a)     (i) all corporate, partnership, limited liability company, financial, income and franchise tax and legal records of Sellers that relate to Sellers' business generally, (ii) all books, records and files that relate to the Excluded Assets, (iii) those records, files and contracts retained by Sellers pursuant to Section 1.2 and (iv) copies of any other records retained by Sellers pursuant to Section 1.5;

(b)     bonds, letters of credit and guarantees retained by Sellers pursuant to Section 12.6;

(c)     the items expressly identified on Exhibit A-2;

(d)     any asset (whether real or personal) not identified as an Asset pursuant to Section 1.2, including, without, limitation, any contract not specifically included on Schedule 1.2(d);

(e)     Sellers' principal office and office lease located at One Riverway, 777 S. Post Oak Lane, Suite 1700, Houston, TX 77056, and all owned computers, phones, office supplies, furniture and related personal effects not related to operation of the Properties;

(f)     all correspondence, reports, analyses and other documents relating to the transaction contemplated hereby prior to the Effective Time, whether internal, with or produced by other prospective purchasers or third parties in respect of such transaction;

(g)     all documents and instruments of Sellers that may be protected by an attorney-client privilege;

(h)     except for those causes of action which relate to an Asset acquired by Purchaser under this Agreement, all other causes of action of Sellers, including without limitation: (i) actions under Chapter 5 of the Bankruptcy Code, (ii) commercial tort claims, (iii) the Archer Litigation and (iv) claims against Directors and Officers of the Sellers;

(i)     the NCI Farmout; and

(j)     any amounts constituting Available Cash Collateral (as defined in the Settlement Order).

4

**Section 1.4      Effective Time; Proration of Costs and Revenues; Return of Professionals' Carve Out.**

(a)      Possession of the Assets shall be transferred from Sellers to Purchaser at the Closing, but certain financial benefits and obligations of the Assets shall be transferred effective as of 12:01 A.M., local time, where the respective Assets are located, on October 1, 2014 (the "**Effective Time**").

(b)      Purchaser shall be entitled to all production from or attributable to the Properties arising prior to, on and after the Effective Time (and all products and proceeds attributable thereto), and to all other income, proceeds, receipts and credits earned with respect to the Assets arising prior to, on and after the Effective Time, including, without limitation, any proceeds of production currently held in suspense.

(c)      All Property Costs incurred in the operation of the Properties before the Effective Time, other than any cure costs assumed by Purchaser hereunder, shall be borne and paid by Sellers (and Purchaser shall have no liability relating to such Property Costs), and all Property Costs incurred in the operation of such Properties from and after the Effective Time shall be borne and paid by the Purchaser.  As used herein, "**Property Costs**" means (i) all costs attributable to the ownership or operation of the Assets (including costs of insurance and ad valorem, property, severance, production and similar Taxes based upon or measured by the ownership or operation of the Assets or the production of Hydrocarbons therefrom, but excluding any other Taxes), (ii) capital expenditures incurred in the ownership or operation of the Assets in the ordinary course of business, (iii) where applicable, such costs and capital expenditures charged in accordance with the relevant operating agreement, unit agreement, pooling agreement, pre-pooling agreement, pooling order or similar instrument, or if none, charged to the Assets on the same basis as charged on the date of this Agreement, and (iv) overhead costs charged to the Assets under the relevant operating agreement, unit agreement, pooling agreement, pre-pooling agreement, pooling order or similar instrument by unaffiliated third parties, or if none, charged to the Assets on the same basis as charged on the date of this Agreement.

**Section 1.5      Delivery and Maintenance of Records**.

(a)      Sellers shall deliver the Records in Sellers' possession or control to Purchaser within ten (10) business days following Closing, in the format in which those Records are maintained in the ordinary course of business.  Sellers may retain copies of any Records.

(b)      Purchaser, its successors or assigns shall preserve the Records for a period of one year after the Closing, or for such longer period (a) as is required by any applicable Law, (b) as is ordered by any Court of competent jurisdiction, or (c) during which there is an ongoing audit or investigation of Sellers, their respective estates, or any successor thereto (collectively, the "Debtor Parties" and each, a "Debtor Party") with respect to such periods.  During such one-year period (as may be extended), Purchaser, its successors or assigns shall (x) keep such Records reasonably accessible, including

maintaining all computer hardware, software, and applications necessary to access such Records in a usable form, (y) not destroy or dispose of any Records without the prior written consent of the Debtor Parties, who shall include, but not be limited to, any Debtor Party, a chapter 11 trustee, a chapter 7 trustee, or a liquidating trustee, each acting on behalf of any Debtor Party (each, "Control Person"), and (z) permit any Control Person reasonable access to any Record upon request, including making any paper or electronic copies thereof at the respective Debtor Party's expense.  Records may be sought under this Section 1.5(b) for any reasonable purpose, including, without limitation, to the extent reasonably required in connection with the administration of the bankruptcy cases of any Debtor Party, any audit, accounting, tax matter, litigation matter, disclosure required by Law, or any other similar needs of any Control Person.

## ARTICLE 2
## PURCHASE PRICE

**Section 2.1    Purchase Price**.  The purchase price for the Assets shall be (a) $44,000,000 in the form of a credit against amounts owed by Sellers under the Existing Credit Agreements; and (b) any cure costs associated with Contracts to be assumed by Purchaser as an Asset (the "**Purchase Price**").

**Section 2.2    Adjustments to Purchase Price**.  The Purchase Price for the Assets shall not be subject to adjustment.  All Imbalances existing as of the Effective Time shall be assigned to Purchaser.

## ARTICLE 3
## SELLERS' TITLE

**Section 3.1    Conveyance**.  The conveyance of the Assets to be delivered by Sellers to Purchaser shall be substantially in the form of Exhibit B (the "**Conveyance**") and shall convey such Assets free and clear of all liens and encumbrances pursuant to Section 363 of the Bankruptcy Code.

**Section 3.2    Consents**.  Sellers shall use commercially reasonable efforts to identify, with respect to the Assets, holders of any required consents to assignment of any Assets, in addition to those certain required consents set forth on Schedule 3.2.  Sellers shall use commercially reasonable efforts to cause such consents to be obtained and delivered prior to Closing; provided, however, to the extent that such consents are not obtained and delivered prior to Closing, the Assets shall be transferred subject to such consents.  Purchaser shall cooperate with Sellers in seeking to obtain such consents.

**Section 3.3    Alaska Litigation and Administrative Proceedings.**

(a)    Purchaser acknowledges that certain disputes exist with regard to (i) CIRI and amounts asserted to be owed to it in connection with the use of and production of Hydrocarbons from certain of the Assets, as set forth in the CIRI Litigation, (ii) the State of Alaska's Department of Natural Resources ("**DNR**") for amounts and obligations allegedly owed to it in connection with DNR's Leases as well as Sellers' appeal of the DNR Division of Oil and Gas's decision denying formation of the Kenai Loop Unit (the

"**DNR Dispute**") and (iii) the impact of the CIRI Litigation and DNR Dispute on the interests of the State of Alaska's Mental Health Trust/Trust Lands Office ("**TLO**") in TLO's Leases.

(b)     In the event that no settlement is reached with CIRI, DNR and TLO in the above referenced disputes and proceedings that has been approved by the AOGCC, the Bankruptcy Court or any other court having jurisdiction over such disputes prior to the Closing, Purchaser agrees to acquire the Assets subject to any rights and/or claims that CIRI, DNR and/or TLO may have against such Assets.

## ARTICLE 4
## INTENTIONALLY OMITTED

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES

**Section 5.1     Disclaimers.**

(a)     WITH RESPECT TO THE ASSETS AND THE TRANSACTIONS CONTEMPLATED HEREBY (i) SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES, STATUTORY, EXPRESS OR IMPLIED, AND (ii) PURCHASER HAS NOT RELIED UPON, AND SELLERS EXPRESSLY DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR, ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO PURCHASER OR ANY OF ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, MEMBERS, MANAGERS, EQUITY OWNERS, CONSULTANTS, REPRESENTATIVES OR ADVISORS (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN PROVIDED TO PURCHASER BY ANY EMPLOYEE, AGENT, OFFICER, DIRECTOR, MEMBER, MANAGER, EQUITY OWNER, CONSULTANT, REPRESENTATIVE OR ADVISOR OF ANY SELLER OR ANY OF ITS AFFILIATES).     PURCHASER ACKNOWLEDGES AND AGREES THAT IN MAKING ITS DECISION TO ENTER INTO THIS AGREEMENT AND TO CONSUMMATE THE TRANSACTIONS CONTEMPLATED HEREBY, PURCHASER HAS RELIED SOLELY UPON ITS OWN INVESTIGATION AND HAS INSPECTED, OR WAIVED ITS RIGHT TO INSPECT PRIOR TO THE DATE HEREOF, THE PROPERTIES FOR ALL PURPOSES AND SATISFIED ITSELF AS TO THEIR PHYSICAL AND ENVIRONMENTAL CONDITION, BOTH SURFACE AND SUBSURFACE, INCLUDING CONDITIONS SPECIFICALLY RELATED TO THE PRESENCE, RELEASE OR DISPOSAL OF HAZARDOUS MATERIALS, ASBESTOS AND OTHER MAN MADE FIBERS, OR NATURALLY OCCURRING RADIOACTIVE MATERIALS.

(b)     WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, SELLERS EXPRESSLY DISCLAIM, AND PURCHASER ACKNOWLEDGES AND AGREES THAT IT HAS NOT RELIED UPON, ANY REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, AS TO (i) TITLE TO ANY

OF THE ASSETS, (ii) THE CONTENTS, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, OR ANY REPORT OF ANY PETROLEUM ENGINEERING CONSULTANT, OR ANY GEOLOGICAL OR SEISMIC DATA OR INTERPRETATION, RELATING TO THE ASSETS, (iii) THE QUANTITY, QUALITY OR RECOVERABILITY OF PETROLEUM SUBSTANCES IN OR FROM THE ASSETS, (iv) ANY ESTIMATES OF THE VALUE OF THE ASSETS OR FUTURE REVENUES GENERATED BY THE ASSETS, (v) THE PRODUCTION OF PETROLEUM SUBSTANCES FROM THE ASSETS, (vi) ANY ESTIMATES OF OPERATING COSTS AND CAPITAL REQUIREMENTS FOR ANY WELL, OPERATION, OR PROJECT, (vii) THE MAINTENANCE, REPAIR, CONDITION, QUALITY, SUITABILITY, DESIGN OR MARKETABILITY OF THE ASSETS, (viii) THE CONTENT, CHARACTER OR NATURE OF ANY DESCRIPTIVE MEMORANDUM, REPORTS, BROCHURES, CHARTS OR STATEMENTS PREPARED BY THIRD PARTIES, (ix) ANY IMPLIED OR EXPRESS WARRANTY OF FREEDOM FROM PATENT OR TRADEMARK INFRINGEMENT, OR (x) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO PURCHASER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, MEMBERS, MANAGERS, EQUITY OWNERS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO (AND NO REPRESENTATION OR WARRANTY IS MADE AS TO THE ACCURACY OR COMPLETENESS OF ANY OF THE FOREGOING AND PURCHASER IS NOT RELYING ON ANY SUCH INFORMATION OR OMISSIONS RELATED THERETO). SELLERS FURTHER DISCLAIM ANY REPRESENTATION OR WARRANTY, STATUTORY, EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS OF ANY EQUIPMENT, IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES HERETO THAT PURCHASER SHALL BE DEEMED TO BE OBTAINING THE ASSETS, INCLUDING THE EQUIPMENT, IN ITS PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT PURCHASER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS PURCHASER DEEMS APPROPRIATE.

**Section 5.2**     **Purchaser Representations and Warranties.**

Purchaser represents and warrants to Sellers as of the date hereof and as of the Closing Date as follows:

(a)    *Organization/Good Standing*.  Purchaser is a limited liability company duly organized, validly existing, and in good standing under the Laws of Delaware and is qualified to conduct business and is in good standing in all jurisdictions where it conducts business.

(b)    *Power and Authorization*.  Purchaser has all requisite limited liability company power and authority to enter into and perform this Agreement and the transactions contemplated hereby. The execution, delivery and performance of this

Agreement and the transactions contemplated hereby have been duly and validly authorized by all requisite action on the part of Purchaser. This Agreement has been duly executed and delivered on behalf of Purchaser, and at the Closing all documents and instruments required hereunder to be executed and delivered by Purchaser shall be duly executed and delivered. This Agreement constitutes, and such Closing documents and instruments shall constitute, legal, valid, and binding obligations of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforceability may be limited by the effect of bankruptcy, insolvency, reorganization, moratorium, and similar laws from time to time in effect relating to the rights and remedies of creditors, as well as by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c)     *No Breach or Violation*.  The execution, delivery and performance of this Agreement by Purchaser, and the transactions contemplated hereby, will not (i) violate, conflict with or result in any breach of any provision of Purchaser's certificate of formation or other governing documents, (ii) conflict with, result in a material breach of, constitute a default (or an event that with the lapse of time or notice, or both, would constitute a default) under any agreement or instrument to which Purchaser is a party or by which Purchaser is bound, (iii) violate any material Order applicable to Purchaser, or (iv) materially violate any applicable Law.

(d)     *Brokers*.  Purchaser has incurred no liability for brokers' or finders' fees in respect of the matters provided for in this Agreement for which Sellers will have any responsibility whatsoever, and any such obligation that might exist shall be the sole obligation of Purchaser.

(e)     *Litigation*.  There are no legal actions or proceedings pending or, to Purchaser's knowledge, threatened against Purchaser or any of its Affiliates which relate to the transactions contemplated by this Agreement. To Purchaser's knowledge, there is no investigation, inquiry or review pending or threatened by any Governmental Body with respect to Purchaser or any of its Affiliates seeking to prevent the consummation of this Agreement or any other action taken or to be taken in connection herewith.

## ARTICLE 6
## INTENTIONALLY OMITTED

## ARTICLE 7
## COVENANTS OF THE PARTIES

### Section 7.1     Access.

Between the date of execution of this Agreement and continuing until the earlier of the Closing or the termination of this Agreement, Sellers will give Purchaser and its representatives, at Purchaser's expense and sole risk, reasonable access to Sellers' offices and the Records, including the right to copy the Records at Purchaser's expense, for the sole purpose of conducting an investigation of the Assets, but only to the extent that Sellers may do so without

violating any applicable Law or obligations to any third party and to the extent that Sellers have authority to grant such access without breaching any restriction binding on Sellers or Sellers' Affiliates.  Such access by Purchaser shall be limited to Sellers' normal business hours, and any weekends and after hours requested by Purchaser that can be reasonably accommodated by Sellers, and Purchaser's investigation shall be conducted in a manner that minimizes interference with the operation of the Assets.

Section 7.2     **Government Reviews.**

Sellers and Purchaser shall in a timely manner and at Purchaser's expense (a) make all required filings, if any, with and prepare applications to and conduct negotiations with, each governmental agency as to which such filings, applications or negotiations are necessary or appropriate in the consummation of the transactions contemplated hereby, and (b) provide such information as each may reasonably request to make such filings, prepare such applications and conduct such negotiations.  Sellers and Purchaser shall cooperate with and use all commercially reasonable efforts to assist the other with respect to such filings, applications and negotiations.

Section 7.3     **Operatorship.**

Sellers will assist Purchaser in its efforts to succeed as operator of any Wells included in the Assets.  Purchaser shall promptly, following Closing (or earlier to the extent provided under Section 12.6), file all appropriate or required forms, permit transfers and declarations or bonds with Governmental Bodies relative to its assumption of operatorship.  For all Seller Operated Assets, Sellers shall execute and deliver to Purchaser at the Closing, on forms to be prepared by Purchaser and acceptable to Sellers, and Purchaser shall promptly file after the Closing, the applicable governmental forms and required bonds transferring operatorship of such Assets to Purchaser or its designee.

Section 7.4     **Operation of Business.**

Except as otherwise consented to in writing by Purchaser, which consent shall not be unreasonably withheld or delayed, until the Closing, Sellers will in compliance with the Bankruptcy Code and orders of the Bankruptcy Court and of the applicable operating agreements and other applicable agreements: (i) operate the Assets in the ordinary course consistent with past practices, (ii) not commit to any single operation, or series of related operations, reasonably anticipated by Sellers to require future capital expenditures by the owner of the Assets in excess of Fifty Thousand Dollars ($50,000) (net to Sellers' interest), (iii) not terminate, materially amend, execute or extend any material agreements affecting the Assets, (iv) will maintain their current insurance coverage on the Assets presently furnished by nonaffiliated third parties in the amounts and of the types presently in force, (v) use commercially reasonable efforts to maintain in full force and effect all Leases, (vi) maintain all material Governmental Authorizations necessary for the ownership or operation of the Assets, (vii) not transfer, farmout, sell, hypothecate, encumber or otherwise dispose of any material Assets except for sales and dispositions of Hydrocarbon production and Equipment made in the ordinary course of business consistent with past practices and (viii) not commit to do any of the foregoing.  Purchaser's approval of any action restricted by this Section 7.4 shall be considered granted within ten (10) days (unless a shorter time is reasonably required by the circumstances and such shorter time is

specified in Sellers' written notice) of Sellers' notice to Purchaser requesting such consent unless Purchaser notifies Sellers to the contrary during that period.  In the event of an emergency, Sellers may take such action as a prudent operator would take and shall notify Purchaser of such action promptly thereafter.

**Section 7.5**     **Tax Matters.**

(a)     Sellers shall be responsible for all Taxes affecting the ownership or operation of the Assets that are attributable to any period of time at or before the Effective Time.  Purchaser shall be responsible for all Taxes affecting the ownership or operation of the Assets that are attributable to any period of time after the Effective Time. Regardless of which Party is responsible, Sellers shall handle payment to the appropriate Governmental Body of all Taxes affecting the ownership or operation of the Assets which are required to be paid prior to Closing (and shall file all Tax Returns with respect to such Taxes), and Purchaser shall handle payment to the appropriate Governmental Body of all Taxes affecting the ownership or operation of the Assets which are required to be paid after Closing (and shall file all Tax Returns with respect to such Taxes). Notwithstanding the foregoing, this Section 7.5(a) shall not apply to income, franchise, corporate, business and occupation, business license and similar Taxes, and Tax returns therefor, which shall be borne, paid and filed by the Party responsible for such Taxes under applicable Law.  If requested by Purchaser, Sellers shall, to the extent practicable, assist Purchaser with preparation of all ad valorem and property Tax Returns due on or before thirty (30) days after Closing (including any extensions requested).

(b)     If Sellers (or an Affiliate, agent, or successor in interest of Sellers) receives a refund of any Taxes (whether by payment, credit offset or otherwise, with any interest thereon, including but not limited to ACES credits, refunds from net operating losses, carry-forward or carry-back losses, the release or refund of withholdings or other taxes returned by a taxing authority or escrow account related to Taxes) covered by Section 7.5(a), such refund shall promptly (but no later than thirty (30) days after receipt) be remitted to Purchaser, including all relevant documentation.  Each Party shall cooperate with the other and its Affiliates and agents in order to take all commercially reasonable necessary steps to claim any refund to which it is entitled.  Purchaser agrees to notify Sellers within ten (10) business days following the discovery of a right to claim and secure receipt of any refund to which Sellers are entitled and upon receipt of any such refund.

(c)     Control of any legal or administrative proceedings concerning any Taxes affecting the Assets shall rest with the Party responsible for paying such Taxes, or the Party that is the beneficiary of a refund, under this Section 7.5.

**Section 7.6**     **Suspended Proceeds.**

Sellers shall transfer and remit to Purchaser, all monies representing the value or proceeds of production removed or sold from the Properties and held by Sellers at the time of the Closing for accounts from which payment has been suspended, such monies, net of applicable rights of set off or recoupment, being hereinafter called "**Suspended Proceeds**".  Purchaser shall

11

be solely responsible for the proper distribution of such Suspended Proceeds to the Person or Persons which or who are entitled to receive payment of the same, all in accordance with the directives and/or orders of the Alaska Oil and Gas Conservation Commission,  the orders of the Superior Court for the State of Alaska, Third Judicial District at Anchorage, in connection with the CIRI Litigation and/or any other orders issued by a court of competent jurisdiction. Suspended Proceeds specifically include the CIRI Reserves.

**Section 7.7** **Further Assurances.**

After Closing, subject to approval of the Bankruptcy Court, to the extent required, Sellers and Purchaser each agree to take such further actions and to execute, acknowledge and deliver all such further documents as are reasonably requested by the other Party for carrying out the purposes of this Agreement or of any document delivered pursuant to this Agreement.

**ARTICLE 8**
**CONDITIONS TO CLOSING**

**Section 8.1** **Conditions of Sellers to Closing.**

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject, at the option of Sellers, to the satisfaction on or prior to Closing of each of the following conditions:

(a) <u>Performance</u>.  Purchaser shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by it under this Agreement prior to or on the Closing Date;

(b) <u>Deliveries</u>.  Purchaser shall have delivered to Sellers duly executed counterparts of the Conveyance and the other documents to be delivered by Purchaser under Section 9.3;

(c) <u>Orders</u>.  The Bankruptcy Court shall have entered a Sale Order, and such Order shall be final and non-appealable.

**Section 8.2** **Conditions of Purchaser to Closing.**

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject, at the option of Purchaser, to the satisfaction on or prior to Closing of each of the following conditions:

(a) <u>Performance</u>.  Sellers shall have performed and observed, in all material respects, all covenants and agreements to be performed or observed by them under this Agreement prior to or on the Closing Date;

(b) <u>Deliveries</u>.  Sellers shall be ready, willing and able to deliver to Purchaser duly executed counterparts of the Conveyance and the other documents and certificates to be delivered by Sellers under Section 9.2; and

12

      (c)      <u>Bankruptcy Conditions</u>.

      (i)      The Sale Order, in form and substance reasonably satisfactory to the Purchaser, incorporating the terms of this Agreement, shall be in full force and effect and shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser (which consent may be withheld in its sole discretion) (i) authorizing and approving the transactions contemplated by this Agreement, including (X) the sale of the Assets free and clear of all liens, claims and encumbrances pursuant to section 363(f) of the Bankruptcy Code other than any liens, claims or encumbrances permitted by this Agreement, and (Y) the assumption and assignment to the Purchaser pursuant to section 365 of the Bankruptcy Code all of the Contracts, (ii) finding that the Purchaser is entitled to the protections afforded under section 363(m) of the Bankruptcy Code and granting such protection to the fullest extent under section 363(m) of the Bankruptcy Code, and (iii) enjoining all persons from asserting any claims which they have, or may have, against any of the Sellers, against the Purchaser (other than any such claims expressly assumed by the Purchaser) based upon successor liability or any other legal theories; and

      (ii)      A Final Cash Collateral Order must be entered in the Bankruptcy Cases, in form and substance reasonably satisfactory to the Purchaser, incorporating a budget for the use of Cash Collateral that has been approved by the Purchaser in its sole discretion (the "**Final Cash Collateral Order**").  There shall exist no default or event of default under this Agreement or under the Final Cash Collateral Order, unless any such defaults and/or events of default are waived by Purchaser, agreed to by the parties, or abrogated by the Court.

**ARTICLE 9**
**CLOSING**

**Section 9.1**      **Time and Place of Closing.**

      (a)      Consummation of the purchase and sale transaction as contemplated by this Agreement (the "**Closing**"), shall, unless otherwise agreed to in writing by Purchaser and Sellers or agreed to in writing or directed by the Bankruptcy Court, and subject to the conditions stated in this Agreement, take place at offices of Norton Rose Fulbright, Fulbright Tower, 1301 McKinney, Suite 5100, Houston, Texas 77010-3095 at 9:00 A.M. local time, on (i) November 7, 2014 (the "**Scheduled Closing Date**") or (ii) if all conditions in Article 8 to be satisfied prior to Closing have not yet been satisfied or waived, as soon as thereafter as such conditions have been satisfied or waived, subject to the rights of the Parties under Article 10, provided that the Purchaser may extend the Scheduled Closing Date in its discretion, in consultation with the Sellers.

      (b)      The date on which the Closing occurs is herein referred to as the "**Closing Date**."

13

**Section 9.2**      **Obligations of Sellers at Closing.**

At the Closing, upon the terms and subject to the conditions of this Agreement, Sellers shall deliver or cause to be delivered to Purchaser, among other things, the following:

(a)     the Conveyance, in sufficient duplicate originals to allow recording in all appropriate jurisdictions and offices, duly executed by Sellers;

(b)     assignments, on appropriate forms, of state and of federal leases comprising portions of the Assets, duly executed by Sellers;

(c)     letters-in-lieu of division or transfer orders covering the Assets that are prepared and provided by Purchaser and reasonably satisfactory to Sellers to reflect the transactions contemplated hereby, duly executed by Sellers;

(d)     change of operator forms naming Purchaser or its designee as operator, duly executed by Sellers;

(e)     executed statements described in Treasury Regulation §1.1445-2(b)(2) certifying that each Seller is not a foreign person within the meaning of the Code and the Treasury Regulations promulgated thereunder; and

(f)     the delivery by Sellers of the Suspended Proceeds (pursuant to Section 7.6).

**Section 9.3**      **Obligations of Purchaser at Closing.**

At the Closing, upon the terms and subject to the conditions of this Agreement, Purchaser shall deliver or cause to be delivered to Sellers, among other things, the following:

(a)     the Conveyance, duly executed by Purchaser;

(b)     assignments, on appropriate forms, of state and of federal leases comprising portions of the Assets, duly executed by Purchaser;

(c)     letters-in-lieu of division or transfer orders covering the Assets duly executed by Purchaser;

(d)     change of ownership forms naming Purchaser as owner, duly executed by the Purchaser; and

(e)     change of operator forms naming Purchaser as operator, duly executed by Purchaser.

**ARTICLE 10**
**TERMINATION**

**Section 10.1    Termination.**

Subject to Section 10.2, this Agreement shall be terminated:  (i) at any time prior to Closing by the mutual prior written consent of Sellers and Purchaser; (ii) by Sellers or Purchaser if Closing has not occurred on or before December 1, 2014 (the "**Termination Date**") *provided* that the failure to Close is not due, *inter alia*, to any breach by the Party attempting to terminate this Agreement of any of its representations, warranties, covenants or other obligations contained in this Agreement; (iii) by Purchaser if any condition set forth in Section 8.2 has not been satisfied or waived on the Scheduled Closing Date; (iv) by Sellers if any condition set forth in Section 8.1 has not been satisfied or waived on the Scheduled Closing Date; (v) by Sellers or Purchaser if, incident to the Bidding Procedures Order, Sellers accept and close on a competing bid for the purchase of all or part of the Assets; (vi) by Sellers or Purchaser if the Sale Order is not entered by the Bankruptcy Court by  November 1, 2014; (vii) by Purchaser if any of the Sellers' chapter 11 cases are dismissed or converted to chapter 7; (viii) by Purchaser if a chapter 11 trustee or examiner with expanded powers or other person with expanded powers is appointed in any of Sellers' chapter 11 cases; or (ix) by Purchaser if the Bankruptcy Court grants relief from the automatic stay to permit foreclosure or the exercise of other remedies on the Assets of any Seller; provided, however, that termination under this Section 10.1 shall not be effective until the Party electing to terminate has delivered written notice to the other Party of its election to so terminate; nor shall termination under Section 10.1 (ix) be effective with respect to any relief from automatic stay sought or obtained by or in conjunction with CIRI or the CIRI litigation.

**Section 10.2    Effect of Termination.**

If this Agreement is terminated pursuant to Section 10.1, except as set forth in this Section 10.2, this Agreement shall become void and of no further force or effect (except for the provisions of Sections 12.2, 12.4, 12.7, 12.8, 12.9, 12.11, 12.12, 12.13, 12.14, 12.15, 12.16, 12.17, 12.18 and 12.19).

**ARTICLE 11**
**POST-CLOSING OBLIGATIONS;**
**DISCLAIMERS AND WAIVERS**

**Section 11.1    Receipts.**

Except as otherwise provided in this Agreement, any production from or attributable to the Assets (and all products and proceeds attributable thereto) and all other income, proceeds, receipts and credits earned with respect to the Assets to which Purchaser is entitled under Section 1.4 shall be the sole property and entitlement of Purchaser, and, to the extent received by Sellers, Sellers shall fully disclose, account for and remit the same to Purchaser within thirty (30) days.

**Section 11.2    Recording.**

As soon as practicable after Closing, Purchaser shall record the Conveyances in the

15

appropriate counties as well as the appropriate Governmental Bodies and file change of operator notices with the appropriate Governmental Bodies and provide Sellers with copies of all recorded or approved instruments.

**Section 11.3   Assumption of Contracts.**

The sale of the Assets is and will be made subject to the Contracts and any applicable governmental rules and regulations related to the ownership and operation of the Properties and to which the Properties are presently subject.  Purchaser shall assume and be responsible for all obligations accruing under the Contracts arising prior to, on or after the Effective Time.

**ARTICLE 12**
**MISCELLANEOUS**

**Section 12.1   Counterparts.**

This Agreement may be executed in counterparts, each of which shall be deemed an original instrument, but all such counterparts together shall constitute but one agreement. Delivery of an executed counterpart signature page by facsimile or electronic transmittal (e.g., in PDF format) is as effective as executing and delivering this Agreement in the presence of other parties to this Agreement.

**Section 12.2   Notice.**

Any notice provided or permitted to be given under this Agreement shall be in writing, and may be served by personal delivery, by registered or certified U.S. mail, addressed to the Party to be notified, postage prepaid, return receipt requested, by facsimile, or by overnight air courier sent, in each case, to the appropriate address or number as follows:

If to Sellers:          c/o Conway MacKenzie, Inc.
                        1301 McKinney St.
                        Suite 2025
                        Houston, Texas 77010
                        Attention: John Y. Young, Jr.,
                              Chief Restructuring Office
                        Fax:  713-650-0502

With a copy to (which shall not constitute notice):

                        Norton Rose Fulbright
                        Fulbright Tower
                        1301 McKinney
                        Suite 5100
                        Houston, Texas 77010-3095
                        Attention:  William R. Greendyke
                        Fax:    713-651-5246

If to Purchaser:        AIX Energy, LLC

16

2441 High Timbers, Ste. 120
The Woodlands, TX 77380
Attention: Fred Tresca
Fax: 832-585-0133

With a copy to (which shall not constitute notice):

Porter Hedges LLP
Attn: Joshua Wolfshohl
1000 Main Street, 36th Floor
Houston, Texas 77002
Fax:   713-226-6295

Either Party may change its address for notice by notice to the other in the manner set forth above. All such notices and communications shall be deemed to have been received: if personally delivered, at the time delivered by hand; if so mailed, three (3) Business Days after being deposited in the mail; if faxed, upon confirmation of receipt if the confirmation is between 9:00 a.m. and 5:00 p.m. local time of the recipient on a Business Day, otherwise on the first Business Day following confirmation of receipt, and, if sent by overnight air courier, on the next Business Day after timely delivery to the courier.

**Section 12.3    Sales or Use Tax Recording Fees and Similar Taxes and Fees.**

Purchaser shall bear and pay any sales, use, excise, real property transfer, gross receipts, goods and services, registration, capital, documentary, stamp or transfer Taxes, recording fees and similar Taxes and fees incurred and imposed upon, or with respect to, the property transfers or other transactions contemplated hereby. If such transfers or transactions are exempt from any such Taxes or fees upon the filing of an appropriate certificate or other evidence of exemption, Purchaser will timely furnish to Sellers such certificate or evidence.

**Section 12.4    Expenses.**

Except as provided in Section 12.3, all expenses incurred by Sellers in connection with or related to the authorization, preparation or execution of this Agreement, the Conveyance delivered hereunder and the Exhibits and Schedules hereto and thereto, and all other matters related to the Closing, including all fees and expenses of counsel, accountants and financial advisers employed by Sellers, shall be borne solely and entirely by Sellers, and all such expenses incurred by Purchaser shall be borne solely and entirely by Purchaser.

**Section 12.5    Intentionally Omitted.**

**Section 12.6    Replacement of Bonds, Letters of Credit and Guarantees.**

To the extent transferable, the bonds, letters of credit and guarantees, if any, posted by Sellers with Governmental Bodies or other parties and relating to the Assets are to be transferred to Purchaser. To the extent that such bonds, letters of credit and guarantees are not transferable, on, before or after Closing, Purchaser shall obtain, or cause to be obtained in the name of

17

Purchaser, replacements for such bonds, letters of credit and guarantees to consummate the transactions contemplated by this Agreement.  Purchaser may also provide evidence that such replacements are not necessary as a result of existing bonds, letters of credit or guarantees that Purchaser has previously posted as long as such existing bonds, letters of credit or guarantees are adequate to secure the release of those posted by Sellers.

Section 12.7   **GOVERNING LAW AND VENUE.**

THIS AGREEMENT AND THE LEGAL RELATIONS AMONG THE PARTIES SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW THAT WOULD DIRECT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.   THE VENUE FOR ANY ACTION BROUGHT UNDER THIS AGREEMENT SHALL BE HARRIS COUNTY, TEXAS.   ALL ACTIONS OR PROCEEDINGS WITH RESPECT TO, ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, RELATED TO, OR FROM THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE EXCLUSIVELY LITIGATED IN THE BANKRUPTCY COURT.

Section 12.8   **JURISDICTION; WAIVER OF JURY TRIAL.**

EACH PARTY CONSENTS TO PERSONAL JURISDICTION IN ANY ACTION BROUGHT IN THE UNITED STATES FEDERAL COURTS AND BANKRUPTCY COURT LOCATED WITHIN HARRIS COUNTY, TEXAS WITH RESPECT TO ANY DISPUTE, CLAIM OR CONTROVERSY ARISING OUT OF OR IN RELATION TO OR IN CONNECTION WITH THIS AGREEMENT, AND EACH OF THE PARTIES AGREES THAT ANY ACTION INSTITUTED BY IT AGAINST THE OTHER WITH RESPECT TO ANY SUCH DISPUTE, CONTROVERSY OR CLAIM WILL BE INSTITUTED EXCLUSIVELY IN THE UNITED STATES BANKRUPTCY OR DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, VICTORIA DIVISION.  THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY ANY PARTY AGAINST ANOTHER IN ANY MATTER WHATSOEVER ARISING OUT OF OR IN RELATION TO OR IN CONNECTION WITH THIS AGREEMENT.

Section 12.9   **Captions.**

The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

Section 12.10   **Waivers.**

Any failure by any Party or Parties to comply with any of its or their obligations, agreements or conditions herein contained may be waived in writing, but not in any other manner, by the Party or Parties to whom such compliance is owed.  No waiver of, or consent to a change in, any of the provisions of this Agreement shall be deemed or shall constitute a waiver of, or consent to a change in, other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

**Section 12.11  Assignment.**

No Party shall assign all or any part of this Agreement, nor shall any Party assign or delegate any of its rights or duties hereunder, without the prior written consent of the other Party and any assignment or delegation made without such consent shall be void.

**Section 12.12  Entire Agreement.**

This Agreement and the documents to be executed hereunder and the Exhibits and Schedules attached hereto, constitute the entire agreement between the Parties pertaining to the subject matter hereof, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties pertaining to the subject matter hereof.

**Section 12.13  Amendment.**

(a)    This Agreement may be amended or modified only by an agreement in writing executed by Sellers, on the one hand, and the Purchaser, on the other hand.

(b)    No waiver of any right under this Agreement shall be binding unless executed in writing by the party to be bound thereby.

**Section 12.14  No Third-Party Beneficiaries.**

Nothing in this Agreement shall entitle any Person other than Purchaser and Sellers to any claims, cause of action, remedy or right of any kind.

**Section 12.15  Invalid Provisions.**

If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws effective during the term hereof, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be effected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

**Section 12.16  References.**

In this Agreement:

(a)    References to any gender includes a reference to all other genders;

(b)    References to the singular includes the plural, and vice versa;

(c)    Reference to any Article or Section means an Article or Section of this Agreement;

(d)    Reference to any Exhibit or Schedule means an Exhibit or Schedule to this Agreement, all of which are incorporated into and made a part of this Agreement;

(e)     Unless expressly provided to the contrary, "hereunder," "hereof," "herein" and words of similar import are references to this Agreement as a whole and not any particular Section or other provision of this Agreement;

(f)     "Include" and "including" shall mean include or including without limiting the generality of the description preceding such term;

(g)     If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  Terms defined in the singular have the corresponding meanings in the plural, and vice versa. Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa;

(h)     The term "cost" includes expense and the term "expense" includes cost. All references to "dollars" or "$" shall be deemed references to United States dollars;

(i)     The words "shall" and "will" are used interchangeably and have the same meaning. The word "or" will have the inclusive meaning represented by the phrase "and/or" unless the context requires otherwise;

(j)     The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement;

(k)     Any event hereunder requiring the payment of cash or cash equivalents and any action to be taken hereunder on a day that is not a Business Day shall be deferred until the first Business Day occurring after such day;

(l)     Each exhibit and schedule to this Agreement is a part of this Agreement, but if there is any conflict or inconsistency between the main body of this Agreement and any exhibit or schedule, the provisions of the main body of this Agreement shall prevail; and

(m)     Time periods within or following which any payment is to be made or an act is to be done shall be calculated by excluding the day on which the time period commences and including the day on which the time period ends and by extending the period to the next Business Day following if the last day of the time period is not a Business Day.

**Section 12.17  Construction.**

Sellers and Purchaser has had substantial input into the drafting and preparation of this Agreement and has had the opportunity to exercise business discretion in relation to the negotiation of the details of the transaction contemplated hereby.  This Agreement is the result of arm's-length negotiations from equal bargaining positions.

**Section 12.18  Limitation on Damages.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NONE OF PURCHASER, SELLERS OR ANY OF THEIR RESPECTIVE AFFILIATES SHALL BE ENTITLED TO EITHER PUNITIVE, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND EACH OF PURCHASER AND EACH SELLERS, FOR THEMSELVES AND ON BEHALF OF THEIR AFFILIATES, HEREBY EXPRESSLY WAIVES ANY RIGHT TO PUNITIVE, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSS OF PROFITS IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, EXCEPT TO THE EXTENT SELLERS OR PURCHASER IS REQUIRED TO PAY PUNITIVE, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES TO A THIRD PARTY.

**Section 12.19  DTPA Waiver.**

To the extent applicable to the Assets or any portion thereof, Purchaser hereby waives the provisions of the Texas Deceptive Trade Practices Act, Chapter 17, Subchapter E, Sections 17.41 through 17.63 inclusive (other than Section 17.555 which is not waived), Tex. Bus. & Com. Code. In order to evidence its ability to grant such waiver, Purchaser hereby expressly recognizes and represents to Sellers that Purchaser is not in a significantly disparate bargaining position and (i) Purchaser is represented by legal counsel in this transaction or (ii) Purchaser is in the business of seeking or acquiring, by purchase or lease, goods or services for commercial or business use, will have as of the Closing assets of Twenty Million Dollars or more according to its most recent financial statement prepared in accordance with generally accepted accounting principles, and has knowledge and experience in financial and business matters that enable it to evaluate the merits and risks of the transaction contemplated hereby.

**Section 12.20  Binding Effect.**

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, and their respective successors and assigns, subject only to approval of the Bankruptcy Court.

*[Signature Page Follows]*

21

IN WITNESS WHEREOF, this Purchase and Sale Agreement has been signed by each of the parties hereto on the date first above written.

**<u>SELLERS</u>**

BUCCANEER RESOURCES, LLC

By: _____
Name: John Y. Young, Jr.
Title: Chief Restructuring Officer

BUCCANEER ENERGY HOLDINGS, INC.

By: _____
Name: John Y. Young, Jr.
Title: Chief Restructuring Officer

BUCCANEER ALASKA OPERATIONS, LLC

By: _____
Name: John Y. Young, Jr.
Title: Chief Restructuring Officer

BUCCANEER ALASKA, LLC,

By: _____
Name: John Y. Young, Jr.
Title: Chief Restructuring Officer

KENAI LAND VENTURES, LLC

By: _____
Name: John Y. Young, Jr.
Title: Chief Restructuring Officer

BUCCANEER ALASKA DRILLING, LLC

By: _____
Name: John Y. Young, Jr.
Title: Chief Restructuring Officer

KENAI DRILLING, LLC
By: _____
Name: John Y. Young, Jr.
Title: Chief Restructuring Officer

**PURCHASER**

AIX ENERGY, LLC

By: _____
      Fred M. Tresca, Manager

APPENDICES, EXHIBITS AND SCHEDULES

| Appendix I | Definitions |
|---|---|
| Exhibit A | Leases |
| Exhibit A-1 | Units, Wells and Personal Property |
| Exhibit A-2 | Excluded Equipment |
| Exhibit B | Conveyance |
| Schedule 1.2(d) | Contracts |
| Schedule 1.2(l) | Accounts, Credits, and Bonds |
| Schedule 3.2 | Consents |

# APPENDIX I

## Definitions

"**Affiliates**" with respect to any Person, means any Person that directly or indirectly controls, is controlled by or is under common control with such Person.

"**Agreement**" has the meaning set forth in the first paragraph of this Agreement.

"**AOGCC**" has the meaning set forth in Section 1.2(f).

"**Archer Litigation**" means that certain case styled *Archer Drilling, LLC and Rig Inspection Services (US), LLC v. Buccaneer Energy, Ltd, Buccaneer Alaska Drilling, LLC, Buccaneer Resources, LLC, Kenai Drilling, LLC and Kenai Offshore Ventures, LLC*, Cause No. 2012-74323, 165th Judicial District, Harris County, Texas.

"**Assets**" has the meaning set forth in Section 1.2.

"**Bankruptcy Case**" has the meaning set forth in the Recital.

"**Bankruptcy Code**" has the meaning set forth in the Recital.

"**Bankruptcy Court**" has the meaning set forth in the Recital.

"**Business Day**" means each calendar day except Saturdays, Sundays, and any other day on which commercial banks in Houston, Texas are authorized or required by Law to close.

"**CIRI**" has the meaning set forth in Section 1.2(f).

"**CIRI Litigation**" shall mean Case No. 3AN-13-09911 CI filed by CIRI against various Buccaneer entities in Alaska Superior Court at Anchorage, Alaska and Case No. 3AN-13-9521, *CIRI v. Alaska Oil and Gas Conservation Commission and Buccaneer Alaska Operations, LLC*, also filed in Alaska Superior Court at Anchorage, Alaska.

"**Closing**" has the meaning set forth in Section 9.1(a).

"**Closing Date**" has the meaning set forth in Section 9.1(b).

"**Contracts**" has the meaning set forth in Section 1.2(d).

"**Conveyance**" has the meaning set forth in Section 3.1.

"**DNR**" has the meaning set forth in Section 3.3(a).

"**DNR Dispute**" has the meaning set forth in Section 3.3(a).

"**Effective Time**" has the meaning set forth in Section 1.4

"**Equipment**" has the meaning set forth in Section 1.2(e).

"**Excluded Assets**" has the meaning set forth in Section 1.3.

"**Existing Credit Agreements**" means that certain Amended and Restated Financing Agreement dated January 24, 2014 by and among Buccaneer Alaska, LLC, Buccaneer Resources, LLC, Buccaneer Alaska Operations, LLC, Buccaneer Cosmopolitan, LLC, Kenai Drilling, LLC, Buccaneer Alaska Drilling, LLC, and Kenai Land Ventures, LLC, as Borrowers, Buccaneer Energy Limited and Buccaneer Energy Holdings, Inc., as Guarantors, the Lenders and Holder identified therein, and Meridian Capital CIS Fund, as Administrative Agent and Collateral Agent for the Lenders and the Holders, and all related documents, including by not limited to, the Senior Secured Term Note dated January 24, 2014 in the principal amount of $60,719,497.98 and the Senior Secured Revolver Note date January 24, 2014 in the principal amount of $6,713,242.74, as assigned to Purchaser by Meridian Capital CIS Fund pursuant to, among other documents, that certain Assignment of Financing Agreement, Notes, Liens, and Security Interests, and Other Rights and that certain Assignment of Overriding Royalty Interests and Production Payments.

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Authorization**" means any federal, state, local, municipal or other government; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, regulatory or taxing authority or power; and any court or governmental tribunal having or asserting jurisdiction.

"**Governmental Body**" means any federal, state, local, municipal, or other governments; any governmental, regulatory or administrative agency, commission, body or other authority exercising or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power; and any court or governmental tribunal.

"**Hydrocarbons**" means oil, gas, condensate and other gaseous and liquid hydrocarbons or any combination thereof, including scrubber liquid inventory and ethane, propane, isobutene, nor-butane and gasoline inventories (including tank bottoms), and sulphur and other minerals extracted from or produced from the foregoing hydrocarbons.

"**Imbalance**" means any over-production, under-production, over-delivery, under-delivery or similar imbalance of Hydrocarbons produced from or allocated to the Assets, regardless of whether such imbalance arises at the platform, wellhead, pipeline, gathering system, transportation system, processing plant or other location.

"**Lands**" has the meaning set forth in Section 1.2(a).

"**Laws**" means all applicable statutes, rules, regulations, ordinances, orders, and codes of Governmental Bodies.

"**Leases**" has the meaning set forth in Section 1.2(a).

"**NCI Farmout**" means that certain North Cook Inlet Deep Farmout Agreement and First Amendment thereto, both dated effective April 15, 2013, among ConocoPhillips Alaska, Inc. and ConocoPhillips Company, as Farmors, and Buccaneer Alaska, LLC, as Farmee.

"**Party**" and "**Parties**" have the meanings set forth in the first paragraph of this Agreement.

"**Person**" means any individual, firm, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, government or agency or subdivision thereof or any other entity.

"**Properties**" and "**Property**" have the meanings set forth in Section 1.2(c).

"**Property Costs**" has the meaning set forth in Section 1.4(c).

"**Purchase Price**" has the meaning set forth in Section 2.1.

"**Purchaser**" has the meaning set forth in the first paragraph of this Agreement.

"**Records**" has the meaning set forth in Section 1.2(i).

"**Sale Order**" is an order of the Bankruptcy Court, acceptable to Sellers and Purchaser, entered pursuant to sections 105, 363, and 365 of the Bankruptcy Code (i) approving this Agreement and the transactions contemplated hereby; (ii) approving the sale and transfer of the Assets to Purchaser free and clear of all liens, claims and interests, pursuant to section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to Purchaser of the assigned Contracts; (iv) finding that Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (v) finding that due and adequate notice of the Sale Motion and an opportunity to be heard were provided to all Persons entitled thereto, including but not limited to federal, state and local taxing and regulatory authorities; (vi) confirming that Purchaser is acquiring the Assets free and clear of all liabilities, other than the Assumed Liabilities; and (vii) providing that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) are waived and there will be no stay of execution of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure.

"**Settlement Order**" has the meaning set forth in Section 1.2(m).

"**Scheduled Closing Date**" has the meaning set forth in Section 9.1(a).

"**Seller**" and "**Sellers**" has the meaning set forth in the first paragraph of this Agreement.

"**Seller Operated Assets**" shall mean Assets operated by any Seller or its Affiliates.

"**Suspended Proceeds**" has the meaning set forth in Section 7.6.

"**Tax Returns**" means all reports, returns, statements (including estimated reports, returns, or statements), and other similar filings.

"**Taxes**" means all federal, state, local, and foreign income, profits, franchise, sales, use, ad valorem, property, severance, production, excise, stamp, documentary, real property transfer or gain, gross receipts, goods and services, registration, capital, transfer, or withholding Taxes or other governmental fees or charges imposed by any taxing authority, including any interest, penalties or additional amounts which may be imposed with respect thereto.

"**Termination Date**" has the meaning set forth in Section 10.1.

"**TLO**" has the meaning set forth in Section 3.3(a).

"**Units**" has the meaning set forth in Section 1.2(c).

"**Wells**" has the meaning set forth in Section 1.2(b).

**EXHIBIT A**

**LEASES**

**Alaska Department of Land Number**:    MHT9300082
**Kenai Recording District Number**:    2011-002227-0
**Lands Covered**:    Township 5 N, Range 12 W, Seward Meridian:

Section 1, Lot 2 2.50 acres;
Section 1, Lot 3 3.62 acres;
Section 1, Lot 4 3.15 acres;
Section 1, Lot 5 1.96 acres;
Section 1, Lot 6 2.35 acres;

Township 6 N, Range 11 W, Seward Meridian:

Section 28, W/2, 320.00 acres;
Section 29, E1/2NE1/4, SW1/4NE1/4, 120.00 acres;
Section 29, SE1/4, 160.00 acres;
Section 29, SW1/4, 160.00 acres;
Section 31, Lot 1, 36.94 acres;
Section 31, Lot 2, 37.80 acres;
Section 31, E1/2NW1/4 80.00 acres;
Section 33, W1/2, 320.00 acres;

Containing 1,247.60 acres, more or less.

3774613v8

**Alaska Department of Land Number**:     MHT9300070
**Kenai Recording District Number**:     2011-002226-0
**Lands Covered**:     Township 6 N, Range 11 W, Seward Meridian:

Section 22: All, 640 acres;
Section 23: All, 640 acres;
Section 24: W1/2, W1/2W1/2E1/2, 400 acres;
Section 25: W1/2, W1/2W1/2E1/2, 400 acres;
Section 26: All, 640 acres;
Section 27: N1/2, SW1/4, N1/2SE1/4, 560 acres;
Section 27: S1/2SE, 80 acres;
Section 34: Lot 151, 2.5 acres;
Section 34: Lot 152, 2.5 acres;
Section 34: Lot 155, 2.5 acres;
Section 34: Lot 156, 2.5 acres;
Section 34: Lot 177, 2.5 acres;
Section 34: Lot 178, 2.5 acres;
Section 35: NW1/4NW1/4, 40 acres;
Section 34: Lot 123, 2.5 acres;
Section 34: Lot 124, 2.5 acres;
Section 34: Lot 130, 2.5 acres;
Section 34: Lot 131, 2.5 acres;
Section 34: Lot 155, 2.5 acres;

Township 6 N, Range 11 W, Seward Meridian:
Section 28: E1/2, 320 acres;

Containing 3,747.5 acres, more or less.

**Alaska Department of Land Number**:  C-061667
**Kenai Recording District Number**:  2011-002923-0
**Lands Covered:**  Township 5 N, Range 11 W, Seward Meridian:

Section 3, Lots 1 to 4, inclusive, SW1/4NW1/4, SW1/4, NE1/4SE1/4, S1/2SE1/4;
Section 4, Lots 1 and 2, S1/2NE1/4, NE1/4SE1/4;

Containing 680.0 acres, more or less.

Township 6 N, Range 11 W, Seward Meridian:

Section 33, Lots 1, 2, 3, 4, 7, 10, 11 and 12, NE1/2NE1/4, SE1/4NE1/4, N1/2SW1/4NE1/4, W1/2SW1/4SE1/4, E1/2SE1/4SE1/4 ;
Section 34, Lots 1, 2, 3, 4, 5, 9, 10, 12, 13, 14, 37, 38, 54, 56, 72, 76, 93, 94, 96, 97, 99, 100, 101, 103, 104, 108, 109, 118, 120, 121, 126, 127, 128, 129, 142, 143, 145, 147, 150, 153, 154, 160, 162, 163, 168, 169, 170 and 172, N1/2NW1/4NE1/4, N1/2S1/2NW1/4NE1/4, W1/2W1/2SW1/4NE1/4, N1/2NW1/4, NW1/4SW1/4NW1/4, E1/2SE1/4NW1/4, N1/2NE1/4NE1/4SW1/4, SE1/4NE1/4SE1/4, NE1/4SE1/4SE1/4, S1/2SE1/4SE1/4;
Section 35, NW1/4NE1/4, NW1/4NW1/4;

Containing 595 acres, more or less.

Aggregating 1,275.00 acres, more or less.

**Alaska Department of Land Number**:  391094
**Kenai Recording District Number**:  2011-002217-0
**Lands Covered:**  Tract: CI2006-157
Township 6 N, Range 11 W, Seward Meridian:

Section 31, Surveyed, Lots 5 thru 20, 23, 24, 26 thru 35, E1/2 of Lot 36, 37, 38, 40 thru 59, 62 thru 117, 119 thru 189, 298.37 acres;
Section 32, Surveyed, All excluding U.S. Survey 4969, 630.27 acres;
Section 33, Surveyed, Lots 5, 6, 8, 9, 13 thru 40, W1/2SE1/4SE1/4, E1/2SW1/4SE1/4, 120.00 acres;

Containing 1,048.64 acres, more or less.

**Alaska Department of Land Number**:    391092
**Kenai Recording District Number**:    2011-002218-0
**Lands Covered:**    Tract: CI2006-126

Township 5 N, Range 11 W, Seward Meridian:

Section 4, Surveyed, SE1/4SE1/4, 40.00 acres;
Section 5, Surveyed, Fractional, Lots 2, 3, 4A, 13,
N1/2SW1/4NW1/4, N1/2N1/2SW1/4SW1/4NW1/4,
143.60 acres;
Section 6, Surveyed, Lots 11, 17 thru 30, 32, 34, 35,
40, 61, 127 and 129 thru  132 , 46.08 acres;

U.S. Survey 3025 A and B, Block 8 Lots 1 and 5,
3.17 acres;

Containing 232.85 acres, more or less.

**Alaska Department of Land Number**:    391091
**Kenai Recording District Number**:    2011-002201-0
**Lands Covered:**    Tract: CI2006-125

Township 5 N, Range 11 W, Seward Meridian:

Section 1, Surveyed, Lots 9, 11 thru 13, 18, and the
bed of the Kenai River, 60.92 acres;
Section 2, Surveyed, Fractional, Lots 4, 5, and the
bed of the Kenai River, 79.81 acres;
Section 3, Surveyed, S1/2NE1/4, NW1/4SE1/4,
SE1/4NW1/4, 160.00 acres;
Section 10, Surveyed, N1/2NE1/4, and the bed of
the Kenai River, 218.37 acres;
Section 11, Surveyed, Fractional, Lots 3 thru 5, 10,
11, E1/2NW1/4, NW1/4NW1/4, and the bed of the
Kenai River, 316.46 acres;
Section 12, Surveyed, SE1/4SE1/4, and the bed of
the Kenai River, 131.26 acres;
Section 13, Surveyed, NE1/4, SE1/4SE1/4, SW1/4,
and the bed of the Kenai River, 364.84 acres;

Containing 1,331.66 acres, more or less.

**Alaska Department of Land Number**: 391095
**Kenai Recording District Number**: 2011-002225-0
**Lands Covered:** Tract: CI2006-158

Township 6 N, Range 11 W, Seward Meridian:

Section 34, Surveyed, Lots 6 thru 8, 11, 15 thru 36, 39 thru 53, 55, 57 thru 71, 73 thru 75, 77 thru 92, 95, 98, 102, 105 thru 107, 110 thru 117, 119, 122, 125, 132 thru 141, 144, 146, 148, 149, 157 thru 159, 161, 164 thru 167, 171, 173 thru 176, 300.00 acres; Section 35, Surveyed, S1/2S1/2S1/2NE1/4, N1/2N1/2N1/2SE1/4, N1/2SW1/4, W1/2NW1/4SW1/4SW1/4, 125.00 acres;

Containing 425.00 acres, more

**Alaska Department of Land Number**: 391611
**Kenai Recording District Number**: 2011-014036-0
**Lands Covered:** Northwest Cook Inlet Unit Tract 1

Township 12 N, Range 10 W, Seward Meridian:

Section 25, Protracted, N2, SW4, 480.00 acres;
Section 26, Protracted, All, 640.00 acres;

Containing 1,120.00 acres, more or less.

**Alaska Department of Land Number**: 391609
**Kenai Recording District Number**: 2011-014036-0
**Lands Covered:** Tract 447- West Nicolai

Township 11 N, Range 13 W, Tract B, Seward Meridian:

Section 22, Unsurveyed, All, 640.00 acres;
Section 23, Unsurveyed, All, 640.00 acres;
Section 24, Unsurveyed, W2, SE4, W2NE4, SE4NE4, 600.00 acres;
Section 25, Unsurveyed, All uplands, 555.86 acres;
Section 26, Unsurveyed, All, 640.00 acres;
Section 27, Unsurveyed, All, 640.00 acres;
Section 34, Unsurveyed, All, 640.00 acres;
Section 35, Unsurveyed, All uplands, 470.17 acres;
Section 36, Unsurveyed, All uplands, 86.73 acres;

Containing 4,912.76 acres, more or less.

**EXHIBIT A-1**

**UNITS, WELLS AND PERSONAL PROPERTY**

Kenai Loop Wells

| Well Name |
|---|
| Kenai Loop Well 1-1 |
| Kenai Loop Well 1-2 |
| Kenai Loop Well 1-3 |
| Kenai Loop Well 1-4 |

Kenai Loop Properties and Equipment

1.  Surface location known as Pad #1 and Pad #2 and all attendant facilities necessary for the production of petroleum such as flare stack, heater treaters, separators and water handling and processing facilities.

2.  Pipelines, rights of way, and surface access from Pad #1 to Kenai City Gate Connection (Enstar/APC Station K686) and Buccaneer/KNPL Junction (Meter 416).

3.  The entire inventory of materials and supplies related to the production and operations conducted on the Kenai properties.

4.  All geological and geophysical data including 3 D Seismic license on Kenai Loop shoot and related work stations, servers and storage equipment as well raw geophysical data, field notes, and tapes, all interpretations, work product related to existing or prospective drilling locations.

5.  All maps, geophysical files, and maps regarding prospects, existing projects (whether in electronic or paper format and verification that all copies are provided or destroyed.

6.  All well data files, AFE's, production reports, gas charts, BTU or quality analysis and support for each operation conducted on the Kenai property both in electronic and paper format and all systems and equipment used to maintain such files and data.

7.  All environmental data including studies or reports related to these properties.

8.  All governmental inspection reports from any government agency.

9.  All air permits or Spill Prevention Countermeasure and Control plans.

10. All engineering files, data or work product in electronic or paper format and all equipment and systems used to maintain such files and data.

11. Any proprietary geological and geophysical data that is owned and all equipment used to support such data.

12. All other property of any kind associated with the Kenai Loop not specifically listed or contemplated in this <u>Exhibit A-1</u> and not specifically excluded in <u>Exhibit A-2</u>.

13. All technical, office, computer or administrative equipment, leases, and vehicles located on or associated with the property both in Alaska on location or in the Kenai, Anchorage office; including, but not limited to the following:

**Kenai Warehouse:**

- 4 ea. Ergonomic Electric L-Shaped Desks
- 11 ea. Desk Chairs
- 29 ea. Reception/Conference Room Chairs
- 1 ea. 8' Conference Table
- 4 ea. 4' Tables
- 3 ea. 3' Round Tables
- 4 ea. 3 Drawer Metal Under desk Cabinets
- 1 ea. 4 Drawer Metal Lateral Filing Cabinet
- 4 ea. 4 shelf Metal Book Shelves
- 1 Hon Desk with right return

**Kenai Office – 215 Fidalgo Ave.**

- 1 ea. Samsung 60" (?) TV
  - Serial # Z2H43CCZA00525K w/ Remote
- 1 ea. Acer Revo Computer
  - Product Key: CPXC4 – WTJH7 – 9GY4K – WQTBX – DQYGT
- 1 ea. Microsoft Lif Cam
  - P/IN # X821857-001
- 1 ea. Polycom Conference Phone
  - Serial # 41D05VC10222
- 5 ea. NEC Multi Line Phones
- 1 ea. Dell Poweredge T110 II Server
  - # 2367K-4Y7RX – 68FTK – W87J4 – P9346
- 1 ea. Sonic Wall
  - # COEAE415ADE4

- 1 ea. Fellowes 99ci Shredder – No #
- 1 ea. Samsung Monitor Syncmaster
  - Serial # ZUELHTMC5025875 823B300
- 1 ea. Dell Desktop
  - Serial # 09XXG MQJRK PW7P3 TKTGT R9VFB
- 1 ea. HP Laserjet P2035 Printer
  - Serial # VNB3D38991
- 1 ea. Epson Projector & Screen
  - Serial # PVQK2400977
- 1 ea.  Dell Optiplex USFF All In One – New In Box
- 2 ea. APC Battery Back UP
  - 1 ea. New in Box
  - 1 ea. 4B1215P13052
- 1 ea. Dell Server T320 – New in box
  - Serial # MWBDD DBRJJ B2PRD DPB93 PJ7F4
- 2 ea. Dell Monitor
  - 1 ea. New in box – No Sticker
  - 1 ea. Serial # CN-0GFXN4-74445-2C6-B9ML
- 1 ea. HP Laptop
  - Serial # 4CVKJ MMGB3 T29VF V4RJ9 6WT6D
- 2 ea. Dell Laptop
  - Serial # CNFZRY1
  - Serial # J2VTGV1
- 1 ea. Konica Minolta Bizhub C224e
- 1 ea. Vizio TV
  - Model # E422VLE
  - Serial # LATKSAN110156
  - w/ remote, stand, and wall mount
- 2 ea. Computers
  - 1 ea. Dell Optiplex Desktop w/ keyboard & mouse
  - Serial # 00186-033-944-279
  - 1 ea. Dell Laptop
  - Serial # 27672488497
- 1 ea. Docking station
  - Dell – Serial# CN-OPKDGR – 75941-2C6-0043-A00
- 1 ea. Wireless keyboard
  - Logitech – PID # - DF24603DX
- 2 ea. Printers/Fax/ Scanner/Copier
  - 1 ea. HP Officejet 4622
  - Serial # CN310231QV

- o   1 ea. Kyocera Ecosys
- o   Mach # Q5L0X01290
- 1 ea. Kodak i2400 Scanner
  - o   Serial # 48180751
- 1 ea. Acer Monitor
  - o   Serial # ETLNY080031081B7054226
- 1 ea. Clear OneMax conference Phone
  - o   Serial # 2513-1210-08
- 7 ea. Desk phones
- 1 ea. Cordless Phone

**Bill Adams:**

- 1 ea. Dell Laptop – Keyboard and Mouse
  - o   Serial # 7689271609
- 1 ea. Dell Docking Station
  - o   Serial # 3103815600245056F
- 1 ea. LG Monitor Flatron EW22rt
  - o   PN # 103NDSK70134
- 1 ea. Kodak i2400 Scanner
  - o   Serial # 48151684

**Ray Schemanski:**

- 1 ea. Dell Laptop
  - o   Serial # JQ5ZRY1
- 1 ea. HP Monitor – No #
- 1 ea. Logitech Cordless Keyboard & Mouse

**Brooke Poole:**

- 1 ea. Dell Laptop
- Serial # C8F6PX1
- 1 ea. Samsung Monitor Syncmaster S23B300
- Serial # ZUELHTMC5000616L
- 1 ea. Logitech Comfort Cordless Keyboard
- PN – 820-002546
- 1 ea. Kensington Cordless Mouse
- Serial # A131A000102
- 1 ea. Kodak i2400 Scanner
- Serial # 47548530

**Furniture:**

- 1 ea. 8' HON Conference Table
- 7 ea. Chairs
- 1 ea. TV Stand
- 1 ea. 3' Round Break room table
- 5 ea. Breakroom/Reception Chairs
- 1 ea. Keurig Coffee Pot
- 1 ea. Westbend Microwave
- 1 ea. GE Minifridge
- 1 ea. Watercooler
- 1 ea. Ergonomic Electric L-Shaped Desk
- 2 ea. 3 Drawer Under Desk Units
- 3 ea. 4 Shelf Metal Book Shelves
- 1 ea. 4 Drawer Metal Lateral Filing Cabinet
- 4 ea. HON Desks
  - 2 ea. Right Returns
  - 1 ea. Left Return
- 10 ea. HON 3 Drawer Under Desk Units
- 4 ea. HON Bookshelf with 2 Lateral Files
- 4 ea. HON 4 drawer Lateral Files
- 4 ea. Reg. Black Mesh Desk Chairs
- 1 ea. Leather Desk Chair
- 3 ea. HON Reception Chairs
- 1 ea. HON round End Table
- 1 ea. Black Italian Leather Sofa
- 1 ea. Black Italian Leather Loveseat
- 1 ea. Black Italian Leather Chair

**Complete Work Stations in Houston Office:**

- Ostrog Enermax Custom Computer Geophysical Workstation including monitors, keyboards and peripheral equipment located in storage room
- Ostrog Enermax Custom Computer Geophysical Workstation including monitors, keyboards and peripheral equipment located in Room #920
- HP Plotter model number C6075A serial number SG0CS33121 located in "War" Room 9C

**Conference Room Equipment in Houston Office:**

- Conference Room 9A (only the telephone speaker system and television)

3774613v8

- Conference Room 9B small meeting table (marble like surface – green) and six executive swivel chairs

**The following licensed software:**

| Product | License # |
|---|---|
| EarthPAK Maintenance (Standalone-Advanced) | 11896 |
| KINGDOM Data Management Maintenance (Standalone-Advanced) | 11896 |
| VuPAK Maintenance (Standalone-Advanced) | 11896 |
| SynPAK Maintenance (Standalone-Advanced) | 11896 |
| 2d/3dPAK Maintenance (Standalone-Advanced) | 11896 |
| 2d/3dPAK Maintenance (Standalone-Advanced) | NT902308 |
| EarthPAK Maintenance (Standalone-Advanced) | 902308 |
| SynPAK Maintenance (Standalone-Advanced) | 902308 |
| VuPAK Maintenance (Standalone-Advanced) | 902308 |
| 2d/3dPAK Maintenance (Standalone-Advanced) | 902309 |
| SynPAK Maintenance (Standalone-Advanced) | 902309 |
| VuPAK Maintenance (Standalone-Advanced) | 902309 |
| EarthPAK | 902309 |
| 2d/3dPAK Maintenance (Standalone-Advanced) | 902474 |
| EarthPAK Maintenance (Standalone-Advanced) | 902474 |
| SynPAK Maintenance (Standalone-Advanced) | 902474 |
| PETRA | N/A (online) |
| SMT-EarthPAK Maintenance (Standalone-Advanced) | 902473 |
| SMT-LoadPAK Maintenance (Standalone-Advanced) | 902473 |
| KDM - dataloader suite | 902475 |
| PETRA | 231478 |
| SMT, EP, 3D | NT902473 |
| PETRA network license) SMT | NW901984 |
| IHS Powertools | Unknown |
| WolfePak Accounting Software | Unknown |
| WolfePak Land Add-On Module | Unknown |

**EXHIBIT A-2**

**<u>EXCLUDED EQUIPMENT</u>**

All drilling related equipment and material owned by Kenai Drilling, LLC or its contractors stored or located on the Kenai Loop Pad No. 1.

**EXHIBIT B**

**<u>CONVEYANCE</u>**

**<u>[TO BE ATTACHED AND CONFORM WITH PSA]</u>**

**SCHEDULE 1.2(d)**

**CONTRACTS**

1. Liquids Sales Agreement dated May 9, 2013 between Tesoro Alaska Company and Buccaneer Alaska Operations, LLC to purchase condensate crude oil at Kenai Pipeline connection.

2. Gas Sales Agreement dated August 10, 2011 between Buccaneer Alaska, LLC and Alaska Pipeline Company.

3. Gas Sales Agreement dated March 22, 2013 between Alaska Pipeline Company and Buccaneer Alaska, LLC.

4. Gas Sales Agreement dated May 28, 2013 between Alaska Pipeline Company and Buccaneer Alaska, LLC.

5. Interruptible Gas Sale and Purchase Contract dated August 21, 2013 between Tesoro Alaska Company and Buccaneer Alaska, LLC.

6. Interruptible Gas Sale and Purchase Agreement dated September 12, 2013 between Cook Inlet Energy and Buccaneer Alaska, LLC.

7. Interruptible Gas Sale and Purchase Agreement dated December 5, 2013 between ConocoPhillips Alaska Natural Gas Corporation and Buccaneer Alaska, LLC.

8. Natural Gas Pipeline Easement dated September 29, 2011, by and between the City of Kenai and Buccaneer Alaska Operations, LLC.

9. Lease of Airport Lands dated December 7, 2011 (Lease No. 2232.01) between City of Kenai and Buccaneer Alaska Operations, LLC for use of surface at City Gate pipeline connection.

10. Lease of Airport Lands dated October 18, 2013 by and between the City of Kenai and Buccaneer Alaska Operations, LLC.

11. Conveyance of Overriding Royalty Interests dated as of January 25, 2013, between Buccaneer Alaska, LLC, as the assignor, and VPC Fund II, L.P. as assignee, such overriding royalty interest burdening certain Leases.

12. Production Payment Agreement dated as of January 25, 2013, between Buccaneer Alaska, LLC, as the assignor, and VPC Fund II, L.P., as assignee

13. Seismic Land Use Permit dated as of March 5, 2012 by and between Cook Inlet Region, Inc. and Buccaneer Alaska, LLC.

14. [Seismic Data Use License dated as of December 2, 2010, by and between American Geophysical Corporation and Buccaneer Alaska, LLC.]

15. Temporary Storage Permit dated September 24, 2014 from the Alaska Department of Environmental Conservation (ADEC).

16. Special Use Permit commencing October 3, 2013 by and between the City of Kenai and Buccaneer Alaska Operations, LLC.

17. Escrow Agreement dated October 2, 2014 by and between Buccaneer Alaska, LLC and First National Bank Alaska (as Escrow Agent).

<u>**SCHEDULE 1.2(l)**</u>

<u>**ACCOUNTS, CREDITS, AND BONDS**</u>

<u>**Cash Collateralized Surety Bonds**</u>

1. **Bond:** Surety Bond No. B006404 made in the penal sum of $200,000 to the Alaska Oil and Gas Conservation Commission
   **Principal:** Buccaneer Alaska Operations, LLC
   **Surety:** U.S. Specialty Insurance Company

2. **Bond:** Single Lease Operation Oil and Gas Lease Bond No. 9300082 made in the penal sum of $10,000 to the Alaska Mental Health Trust Authority
   **Principal:** Buccaneer Alaska, LLC
   **Surety:** Wells Fargo Bank, N.A.

3. **Bond:** Single Lease Operation Oil and Gas Lease Bond No. 9300070 made in the penal sum of $17,140 to the Alaska Mental Health Trust Authority
   **Principal:** Buccaneer Alaska, LLC
   **Surety:** Wells Fargo Bank, N.A.

4. **Bond:** Certificate of Deposit No. 7504515383, made in the amount of $25,093.94 to the Alaska Mental Health Trust Land Office
   **Principal:** Buccaneer Alaska, LLC
   **Issuing Institution:** Wells Fargo Bank, N.A.

5. **Bond:** Statewide Oil and Gas Bond No. SUR0015393 in the sum of $500,000 to the State of Alaska Department of Natural Resources Division of Oil and Gas
   **Principal:** Buccaneer Alaska Operations, LLC
   **Surety:** Argonaut Insurance Company

6. **Bond:** Land Use Permit Bond No. LAS 28719 made in the sum of $50,000 to the Division of Land and Mining, Department of Natural Resources
   **Principal:** Buccaneer Alaska Operations, LLC
   **Surety:** Argonaut Insurance Company

## SCHEDULE 3.2

## CONSENTS

1.  Consent to assign all material contracts listed on <u>Schedule 1.2(d), Contracts</u>.

2.  Consent of the Cook Inlet Region, Inc. ("<u>CIRI</u>") under the Cook Inlet Region, Inc. Oil and Gas Lease C-0161667 dated March 1, 2011 between CIRI and Buccaneer Alaska, LLC is required to encumber the property or assign an interest in such Lease.

3.  Consent of the Alaska Mental Health Trust Authority ("<u>Trust Authority</u>") under The Alaska Mental Health Trust Authority Trust Land Office Competitive Oil and Gas Lease MHT No. 9300082 dated February 1, 2011 between the Trust Authority acting by and through the State of Alaska, Department of Natural Resources, Trust Land Office and Buccaneer Alaska, LLC is required for the approval of any assignment of an interest in such Lease.

4.  Consent of the Trust Authority under The Alaska Mental Health Trust Authority Trust Land Office Competitive Oil and Gas Lease MHT No. 9300070 dated January 1, 2011 between the Trust Authority acting by and through the State of Alaska, Department of Natural Resources, Trust Land Office and Buccaneer Alaska, LLC is required for the approval of any assignment of an interest in the Mortgages in such Lease.

5.  Consent of the State of Alaska Department of Natural Resources (the "DNR") is required for the approval of any assignment of an interest in any DNR Leases in Alaska.