**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **Buccaneer Resources, LLC** *et al.*,[1] | § | **Case No. 14-60041 through** |
| | § | **14-60049** |
| **Debtors** | § | |
| | § | **Jointly Administered Under** |
| | § | **Case No. 14-60041** |

**FIRST AMENDED DISCLOSURE STATEMENT ACCOMPANYING THE FIRST
AMENDED JOINT PLAN OF REORGANIZATION FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**
(as modified through November 5, 2014)

**FULBRIGHT & JAWORSKI LLP**
WILLIAM R. GREENDYKE
STATE BAR NO. 08390450
JASON L. BOLAND
STATE BAR NO. 24040542
R. ANDREW BLACK
STATE BAR NO. 02375110
1301 MCKINNEY STREET, SUITE 5100
HOUSTON, TEXAS 77010-3095
TELEPHONE: (713) 651-5151
FACSIMILE: (713) 651-5246
william.greendyke@nortonrosefulbright.com
jason.boland@nortonrosefulbright.com
andrew.black@nortonrosefulbright.com

ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION

Dated:  November 5, 2014

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: (i) Buccaneer Energy Limited (0107); (ii) Buccaneer Energy Holdings, Inc. (7170); (iii) Buccaneer Alaska Operations, LLC (7562); (iv) Buccaneer Resources, LLC (8320); (v) Buccaneer Alaska, LLC (4082); (vi) Kenai Land Ventures, LLC (2661); (vii) Buccaneer Alaska Drilling, LLC (7781); (viii) Buccaneer Royalties, LLC (5015); and (ix) Kenai Drilling, LLC (6370).

# TABLE OF CONTENTS

**Page**

ARTICLE I INTRODUCTION ...................................................................................... 1

    A.    General Information Concerning Disclosure Statement and Plan ................................................................................................... 1
    B.    Disclaimers ................................................................................................. 2
    C.    Answers to Commonly Asked Questions. ................................................. 5
    D.    Recommendation of the Debtors to Approve the Plan ............................. 8
    E.    Rules of Interpretation ............................................................................... 8

ARTICLE II OVERVIEW OF THE PLAN ................................................................... 9

ARTICLE III GENERAL INFORMATION REGARDING THE DEBTORS ......................... 11

    A.    Overview of the Debtors' Businesses ..................................................... 11
    B.    Description of the Debtors' Corporate Structure. ................................... 12
    C.    Description of the Debtors' Management and Board. ............................. 13
    D.    Description of the Debtors' Businesses ................................................... 14
    E.    The Debtors' Capital Structure ............................................................... 16
    F.    Events Leading to the Filing of these Chapter 11 Cases ....................... 18
    G.    Significant Events during the Chapter 11 Cases ..................................... 22
    H.    The Ancillary Insolvency Proceeding in Australia ................................. 25
    I.    The AIX/Meridian Settlement ................................................................. 25

ARTICLE IV ASSETS AND LIABILITIES OF THE DEBTORS .......................................... 26

    A.    The Debtors' Pre-Petition Assets ........................................................... 26
    B.    The Debtors' Pre-Petition Liabilities ..................................................... 27
    C.    Avoidance Actions .................................................................................. 27
    D.    Preservation of Claims and Causes of Action ........................................ 29

ARTICLE V CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN ........................................................................................................ 37

    A.    Administrative Claims and Priority Tax Claims ..................................... 37
    B.    Classification of Claims and Interests ..................................................... 38
    C.    Summary of Proposed Distributions Under the Plan .............................. 39

ARTICLE VI MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN ........................................................................................................ 43

    A.    Sale of Substantially All Assets of the Debtors ..................................... 43
    B.    Rejection of Executory Contracts and Unexpired Leases ...................... 44
    C.    Liquidating Trustee ................................................................................. 45
    D.    Creation of the Liquidating Trust ........................................................... 45

E.      Prosecution, Enforcement and Compromise of Claims
        Belonging to the Bankruptcy Estates ...................................... 46
F.      Payment of U.S. Trustee Fees ................................................ 47
G.      Allowance, Objection to, Compromise, Adjustment and
        Estimation of Proofs of Claim ............................................... 47
H.      Bar Dates for Unclassified Claims ......................................... 48

ARTICLE VII VOTING PROCEDURES AND CONFIRMATION
          REQUIREMENTS ................................................................... 48

A.      Ballots and Voting Deadline ................................................... 48
B.      Holders of Claims Entitled to Vote ........................................ 49
C.      Bar Date for Filing Proofs of Claim ...................................... 49
D.      Definition of Impairment ....................................................... 50
E.      Classes Impaired Under the Plan ........................................... 50
F.      Information on Voting and Ballots ......................................... 51
G.      Confirmation of Plan .............................................................. 51

ARTICLE VIII EFFECT OF CONFIRMATION OF THE PLAN, INJUNCTION
          AGAINST ENFORCEMENT OF PRE-CONFIRMATION DEBT
          AND EXCULPATION ............................................................. 56

A.      Effect of Confirmation of the Plan ......................................... 56
B.      Prohibition Against Enforcement of Pre-Confirmation Debt,
        Exculpation .............................................................................. 57

ARTICLE IX CONDITIONS PRECEDENT TO EFFECTIVE DATE ..................... 57

ARTICLE X LIQUIDATION ANALYSIS, FEASIBILITY, AND RISK FACTORS .............. 58

A.      Liquidation Analysis ............................................................... 58
B.      Feasibility of the Plan ............................................................. 58
C.      Risks Associated with the Plan .............................................. 59

ARTICLE XI ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS ................... 62

A.      Alternative Plans .................................................................... 62
B.      Chapter 7 Liquidation ............................................................ 62
C.      Dismissal ................................................................................. 63

ARTICLE XII CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
          PLAN ...................................................................................... 63

A.      U.S. Federal Income Tax Consequences to the Debtors ........................ 64
B.      U.S. Federal Income Tax Consequences to U.S. Holders of
        Claims or Interests ................................................................. 65
C.      Information Reporting and Backup Withholding ..................... 66
D.      Importance of Obtaining Professional Tax Assistance ........................... 66

ARTICLE XIII CONCLUSION ................................................................... 67

## EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A      First Amended Joint Plan of Reorganization of the Debtors and Debtors-in-Possession Under Chapter 11 of the United States Bankruptcy Code (as modified through November 5, 2014)

Exhibit B      Order Conditionally Approving Disclosure Statement (without exhibits)

Exhibit C      Liquidation Analysis

# ARTICLE I
# INTRODUCTION

## A.      General Information Concerning Disclosure Statement and Plan

Buccaneer Resources, LLC, Buccaneer Energy Limited, Buccaneer Energy Holdings, Inc., Buccaneer Alaska Operations, LLC, Buccaneer Alaska, LLC, Kenai Land Ventures, LLC, Buccaneer Alaska Drilling, LLC, Buccaneer Royalties, LLC, and Kenai Drilling, LLC (collectively, the "Debtors"), submit this *First Amended Disclosure Statement Accompanying the First Amended Joint Plan of Reorganization for the Debtors and Debtors-in-Possession under Chapter 11 of the Bankruptcy Code (as modified through November 5, 2014)* (the "Disclosure Statement"), as may be amended from time to time, under § 1125 of the Bankruptcy Code and Rule 3016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to all of the Debtors' known Creditors and Interest Holders entitled to vote on the Plan. The purpose of this Disclosure Statement is to provide adequate information to enable Creditors and Equity Interest Holders who are entitled to vote on the *First Amended Joint Chapter 11 Plan of Reorganization for the Debtors and Debtors-in-Possession (as modified through November 5, 2014)* (the "Plan") to arrive at a reasonably informed decision in exercising their respective right to vote on the Plan.  A copy of the Plan is included with this Disclosure Statement.  Capitalized terms used but not defined in this Disclosure Statement shall have the meanings assigned to them in the Plan or in the Bankruptcy Code and Bankruptcy Rules.   All section references in this Disclosure Statement are to the Bankruptcy Code unless otherwise indicated.

The Debtors' assets are being marketed for sale with the assistance of a sales agent based on prior authorization from the Bankruptcy Court.  The Debtors anticipate that the majority of their oil and gas properties and interests will be sold at an auction to be held prior to the hearing on the Plan.  This Plan will not become effective until after the closing of this sale.

On the Effective Date, after auction of the Debtors' assets, a Settlement Payment of $10,000,000 will be transferred from the Debtors' Estates to the Liquidating Trust to be held and distributed for the benefit of Allowed Unsecured Claims and Equity Interests.  Additional funds shall be transferred from the Debtors' estates to the Liquidating Trustee to be held in a segregated, non-trust account, and paid to holders of Allowed Administrative Claims.

To the extent funds in the Debtors' estates are insufficient to make the Settlement Payment or pay Allowed Administrative Claims (subject, in the case of Committee Professional Fee Claims, to the maximum amount of the Committee Professional Fund), such shortfall will be paid by AIX Energy, LLC, the Debtors' prepetition secured lender.

The Plan provides for the creation of the Liquidating Trust for the benefit of the Allowed Unsecured Claims and Equity Interests, to be administered by the Liquidating Trustee.  The Liquidating Trustee will collect and liquidate the Liquidating Trust Assets and prosecute the Causes of Action for the benefit of creditors and make distributions to the beneficiaries of the Liquidating Trust.  The Plan also proposes the creation of a Post-Confirmation Committee to monitor the administration of the Liquidating Trust. Upon the Effective Date of the Plan, the Unsecured Creditors Committee will be terminated. Although the Debtors and the Committee have not completed the investigation of the possible Causes of Action, all such Causes of Action

-1-

will be preserved and retained by the Debtors and transferred to the Liquidating Trust. Additional information regarding the retained Causes of Action will be provided in the Plan Supplement described below.

The Debtors have proposed the Plan consistent with the provisions of the Bankruptcy Code. The purpose of the Plan is, among other things, to (i) distribute the Settlement Payment and Committee Professional Fund along with any excess proceeds, if any, resulting from the sale of the Debtors' oil and gas assets sold prior to the Effective Date of the Plan; (ii) facilitate the prosecution of the Debtors' Causes of Action and claims against third parties and the sale of any of the Debtors' remaining unsold assets not otherwise subject to AIX Energy, LLC's liens and security interests as provided by and subject to the AIX/Meridian Settlement (defined below); (iii) distribute the litigation and sales proceeds, if any, and other assets of the estates transferred to the Liquidating Trust provided by and subject to the AIX/Meridian Settlement; and (iv) maximize recovery to each Class of Claims and Equity Interests. The Debtors believe that the Plan provides for the maximum recovery available for all Classes of Claims and Equity Interests.

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS APPOINTED IN THIS CASE BY THE UNITED STATES TRUSTEE SUPPORTS CONFIRMATION OF THE PLAN, AND URGES ALL UNSECURED CREDITORS TO VOTE IN FAVOR OF AND TO SUPPORT CONFIRMATION OF THE PLAN.

This Disclosure Statement is not intended to replace a careful review and analysis of the Plan, including the specific treatment of Claims and Equity Interests under the Plan. It is submitted as an aid and supplement to your review of the Plan and to explain the terms of the Plan. Every effort has been made to fairly summarize the Plan and to inform Creditors and Interest Holders how various aspects of the Plan affect their respective positions.

**The Debtors will file a Plan Supplement containing additional information relating to the Plan not later than five (5) business days prior to the Voting Deadline described below.** You may obtain a copy of the Plan Supplement through the Bankruptcy Court's PACER System at *www.txs.uscourts.gov* or at the website of the Debtors' Noticing and Solicitation Agent at *http://dm.epiq11.com/BUC.*

### B.    Disclaimers

NO SOLICITATION OF VOTES HAS BEEN OR MAY BE MADE EXCEPT PURSUANT TO THIS DISCLOSURE STATEMENT AND § 1125 OF THE BANKRUPTCY CODE. NO PERSON HAS BEEN AUTHORIZED TO USE ANY INFORMATION CONCERNING THE DEBTORS TO SOLICIT ACCEPTANCES OR REJECTIONS OF THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. CREDITORS AND INTEREST HOLDERS SHOULD NOT RELY ON ANY INFORMATION RELATING TO THE DEBTORS OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT, ANY ATTACHMENTS THERETO AND THE PLAN.

EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATION CONCERNING THE DEBTORS, THEIR ASSETS, THEIR

LIABILITIES, PAST OR FUTURE OPERATIONS, OR CONCERNING THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE IMMEDIATELY REPORTED TO COUNSEL FOR THE DEBTORS AND COUNSEL FOR THE COMMITTEE.

THE DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO AND MADE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.  UNLESS ANOTHER TIME IS SPECIFIED, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT.  NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE CONCERNING THE DISCLOSURE STATEMENT AND THE PLAN SHALL UNDER ANY CIRCUMSTANCES IMPLY THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED. HOLDERS OF CLAIMS AND INTERESTS MUST RELY ON THEIR OWN EVALUATION OF THE DEBTORS AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN IN DECIDING WHETHER TO ACCEPT OR REJECT THE PLAN.

THE INFORMATION PROVIDED HEREIN WAS OBTAINED FROM A VARIETY OF SOURCES AND IS BELIEVED TO BE RELIABLE.  HOWEVER, THE DEBTORS HAVE NOT BEEN ABLE TO INDEPENDENTLY VERIFY EACH AND EVERY STATEMENT CONTAINED HEREIN.  ACCORDINGLY, THE DEBTORS AND THEIR PROFESSIONALS CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.  MOREOVER, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE SUMMARY OF THE PLAN AND OTHER DOCUMENTS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE ACTUAL DOCUMENTS THEMSELVES AND THE EXHIBITS THERETO.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE.  FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE FINANCIAL PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND, THUS, THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

THE DEBTORS' BUSINESS AFFAIRS ARE COMPLEX.  IT IS POSSIBLE THAT THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN COULD HAVE

NEGATIVE TAX AND OTHER ECONOMIC CONSEQUENCES.  THE DEBTORS MAKE NO REPRESENTATIONS REGARDING THE TAX IMPLICATIONS OF ANY TRANSACTION CONTEMPLATED UNDER THE PLAN.  IT IS NOT UNCOMMON FOR PARTIES TO RETAIN THEIR OWN TAX ADVISORS TO ANALYZE THE PLAN. THE DEBTORS ENCOURAGE ALL PERSONS THAT MIGHT BE AFFECTED TO SEEK INDEPENDENT ADVICE REGARDING THE TAX EFFECTS OF THE PLAN.

DISTRIBUTION OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS ANY REPRESENTATION OR WARRANTY AT ALL, EITHER EXPRESS OR IMPLIED, BY THE DEBTORS OR THEIR PROFESSIONALS THAT THE PLAN IS FREE FROM RISK, THAT THE ACCEPTANCE OF THE PLAN WILL RESULT IN A RISK-FREE REORGANIZATION AND/OR LIQUIDATION OF THE DEBTORS' ASSETS OR THAT ALL POTENTIAL ADVERSE EVENTS HAVE BEEN ANTICIPATED.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE.   THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE.

THE CONDITIONAL APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTY OF THE ACCURACY OR THE COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT AND THE PLAN SHOULD BE READ IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.  FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THE TERMS OF THE PLAN ARE SUMMARIZED IN THIS DISCLOSURE STATEMENT, BUT ALL SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.

THE COMMITTEE SUPPORTS CONFIRMATION OF THE PLAN, AND URGES ALL UNSECURED CREDITORS TO VOTE IN FAVOR OF AND TO SUPPORT CONFIRMATION OF THE PLAN.

*******

FOR A VOTE ON THE PLAN TO BE COUNTED, THE BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE DEBTORS' NOTICING AND SOLICITATION AGENT, EPIQ BANKRUPTCY SOLUTIONS, LLC, NO LATER THAN **5:00 P.M. EASTERN TIME, ON DECEMBER 2, 2014**.  SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION NOTICE ACCOMPANYING THE DISCLOSURE STATEMENT AND APPROVED BY THE BANKRUPTCY COURT.  ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL NOT BE COUNTED UNLESS OTHERWISE DETERMINED BY THE DEBTORS IN THEIR SOLE AND ABSOLUTE DISCRETION.  **THE CONFIRMATION HEARING WILL COMMENCE ON DECEMBER 8, 2014 AT 9:00**

A.M. CENTRAL TIME, BEFORE THE HONORABLE DAVID R. JONES, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, VICTORIA DIVISION, 515 RUSK, HOUSTON, TEXAS 77002.  THE DEBTORS MAY CONTINUE THE CONFIRMATION HEARING FROM TIME TO TIME WITHOUT FURTHER NOTICE OTHER THAN AN ADJOURNMENT ANNOUNCED IN OPEN COURT OR A NOTICE OF ADJOURNMENT FILED WITH THE BANKRUPTCY COURT AND SERVED ON THE MASTER SERVICE LIST AND THE ENTITIES WHO HAVE FILED AN OBJECTION TO THE PLAN, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.  THE BANKRUPTCY COURT, IN ITS DISCRETION AND BEFORE THE CONFIRMATION HEARING, MAY PUT IN PLACE ADDITIONAL PROCEDURES GOVERNING THE CONFIRMATION HEARING.  THE PLAN MAY BE MODIFIED, IF NECESSARY, PRIOR TO, DURING, OR AS A RESULT OF THE CONFIRMATION HEARING, WITHOUT FURTHER NOTICE TO PARTIES IN INTEREST.

**THE PLAN OBJECTION DEADLINE IS DECEMBER 2, 2014, AT 5:00 P.M. CENTRAL TIME**.  ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM OR THE NATURE OF ITS EQUITY INTEREST AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### C.    Answers to Commonly Asked Questions.

As part of the Debtors' efforts to inform Creditors and Interest Holders regarding the Plan and the Plan confirmation process, the following summary provides answers to questions which parties who receive a disclosure statement often ask.

**THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH CONTROLS IN CASE OF ANY INCONSISTENCY.**

### 1.    Who are the Debtors?

The Debtors are: Buccaneer Resources, LLC; Buccaneer Energy Limited; Buccaneer Energy Holdings, Inc.; Buccaneer Alaska Operations, LLC; Buccaneer Alaska, LLC; Kenai Land Ventures, LLC; Buccaneer Alaska Drilling, LLC; Buccaneer Royalties, LLC; and Kenai Drilling, LLC.

The Debtors filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 31, 2014 (the "Petition Date") in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division.

### 2.    What is a Chapter 11 bankruptcy?

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code that allows financially distressed businesses to reorganize their debts or to liquidate their assets in a

controlled fashion.  The commencement of a chapter 11 case creates an "estate" containing all of the legal and equitable interests of the debtor in property as of the date the bankruptcy case is filed.  During a chapter 11 bankruptcy case, the debtor remains in possession of its assets unless the Court orders the appointment of a trustee.  No trustee has been appointed in the Debtors' cases.  The Plan is being jointly proposed by the Debtors.  The Plan is being jointly proposed by the Debtors, and is supported by the Committee who has provided input regarding the terms of the Plan and this Disclosure Statement.  The Debtors have worked with their secured lender and the Committee to propose a joint plan of reorganization in an effort to minimize the overall administrative costs associated with these bankruptcy cases and maximize value to Creditors and Interest Holders.

> **3.      If the Plan governs how my Claim or Interest is treated, what is the purpose of this Disclosure Statement?**

The Bankruptcy Code requires that in order to solicit votes on a bankruptcy plan, the proponent of the plan must first prepare a disclosure statement that provides sufficient information to allow creditors and interest holders to make an informed decision about the plan.  The disclosure statement and plan are distributed to creditors and interest holders only after the Bankruptcy Court has approved the disclosure statement and determined that the disclosure statement contains information adequate to allow creditors and interest holders to make an informed judgment about the plan.  At that time, creditors and interest holders whose claims and interests are impaired under the Plan also receive a voting ballot.

> **4.      Has this Disclosure Statement been approved by the Bankruptcy Court?**

On November 5, 2014, the Bankruptcy Court conditionally approved this Disclosure Statement as containing adequate information.  "Adequate information" means information of a kind, and in sufficient detail, as far as is practicable considering the nature and history of the Debtors and the condition of the Debtors' books and records, to enable a hypothetical investor typical of holders of claims or interests of the relevant classes to make an informed judgment whether to vote to accept or reject the Plan.  The Bankruptcy Court will consider any objections to the adequacy of the information in this Disclosure Statement at the Confirmation Hearing described below and in the Plan, and final approval of the Disclosure Statement will be determined at that time.   The Bankruptcy Court's conditional approval of this Disclosure Statement does not constitute an endorsement of any of the representations contained in either the Disclosure Statement or the Plan.

> ***The Committee supports the conditional approval of this Disclosure Statement and confirmation of the Plan, and urges all unsecured creditors to vote in favor of and to support confirmation of the Plan.***

> **5.      How do I determine how my Claim or Interest is classified?**

To determine the classification of your Claim or Interest, you must determine the nature of your Claim or Interest. Under the Plan, Claims and Interests are classified into a series of classes.  The pertinent articles and sections of the Disclosure Statement and Plan disclose, among

other things, the treatment that each class of Claims or Interests will receive if the Plan is confirmed.

### 6.      Why is confirmation of the Plan important?

The Bankruptcy Court's confirmation of the Plan is a condition to the Debtors carrying out the treatment of Creditors and Interest Holders under the Plan.  Unless the Plan is confirmed, and any other conditions to confirmation or to the effectiveness of the Plan are satisfied, all parties are legally prohibited from satisfying Claims or Interests as provided in the Plan.  Put more simply, confirmation of a plan in chapter 11 is required before any distributions can be made to creditors absent a court order providing otherwise.

### 7.      What is necessary to confirm the Plan?

Under applicable provisions of the Bankruptcy Code, confirmation of the Plan requires that, among other things, at least one class of impaired Claims or Interests vote to accept the Plan.  Acceptance by a class of claims or interests means that at least two-thirds in the total dollar amount of the Allowed Claims or Interests, and more than one-half in number of the Allowed Claims, actually voting in the class vote in favor of the Plan.  Because only those claims or interests who vote on a plan will be counted for purposes of determining acceptance or rejection of a plan by an impaired class, a plan can be approved with the affirmative vote of members of an impaired class who own less than two-thirds in amount and one-half in number of the claims/interests.  Besides acceptance of the Plan by each class of impaired creditors or interests, a bankruptcy court also must find that the Plan meets a number of statutory tests before it may confirm the Plan.  These requirements and statutory tests generally are designed to protect the interests of holders of impaired claims or interests who do not vote to accept the Plan but who will nonetheless be bound by the Plan's provisions if the bankruptcy court confirms the Plan.

Even if all classes of claims and interests accept a plan of reorganization, a bankruptcy court may nonetheless still deny confirmation.  Bankruptcy Code section 1129 sets forth the requirements for confirmation and, among other things, requires that a plan be in the "best interests" of impaired and dissenting creditors and interest holders and that the plan be feasible.  The "best interests" test generally requires that the value of the consideration to be distributed to impaired and dissenting creditors and interest holders under a plan may not be less than those parties would receive if the debtor were liquidated under a hypothetical liquidation occurring under chapter 7 of the Bankruptcy Code.  A plan must also be determined to be "feasible," which generally requires a finding that there is a reasonable probability that the debtor will be able to perform the obligations incurred under the plan and that the debtor will be able to continue operations without the need for further financial reorganization.

In addition to the statutory requirements imposed by the Bankruptcy Code, the plan itself also provides for certain conditions that must be satisfied as conditions to confirmation.

If one or more classes vote to reject the Plan, the Debtors may still request that the bankruptcy court confirm the Plan under § 1129(b) of the Bankruptcy Code.  To confirm a plan not accepted by all classes, the plan proponent must demonstrate that the plan does not

discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and that has not accepted, the plan. This method of confirming a plan is commonly called a "cramdown."

### 8.      Is there a Committee in this case?

Yes.  On June 10, 2014, the Office of the United States Trustee appointed an official committee of unsecured creditors in this case.  The Official Committee of Unsecured Creditors represents the collective interests of all unsecured creditors in these Chapter 11 Cases.  The Committee has provided input regarding the information contained in this Disclosure Statement and the terms of the Plan, supports the conditional approval of this Disclosure Statement, and urges all unsecured creditors to vote in favor of and to support confirmation of the Plan.

### 9.      When is the deadline for returning my ballot?

The Bankruptcy Court has directed that, to be counted for voting purposes, your ballot must be received by the Debtors' Balloting Agent, Epiq Bankruptcy Solutions, LLC by **December 2, 2014** at **5:00 p.m. Eastern** Time.

**IT IS IMPORTANT THAT ALL IMPAIRED CREDITORS AND INTEREST HOLDERS VOTE ON THE PLAN.  THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE BEST POSSIBLE RECOVERY TO CREDITORS AND INTEREST HOLDERS.  THE DEBTORS THEREFORE BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF CREDITORS AND INTEREST HOLDERS AND RECOMMENDS THAT ALL IMPAIRED CREDITORS VOTE TO ACCEPT THE PLAN.  THE COMMITTEE ALSO SUPPORTS CONFIRMATION OF THE PLAN, AND RECOMMENDS THAT ALL UNSECURED CREDITORS VOTE TO ACCEPT THE PLAN.**

### D.      Recommendation of the Debtors to Approve the Plan

The Debtors approved the solicitation of acceptances of the Plan and all of the transactions contemplated thereunder. In light of the benefits to be attained by the holders of Claims and Interests contemplated under the Plan, the Debtors and Committee recommend that such holders of Claims and Interests vote to accept the Plan. The Debtors have reached this decision after considering the alternatives to the Plan that are available to the Debtors, and after consulting with and receiving input from the Committee.  These alternatives include liquidation under chapter 7 of the Bankruptcy Code or reorganization under chapter 11 of the Bankruptcy Code with an alternative plan of reorganization.  The Debtors determined, after consulting with their financial and legal advisors as well as the financial and legal advisors for the Committee, that the transactions contemplated in the Plan would likely result in a distribution of greater value to creditors than would a liquidation of the nine Debtors under chapter 7.

### E.      Rules of Interpretation

The following rules for interpretation and construction shall apply to the Disclosure Statement:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the

masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference in the Disclosure Statement to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (3) unless otherwise specified, any reference in the Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to a person or entity as a holder of a Claim or Interest includes that person or entity's successors and assigns; (5) unless otherwise specified, all references in the Disclosure Statement to Articles are references to Articles of the Disclosure Statement; (6) unless otherwise specified, all references in the Disclosure Statement to exhibits are references to exhibits to the Disclosure Statement; (7) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to a particular portion of the Disclosure Statement; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (9) unless otherwise set forth in the Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form in the Disclosure Statement that is not otherwise defined in the Disclosure Statement, Plan, or exhibits to the Disclosure Statement Order, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (11) all references to docket numbers of documents filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, unless otherwise stated; (13) in computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply, and if the date on which a transaction may occur pursuant to the Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day; and (14) unless otherwise specified, all references in the Disclosure Statement to monetary figures shall refer to currency of the United States of America.

## ARTICLE II
## OVERVIEW OF THE PLAN

An overview of the Plan is set forth below.  This overview is qualified in its entirety by reference to the Plan.  If the Court confirms the Plan and, in the absence of any applicable stay, all other conditions set forth in the Plan are satisfied, the Plan will take effect on the Effective Date.  A summary of certain risk factors relating to the Plan is set forth below and in Article X of the Disclosure Statement.

The Debtors' assets are being marketed for sale with the assistance of a sales agent based on prior authorization from the Bankruptcy Court.  The Debtors anticipate that the majority of their oil and gas properties and interests will be sold at an auction to be held prior to the hearing on the Plan.  **The Plan will not become effective until after the closing of this sale**.  The proceeds of the sale will be distributed pursuant to a settlement agreement between the Debtors, the Committee and the secured lender to the Debtors approved by the Bankruptcy Court on September 2, 2014.  Among other things, a Settlement Payment of $10,000,000 will be funded for the benefit of the Debtors' creditors pursuant to the Plan.

The Plan provides for the creation of a Liquidating Trust for the benefit of Holders of Allowed Priority Unsecured Tax Claims, Priority Unsecured Non-Tax Claims, General Unsecured Claims, Subordinated Claims, and Equity Interests.  The Plan also proposes the creation of a Post-Confirmation Committee to monitor the administration of the Liquidating Trust.  The expenses of collection, prosecution and administration will be paid from the trust assets.

Upon the Effective Date of the Plan, the Settlement Payment and all other assets not otherwise sold under the Bid and Sale Motion (which assets shall include all retained claims and Causes of Action) will be transferred to a Liquidating Trust, provided, however, that Coverage Claims and D&O Insurance except insurance proceeds will vest with the Reorganized Debtors, and will not be transferred to the Liquidating Trust.  The Liquidating Trust will be vested with and have the sole authority to, among other things, review, initiate, and/or pursue any and all claims and Causes of Action (including Avoidance Actions), file claim objections, and set reserves, and the Debtors will have no responsibility or authority to review, initiate, and/or pursue any and all claims and Causes of Action (including Avoidance Actions).  The Liquidating Trust will be administered by the Liquidating Trustee, who will make Distributions provided by the Plan to holders of priority, unsecured and subordinated claims and equity interests.  The Liquidating Trustee will collect and liquidate the assets and prosecute the Causes of Action for the benefit of creditors and make distributions to the beneficiaries of the Liquidating Trust.  Distributions to holders of administrative claims will be funded from Available Cash Collateral and backstopped by AIX as provided in the 9019 Order, and will be made by the Liquidating Trustee as Disbursing Agent.

The Plan is also premised on the substantive consolidation of the Debtors' estates solely for purposes of voting and making distributions.  Such substantive consolidation results in combining the creditors of the companies solely for purposes of voting on reorganization plans; and, solely for purposes of making distributions, pooling the assets of, and claims against, the Debtors, and satisfying liabilities from the resultant common fund.  Such substantive consolidation does not actually affect, alter or impair the Debtors legal or corporate structure, does not prejudice the Liquidating Trustee's ability to bring Causes of Action as they existed immediately before the Effective Date, and does not alter any insurance coverage provided to the Debtors or their directors or officers prior to the Petition Date.

The Bankruptcy Court's approval of the Debtors' request for substantive consolidation solely for purposes of voting and making distributions is a condition for the effectiveness of this Plan.  **If the Bankruptcy Court does not grant the Debtors' request for substantive consolidation,  the voting, confirmation and distribution procedures under the Plan will be affected, the Debtors may need to modify the Plan and may need to re-solicit votes on any modified Plan.**  The treatment of General Unsecured Claims under the Plan could be materially affected by this modification.

*Counsel for CIRI (defined below) has requested that the following be included in the Disclosure Statement:*

As a general matter, almost all substantive consolidations will cause prejudice to some creditors of at least one of the entities to be consolidated.  For this reason, courts,

particularly in the Fifth Circuit where the Debtors' bankruptcy cases are located, warn that the power to consolidate is an "extreme" or "drastic" remedy to be used sparingly. Cook Inlet Region Inc. ("CIRI") intends to object to the Debtors' request for substantive consolidation under the Plan,  because CIRI disputes the necessity or alleged benefits of the proposed consolidation.   CIRI particularly questions the alleged difficulty and expense of segregating the assets and liabilities of each of the Debtors, and questions whether a partial consolidation of only some of the Debtors, or if two or more consolidations of various Debtors, would be more appropriate in this case (for example, if the Debtors' "lower-48" operations were consolidated in one pool and the Alaska operations were consolidated in a separate pool), instead of a single consolidation of all the Debtors.

The Debtors (i) support substantive consolidation of the Debtors' estates; (ii) believe that substantive consolidation is appropriate in these cases and will result in a greater recovery to all creditors than if the estates were not substantively consolidated; (iii) disagree with CIRI's objection; and (iv) will ask the Bankruptcy Court to overrule any objection lodged by CIRI with respect to substantive consolidation.  The Committee supports substantive consolidation of the Debtors' estates on the terms set forth in the Plan.

## ARTICLE III
## GENERAL INFORMATION REGARDING THE DEBTORS

### A.    Overview of the Debtors' Businesses

The Debtors are nine affiliated companies involved in the exploration for and production of oil and natural gas in North America.  Current operations are principally focused on both onshore and offshore opportunities in the Cook Inlet of Alaska as well as the development of offshore projects in the Gulf of Mexico and onshore oil opportunities in Texas and Louisiana.

The ultimate parent company of the Debtors, Buccaneer Energy Limited ("BCC"), is a publicly traded independent oil and gas company founded in 2006 and listed on the Australian Securities Exchange (the "ASX") under the symbol "BCC".[2]   Although BCC is an Australian listed entity, the company operates exclusively through its eight U.S. subsidiaries, each of which are headquartered in the U.S. and collectively maintained office, warehouse and a corporate apartment lease properties located in Houston, Texas, and Kenai, Anchorage, and Soldotna, Alaska.

The Debtors have pursued a business strategy of attempting to identify undervalued assets that can be quickly monetized through the use of leading edge, proven technologies.  For example, in 2008 when natural gas prices reached over $10 per MCF in the U.S., the Debtors, through Houston-based Buccaneer Resources, LLC ("BUC"), accumulated several offshore opportunities in the shallow Gulf of Mexico stretching between Texas and Louisiana.  BUC increased its reserves by over 180% in a matter of months.  At the same time, BUC also acquired

---

[2] An initial public offering ("IPO") was successfully completed and BCC was listed on the ASX on November 19, 2007.  On February 19, 2014, BCC requested and was granted a voluntary suspension of all trading of its securities. Pursuant to that request, trading continues to be suspended.

acreage in the coveted Eagle Ford Shale under the Austin Chalk in Lee County, Texas, one of the oldest producing regions in the U.S.  As the price of natural gas fell in the lower 48 states of the U.S., the Debtors repositioned themselves to take advantage of opportunities in Alaska.

A more detailed description of the Debtors' corporate structure and business is discussed below.

**B.      Description of the Debtors' Corporate Structure.**

The Debtors' corporate structure is as follows:



As noted above, BCC is a publicly listed Australian holding company that operates in the U.S. entirely through its wholly-owned subsidiaries—primarily BUC and Buccaneer Alaska, LLC ("BAK").  While BCC has an office in Australia, it has no employees; rather, BCC's operations are limited to (a) ensuring compliance with the ASX and related reporting requirements; and (b) other administrative functions.

BUC, also formed in 2006, is a Texas limited liability company based in Houston, Texas. BUC operates as an upstream oil and gas company specializing in the development and expansion of behind-pipe proved and probable reserves, and low-risk exploration plays with growth potential.  BUC owns all of the Debtors' interests in oil and gas leaseholds in Texas which—with one exception—are currently non-producing.  Immediately prior to the Petition Date, BUC employed 33 salaried and hourly employees.  To date, as a result of a significant reduction in BUC's work force, only 6 employees remain.

BAK is a Texas limited liability company also based in Houston, Texas. BAK owns all of the Debtors' interests in oil and gas leaseholds in Alaska, including oil and gas wells in the Alaskan Cook Inlet.

Buccaneer Alaska Operations, LLC ("BAO"), formed in 2010, is an Alaska limited liability company that operates on behalf of BAK.

Buccaneer Energy Holdings, Inc. ("BEH") is a Delaware company formed in November 2012 to hold certain permits for BAO. Specifically, in order to commence drilling in Alaska, various permits were required to be held in the name of the parent company who, at the time, was BCC. Because the State of Alaska required that such permits be held by a U.S. corporation, BEH was established.

Kenai Drilling, LLC ("Kenai Drilling") is an Alaska limited liability company established in 2012 to manage drilling operations for Buccaneer in the Cook Inlet. Kenai Drilling was also the charterer of an offshore jack-up drilling rig named the Endeavour—Spirit of Independence (the "Endeavour") pursuant to a certain bareboat charter agreement. As discussed, below, the Debtors rejected the bareboat charter agreement on June 10, 2014, with such rejection effective as of the Petition Date.

Buccaneer Alaska Drilling, LLC ("BAD"), formed in 2010, is an Alaska limited liability company and is the sole member of Kenai Drilling.

Buccaneer Royalties, LLC ("Buccaneer Royalties") is a Texas limited liability company formed in October 2011 that owns certain overriding royalty interests ("ORRIs")[3] created by BAK and BUC against certain of the Buccaneer leaseholds. Buccaneer Royalties was formed for the express purpose to hold these contingent ORRIs to secure the repayment of certain obligations owed to the Alaska Industrial Development and Export Authority ("AIDEA") pursuant to a certain LLC Agreement relating to Kenai Offshore Ventures, LLC ("KOV"), an entity originally organized by BAD. The Debtors' relationship with KOV and AIDEA is discussed more fully below.

Kenai Land Ventures, LLC ("Kenai Land") f/k/a Buccaneer Offshore Operations, LLC is an Alaska limited liability company formed in 2011 to acquire rights in a certain onshore drilling rig named the Glacier Drilling Rig # 1 (the "Glacier Rig").

### C. Description of the Debtors' Management and Board.

The current members of the Board of Directors of BCC are Dr. Alan Stein, Gavin Wilson, and Patrick O'Connor.

---

[3] An "overriding royalty interest" means fractional, undivided interests or rights of participation in the oil or gas, or in the proceeds from the sale of the oil or gas, produced from a specified tract or tracts, which are limited in duration to the terms of an existing lease and which are not subject to any portion of the expense of development, operation or maintenance.

The current senior management group serving on behalf of all Debtors includes John T. Young, Jr. as Chief Restructuring Officer (with all the authority and duties of the vacant Chief Executive Officer position) and Ron Huff as Chief Financial Officer.

### D.      Description of the Debtors' Businesses

#### 1.      The Debtors' Acquisition of Leasehold Interests and Related Operations in the Gulf Coast.

When BCC was formed in 2006, BCC's strategy was to concentrate on acquiring small prospects in the Gulf of Mexico and onshore coastal areas which, because of their size, were not appealing to major oil companies but presented potential economic opportunity favorable to smaller, more aggressive firms like BCC.  Of the two onshore working interests BUC acquired in Texas, the "Alexander unit" in Lee County, Texas, is currently the only remaining active unit. However, even this unit well is not currently producing in paying quantities.

BUC's offshore prospect, a 65% working interest in the Pompano field which is located approximately seven miles offshore in the Gulf of Mexico and approximately 28 miles east of Port O'Connor, Texas, was acquired in 2008. While the project has existing production facilities in place, all wells in this field are currently shut in,[4] and all of BUC's leases in the Pompano field have since expired.  All that remains of the expired leases is surface access that would be required in the event the project is not developed further and the wells are plugged and abandoned and production facilities are removed.

#### 2.      The Debtors' Expansion into Alaska.

In 2008, when the meltdown in financial markets significantly and negatively impacted the Debtors and their ability to raise funds to develop its Gulf Coast assets, the Debtors turned their focus to Alaska—specifically, the Cook Inlet basin, the second largest production area for oil and gas in the State of Alaska.  In addition to its production potential, Debtors sought to take advantage of Alaska's Clear and Equitable Share ("ACES") program which is designed specifically to develop and promote drilling activity in many of Alaska's undeveloped or underdeveloped locations, such as the Cook Inlet.  The program provides companies with generous incentives to develop existing resources in the area by offering a cash rebate of up to 65% of all monies spent on exploration, drilling, and building production facilities, and up to 45% of facilities related capital expenditures, such as on platforms, flow-lines and pipelines. Importantly, these incentives apply irrespective of the success of any well or development program.[5]

---

[4] BUC spudded its first well in the Pompano field on January 12, 2008, and its second well on February 24, 2008.

[5] After applying for ACES credits, it typically takes up to 120 days for the State of Alaska to issue the credit, and then another 30 days to convert the credit into cash.  To date, the Debtors have recovered a total of approximately $30.5 million in ACES rebates since commencing operations in Alaska, and the Debtors expect to receive an additional approximately $22.4 million in 2014.  AIDEA has asserted that it has a lien on certain of the ACES rebates, and CIRI has asserted that it may be entitled to a portion of the ACES rebates, depending on the outcome of the CIRI Litigation described below in section III.E.2(b).

The Debtors, through BAK, began their Alaskan program in March 2010, when BAK acquired 70,000 acres and onshore and offshore leases in the Cook Inlet.  With this acquisition, BAK became the 6th largest lease holder in the Cook Inlet and began an aggressive exploration and development program with both onshore and offshore components, beginning with the acquisition of 9,308 acres at the Kenai Loop Project[6] through leasing agreements with the Alaska Mental Health Land Trust ("MHLT"), the State of Alaska, and CIRI.

Upon acquiring an interest in the Kenai Loop Project, BAK, through use of the Glacier Rig, drilled the Kenai Loop No. 1-1 discovery well in April 2011, and began first commercial production in January 2012.  BAK subsequently drilled three additional wells in the Kenai Loop field, one producing well, one dry hole, and one well that was completed and tested but shut-in pending the resolution of a lease dispute with CIRI that is described below in section III.E.2(b). In May 2012, through a rig charter agreement executed by Kenai Land, the Debtors secured exclusive leasing rights for the Glacier Rig for a period of three (3) years through May 2015.

As part of the Debtors' plan to execute on their offshore program, the Debtors sought to acquire a jack-up rig.  On November 3, 2010, BAD organized KOV to acquire and own the "Endeavour"—an offshore jack-up rig capable of drilling in all areas of the Cook Inlet.  To obtain the necessary capital to acquire the Endeavour, Singapore based Ezion Holdings Limited ("Ezion")[7] was added as a member to KOV on April 14, 2011, and AIDEA[8] was added as a preferred member on November 8, 2011.  Pursuant to the joint venture, KOV would own the Endeavour while Kenai Drilling, a wholly owned subsidiary of BCC, would serve as operator and maintain control of the Endeavour through a Bareboat Charter Agreement (the "Charter") entered on November 3, 2011,[9] with an initial term of 5 years, during which time Kenai Drilling was required to pay KOV monthly pursuant to a specified day rate of approximately $70,000 for exclusive access of the rig.

Upon acquiring the Endeavour in November 2011, and because the Endeavour had been idle for several years, BAD and its venture partners, AIDEA and Ezion, deemed it necessary to complete extensive upgrades and repairs to ensure that the rig was ready for safe, long-term operations in Alaska.  The rig was dry docked at a shipyard in Singapore for six (6) months undergoing repairs and upgrades.  Those repairs and upgrades continued at the Homer Deep Water Dock in Homer, Alaska when the rig arrived in the Cook Inlet in August of 2012.  Upon

---

[6] The Kenai Loop is an onshore gas field near Kenai, Alaska located in the Cook Inlet.

[7] Ezion is a Singapore-based company that owns and operates a large fleet of support and drilling vessels for the oil and gas business.  Ezion currently has operations in Australia and the North Sea; this was Ezion's first investment in Alaska.  Overseas Chinese Banking Corporation, Ltd., a Singapore-based bank that has a long-term relationship with Ezion, provided a long-term, low interest loan for the rig purchase and refurbishment.

[8] AIDEA is a public corporation of the State of Alaska.  AIDEA invested $23.6 million in the LLC for the purchase of the rig, which amounts were to be paid back through six annual payments made by Kenai Drilling for use of the rig.  Additionally, as the preferred member in the LLC, over the five years of ownership payments, AIDEA was entitled to collect dividend payments and received a 3.5% ORRI in the Debtors' Texas and Alaskan properties, including the onshore Kenai peninsula leases.

[9] On March 28, 2013, Kenai Drilling entered into a Crew & Management Services Agreement (the "Spartan Agreement") with Spartan Offshore Drilling, LLC ("Spartan") to manage, on its behalf, the operation and maintenance of the Endeavour.  A further discussion of the Spartan Agreement is found below.

-15-

the Endeavour's arrival in Homer in August 2012, KOV worked with local contractors through the Endeavour's project manager, Archer Drilling, LLC ("Archer").[10]

The Endeavour drilled one producing well in the "Cosmopolitan project," one dry hole, and had to suspend drilling operations on a third well after the tidal action in the Inlet began to erode the sea bed around the jack-up legs.

### 3. The Debtors' Portfolio Review and Recapitalization Process.

Beginning in mid-2013 and continuing in 2014, the Board and management team of the Debtors undertook multiple initiatives to reduce debt and improve the Debtors' balance sheet. As part of its recapitalization initiative, the Debtors refinanced their existing debt facilities with Victory Park Capital ("Victory Park") in January 2014, with the assignment of the $100 million Victory Park Facility (defined below) to Meridian Capital CIS Fund, an affiliate of Meridian Capital International Fund (collectively, "Meridian"), on amended terms. The Victory Park Facility and Meridian Facility (as well as the assignment of the Meridian Facility to AIX Energy LLC ("AIX")), are discussed in more detail below.

In addition to this refinancing, the Debtors embarked on a series of asset sales designed to generate additional working capital. On January 24, 2014, the Debtors sold their interest in the Cosmopolitan project to BlueCrest Energy Inc. for a total consideration of $40.6 million.

Further, due to the various issues associated with the mobilization of the Endeavour rig and related issues tied to the Archer litigation described below, the Endeavour had not been fully utilized, and day rate charges had continued to accrue while the Rig remained idle at Port Graham in the Kenai Peninsula. On December 31, 2013, pursuant to a Membership Interest Purchase Agreement, BAD sold its membership interest in KOV to Teras Investments Pte Ltd.— a company organized under the laws of Singapore and a wholly owned subsidiary of Ezion—for $23,950,000. Proceeds from the sale were used to repay certain related unsecured loans of $11.2 million and to pay unpaid bareboat charter fees for the period of October 2013 to December 2013. No net cash proceeds flowed to the Debtors from this transaction.

The Meridian assumption of the Victory Park Facility (and subsequent assignment to and assumption by AIX), the sale of the Debtors' interest in the Cosmopolitan project, and the sale of BAD's 50% equity interest in KOV resulted in approximately $120 million in cash, debt repayments and debt reduction, including repayment of approximately $22.1 million to KOV, repayment of $10.8 million of the Meridian debt, and settlement of approximately $20.0 million of accounts payable.

### E. The Debtors' Capital Structure

### 1. The AIX Facility.

On January 25, 2013, the Debtors entered into a credit facility totaling $100 million with Chicago-based Victory Park. The credit facilities were broken into a Delayed Draw Senior

---

[10] As discussed below, KOV and several of the Debtors are currently in litigation with Archer in connection with work performed in connection with the Endeavour.

Secured Term Note (the "Term Note") with a maximum issue amount of $75 million, and a Senior Secured Revolver (the "Revolver," and collectively, the "Victory Park Facility") with a maximum limit of $25 million. The amount that could be drawn by the Debtors (the "Borrowing Base") under the Term Note was predominately determined by the value of the Proved Developed Producing ("PDP") reserves of the Debtors' 100%-owned Kenai Loop project. The Debtors initially drew on the Facility to refinance its previous lender and to pay fees and expenses associated with that transaction. The Victory Park Facility was to expire on June 30, 2016, and was secured by the Debtors' U.S. assets.

In early 2014, as part of the Debtors' recapitalization process discussed above, the Debtors executed an Amended and Restated Financing Agreement with Meridian, dated as of January 24, 2014, under which Meridian took assignment of the Victory Park Facility on amended terms (the "Meridian Facility"). The Meridian Facility was on similar commercial terms to the prior Victory Park Facility and encompassed, *inter alia*, (a) the existing Term Note that was held by Victory Park, drawn to $43.5 million; (b) the existing Revolver that was held by Victory Park drawn to $6.3 million; and (c) funds provided to the Debtors to pay $3.8 million for costs and expenses associated with the assignment from Victory Park. Thus, the total principal amount initially owed under the Meridian Facility was $6.6 million, with no further amounts available for draw down.

On April 30, 2014, AIX, a recently formed Delaware limited liability company affiliated with The Woodlands-based Branta II, LLC, took assignment of the Meridian Facility (the "AIX Facility"). As was the case under the Meridian Facility, each of BAO, BUC, BAK, Kenai Land, BAD and Kenai Drilling are Borrowers under the AIX Facility, which continues to be guaranteed by BEH and BCC. As of the Petition Date, the aggregate unpaid principal balance of the AIX Facility, including all accrued, unpaid interest, fees, expenses and other amounts owing under the financing agreement and credit documents, was $58,226,264.71. The AIX Facility matured on June 30, 2014.

## 2.    Outstanding Letter of Credit.

In addition to the AIX Facility, there is a $1.495 million letter of credit with Macquarie Bank Limited to satisfy the Debtors' share of certain bonding obligations for the Debtors' Pompano production facilities. The letter of credit is for the benefit of the prior owner, PetroQuest, and only satisfies the plugging and abandonment obligations if the parties to the Joint Operating Agreement are unable to fund the plugging and abandonment obligations themselves. The letter of credit is secured by cash deposits held by Macquarie Bank Limited in the amount of $1.5 million. The Plan provides that PetroQuest's rights in the letter of credit and Macquarie Bank Limited's rights in the cash cover account will be preserved after the Effective Date.

On the Petition Date, there was another $2.472 million letter of credit issued by Wells Fargo Bank, N.A. to back Kenai Drilling's obligations to Spartan Offshore Drilling, LLC ("Spartan") under a certain Crew & Management Services Agreement (the "Spartan Agreement"). The letter of credit was secured by cash deposits held by Wells Fargo Bank, N.A. Kenai Drilling received Notices of Late Payment from Spartan, alleging that $941,249.94 was past due and owing to Spartan under the Spartan Agreement. As of the Petition Date, Spartan

had drawn over $822,000 on the letter of credit.  On June 23, 2014, Spartan drew another $571,295.55 on the letter of credit.  Shortly after the Petition Date, the Debtors rejected the Spartan Agreement, Spartan made a final draw against the letter of credit in an amount sufficient to cover the amounts owed, the letter of credit was cancelled and the remaining funds backing the letter of credit were returned to the Debtors.  Spartan has agreed to waive any rejection damage Claims it may have against the Debtors' estates.

### F.   Events Leading to the Filing of these Chapter 11 Cases

#### 1.   Poor Results from Operations and Debtors' Mounting Charter Obligations and Related Liabilities.

As described above, the Debtors operations in Texas and Louisiana resulted in the expenditure of considerable capital with no resulting production of oil or gas in paying quantities.

Further, the Debtors spent over $100 million to develop their Alaskan onshore and offshore program.  While the Debtors acquired substantial oil and gas reserves,[11] only two wells are currently producing, 100% of the net production proceeds are required to be escrowed (the "Escrow Order") pursuant to an order entered by the Alaska Oil and Gas Conservation Commission ("AOGCC") in connection with litigation with CIRI (described below), and the Debtors ran out of available working capital to repay the AIX Facility due in June 2014 or to meet their contractual obligations.  Specifically, due to various issues associated with the mobilization of the Endeavour rig and related issues tied to the Archer matters discussed below, the offshore Endeavour rig was never fully utilized, and day rate charges continued to accrue at over $70,000 per day (payable monthly) while the rig remained docked.  This resulted in Kenai Drilling receiving a notice from KOV on May 8, 2014 of its payment default, and demanding that $6,520,289.05 be paid immediately.  Kenai Drilling was unable to pay this amount, and was unable to pay the day rate charges on a go-forward basis without ongoing drilling operations to utilize the rig.  The total amount due under the Charter for the duration of the contract term exceeds $90 million (excluding over $6 million past due and owing and the $12 million due October 1, 2014).  This obligation represents the single largest liability of Kenai Drilling and all of the Debtor entities given that these obligations have been guaranteed by both BCC and BAD under a Guaranty, dated November 3, 2011.

The inability of Kenai Drilling to place the Endeavour rig into operation led to additional defaults and accruing obligations.  As discussed above, in the weeks leading up to the commencement of these bankruptcy cases, Kenai Drilling received multiple Notices of Late Payment from Spartan, alleging that $941,249.94 was past due and owing to Spartan under the Spartan Agreement.

In addition, the charter and crew costs for the onshore Glacier rig totaled approximately $250,000 per month.

---

[11] Proven and Probable Reserves (2P) of 32.2 MMBOE, Contingent Resources (2C) of 18.7 MMBOE and Prospective Resources (P50) of 6.3 MMBOE as of January 31, 2014.  The Debtors' reserves have been independently verified by Ralph E. Davis Associates, Inc., an independent third party consulting firm.

## 2.        The Debtors' Involvement in Significant and Ongoing Litigation.

### (a)        The Archer Litigation.

In October 2011, KOV entered into an agreement with Archer under which Archer was to provide project management services for modifications and repairs to the Endeavour rig.  Under this agreement, Archer had sole responsibility to manage the modifications and repairs on the Endeavour both in Singapore and on arrival of the Endeavour in Alaska.  KOV found that Archer's work was not satisfactory, would have to be recompleted (sometimes by third parties after Archer's attempts to cure failed), and took far longer than Archer originally projected. Moreover, Archer submitted invoices substantially in excess of its budget.  All work under the project management supervision of Archer ceased in December 2012, and KOV has withheld payments to Archer for billings which it has disputed with Archer.

In December 2012, Archer filed a lawsuit in Harris County, Texas against several Debtor entities and KOV for approximately $6 million in unpaid invoices.  Archer has also filed discovery responses claiming additional damages. The Debtors and KOV have denied all liability, and have lodged counterclaims against Archer for damages, including for loss of income, of $30.0 million.  The case was originally set for trial in October 2014; however, that trial date has been delayed as a result of these bankruptcy proceedings.

On August 28, 2014, Archer filed a Notice of Removal of Civil Action removing the pending state court action to the Bankruptcy Court.

*Counsel for Archer has requested that the following be included in the Disclosure Statement:*

> "Archer disputes the Debtors' allegation herein, denies all liability, and will vigorously defend any counterclaims and prosecute its claims for damages against the Debtors and KOV.  Archer expressly reserves all rights regarding same."

### (b)        The CIRI Litigation.

As described above, the Debtors obtained interests in the Kenai Loop field through leasing agreements with the MHLT, the State of Alaska, and CIRI.  The Debtors have drilled four wells on the MHLT lease and placed two of these wells onto commercial production.  All of the Debtors' activities were properly permitted and approved by the appropriate regulatory agencies.

Notwithstanding such permitting and approval, CIRI has alleged that its lease with the Debtors terminated in January 2013 based on an assertion that the Debtors failed to meet various lease commitments.  CIRI asserts that the Kenai Loop No. 1-4 targeted natural gas resources on CIRI land, and thus CIRI filed an opposition with the AOGCC and obtained a hearing on a spacing exception to protect its property rights.  CIRI appealed the AOGCC's order in an administrative appeal that is pending before the Alaska Superior Court.

In October 2013, CIRI filed (i) a lawsuit in Alaska Superior Court (the "Alaska State Court Lawsuit") against the Debtors to recover alleged losses from uncompensated gas

production purportedly attributable from its land; and (ii) an administrative action with the AOGCC (the "AOGCC Proceeding") asking for the establishment of an escrow account funded out of Kenai Loop production to protect all of the landowners—MHLT, the State of Alaska and CIRI—until the precise geological allocation of gas attributable to each of the landowners could be sorted out.

On May 22, 2014 the AOGCC issued a decision (a conservation order), ordering, in part, that the Debtors escrow 100% of their production revenue from the Kenai Loop wells beginning June 10, 2014 until such time that an allocation of gas attributable to each of the adjacent landowners is made or upon further order by the AOGCC (a process that could take months) (the "Escrow Order").  The May 22nd AOGCC ruling negatively impacted the Debtors' operations, their cash flow, and their ability to survive as a going concern.

On July 1, 2014, CIRI filed a motion with the Bankruptcy Court seeking to lift the automatic stay with respect to both the Alaska State Court Lawsuit and the AOGCC Proceeding. Both the Debtors and Committee filed objections to CIRI's motion, and on August 18, 2014, the Bankruptcy Court entered an Agreed Order Relating to Cook Inlet Region, Inc.'s Motion for Relief from the Automatic Stay (the "Agreed Stay Order").  The Agreed Stay Order lifted the automatic stay to allow the AOGCC Proceeding to proceed.  The automatic stay remains in effect with respect to the Alaska State Court Lawsuit, and a continued hearing on CIRI's request to lift the stay as to that state court lawsuit is currently set for December 9, 2014.

*CIRI has requested that the following be included in the Disclosure Statement:*

As described above, BAK obtained interests in the Kenai Loop field through separate leasing agreements with the MHLT, the State of Alaska, and CIRI.  Buccaneer Alaska Operations, LLC ("Buccaneer Operations") caused three wells to be drilled on the MHLT lease, two of which were placed into commercial production.  The third well was a dry hole.

Approximately six months after CIRI notified BAK of the termination of the CIRI lease due to BAK's failure to meet certain work commitments, Buccaneer Operations applied to the AOGCC to drill a fourth well.  CIRI and the State objected to the application and asserted, among other things, that the proposed well would improperly drain their lands.  Buccaneer Operations completed the well before the AOGCC ruled. The AOGCC's order authorized Buccaneer Operations to drill the well, but ruled that BAK could not produce it without first forming a pooling agreement with CIRI, the MHLT and the State.  CIRI appealed that portion of the AOGCC's decision allowing the drilling of the fourth well.  The appeal is pending and is not part of CIRI's motion for relief from stay.

During the AOGCC hearings regarding the drilling of the fourth well, CIRI became aware that, despite BAK's representations to the contrary, the two Kenai Loop producing wells were draining CIRI lands and that BAK had failed to comply with AOGCC regulations when it began producing the two Kenai Loop wells without a pooling agreement.  Accordingly, in October 2013, CIRI filed a petition with the AOGCC requesting that BAK escrow sufficient proceeds from the producing wells to ensure that

CIRI received its share of production from them.  In hearings on CIRI's petition, BAK admitted that it was draining CIRI and State of Alaska land.  On May 22, 2014, the AOGCC granted CIRI's request and entered an order finding, among other things, that the wells were draining CIRI and State land and directing BAK to deposit all future revenues, less operating expenses, into an escrow account until a production allocation agreement could be reached.  The AOGCC also found that a production allocation agreement was necessary to protect correlative rights, and that such an agreement would allow the AOGCC to determine the amounts BAK and MHLT owed the State and CIRI for royalties and production payments and whether CIRI should be accountable for any drilling expenses incurred.   That hearing was continued as a result of the bankruptcy filing.  CIRI has moved for relief from the stay with respect to the hearing.

On October 9, 2013, CIRI filed a civil lawsuit in the Alaska state court against BAK and its affiliates in part to quiet title and seeking damages for alleged trespass, bad faith trespass without claim of right, conversion, and bad faith conversion of CIRI's Kenai Loop gas ("CIRI's Drainage Claims").  BAK cross-claimed against CIRI to, among other things, quiet title to the CIRI lease.  On April 22, 2014, the court granted CIRI's motion for summary judgment in part and denied BAK's cross-motion for summary judgment. The court found that the lease language is "clear and unequivocal" and that there "is no disputed material fact as to whether it has terminated." The court also held that "[t]he [CIRI] lease was no longer in force after January 9, 2013, and may have terminated before that date."  BAK asked the court to reconsider its decision, but the court denied BAK's request.  The court also denied BAK's motion to dismiss CIRI's Drainage Claims, instead staying the claims pending a decision from the AOGCC.  The court expressly stated it has not decided any of CIRI's claims on the merits.

### (c) The Chrystal Statutory Demand.

In November of 2012, BCC engaged Chrystal Capital Partners LLP ("Chrystal"), a corporate finance firm based in London, to serve as its financial advisor to examine a variety of strategic options, including potential refinancing(s), fundraising(s), acquisitions and/or asset disposals.  Under the engagement, Chrystal was to be paid an advisory fee of GBP £10,000 per month and would be entitled to various success fees upon completion of successive closings of various fund raisings.

On March 18, 2014, Chrystal filed in the Supreme Court of New South Wales a Creditor's Statutory Demand for Payment of Debt, a demand for payment of a debt in a prescribed form made under section 459E of the Australia Corporations Act 2001, asserting that BCC is indebted to Chrystal in the sum of $2,660,000 arising out of the Chrystal engagement for unpaid fees based on its introduction of several potential prospects to BCC.  In April of 2014, BCC filed an application seeking to set aside the demand asserting that Chrystal is not entitled to any success fee, which was solely dependent upon the completion of a successful funding.  The matter remains pending.

(d)     **The Suspension and Termination of BCC's Chief Executive Officer and Resulting Litigation.**

Mr. Curtis Burton served as the Managing Director and Chief Executive Officer of BCC since its founding in 2006. Mr. Burton had also been a member of BCC's Board of Directors since 2006. On March 4, 2014, BCC temporarily suspended Mr. Burton from his role as Chief Executive Officer with pay while BCC investigated the state of the business, as well as other serious concerns regarding Mr. Burton's leadership of BCC during his tenure.

On March 6, 2014, the Board engaged the financial advisory firm of Conway MacKenzie Management Services, LLC ("Conway MacKenzie") to assist in their financial management and restructuring and appointed John T. Young, Jr. of Conway MacKenzie as Chief Restructuring Officer for BCC and its various subsidiaries to work with, and report to, the Board on the Debtors' ongoing operations and their options relating to a financial restructuring.

On March 6, 2014, and while BCC was only in the initial stages of its internal investigation, Mr. Burton filed a lawsuit in Harris County District Court alleging that BCC wrongfully terminated him without cause from his employment in violation of his employment agreement and seeking damages against BCC for approximately $2.4 million. BCC answered Mr. Burton's suit with a general denial and filed a Motion to Compel Arbitration, which was granted. Mr. Burton dismissed the state court action against BCC and initiated an arbitration proceeding with the American Arbitration Association.

On May 7, 2014, Mr. Burton sent a letter to BCC's shareholders purportedly announcing his resignation from BCC's Board of Directors. The Board subsequently accepted Mr. Burton's resignation from the Board from BCC and from all other companies within the Debtors' corporate structure effective May 12, 2014. Notwithstanding Mr. Burton's resignation from the Board, the Board of Directors convened a Special Purposes Meeting on May 12, 2014 to consider whether cause existed to terminate Mr. Burton's employment contract as Chief Executive Officer of BCC. Upon the conclusion of the meeting, the Board (excluding Mr. Burton), unanimously concluded that cause existed, and thus Mr. Burton's employment contract was terminated effective May 12, 2014. The day after the Petition Date, Mr. Burton filed a notice of withdrawal of the arbitration proceeding.

**G.     Significant Events during the Chapter 11 Cases**

**1.     First-Day Pleadings.**

On the Petition Date, the Debtors filed several first-day motions designed to make the administration of these bankruptcy cases more efficient and cost effective and to ensure that the Debtors' ongoing operations would continue with minimal disruption. Among those motions were (i) a motion requesting that the bankruptcy cases be jointly administered [Dkt. No. 2]; (ii) a notice designating the bankruptcy cases as complex Chapter 11 bankruptcy cases [Dkt. No. 3]; (iii) a motion for authority to implement certain notice procedures [Dkt. No. 4]; (iv) an emergency motion requesting authorization to pay certain prepetition wages, salaries and other compensation, expenses and benefits to employees [Dkt. No. 5]; (v) an emergency motion requesting authorization to continue use of existing business forms, bank accounts, and cash

management system [Dkt. No. 6]; (vi) an emergency motion requesting authorization to prepare and file a consolidated list of creditors and a consolidated list of 30 largest general unsecured creditors [Dkt. No. 7]; and (vii) an emergency first omnibus motion to reject certain executory contracts and unexpired leases of nonresidential real property *nunc pro tunc* [Dkt. No. 8]. The Court ultimately entered orders granting each of the Debtors' first-day motions.

### 2.      Use of Cash Collateral and DIP Financing.

On June 3, 2014, the Debtors filed an emergency motion for entry of interim and final orders (A) authorizing use of cash collateral and granting adequate protection and (B) scheduling a final hearing [Dkt. No. 26]. The Court entered an interim order authorizing the use of cash collateral on June 4, 2014 [Dkt No. 42], a second interim order on June 17, 2014 [Dkt. No. 119], and a series of bridge orders [Dkt. Nos. 222, 315, 331 & 356] (collectively, the "Cash Collateral Order"). The Debtors have continued to use cash collateral with the agreement of AIX Energy, LLC during the case. The hearing on entry of a Final Order Authorizing the Use of Cash Collateral is currently set for September 16, 2014, at 3:00 p.m.

The Debtors have not sought to obtain any debtor-in-possession ("DIP") post-petition financing.

### 3.      Proof of Claim Bar Date.

The current Bar Date for non-governmental creditors to file proofs of claim was September 29, 2014. Governmental Units have until November 27, 2014 to file proofs of claim. [Dkt. No. 30].

### 4.      Retention of Professionals.

On June 17, 2014, the Court entered an order granting the Debtors' Application for Authority to Employ Fulbright & Jaworski LLP as bankruptcy counsel. [Dkt. No. 116]. The Debtors also obtained Court approval to employ: (i) Epiq Bankruptcy Solutions, LLC as the Debtors' Noticing and Solicitation Agent (the "Noticing and Solicitation Agent") [Dkt. No. 72]; (ii) Conway MacKenzie, Inc. to provide financial advisory services to the Debtors in connection with the operation of the Debtors' businesses and their formulation of a plan of reorganization [Dkt. No. 191]; and (iii) Global Hunter Securities, LLC ("Global Hunter") as sale advisor to the Debtors [Dkt. No. 168].

An estimation of the professional fees and expenses that will be incurred throughout the rest of the chapter 11 cases is also set forth in **Exhibit C**.

### 5.      Appointment of the Committee.

On June 10, 2014, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (previously defined as the "Committee"), consisting of (i) Kenai Offshore Ventures, L.L.C.; (ii) Archer Drilling, L.L.C.; (iii) Teras Oilfield Support Limited; (iv) Frank's International, L.L.C.; and (v) AIMM Technologies, Inc. The Committee has employed Greenberg Traurig, LLP, 1000 Louisiana, Suite 1800, Houston, TX 77002, and 3333 Piedmont Road, Suite 2500, Atlanta, Georgia 30305 as its bankruptcy counsel

[Dkt. No. 189] and Alvarez & Marsal North America, LLC as its financial advisor [Dkt. No. 235].

### 6.     Lease/Contract Rejection.

Since the filing of these cases, the Debtors have filed motions to reject equipment leases and executory contracts including contracts relating to the Endeavour Rig and the Glacier Rig, and the related service contracts with Spartan Offshore Drilling, LLC and All American Oilfield Associates, LLC, respectively [Dkt. No. 8].   The Debtors will continue to analyze executory contracts and unexpired leases of non-residential property and may file additional motions to reject certain of these contracts prior to the Confirmation Hearing.  Any Executory Contract or Unexpired Lease not expressly assumed pursuant to a the Plan or a separate motion filed and served before the Confirmation Hearing will be rejected on the Effective Date.

### 7.     The Marketing and Sale Process.

On June 20, 2014, the Debtors filed their original *Emergency Motion for Entry of an Order (A) Approving Bidding Procedures in Connection with Sale of Substantially All of the Debtors' Assets; (B) Scheduling an Auction; and (D) Granting Related Relief* [Dkt. No. 150] seeking authority to sell their assets pursuant to certain bid procedures.  The Debtors ultimately withdrew that motion in light of ongoing settlement negotiations with the Committee, AIX and Meridian.

On June 27, 2014, the Court approved the Debtors' application to employ Global Hunter as sale advisor   [Dkt. No. 168]. After assembling the necessary marketing and due diligence materials, Global Hunter initiated a process designed to sell substantially all of the Debtors' assets.  During the process, Global Hunter developed a list of over 60 different potential financial and strategic partners tiered in priority based upon their likely interest and ability to purchase the Debtors' assets.

On October 7, 2014, the Debtors filed an *Emergency Motion for Entry of an Order (A) Approving Bid and Sale Procedures in Connection with the Sale of Certain of the Debtors' Assets; (B) Scheduling a Sale Hearing; and (C) Granting Related Relief* [Dkt. No. 424] which the Court approved on October 15, 2014 and entered an order on October 17, 2014 [Dkt. No. 442].

Pursuant to that order, preliminary bids were received and an auction was held on October 27, 2014.  That same day the Debtors filed their *Notice of Successful Bid and Expedited Motion Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure, for Entry of an Order Approving the Sale of Certain of the Debtors' Assets* [Dkt. No. 466].

At a hearing held October 31, 2014, the Court approved the sale of the assets pursuant to the previously approved sales procedures.

With particular reference to the Kenai Loop Assets, which are the subject of the CIRI litigation described above, the Debtors anticipate that the buyer of the Assets will be added as a party to the AOGCC proceeding and that the Liquidating Trust will, subject to the AIX/Meridian

Settlement, the sale order and the Plan, retain the Debtors' claims and defenses associated with the CIRI litigation, including any objections to claims of CIRI.

*CIRI has requested that the following language be included in the Disclosure Statement, the Debtors and their Estates reserve all rights with regard thereto:*

> With the exception of possible defenses or objections to CIRI's proofs of claims filed in these Bankruptcy Cases, CIRI disputes and denies that the Debtors have any affirmative claims or causes of action claims against it. CIRI further contends that upon confirmation of the Plan, the Liquidating Trust will not retain or obtain any affirmative claims or causes of action against CIRI. Notwithstanding the foregoing, CIRI is reserving all rights, claims and defenses it has and which may arise in the future in connection with the CIRI litigation against Debtors, buyers or other interested parties.

### H.    The Ancillary Insolvency Proceeding in Australia

On June 6, 2014, John T. Young Jr. on behalf of BCC filed an application in the Federal Court of Australia seeking to have its Chapter 11 bankruptcy proceeding recognized as a foreign main proceeding under the UNCITRAL Model Law on Cross-Border Insolvency, as enacted in Australia under the Cross-Border Insolvency Act 2008 (Cth). A hearing on the interim application for recognition was held on June 6, 2014, at which time the Court set the application for final relief and recognition for hearing on June 13, 2014. At the June 13th hearing, an interested party—Chrystal Capital Partners LLP ("Chrystal")—appeared and requested a 14-day adjournment so that it could consider whether or not it would oppose the application. A 7-day adjournment was ultimately granted, thereby moving the final hearing on the recognition application to June 20th. At the June 20th hearing, Chrystal opposed the recognition application. As a result of Chrystal's opposition, the Court set additional deadlines for the parties to submit evidence in support of their respective positions. At a further hearing on June 27, 2014, the Australian Court entered an order staying other proceedings against BCC and enjoining creditors from enforcement or execution against BCC or its assets in Australia until the final hearing on recognition of BCC's US bankruptcy case. At the final hearing held July 2, 2014, the Australian Court entered a judgment recognizing the US bankruptcy case for BCC as a foreign main proceeding.

### I.    The AIX/Meridian Settlement

During the case, the Committee challenged the validity of the liens of AIX on the Debtor's assets and asserted other claims against both AIX and Meridian. The Committee conducted extensive discovery including multiple depositions and the review of thousands of pages of documents. After negotiations between the parties, the Bankruptcy Court, on September 2, 2014, approved a settlement between the Debtors, the Committee, AIX, Meridian Capital CIS Fund and Meridian Capital International Fund and entered an Order Approving Joint Emergency Motion to Compromise Controversy Under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "AIX/Meridian Settlement") [Dkt. No. 346]. A copy of the AIX/Meridian Settlement is attached to the Plan as Exhibit D.

Pursuant to the AIX/Meridian Settlement, on the Effective Date of the Plan, the Debtors shall transfer to the Liquidating Trust the Settlement Payment in the amount of $10 million, plus certain other of the assets not sold by the Debtors, plus all assets and other value generated by sale of the Debtors' assets that exceeds the value of the AIX Secured Claim. The Liquidating Trust shall be administered by the Liquidating Trustee and shall make distributions to holders of priority, general unsecured and subordinated claims, as well as to holders of equity interests, out of assets held in the Liquidating Trust. The Liquidating Trustee will be selected by the Committee on or before five (5) days before the Voting Deadline.

The Liquidating Trust will also succeed to all the Debtors' Causes of Action, including Avoidance Actions, and the Liquidating Trustee shall have authority to prosecute these actions as appropriate to maximize the value of the assets of the Debtors and their Estates for creditors. All the Liquidating Trusts' rights with respect to all Causes of Action held by the Debtors and their Estates are reserved under the Plan. Certain of such Causes of Action are identified on Exhibit A to the Plan. The Liquidating Trust will not have any interest in the Coverage Claims or D&O Insurance except insurance proceeds, which shall be retained by the Reorganized Debtors.

The Liquidating Trustee will be overseen by a Post-Confirmation Committee, which will be composed of three (3) members and will be formed on the Plan's Effective Date. The identities of the members of the Post-Confirmation Committee are:

Archer Drilling, L.L.C.;

Frank's International, L.L.C.; and

Kenai Offshore Ventures, L.L.C.

On the Effective Date, the Committee appointed in the Debtors' Chapter 11 Cases will be terminated.

## ARTICLE IV
## ASSETS AND LIABILITIES OF THE DEBTORS

### A.    The Debtors' Pre-Petition Assets

The Debtors' assets and liabilities as of the Petition Date are set forth in the Schedules of Assets and Liabilities (the "Schedules") filed June 20, 2014,[12] and reference should be made thereto for information concerning such assets and liabilities as of the Petition Date. Copies of the Debtors' Schedules and any amendments thereto filed in this bankruptcy case may be viewed online at any time through the Bankruptcy Court's PACER System at *www.txs.uscourts.gov* or at the website of the Debtors' Noticing and Solicitation Agent at *http://dm.epiq11.com/BUC.*

The Schedules filed by the Debtors in their respective bankruptcy cases included intercompany receivables between and amongst the Debtors. The Plan provides that all such inter-Debtor receivables will be consolidated on the Effective Date solely for voting and

---

[12] See Dkt. Nos. 132, 134,136, 138, 140, 142, 144, 146, and 148, respectively.

distribution purposes. The Schedules reflect that, on a consolidated basis, the Debtors had assets with a book value of $39,483,122.53 on the Petition Date. Certain assets listed in the Schedules were listed as having unknown value.

After the Closing of the sale to the Purchaser, the Debtors' assets will consist of (i) the funds to be retained by and/or paid to the Liquidating Trust pursuant to the AIX/Meridian Settlement; and (ii) the assets excluded from the sale to Purchaser under the terms of the Purchase and Sale Agreement, including without limitation the Debtors' Causes of Action and Avoidance Actions, which will be transferred to the Liquidating Trust. The Liquidating Trustee is charged with, *inter alia*, dissolving the Debtors' corporate existence when appropriate in accordance with the terms of the Plan.

### B.     The Debtors' Pre-Petition Liabilities

#### 1.     Liabilities Scheduled by the Debtors.

The Debtors' liabilities as of the Petition Date are set forth in the Schedules described above. The Schedules filed by the Debtors included intercompany payables between and amongst the Debtors. The Plan provides that all such inter-Debtor payables will be consolidated on the Effective Date solely for purposes of voting and distribution. The Schedules reflect that, on a consolidated basis, the Debtors owed liabilities to unsecured creditors of $30,771,939.96 on the Petition Date.

The Claims for rejection of Executory Contracts and Unexpired Leases were estimated in the Schedules to be over $100 million.

After the Petition Date, (i) AIDEA filed claims against the Debtors totaling approximately $34.7 million, (ii) claims filed for rejection damages totaled approximately $128.6 million, and (iii) Debtors estimated litigation claims against them at approximately $23 million.

#### 2.     Secured Revolving Credit Facility.

As described above, each of BAO, BUC, BAK, Kenai Land, BAD and Kenai Drilling are Borrowers under the AIX Facility, which continues to be guaranteed by BEH and BCC. As of the Petition Date, the aggregate unpaid principal balance of the AIX Facility, including all accrued, unpaid interest, fees, expenses and other amounts owing under the financing agreement and credit documents, was $58,226,264.71. The AIX Facility matured on June 30, 2014.

Pursuant to the AIX/Meridian Settlement described above, AIX's secured claim has been stipulated to be $63,842,290.61.

### C.     Avoidance Actions

Under section 547 of the Bankruptcy Code, a debtor's bankruptcy estate may recover certain preferential transfers of property, including cash, made while insolvent during the 90 days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt

had the debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one (1) year preference period.

There are certain defenses to preference recoveries. Transfers made in the ordinary course of the debtor's and transferee's business according to the ordinary business terms in respect of debts less than 90 days before the filing of a bankruptcy are not recoverable. Additionally, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension of credit may constitute a defense to recovery, to the extent of any new value, against an otherwise recoverable transfer of property. If a transfer is recovered by the estate, the transferee has an Unsecured Claim against the debtor to the extent of the recovery.

On June 20, 2014, each Debtor filed its Statement of Financial Affairs which includes, among other information, a list of potentially preferential transfers made within the preference period.[13] Copies of each Debtor's Statement of Financial Affairs and any amendments thereto filed in this bankruptcy case may be viewed online any time through the Bankruptcy Court's PACER System at *www.txs.uscourts.gov* or at the website of the Debtors' Noticing and Solicitation Agent at *http://dm.epiq11.com/BUC*. The Debtors have not yet analyzed whether any of these payments are preferences (within the meaning of the Bankruptcy Code) or whether the recipients of such payments would have a defense to a preference action, if commenced. Creditors should be aware that payments received within the preference period may be subject to avoidance and recovery in a subsequent action by the Liquidating Trustee on behalf of the Liquidating Trust. **UPON THE EFFECTIVE DATE, THE LIQUIDATING TRUSTEE WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL PREFERENCE ACTIONS.**

Under section 548 of the Bankruptcy Code and various state laws, a debtor may avoid as "constructive fraudulent transfers" certain obligations and may recover certain prepetition transfers of property, including the grant of a security interest in property, incurred or made while insolvent to the extent the debtor receives less than fair (or "reasonably equivalent") value for such obligations or property. In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property. As of the date of the distribution of this Disclosure Statement, the Debtors have not analyzed whether certain large claims against multiple Debtors are subject to challenge as constructive fraudulent transfers. Any and all such potential claims and causes of action will be preserved and transferred to the Liquidating Trust, and the Liquidating Trustee will pursue this investigation and analysis.

As of the date of the distribution of this Disclosure Statement, the Debtors have not yet estimated the potential recovery from the prosecution of their Avoidance Actions. Under the Plan, the Avoidance Actions belonging to the Debtors' estates are specifically reserved and the Liquidating Trustee will have the exclusive authority as a representative of the Estates to investigate and prosecute all such Avoidance Actions in accordance with section 1123(b)(3) of the Bankruptcy Code. **UPON THE EFFECTIVE DATE, THE LIQUIDATING TRUSTEE**

---

[13] See Dkt. Nos. 133, 135, 137, 139, 141, 143, 145, 147 and 149, respectively.

WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL FRAUDULENT TRANSFER ACTIONS.

UPON THE EFFECTIVE DATE, ALL OF THE DEBTORS' CAUSES OF ACTION, INCLUDING AVOIDANCE ACTIONS, WILL BE TRANSFERRED TO AND VEST IN THE LIQUIDATING TRUST, AND THE LIQUIDATING TRUSTEE, ON BEHALF OF THE LIQUIDATING TRUST, WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL AVOIDANCE ACTIONS.

### D.  Preservation of Claims and Causes of Action

In addition to the Avoidance Actions described above, the Debtors have claims and potential Causes of Action against third parties which, if successful, could generate additional Cash or result in the reduction or elimination of Claims against the Debtors' Estates.

In addition to the $30 million counterclaim against Archer discussed above, the Debtors' may also have claims and/or Causes of Action for, without limitation, commercial torts, tortious interference with contractual and/or business relations, unfair competition, breach of contract, loss of income, setoff, recoupment, fraud, fraudulent inducement, misrepresentation, fraudulent or negligent omission, fraudulent or preferential transfers arising other than under the United States Bankruptcy Code, conversion, replevin, lender liability, recharacterization of debt as equity, equitable subordination, challenges as to the extent, priority and validity of any purported claims, liens and/or security interests, injury to property and/or title to property, negligence, recklessness, conspiracy, aiding and abetting, breach of fiduciary duty, breach of confidential relationship, mismanagement, violation of securities laws, self-dealing, usurpation of corporate opportunity, insolvent trading, breach of duty of loyalty, allowing, authorizing and/or receiving unlawful or improper distributions, unreasonable related party transactions, uncommercial transactions, improper redemption of equity interests, breach of duty of good faith, breach of duty to provide information, breach of duties of care and/or diligence, failure to make informed decisions, improper use of information to gain improper advantage and other, similarly grounded claims and Causes of Action against, without limitation, current and/or former shareholders, members, equity interest holders, debt holders, partners, prospective joint venture participants, joint venture participants, prospective contracting parties, contracting parties, prospective purchasers, purchasers, prospective sellers, sellers, directors, officers, managers, employees, agents, contractors, insurers, sureties, investment bankers, consultants, advisors, representatives, competitors, vendors and/or other creditors of the Debtors and/or entities affiliated with or otherwise related to any of the foregoing.  Except as otherwise specifically provided by the Plan, all claims and Causes of Action will be retained under the Plan and transferred to the Liquidating Trust to be prosecuted for the benefit of creditors.  A non-exclusive list of certain retained claims and Causes of Action is attached to the Plan as **Exhibit A and/or will be included in the Plan Supplement**.

Pre-petition, the Debtors purchased various policies of insurance, including, without limitation directors' and officers' insurance, and are currently analyzing the extent of coverage such policies may provide.

*For the avoidance of doubt, the Committee has requested that the following be included in the Disclosure Statement:*

ALL OF THE DEBTORS' CLAIMS, COUNTERCLAIMS AND CAUSES OF ACTION WILL BE RETAINED UNDER THE PLAN AND TRANSFERRED TO AND VEST IN THE LIQUIDATING TRUST TO BE PROSECUTED EXCLUSIVELY BY THE LIQUIDATING TRUSTEE FOR THE BENEFIT OF CREDITORS.

ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES AS OF THE EFFECTIVE DATE, WHETHER OR NOT PREVIOUSLY ASSERTED, ARE PRESERVED UNDER THE PLAN FOR THE BENEFIT OF THE LIQUIDATING TRUST.  THE DEBTORS, COMMITTEE AND/OR THE LIQUIDATING TRUSTEE, AS THE CASE MAY BE, EXPRESSLY RESERVE AND PRESERVE ALL RIGHTS TO SUPPLEMENT AT ANY TIME ANY AND ALL RETAINED CLAIMS AND CAUSES OF ACTION, INLCUDING, WITHOUT LIMITATION, THOSE DESCRIBED HEREINAFTER, WHETHER BASED ON THE RESULTS OF PRIOR, ONGOING, OR FUTURE INVESTIGATIONS OR OTHERWISE.

THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, INCLUDING, WITHOUT LIMITATION, COMMERCIAL TORTS, TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, LOSS OF  INCOME, SETOFF, RECOUPMENT, FRAUD, FRAUDULENT INDUCEMENT, MISREPRESENTATION, FRAUDULENT OR NEGLIGENT OMISSION, FRAUDULENT OR PREFERENTIAL TRANSFERS ARISING OTHER THAN UNDER THE UNITED STATES BANKRUPTCY CODE, CONVERSION, REPLEVIN, LENDER LIABILITY, RECHARACTERIZATION OF DEBT AS EQUITY, EQUITABLE SUBORDINATION, CHALLENGES AS TO THE EXTENT, PRIORITY AND VALIDITY OF ANY PURPORTED CLAIMS, LIENS AND/OR SECURITY INTERESTS, INJURY TO PROPERTY AND/OR TITLE TO PROPERTY, NEGLIGENCE, RECKLESSNESS, CONSPIRACY, AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY, BREACH OF CONFIDENTIAL RELATIONSHIP, MISMANAGEMENT, VIOLATION OF SECURITIES LAWS,  SELF-DEALING, USURPATION OF CORPORATE OPPORTUNITY, INSOLVENT TRADING, BREACH OF DUTY OF LOYALTY, ALLOWING, AUTHORIZING AND/OR RECEIVING UNLAWFUL OR IMPROPER DISTRIBUTIONS, UNREASONABLE RELATED PARTY TRANSACTIONS, UNCOMMERCIAL TRANSACTIONS, IMPROPER REDEMPTION OF EQUITY INTERESTS, BREACH OF DUTY OF GOOD FAITH, BREACH OF DUTY TO PROVIDE INFORMATION, BREACH OF DUTIES OF CARE AND/OR DILIGENCE, FAILURE TO MAKE INFORMED DECISIONS, IMPROPER USE OF INFORMATION TO GAIN IMPROPER ADVANTAGE AND OTHER, SIMILARLY GROUNDED CLAIMS AND CAUSES OF ACTION AGAINST, WITHOUT LIMITATION, CURRENT AND/OR FORMER SHAREHOLDERS, MEMBERS, EQUITY INTEREST HOLDERS, DEBT HOLDERS, PARTNERS, PROSPECTIVE JOINT VENTURE PARTICIPANTS, JOINT VENTURE PARTICIPANTS, PROSPECTIVE CONTRACTING PARTIES, CONTRACTING

PARTIES, PROSPECTIVE PURCHASERS, PURCHASERS, PROSPECTIVE SELLERS, SELLERS, DIRECTORS, OFFICERS, MANAGERS, EMPLOYEES, AGENTS, CONTRACTORS, INSURERS, SURETIES, INVESTMENT BANKERS, CONSULTANTS, ADVISORS, REPRESENTATIVES, COMPETITORS, VENDORS AND/OR OTHER CREDITORS OF THE DEBTORS AND/OR PERSONS OR ENTITIES AFFILIATED WITH OR OTHERWISE RELATED TO ANY OF THE FOREGOING.

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, AGAINST ALL *FORMER* MANAGERS, OFFICERS AND DIRECTORS OF ANY OF THE DEBTORS (INCLUDING, WITHOUT LIMITATION, ALAN STEIN, PATRICK O'CONNER, GAVIN WILSON, DEAN GALLEGOS, CURTIS BURTON, ALAN BROOME, FRANK CULBERTSON, GARY RINEHART, KENDALL WILLIAMS, JAMES WATT, W. ALAN HUCKABAY, RON HUFF, MARK LANDT, CLINT WAINRIGHT,  ANDY RIKE, DAVID FULTON, AND JAMES WATT), INCLUDING, BUT NOT LIMITED TO, AVOIDANCE ACTIONS, COMMERCIAL TORTS, TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, LOSS OF  INCOME, SETOFF, RECOUPMENT, FRAUD, FRAUDULENT INDUCEMENT, MISREPRESENTATION, FRAUDULENT OR NEGLIGENT OMISSION, FRAUDULENT OR PREFERENTIAL TRANSFERS ARISING OTHER THAN UNDER THE UNITED STATES BANKRUPTCY CODE, CONVERSION, REPLEVIN, LENDER LIABILITY, RECHARACTERIZATION OF DEBT AS EQUITY, EQUITABLE SUBORDINATION, CHALLENGES AS TO THE EXTENT, PRIORITY AND VALIDITY OF ANY PURPORTED CLAIMS, LIENS AND/OR SECURITY INTERESTS, INJURY TO PROPERTY AND/OR TITLE TO PROPERTY, NEGLIGENCE, RECKLESSNESS, CONSPIRACY, AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY, BREACH OF CONFIDENTIAL RELATIONSHIP, MISMANAGEMENT, VIOLATION OF SECURITIES LAWS,  SELF-DEALING, USURPATION OF CORPORATE OPPORTUNITY, INSOLVENT TRADING, BREACH OF DUTY OF LOYALTY, ALLOWING, AUTHORIZING AND/OR RECEIVING UNLAWFUL OR IMPROPER DISTRIBUTIONS, UNREASONABLE RELATED PARTY TRANSACTIONS, UNCOMMERCIAL TRANSACTIONS, IMPROPER REDEMPTION OF EQUITY INTERESTS, BREACH OF DUTY OF GOOD FAITH, BREACH OF DUTY TO PROVIDE INFORMATION, BREACH OF DUTIES OF CARE AND/OR DILIGENCE, FAILURE TO MAKE INFORMED DECISIONS, IMPROPER USE OF INFORMATION TO GAIN IMPROPER ADVANTAGE, AND ACTIONS SEEKING AFFIRMATIVE RECOVERIES, AND OTHER, SIMILARLY GROUNDED CLAIMS AND CAUSES OF ACTION.

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, AGAINST ALL *CURRENT*

MANAGERS, OFFICERS AND DIRECTORS OF ANY OF THE DEBTORS (INCLUDING, WITHOUT LIMITATION, ALAN STEIN, PATRICK O'CONNER, GAVIN WILSON, DEAN GALLEGOS, CURTIS BURTON, ALAN BROOME, FRANK CULBERTSON, GARY RINEHART, KENDALL WILLIAMS, JAMES WATT, W. ALAN HUCKABAY, RON HUFF, MARK LANDT, CLINT WAINRIGHT,  ANDY RIKE, DAVID FULTON, AND JAMES WATT), INCLUDING, BUT NOT LIMITED TO, AVOIDANCE ACTIONS, COMMERCIAL TORTS, TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, LOSS OF  INCOME, SETOFF, RECOUPMENT, FRAUD, FRAUDULENT INDUCEMENT, MISREPRESENTATION, FRAUDULENT OR NEGLIGENT OMISSION, FRAUDULENT OR PREFERENTIAL TRANSFERS ARISING OTHER THAN UNDER THE UNITED STATES BANKRUPTCY CODE, CONVERSION, REPLEVIN, LENDER LIABILITY, RECHARACTERIZATION OF DEBT AS EQUITY, EQUITABLE SUBORDINATION, CHALLENGES AS TO THE EXTENT, PRIORITY AND VALIDITY OF ANY PURPORTED CLAIMS, LIENS AND/OR SECURITY INTERESTS, INJURY TO PROPERTY AND/OR TITLE TO PROPERTY, NEGLIGENCE, RECKLESSNESS, CONSPIRACY, AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY, BREACH OF CONFIDENTIAL RELATIONSHIP, MISMANAGEMENT, VIOLATION OF SECURITIES LAWS,  SELF-DEALING, USURPATION OF CORPORATE OPPORTUNITY, INSOLVENT TRADING, BREACH OF DUTY OF LOYALTY, ALLOWING, AUTHORIZING AND/OR RECEIVING UNLAWFUL OR IMPROPER DISTRIBUTIONS, UNREASONABLE RELATED PARTY TRANSACTIONS, UNCOMMERCIAL TRANSACTIONS, IMPROPER REDEMPTION OF EQUITY INTERESTS, BREACH OF DUTY OF GOOD FAITH, BREACH OF DUTY TO PROVIDE INFORMATION, BREACH OF DUTIES OF CARE AND/OR DILIGENCE, FAILURE TO MAKE INFORMED DECISIONS, IMPROPER USE OF INFORMATION TO GAIN IMPROPER ADVANTAGE, AND ACTIONS SEEKING AFFIRMATIVE RECOVERIES, AND OTHER, SIMILARLY GROUNDED CLAIMS AND CAUSES OF ACTION.

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, AGAINST ALAN STEIN, PATRICK O'CONNER, GAVIN WILSON, DEAN GALLEGOS, CURTIS BURTON, ALAN BROOME, FRANK CULBERTSON, GARY RINEHART, KENDALL WILLIAMS, JAMES WATT, W. ALAN HUCKABAY, RON HUFF, MARK LANDT, CLINT WAINRIGHT, ANDY RIKE, DAVID FULTON, AND JAMES WATT, TOGETHER WITH ANY AFFILIATED OR RELATED PERSONS OR ENTITIES, EACH IN THEIR INDIVIDUAL CAPACITY, INCLUDING, BUT NOT LIMITED TO, AVOIDANCE ACTIONS, COMMERCIAL TORTS, TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, LOSS OF  INCOME, SETOFF, RECOUPMENT, FRAUD, FRAUDULENT INDUCEMENT, MISREPRESENTATION, FRAUDULENT OR NEGLIGENT OMISSION, FRAUDULENT OR PREFERENTIAL TRANSFERS ARISING OTHER THAN UNDER THE UNITED STATES BANKRUPTCY CODE, CONVERSION, REPLEVIN, LENDER LIABILITY, RECHARACTERIZATION OF DEBT AS EQUITY, EQUITABLE SUBORDINATION,

CHALLENGES AS TO THE EXTENT, PRIORITY AND VALIDITY OF ANY PURPORTED CLAIMS, LIENS AND/OR SECURITY INTERESTS, INJURY TO PROPERTY AND/OR TITLE TO PROPERTY, NEGLIGENCE, RECKLESSNESS, CONSPIRACY, AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY, BREACH OF CONFIDENTIAL RELATIONSHIP, MISMANAGEMENT, VIOLATION OF SECURITIES LAWS,  SELF-DEALING, USURPATION OF CORPORATE OPPORTUNITY, INSOLVENT TRADING, BREACH OF DUTY OF LOYALTY, ALLOWING, AUTHORIZING AND/OR RECEIVING UNLAWFUL OR IMPROPER DISTRIBUTIONS, UNREASONABLE RELATED PARTY TRANSACTIONS, UNCOMMERCIAL TRANSACTIONS, IMPROPER REDEMPTION OF EQUITY INTERESTS, BREACH OF DUTY OF GOOD FAITH, BREACH OF DUTY TO PROVIDE INFORMATION, BREACH OF DUTIES OF CARE AND/OR DILIGENCE, FAILURE TO MAKE INFORMED DECISIONS, IMPROPER USE OF INFORMATION TO GAIN IMPROPER ADVANTAGE, AND ACTIONS SEEKING AFFIRMATIVE RECOVERIES, AND OTHER, SIMILARLY GROUNDED CLAIMS AND CAUSES OF ACTION.

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION, ASSERTED OR THAT COULD BE ASSERTED, IN ANY ADVERSARY PROCEEDINGS COMMENCED BY THE DEBTORS, THE COMMITTEE AND/OR THE LIQUIDATING TRUSTEE AGAINST INDIVIDUAL DEFENDANTS OR OTHER ENTITIES NAMED THEREIN, INCLUDING, BUT NOT LIMITED TO, AVOIDANCE ACTIONS, COMMERCIAL TORTS, TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, LOSS OF INCOME, SETOFF, RECOUPMENT, FRAUD, FRAUDULENT INDUCEMENT, MISREPRESENTATION, FRAUDULENT OR NEGLIGENT OMISSION, FRAUDULENT OR PREFERENTIAL TRANSFERS ARISING OTHER THAN UNDER THE UNITED STATES BANKRUPTCY CODE, CONVERSION, REPLEVIN, LENDER LIABILITY, RECHARACTERIZATION OF DEBT AS EQUITY, EQUITABLE SUBORDINATION, CHALLENGES AS TO THE EXTENT, PRIORITY AND VALIDITY OF ANY PURPORTED CLAIMS, LIENS AND/OR SECURITY INTERESTS, INJURY TO PROPERTY AND/OR TITLE TO PROPERTY, NEGLIGENCE, RECKLESSNESS, CONSPIRACY, AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY, BREACH OF CONFIDENTIAL RELATIONSHIP, MISMANAGEMENT, VIOLATION OF SECURITIES LAWS,  SELF-DEALING, USURPATION OF CORPORATE OPPORTUNITY, INSOLVENT TRADING, BREACH OF DUTY OF LOYALTY, ALLOWING, AUTHORIZING AND/OR RECEIVING UNLAWFUL OR IMPROPER DISTRIBUTIONS, UNREASONABLE RELATED PARTY TRANSACTIONS, UNCOMMERCIAL TRANSACTIONS, IMPROPER REDEMPTION OF EQUITY INTERESTS, BREACH OF DUTY OF GOOD FAITH, BREACH OF DUTY TO PROVIDE INFORMATION, BREACH OF DUTIES OF CARE AND/OR DILIGENCE, FAILURE TO MAKE INFORMED DECISIONS, IMPROPER USE OF INFORMATION TO GAIN IMPROPER ADVANTAGE, AND ACTIONS SEEKING AFFIRMATIVE RECOVERIES, AND OTHER, SIMILARLY GROUNDED CLAIMS AND CAUSES OF ACTION.

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, AGAINST ARCHER DRILLING, LLC ("ARCHER"), INCLUDING, BUT NOT LIMITED TO, (I) NEGLIGENCE, MISREPRESENTATION, FRAUDULENT INDUCEMENT, TORTIOUS INTERFERENCE, AND BREACH OF CONTRACT AND DAMAGES AND LOSS OF INCOME RESULTING THEREFROM AND (II) ANY CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CAUSES OF ACTION ASSERTED OR THAT COULD BE ASSERTED IN ANY LITIGATION INVOLVING THE DEBTORS AND ARCHER PENDING IN ANY TEXAS OR ALASKA STATE COURTS OR FEDERAL COURT, INCLUDING ANY PENDING LAWSUITS FILED BY ARCHER AGAINST ANY OF THE DEBTORS IN HARRIS COUNTY, TEXAS OR IN THE BANKRUPTCY COURT.

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, AND SUBJECT TO THE AIX/MERIDIAN SETTLEMENT, THE SALE ORDER AND THE PLAN, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, AGAINST COOK INLET REGION INC. ("CIRI"), INCLUDING BUT NOT LIMITED TO, (I) NEGLIGENCE, TORTIOUS INTERFERENCE, MISREPRESENTATION, FRAUDULENT INDUCEMENT, AND BREACH OF CONTRACT AND DAMAGES AND LOSS OF INCOME THEREFROM AND (II) ANY CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CAUSES OF ACTION ASSERTED OR THAT COULD BE ASSERTED IN ANY LITIGATION INVOLVING THE DEBTORS AND CIRI PENDING IN THE ALASKA SUPERIOR COURT OR AN ADMINISTRATIVE PROCEEDING BEFORE THE ALASKA OIL AND GAS CONSERVATION COMMISSION.

*Counsel for CIRI (defined below) has requested that the following language be included in the Disclosure Statement, the Debtors and their Estates reserve all rights with regard thereto:*

> With the exception of possible defenses or objections to CIRI's proofs of claims filed in these Bankruptcy Cases, CIRI disputes and denies that the Debtors  have any affirmative claims or causes of action claims against it.  CIRI further contends that upon confirmation of the Plan, the Liquidating Trust will not retain or obtain any affirmative claims or causes of action against CIRI.

*The Committee's language continues:*

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, AGAINST CHRYSTAL

CAPITAL PARNERS LLP ("CHRYSTAL") AND ITS AFFILIATES, RELATED ENTITIES, PRINCIPALS, OFFICERS AND EMPLOYEES, INCLUDING, BUT NOT LIMITED TO, (I) AVOIDANCE ACTIONS, COMMERCIAL TORTS, TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, LOSS OF INCOME, SETOFF, RECOUPMENT, FRAUD, FRAUDULENT INDUCEMENT, MISREPRESENTATION, FRAUDULENT OR NEGLIGENT OMISSION, FRAUDULENT OR PREFERENTIAL TRANSFERS ARISING OTHER THAN UNDER THE UNITED STATES BANKRUPTCY CODE, CONVERSION, REPLEVIN, RECHARACTERIZATION OF DEBT AS EQUITY, EQUITABLE SUBORDINATION, CHALLENGES AS TO THE EXTENT, PRIORITY AND VALIDITY OF ANY PURPORTED CLAIMS, LIENS AND/OR SECURITY INTERESTS, INJURY TO PROPERTY AND/OR TITLE TO PROPERTY, NEGLIGENCE, RECKLESSNESS, CONSPIRACY, AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY, BREACH OF CONFIDENTIAL RELATIONSHIP, VIOLATION OF SECURITIES LAWS, SELF-DEALING, USURPATION OF CORPORATE OPPORTUNITY, BREACH OF DUTY OF LOYALTY, UNREASONABLE RELATED PARTY TRANSACTIONS, BREACH OF DUTY OF GOOD FAITH, BREACH OF DUTY TO PROVIDE INFORMATION, BREACH OF DUTIES OF CARE AND/OR DILIGENCE, IMPROPER USE OF INFORMATION TO GAIN IMPROPER ADVANTAGE, AND ACTIONS SEEKING AFFIRMATIVE RECOVERIES, AND OTHER, SIMILARLY GROUNDED CLAIMS AND CAUSES OF ACTION (II) ANY CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CAUSES OF ACTION ASSERTED OR THAT COULD BE ASSERTED IN ANY LITIGATION INVOLVING THE DEBTORS AND CHRYSTAL PENDING IN THE SUPREME COURT OF NEW SOUTH WALES.

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, AGAINST CANACCORD GENUITY (AUSTRALIA), LTD., CANACCORD GENUITY GROUP, INC. AND THEIR AFFILIATES, RELATED ENTITIES, PRINCIPALS, OFFICERS AND EMPLOYEES, INCLUDING, BUT NOT LIMITED TO, AVOIDANCE ACTIONS, COMMERCIAL TORTS, TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, LOSS OF INCOME, SETOFF, RECOUPMENT, FRAUD, FRAUDULENT INDUCEMENT, MISREPRESENTATION, FRAUDULENT OR NEGLIGENT OMISSION, FRAUDULENT OR PREFERENTIAL TRANSFERS ARISING OTHER THAN UNDER THE UNITED STATES BANKRUPTCY CODE, CONVERSION, REPLEVIN, RECHARACTERIZATION OF DEBT AS EQUITY, EQUITABLE SUBORDINATION, CHALLENGES AS TO THE EXTENT, PRIORITY AND VALIDITY OF ANY PURPORTED CLAIMS, LIENS AND/OR SECURITY INTERESTS, INJURY TO PROPERTY AND/OR TITLE TO PROPERTY, NEGLIGENCE, RECKLESSNESS, CONSPIRACY, AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY, BREACH OF CONFIDENTIAL RELATIONSHIP, VIOLATION OF SECURITIES LAWS, SELF-DEALING, USURPATION OF CORPORATE OPPORTUNITY, BREACH OF DUTY OF LOYALTY, UNREASONABLE RELATED PARTY TRANSACTIONS, BREACH OF DUTY OF GOOD FAITH, BREACH OF DUTY TO PROVIDE INFORMATION,

BREACH OF DUTIES OF CARE AND/OR DILIGENCE, IMPROPER USE OF INFORMATION TO GAIN IMPROPER ADVANTAGE, AND ACTIONS SEEKING AFFIRMATIVE RECOVERIES, AND OTHER, SIMILARLY GROUNDED CLAIMS AND CAUSES OF ACTION.

WITHOUT LIMITING THE SCOPE OF ANY OTHER PROVISIONS PRESERVING CLAIMS OR CAUSES OF ACTION, THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS, COUNTERCLAIMS, CAUSES OF ACTION AND POTENTIAL CLAIMS AND CAUSES OF ACTION HELD BY ANY OF THE DEBTORS AND/OR ANY OF THEIR ESTATES, WHETHER OR NOT PREVIOUSLY ASSERTED, AGAINST GIANT CAPITAL MANAGEMENT PTY LIMITED AND/OR THOMAS WAGENHOFER AND THEIR AFFILIATIES, RELATED ENTITIES, PRINCIPALS, OFFICERS AND EMPLOYEES, INCLUDING, BUT NOT LIMITED TO, AVOIDANCE ACTIONS, COMMERCIAL TORTS, TORTIOUS INTERFERENCE WITH CONTRACTUAL AND/OR BUSINESS RELATIONS, UNFAIR COMPETITION, BREACH OF CONTRACT, LOSS OF INCOME, SETOFF, RECOUPMENT, FRAUD, FRAUDULENT INDUCEMENT, MISREPRESENTATION, FRAUDULENT OR NEGLIGENT OMISSION, FRAUDULENT OR PREFERENTIAL TRANSFERS ARISING OTHER THAN UNDER THE UNITED STATES BANKRUPTCY CODE, CONVERSION, REPLEVIN, RECHARACTERIZATION OF DEBT AS EQUITY, EQUITABLE SUBORDINATION, CHALLENGES AS TO THE EXTENT, PRIORITY AND VALIDITY OF ANY PURPORTED CLAIMS, LIENS AND/OR SECURITY INTERESTS, INJURY TO PROPERTY AND/OR TITLE TO PROPERTY, NEGLIGENCE, RECKLESSNESS, CONSPIRACY, AIDING AND ABETTING, BREACH OF FIDUCIARY DUTY, BREACH OF CONFIDENTIAL RELATIONSHIP, VIOLATION OF SECURITIES LAWS,  SELF-DEALING, USURPATION OF CORPORATE OPPORTUNITY, BREACH OF DUTY OF LOYALTY, UNREASONABLE RELATED PARTY TRANSACTIONS, BREACH OF DUTY OF GOOD FAITH, BREACH OF DUTY TO PROVIDE INFORMATION, BREACH OF DUTIES OF CARE AND/OR DILIGENCE, IMPROPER USE OF INFORMATION TO GAIN IMPROPER ADVANTAGE, AND ACTIONS SEEKING AFFIRMATIVE RECOVERIES, AND OTHER, SIMILARLY GROUNDED CLAIMS AND CAUSES OF ACTION.

THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL AVOIDANCE ACTIONS (AS THAT TERM IS DEFINED IN THE PLAN), INCLUDING WITHOUT LIMITATION, (I) FOR ALL PAYMENTS MADE BY THE DEBTORS TO CREDITORS WITHIN 90 DAYS PRIOR TO THE FILING OF THE BANKRUPTCY PETITION, INCLUDING BUT NOT LIMITED TO, ALL PERSONS AND ENTITIES IDENTIFIED IN QUESTION 3(B) OF THE DEBTORS' RESPECTIVE STATEMENTS OF FINANCIAL AFFAIRS FILED IN THE CHAPTER 11 CASES, AND (II) FOR ALL PAYMENTS MADE BY THE DEBTORS TO "INSIDERS" WITHIN ONE YEAR PRIOR TO THE FILING OF THE BANKRUPTCY PETITION, INCLUDING BUT NOT LIMITED TO, THOSE PERSONS AND ENTITIES IDENTIFIED IN QUESTION 3(C) OF THE DEBTORS' RESPECTIVE STATEMENTS OF FINANCIAL AFFAIRS.

THE DEBTORS AND THE LIQUIDATING TRUST ARE RETAINING ALL CLAIMS AND CAUSES OF ACTION AGAINST ANY PERSON OR ENTITIY FOR FRAUDULENT OR PREFERENTIAL TRANSFERS UNDER ANY APPLICABLE LAW.

THE LIQUIDATING TRUST AND THE LIQUIDATING TRUSTEE SHALL CONTINUE TO ANALYZE ALL POTENTIAL CAUSES OF ACTION AND TAKE APPROPRIATE ACTION, INCLUDING BUT NOT LIMITED TO, FILING A LAWSUIT IN THE APPROPRIATE VENUE.  BY FILING THIS VERSION OF THE DISCLOSURE STATEMENT AND THE PLAN, THE DEBTORS, THE COMMITTEE AND THE LIQUIDATING TRUST DO NOT WAIVE ANY CLAIMS AND CAUSES OF ACTION THAT MAY EXIST.  NOR SHALL CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT PREJUDICE THE COMMITTEE'S AND LIQUIDATING TRUST'S, AS APPLICABLE, RIGHT TO ASSERT ANY CLAIMS AND CAUSES OF ACTION NOT IDENTIFIED HEREIN, AND ALL SUCH CLAIMS AND CAUSES OF ACTION ARE EXPRESSLY RESERVED AND PRESERVED.

## ARTICLE V
## CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN

### A.      Administrative Claims and Priority Tax Claims

In accordance with § 1123(a)(l) of the Bankruptcy Code, certain Administrative Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in this Article V.  These unclassified Claims are treated as follows.

### 1.      Administrative Claims

On the Initial Distribution Date or fifteen (15) days after the Claim Allowance Date, whichever is later, and except as otherwise provided herein, each Holder of an Allowed Administrative Claim, including Allowed Professional Fee Claims, will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Administrative Claim (i) Cash equal to the unpaid portion of such Allowed Administrative Claim; (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; or (iii) such other lesser treatment as to which the Debtors and such Holder have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases will be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  Allowed Administrative Claims shall be paid with funds from the Administrative Claims Account: provided, however, that if the aggregate amount of Allowed Professional Fee Claims for Professionals employed by the Committee exceeds the amount of the Committee Professional Fund, then the Committee Professionals agree to a pro rata distribution of the Committee Professional Fund and shall not to be paid any amounts in excess of the Committee Professional Fund; provided, further, however, that if the AIX Secured Claim is paid in full, then the surplus shall be distributed to any remaining unpaid Allowed Professional Fee Claims of Committee Professionals.

### 2.      Priority Unsecured Tax Claims

On the Initial Distribution Date or fifteen (15) days after the Claim Allowance Date, whichever is later, and except as otherwise provided herein, each Holder of an Allowed Priority Unsecured Tax Claim will receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Unsecured Tax Claim (i) Cash equal to the unpaid portion

of such Allowed Priority Unsecured Tax Claim; (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code; or (iii) such other lesser treatment as to which the Debtors and such Holder have agreed upon in writing; provided, however, that Allowed Priority Unsecured Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.  Allowed Priority Unsecured Tax Claims shall be paid with funds from the Trust Distribution Cash prior to any Distribution to any Allowed Claim that is not an Allowed Priority Unsecured Tax Claim or Allowed Priority Unsecured Non-Tax Claim.

### B.      Classification of Claims and Interests

All Claims and Interests, except for Administrative Claims and Priority Tax Claims, are placed in the Classes as set forth below.

A Claim or Interest is placed in a particular Class only to the extent the Claim or Interest falls within the description of that Class and classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim or Interest is also placed in a particular Class only for the purpose of voting on, and receiving distributions pursuant to, the Plan to the extent such Claim or Interest is an Allowed Claim or an Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

Under the Plan, Claims and Interests are classified as follows:

| Class | Description | Status | Voting Rights |
|-------|-------------|--------|---------------|
| Class 1(a) | Secured Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 1(b) | Other Secured Claims | Unimpaired | Not Entitled to Vote |
| Class 2 | Priority Non-Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Subordinated Claims | Impaired | Entitled to Vote |
| Class 5 | Equity Interests in the Subsidiary Debtors | Non-voting | Not Entitled to Vote |
| Class 6 | Equity Interests in Buccaneer Energy Limited | Non-voting | Not Entitled to Vote |

The Secured Claims in Class 1(a) and 1(b) are further subdivided into subclasses.

Class 1(a), contains two subclasses for the Secured Tax Claims of the City of Kenai, Alaska, Class 1(a)(1), and the State of Alaska, Class 1(a)(2), respectively, and a third subclass, Class 1(a)(3), for any miscellaneous Secured Tax Claims not currently identified by the Debtors. Holders of Allowed Secured Tax Claims will retain their interests in any collateral securing their Allowed Secured Tax Claims and Allowed Secured Tax Claims will receive the treatment described in the chart below.

Class 1(b) contains seven subclasses.  The Secured Claims in Classes 1(b)(2) through 1(b)(5) are the Claims of, respectively, the Alaska Mental Health Trust Authority, the Alaska

Mental Health Trust Land Office, the Alaska Oil and Gas Conservation Commission, and the State of Alaska Department of Natural Resources which are secured by surety bonds or other similar security.  The Secured Claims in Class 1(b)(6) are the Claims of PetroQuest Energy LLC, which is secured by a letter of credit, described above, and Macquarie Bank Limited which issued the letter of credit and which holds a cash deposit of $1.5 million to secure its obligations thereunder.  Article 5.1.2.2 of the Plan provides that, the rights of any bank or bonding company holding collateral securing the issuance of a surety bond, letter of credit or other similar security will be preserved under the Plan until the obligation to the Class 1(b)(2)-(6) beneficiary of the surety bond, letter of credit or other similar security is satisfied or terminated in accordance with the terms thereof, and any funds remaining after payment of any claims of such bank or bonding company under or related to the letter of credit, surety bond or similar security will be transferred to the Liquidating Trust to be used as Liquidating Trust Assets in accordance with the Plan or to AIX as determined pursuant to the AIX/Meridian Settlement.  Class 1(b)(7) contains any miscellaneous Secured Claims not currently identified by the Debtors.  Class 1(b)(1) contains the Secured Claim of AIX Energy, LLC and, as described in Article 5.1.2.1 of the Plan, that will be treated in accordance with the AIX/Meridian Settlement and has been created to provide for the treatment of that Claim upon the occurrence of certain contingencies.  Except as otherwise provided, Holders of Class 1(b) Allowed Secured Claims will retain their interests in any collateral securing their Allowed Secured Claims and the Allowed Secured Claim will receive the treatment described in the chart below.

Subordinated Claims, if any, represent Claims that have a priority in payment junior to that provided to General Unsecured Claims under §726(a)(2) of the Bankruptcy Code or that have been subordinated by order of the Bankruptcy Court.  The Debtors are not currently aware of Claims that will be classified as Class 4 Subordinated Claims, but to the extent such Claims exist they will be treated in accordance with Article 5.4 of the Plan.

In the event a controversy or dispute should arise involving issues related to the classification, impairment or voting rights of any Creditor or Interest Holder under the Plan, prior to the Confirmation Date, the Bankruptcy Court may, after notice and a hearing, determine such controversy.  Without limiting the foregoing, the Bankruptcy Court may estimate for voting purposes the amount of any contingent or unliquidated Claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the Chapter 11 Cases.  In addition, the Bankruptcy Court may in accordance with § 506(b) of the Bankruptcy Code conduct valuation hearings to determine the Allowed Amount of any Secured Claim.

### C.     Summary of Proposed Distributions Under the Plan

Certain Claims, including Priority Tax Claims and Administrative Claims, are not classified under the Plan, and are not entitled to vote on the Plan.  The treatment of these Claims is set forth in Article V.A., *supra*.

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan.  This summary is qualified in its entirety by reference to the provisions of the Plan.

| Class | Type of Claim or Equity Interest | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Percentage of Recovery under the Plan |
|---|---|---|---|---|
| **1(a)** | Secured Tax Claims | Expected - $0

Bar date is November 27, 2014 | Holders of Allowed Secured Tax claims will receive either (i) Cash in the amount of the Allowed Claim or (ii) such other lesser treatment as to which the Debtors or Liquidating Trustee and such Holder have agreed upon in writing; provided, however, that to the extent the Collateral securing any such Allowed Claim, if any, including the proceeds of the sales thereof, is insufficient to pay the Allowed Claims in Class 1(a) in full, the Holders of such claims shall have an Allowed Class 3 or 4 Claim, as the case may be, for the deficiency. | **100%** |
| **1(b)** | Other Secured Claims | ~$2,078,745*



*$63,842,290 claim of AIX satisfied pursuant to AIX/Meridian Settlement | Holders of Allowed Other Secured Claims, if any, will receive (i) Cash in the amount of the Allowed Claim; (ii) the proceeds from the surety bond, certificate of deposit or letter of credit securing the Debtors' obligation(s) if properly drawn or otherwise obtained in conformity with the terms of the agreement posting the applicable surety bond, certificate of deposit or letter of credit; (iii) the return of the Collateral securing such Allowed Claim; or (iv) such other lesser treatment as to which the Debtors and such Holder have agreed upon in writing.

To the extent any Holders of Allowed Class 1(b) Claims have Liens of equal priority on the same Collateral, such Holders of Allowed Class 1(b) Claims shall receive Distributions equal to their Ratable Portion of their respective Allowed Claims. To the extent the Collateral securing any such Allowed Claim, including the proceeds of the sales thereof, is insufficient to pay the Allowed Claims in Class 1(b) in full, the Holders of such Claims shall have Allowed Class 3 or 4 Claim, as the case may be, for the deficiency.

Unless they have expired by their own terms or have otherwise been dealt with in the Plan or by order of the Bankruptcy Court, letters of credit, certificates of deposit and surety bonds securing obligations of the Debtors shall remain in place after the Effective Date. Creditors whose Claims are secured by a letter of credit, certificate of deposit or surety bond retain their rights in such collateral according to the terms of the agreements and instruments under which they obtained their secured interest. Issuing banks, sureties or bonding companies who hold cash cover accounts or collateral for the issuance of such an instrument shall retain their rights and interests in the cash cover | **100%** |

| Class | Type of Claim or Equity Interest | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Percentage of Recovery under the Plan |
|---|---|---|---|---|
| | | | account or collateral they hold securing their own claims under or related to the letter of credit, certificate of deposit or surety bond.<br><br>The Claims of AIX will be treated in accordance with the Plan and the terms of the AIX/Meridian Settlement. | |
| 2 | Priority Non-Tax Claims | $9,550 | Holders of Allowed Priority Unsecured Non-Tax Claims will receive either (i) Cash equal to the unpaid portion of such Allowed Class 2 Claim plus (A) pre-Petition Date interest due under applicable bankruptcy or non-bankruptcy law and claimed in a Proof of Claim by the Creditor (or in any amendment or supplement thereto permitted by the Bankruptcy Rules, order of the Bankruptcy Court or this Plan) or as scheduled by the Debtors, (B) post-Petition Date interest at the contractual rate of interest and, if a contractual default rate is provided in the contract, at the contractual default rate of interest, or, in the absence of a contractual rate of interest, at the Plan Rate, and (C) reasonable attorney's fees and costs to the extent due under applicable bankruptcy or nonbankruptcy law, until such Allowed Claim is paid in full, or (ii) such other lesser treatment agreed to in writing by such Holder and the Debtors or the Liquidating Trustee.  Allowed Class 2 Claims shall be paid in full with Trust Distribution Cash prior to any Distribution to Claims in Classes, 3, 4 and 6. | **100%** |
| 3 | General Unsecured Claims | $206,520,000-$216,520,000 | Holders of Allowed General Unsecured Claims will receive Pro Rata Distributions of Trust Distribution Cash pursuant to Articles 5 and/or 9 of the Plan.  The Liquidating Trustee will make additional future Distributions to holders of Allowed Claims in Class 3 from Trust Distribution Cash on subsequent Payment Dates as the Liquidating Trustee determines appropriate after consultation with the Post-Confirmation Committee.  In the event that the Allowed Amount of Allowed Claims in Class 3 is paid in full and there exists remaining Trust Distribution Cash, holders of Allowed Claims in such class shall receive interest at the Plan Rate. | **4.5% - 7.2%** |
| 4 | Subordinated Claims | $0 | Holders, if any, of an Allowed Subordinated Claim shall receive, after the payment if full of Allowed Claims in Classes 1(a), 1(b), 2, and 3, Pro Rata Distributions of Trust Distribution Cash pursuant to | **Unknown** |

| Class | Type of Claim or Equity Interest | Estimated Range of Allowed Claims or Interests | Treatment of Claims or Interests | Estimated Percentage of Recovery under the Plan |
|---|---|---|---|---|
| | | | Articles 5 and/or 9 of the Plan.  In the event that the Allowed Amount of principal of Allowed Claims in Class 4 is paid in full and there exists remaining Trust Distribution Cash, holders of Allowed Claims in such class shall receive interest at the Plan Rate. | |
| 5 | Interests in Subsidiary Debtors | | On the Effective Date all Equity Interests of (i) Buccaneer Energy Limited in Buccaneer Resources, LLC, Buccaneer Energy Holdings, Inc., Buccaneer Alaska, LLC, Kenai Land Ventures, LLC, Buccaneer Alaska Drilling, LLC, and Buccaneer Royalties, LLC; (ii) Buccaneer Energy Holdings, Inc. in Buccaneer Alaska Operations, LLC; and (iii) Buccaneer Alaska Drilling, LLC in Kenai Drilling, LLC shall be preserved and transferred to the Liquidating Trust. | **0%** |
| 6 | Interests in Buccaneer Energy Limited | | On the Effective Date all existing Equity Interests in Buccaneer Energy Limited shall be preserved and continue to be owned by their current holders solely for the purposes of Distributions under this Article 5.6, shall not be transferrable except by applicable laws of descent or upon entry of an order by a court of competent jurisdiction, and shall have no voting rights or other powers.  If the Effective Date has occurred, and, as the result of Distributions made by the Debtors and/or the Liquidating Trustee, (i) all Allowed Claims provided for in this Plan have been paid in full in accordance with the Plan and (ii) all fees and expenses of the Liquidating Trust and its Professionals have been paid in full or sufficient reserves have been set aside for such payments, and there remains any Trust Distribution Cash in the Liquidating Trust, then the Liquidating Trustee shall make a Final Distribution of that Trust Distribution Cash to Holders of Class 6 Equity Interests in proportion to each Equity Interest Holder's percentage of ownership in Buccaneer Energy Limited as reflected on the share registry of Buccaneer Energy Limited as of the Petition Date.  In the event there is no such Trust Distribution Cash, then Holders of Class 6 Equity Interests in Buccaneer Energy Limited shall receive no Distributions on account of their Equity Interests. | **0%** |

**Except as provided otherwise in the Plan or by order of the Bankruptcy Court, only holders of Claims or Interests who hold those Claims or Interests as of the Record Date shall be entitled to the treatment described above.**  The Record Date for Allowed Claims is the date the order conditionally approving the Disclosure Statement was entered by the Bankruptcy Court.  The Record Date for Equity Interests shall be the Petition Date.

## ARTICLE VI
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

The Plan proposes the orderly liquidation of the Debtors' Estates.  On or prior to the Effective Date of the Plan, the Kenai Loop Assets and certain other of the Assets will have been sold at an auction to be held prior to the Confirmation Hearing pursuant to bid procedures approved by the Bankruptcy Court.  The closing of the sale of substantially all of the Debtors' assets including the Kenai Loop Assets, in which AIX has a secured interest, is a condition to the Effective Date.  The Bankruptcy Court previously approved the AIX/Meridian Settlement pursuant to which, among other things, all controversies regarding the liens of AIX on the Assets and Kenai Loop Assets of the Debtors were settled.  Pursuant to the AIX/Meridian Settlement, on the Effective Date, the Debtors' Estate will receive or retain funds related to the sale in accordance with the terms of the AIX/Meridian Settlement, including, at a minimum and without limitation, sufficient to fund the Settlement Payment.  Assets of the Debtors that are not sold pursuant to the Plan, the Settlement Payment, and all of the Debtors' Causes of Action will comprise the Liquidating Trust Assets transferred to the Liquidating Trust for the benefit of holders of Allowed Claims and Interests pursuant to the Plan.

### A.      Sale of Substantially All Assets of the Debtors

The Debtors' Plan is conditioned upon the closing of a sale of all or substantially all of the Debtors' assets prior to the Effective Date.  The sale of the assets, the approval of the sale and closing of the sale are anticipated to occur on or before the Effective Date.  The Debtors' secured lender is authorized to credit bid its debt at the auction.  Whether the assets are sold pursuant to credit bid or a cash bid, the Liquidating Trust will receive, at a minimum, the Settlement Payment as provided for in the AIX/Meridian Settlement.  The Plan proposes the orderly liquidation of the Debtors' assets.   All of the assets of the Debtors including the Settlement Payment described above, any remaining unsold assets, rights to receivables and refunds, and the Debtors' Causes of Action against third parties will be transferred to the Liquidating Trust, except as otherwise provided in the Plan, and will be treated according to the Plan.  The Liquidating Trustee, on behalf of the Liquidating Trust, will collect and liquidate the assets and prosecute the Causes of Action for the benefit of creditors and make distributions to the beneficiaries of the Liquidating Trust.

The terms of any sale of all or substantially all of the debtors' assets will not be known until the auction occurs and the sale is approved by the bankruptcy court.  Until the approval and closing of the sale occurs, potential recoveries to creditors cannot be determined with complete accuracy.  Moreover, the Plan is conditioned upon the closing of a sale, and should closing not occur, the Plan will not go effective and distributions contemplated under the Plan will not be made.

### B.        Rejection of Executory Contracts and Unexpired Leases

Plan Exhibit B lists the Executory Contracts and Unexpired Leases, if any, to be assumed by the Debtors.  Pursuant to Bankruptcy Code section 365(a), the Plan constitutes a motion to assume any Executory Contracts and Unexpired Leases listed on Plan Exhibit B.  **Prior to the Confirmation Hearing, the Debtors intend to file a Plan Supplement that includes, among other things, the list of assumed Executory Contracts (with associated Cure Amounts, if any).**  As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the website of the Debtors' Noticing and Solicitation Agent, *http://dm.epiq11.com/BUC*.

Pursuant to Bankruptcy Code section 365(a), the Plan constitutes a motion to reject all Executory Contracts and Unexpired Leases <u>not</u> listed on Plan Exhibit B.  Entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code section 365(a), of the rejection of the Executory Contracts and Unexpired Leases not assumed pursuant to the Plan.

Unless the Bankruptcy Court, the Bankruptcy Code, or the Bankruptcy Rules establish an earlier deadline concerning the rejection of particular Executory Contracts or Unexpired Leases, any Claim arising out of the rejection of Executory Contracts and Unexpired Leases under the Plan, or arising out of the rejection of Executory Contracts or Unexpired Leases after the Bar Date and before the Effective Date, must be filed with the Bankruptcy Court and served on the Reorganized Debtors and Liquidating Trustee within thirty (30) days after the Effective Date, or if an earlier date has been set by the Court, on the earlier date.  Any Claims not filed within that time period will be extinguished and forever barred, and therefore will not receive any Distributions under the Plan.  Any Claims arising out of the rejection of an Executory Contract or Unexpired Leases pursuant to a Final Order entered before the Bar Date must have been filed before the Bar Date; otherwise those Claims are extinguished and forever barred, and therefore will not receive Distributions under the Plan.  All Claims arising from the rejection of an Executory Contract that give rise to a general, non-priority, unsecured claim shall be treated as a Class 3 General Unsecured Claim under the Plan.

To the extent not already rejected pursuant to a Final Order, all employment and retirement practices and policies and all compensation, retirement and employee benefit plans (except as provided below), policies and programs of the Debtors applicable to its current or former directors, officers, or employees (including all savings plans, retirement plans, health care plans, accrued unpaid vacation, sick leave, medical benefits, incentive plans, workers' compensation programs, and life, disability and other insurance plans), to the extent arising from Executory Contracts, shall be rejected as of the Effective Date, and shall not be binding on the Debtors, the Reorganized Debtors or Liquidating Trustee to any extent.

Subject to the occurrence of the Effective Date, the obligations of the Debtors to indemnify, defend, reimburse or limit the liability of directors or officers who were or are directors or officers of the Debtors at any time, against any claims or causes of action as provided in the Debtor's certificate of incorporation, by-laws, applicable state law, contract, or otherwise shall not survive confirmation of the Plan except as otherwise provided in the Plan or by order of the Bankruptcy Court; provided, however, that such obligations as may be covered

by an insurance policy of any of the Debtors shall continue to the extent necessary to preserve the validity and enforceability of such insurance policy and coverage.

### C.    Liquidating Trustee

The Committee shall appoint, in its sole discretion, the Liquidating Trustee of the Liquidating Trust.  The Liquidating Trustee will not be a successor to the Debtors or the Reorganized Debtors.  The Liquidating Trustee will have all the powers of a debtor-in-possession and a trustee appointed under chapter 7 of the Bankruptcy Code and will answer to and be directed by a three-member Post-Confirmation Committee.  The initial members of the Post-Confirmation Committee are Archer Drilling, L.L.C.; Frank's International, L.L.C.; and Kenai Offshore Ventures, L.L.C.  On the Effective Date, the Liquidating Trust will be formed, the Liquidating Trust Assets will be transferred by the Reorganized Debtors to the Liquidating Trust and the Liquidating Trustee will administer those assets, administer claims and make distributions of Liquidating Trust Assets to holders of Allowed Claims and Interests in accordance with the terms of the Plan.

Subject to establishing the reserves required under the Plan, the Liquidating Trustee shall have authority to make distributions of Cash at such time or times the Liquidating Trustee believes there is sufficient Trust Distribution Cash to warrant a Distribution.  As soon as practicable after the Effective Date, the Liquidating Trustee will make a Distribution on the Initial Distribution Date to holders of Allowed Claims.  Only the Holders of Allowed Priority Tax Claims, Priority Non-Tax Claims, General Unsecured Claims, Subordinated Claims, and Equity Interests shall be entitled to Distributions from Trust Distribution Cash, except as otherwise provided in the Plan.

The Liquidating Trustee shall serve as the sole officer/director/manager of the Reorganized Debtors.  If the Liquidating Trustee determines that dissolution of Buccaneer Energy Limited will not affect, alter or otherwise impair any right or recovery of the Liquidating Trust, then, after any Assets of Buccaneer Energy Limited have been administered, the Liquidating Trustee shall file all documents necessary to effect a dissolution of or otherwise dispose of Buccaneer Energy Limited under applicable law.

Following the liquidation of the Liquidating Trust Assets and the distribution of all Trust Distribution Cash and any reserve provided for or contemplated by the Plan, the Liquidating Trustee shall file with the Bankruptcy Court and serve on the U.S. Trustee a final report outlining funds distributed under the Plan and shall take such other steps as necessary to close the bankruptcy cases.

### D.    Creation of the Liquidating Trust

On the Effective Date, all property of the Estate of any kind and nature whatsoever, real, personal, intellectual or otherwise, shall be transferred to the Liquidating Trust, without the need to execute any documents or instruments of transfer; provided, however, that Coverage Claims, D&O Insurance (but not insurance proceeds), and property subject to Article 7.4.1.4 of the Plan shall not be transferred to the Liquidating Trust.  **The Liquidating Trust Assets (including, without limitation, all Avoidance Actions, Claims and Causes of Action, including, but not**

**limited to, those Avoidance Actions, Claims and Causes of Action listed identified in Article IV. D hereof) will be reserved, preserved, assigned, transferred and conveyed, as the case may be, to the Liquidating Trust and shall vest free and clear of all liens, claims and encumbrances or interests except to the extent that such liens and claims are retained under the plan.** The transfer of the Liquidating Trust Assets is subject to the right of the Liquidating Trustee during the 180-days after the Effective Date to renounce such assets *nunc pro tunc* to immediately before the Effective Date. The Liquidating Trust shall be established for the sole purpose of receiving the benefit of the ongoing obligations of third parties, liquidating and distributing the Liquidating Trust Assets in accordance with the Plan, and disbursing funds from the Administrative Claims Account in accordance with the Plan.

Upon creation of the Liquidating Trust, holders of Allowed Claims in Classes 3 and 4 and Class 6 Allowed Interests shall be the Beneficiaries of the Liquidating Trust. Upon the liquidation of any remaining assets of the Estates, and after the payment of all costs and expenses of collection, the Liquidating Trustee will distribute the corpus of the Liquidating Trust to the Beneficiaries of the Liquidating Trust in accordance with the Plan and the priority and percentage of their interests in the Liquidating Trust.

The Liquidating Trust shall remain and continue in full force and effect until the earlier of five (5) years from the Effective Date or the date on which (1) all Liquidating Trust Assets have been distributed or abandoned, (2) all costs, expenses, and obligations incurred in administering the Liquidating Trust have been fully paid, and (3) all remaining income and proceeds of the Liquidating Trust Assets have been distributed in accordance with the provisions of the Plan; provided, however, that if the complete liquidation of the Liquidating Trust Assets and satisfaction of all remaining obligations, liabilities and expenses of the Liquidating Trust pursuant to the Plan has not been completed prior to five (5) years from the Effective Date, the Liquidating Trustee may, for good cause shown, seek the approval of the Bankruptcy Court for an extension of the termination date of the Liquidating Trust for a specified period of time in order to complete the purpose of the Liquidating Trust as set forth in the Plan and the Liquidating Trust Agreement. Upon termination and complete satisfaction of its duties under the Liquidating Trust Agreement, the Liquidating Trustee will be forever discharged and released from all powers, duties, responsibilities, and liabilities pursuant to the Liquidating Trust other than those attributable to the gross negligence or willful misconduct of the Liquidating Trustee.

### E. Prosecution, Enforcement and Compromise of Claims Belonging to the Bankruptcy Estates

After the Effective Date, pursuant to, among other authority, section 1123(b)(3)(B) of the Bankruptcy Code, until unsecured creditors are paid in full, the Liquidating Trustee shall have the sole and full power, authority, and standing to prosecute, compromise, or otherwise resolve any of the Debtors' Causes of Action, including Avoidance Actions. All net proceeds derived from the Causes of Action shall become Liquidating Trust Assets and be distributed as Trust Distribution Cash in accordance with the Plan. The Reorganized Debtors and the Liquidating Trustee shall not be subject to any counterclaims with respect to the Avoidance Actions and any other claims and causes of actions constituting property of the Liquidating Trust provided, however, that the claims and Causes of Action (other than Avoidance Actions) will be subject to any applicable setoff rights.

The Debtors' failure to identify a claim or Cause of Action herein is specifically not a waiver of any claim or Cause of Action. The Debtors will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any Cause of Action or the value of such Causes of Action at the Confirmation Hearing; accordingly, except for claims or Causes of Action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtors' failure to identify a claim or Cause of Action herein shall not give rise to any defense of any preclusion doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or Causes of Action which could be asserted, except where such claims or Causes of Action have been explicitly released in the Plan or the Confirmation Order.

## F.    Payment of U.S. Trustee Fees

All post-petition pre-confirmation quarterly fees of the U.S. Trustee will be paid in full on or before the Effective Date. After the Effective Date and until the chapter 11 cases are closed, the Liquidating Trustee shall pay all fees incurred under 28 U.S.C.§ 1930(a)(6) in the ordinary course of business.

## G.    Allowance, Objection to, Compromise, Adjustment and Estimation of Proofs of Claim

Article 9 of the Plan sets forth the procedure for administering Claims of Creditors against the Debtors. The Liquidating Trustee on behalf of the Liquidating Trust, and in consultation with the Post-Confirmation Committee, shall have the sole right to administer the Claims process, including allowing, objecting to, and compromising Claims against the Debtors. After the Effective Date, the Liquidating Trustee will have sole authority to administer, reconcile and settle Claims against the Debtors' Estates. The Debtors will, if necessary, object to Administrative, Secured, Priority Tax Claims and Priority Non-Tax Claims prior to the Confirmation Date. **The Liquidating Trustee will have the right through the claim objection process to object to or seek to disallow any Claim for distribution purposes under the Plan.**

Except as otherwise provided herein, the Liquidating Trustee must file any objections to Claims with the Bankruptcy Court and serve a copy of the objection on the holder of such Disputed Claim before the later of (i) 365 days after the Effective Date; and (ii) 60 days after the later of (a) the applicable Bar Date, or (b) entry of a Final Order deeming a late-filed Proof of Claim to be treated as timely filed; *provided*, *however*, that this deadline may be extended by the Bankruptcy Court upon motion of the Liquidating Trustee, with or without notice or hearing.

For holders of Claims that are Allowed as of the Effective Date, the Plan provides for Distributions to commence to such holders as soon as practicable after the Effective Date, in the reasonable discretion of the Liquidating Trustee. However, if a Claim is a Disputed Claim, the payment will occur following the allowance of the Claim by a Final Order of the Bankruptcy Court.

Article 9 of the Plan also provides that disputed, contingent or unliquidated Claims may be estimated for purposes of voting, distribution and the establishment of Disputed Claim Reserves or Disputed Cure Claim Reserves by separate order of the Bankruptcy Court. The

-47-

Bankruptcy Court has broad discretion to fashion procedures for the estimation of unliquidated claims under section 502(c) of the Bankruptcy Code using whatever method is best suited to the circumstances, including a summary trial procedure involving proffers of evidence, affidavits, deposition testimony, exhibits, answers to discovery requests, and limited live testimony.

### H.    Bar Dates for Unclassified Claims

All requests for payment of Administrative Claims arising on or before the Effective Date (except applications for payment of Professional Fee Claims) must be filed with the Bankruptcy Court and served on the Debtors, the Committee, and the U.S. Trustee no later than the Administrative Claims Bar Date, or by such earlier deadline as may apply to a particular Administrative Claim pursuant to an order of the Bankruptcy Court entered before the Effective Date. Any Administrative Claim, except Professional Fee Claims, for which an application or request for payment is not filed within the above-referenced time period shall be discharged and forever barred, and shall not be entitled to any Distributions under the Plan.

All requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on the Liquidating Trustee, the Reorganized Debtors and the U.S. Trustee no later than the Professional Fee Claims Bar Date. Any such Professional Fee Claims for which an application or request for payment is not filed within that time period shall be discharged and forever barred, and shall not be entitled to any Distributions under the Plan.

## ARTICLE VII
## VOTING PROCEDURES AND CONFIRMATION REQUIREMENTS

### A.    Ballots and Voting Deadline

Accompanying this Disclosure Statement is a "Notice of: (A) Deadline to Vote to Accept or Reject the First Amended Joint Chapter 11 Plan of Reorganization for the Debtors and Debtors-in-Possession, (B) Deadline to Object to Approval of the First Amended Disclosure Statement for the First Amended Joint Chapter 11 Plan of Reorganization for the Debtors and Debtors-in-Possession, (C) Deadline to Object to Plan Confirmation, (D) Combined Hearing to Consider Final Approval of Disclosure Statement and Confirmation of Plan, and (E) Related Matters and Procedures" (the "<u>Solicitation Notice</u>").

**In order for your vote to count, you must follow the directions set forth in the Solicitation Notice accompanying the Disclosure Statement and Plan which contains a detailed description of the process for voting and the tabulation of ballots.**

A ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement, and has been mailed to holders of Claims and Interests entitled to vote. After carefully reviewing the Disclosure Statement and all exhibits, including the Plan, each holder of a Claim or Interest entitled to vote should indicate its vote on the enclosed ballot. All holders of Claims or Interests entitled to vote must (i) carefully review the ballot and instructions thereon, (ii) execute the ballot, and (iii) return it to the address indicated on the ballot by the Voting Deadline (defined below) for the ballot to be considered.

In order for your vote on the Plan to count, the original, signed Ballot must be actually received by Balloting Agent no later than **December 2, 2014 at 5:00 p.m.** United States **Eastern** Time ("Voting Deadline").  The Balloting Agent is Epiq Bankruptcy Solutions, LLC, and Ballots should be sent:

| By regular US mail to: | | By messenger or overnight courier to: |
|---|---|---|
| Buccaneer Resources, LLC | OR | Buccaneer Resources, LLC |
| Ballot Processing | | Ballot Processing |
| c/o Epiq Bankruptcy Solutions, LLC | | c/o Epiq Bankruptcy Solutions, LLC |
| FDR Station, P.O. Box 5014 | | 757 Third Avenue, 3rd Floor |
| New York, NY 10150-5014 | | New York, NY 10017 |

Or by email to:

**tabulation@epiqsystems.com** with a reference to "Buccaneer Balloting" in the subject line

Any Ballot received by the Balloting Agent after the Voting Deadline shall not be counted, unless the Court orders otherwise.  Ballots will not be counted if they are delivered by facsimile or if they are unsigned.

### B.      Holders of Claims Entitled to Vote.

Except as otherwise provided in the Plan, any holder of a Claim against the Debtors whose claim is impaired under the Plan is entitled to vote, if either (i) the Debtors have scheduled the holder's Claim at a specific amount other than $0.00 (and such Claim is not scheduled as "disputed," "contingent," or "unliquidated") or (ii) the holder of such Claim has filed a Proof of Claim on or before the deadline set by the Bankruptcy Court for such filings in a liquidated amount.  Any holder of a Claim as to which an objection has been filed (and such objection is still pending as of the time of confirmation of the Plan) is not entitled to vote, unless the Bankruptcy Court (on motion by a party whose Claim is subject to an objection) temporarily allows the Claim in an amount that it deems proper for the purpose of accepting or rejecting the Plan.  Such motion must be heard and determined by the Bankruptcy Court before the first date set by the Bankruptcy Court for the Confirmation Hearing of the Plan.  In addition, the vote of a holder of a Claim may be disregarded if the Bankruptcy Court determines that the holder's acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code.

### C.      Bar Date for Filing Proofs of Claim

The Bankruptcy Court established a bar date for filing proofs of claim or interests in these chapter 11 cases of September 29, 2014.  The Bankruptcy Court further established a bar date for filing proofs of claim in these chapter 11 cases by Governmental Units of November 27, 2014.  Timeliness or other substantive issues which may affect the ultimate allowability of a particular claim have not been considered in connection with classification.  As described in Article VI.G., for the filing of claims objections, the Plan provides the Liquidating Trustee a

period of the later of (i) 365 days after the Effective Date; and (ii) 60 days after the later of (a) the applicable Bar Date, or (b) entry of a Final Order deeming a late-filed Proof of Claim to be treated as timely filed; *provided*, *however*, that this deadline may be extended by the Bankruptcy Court upon motion of the Liquidating Trustee, with or without notice or hearing.

Prior to the Confirmation Hearing, the Debtors intend to file a Plan Supplement that includes, among other things, the list of assumed Executory Contracts (with associated Cure Amounts, if any), and a description of Retained Causes of Action.  As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the website of the Debtors' Noticing and Solicitation Agent, *http://dm.epiq11.com/BUC*.

### D.      Definition of Impairment

Under Bankruptcy Code section 1124, a class of Claims or Interests is impaired under a plan of reorganization unless, with respect to each Claim or Interests of such class, the plan:

(1)      leaves unaltered the legal, equitable, and contractual rights of the holder of such Claim or Interest; or

(2)      notwithstanding any contractual provision or applicable law that entitles the holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default –

(a)      cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Bankruptcy Code section 365(b)(2);

(b)      reinstates the maturity of such claim or interest as it existed before the default;

(c)      compensates the holder of such claim or interest for damages incurred as a result of any reasonable reliance on such contractual provision or applicable law; and

(d)      does not otherwise alter the legal, equitable, or contractual rights to which such Claim or Interest entitles the holder of such Claim or Interest.

### E.      Classes Impaired Under the Plan

Claims in Class 1(a), 1(b) and 2 are not impaired under the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims within these Classes are conclusively presumed to have accepted the Plan, and therefore are not entitled to vote to accept or reject the Plan.

Allowed Claims in Classes 3 and 4 are impaired under the Plan and are entitled to vote to accept or reject the Plan.

Interests in Class 5 and 6 are impaired under the Plan, are not expected to receive or retain any property under the Plan, are conclusively presumed to have rejected the Plan under Bankruptcy Code section 1126(g), and therefore are not entitled to vote to accept or reject the Plan.

### F.      Information on Voting and Ballots

Ballots are being forwarded to all holders of Claims entitled to vote.  The Bankruptcy Court has approved the procedures for solicitation of votes on the Plan and the tabulation of the ballots received from holders of Claims and Interests that are contained in the Solicitation Notice included in the solicitation package.  **The descriptions of the solicitation and tabulation procedures contained in the Solicitation Notice are incorporated by reference as if fully set forth herein**.

### G.      Confirmation of Plan

#### 1.      Solicitation of Acceptances

NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE PLAN ARE AUTHORIZED BY THE DEBTORS OR ANY OTHER PARTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE FOR OR AGAINST THE PLAN (OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT) SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS.

Under the Bankruptcy Code, a vote for acceptance or rejection of a plan may not be solicited unless the claimant has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation.  The solicitation of votes on the Plan is governed by section 1125(b) of the Bankruptcy Code.  Violation of section 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowance of any improperly-solicited vote.

#### 2.      Confirmation Hearing

Pursuant to section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing on Confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

**The Confirmation Hearing will commence on December 8, 2014 at 9:00 a.m. Central time** before the Honorable David R. Jones, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of Texas, Victoria Division, 515 Rusk, Houston, Texas 770021.  The Debtors may continue the confirmation hearing from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the bankruptcy court and served on the Master Service List and the entities who have filed an objection to the Plan, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures

governing the Confirmation Hearing. The Plan may be modified, if necessary, prior to, during, or as a result of the confirmation hearing, without further notice to parties in interest.

**The Plan Objection Deadline is December 2, 2014, at 5:00 p.m. Central time**. All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are received on or before the Plan Objection Deadline.

If the Plan is rejected by one or more impaired Classes of Claims or Interests, the Bankruptcy Court may still confirm the Plan, or a modification thereof, under Bankruptcy Code section 1129(b) (commonly referred to as a "cramdown") if it determines, among other things, that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting Class or Classes of Claims or Interests impaired under the Plan. The procedures and requirements for voting on the Plan are described in more detail below.

### 3.      Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court shall determine whether the requirements of section 1129 of the Bankruptcy Code have been satisfied, in which event the Bankruptcy Court shall enter an Order confirming the Plan. For the Plan to be confirmed, section 1129 of the Bankruptcy Code requires that:

a)      The Plan complies with the applicable provisions of the Bankruptcy Code;

b)      The Debtors, as proponents of the Plan, have complied with the applicable provisions of the Bankruptcy Code;

c)      The Plan has been proposed in good faith and not by any means forbidden by law;

d)      Any payment or distribution made or promised by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in connection with the case, or in connection with Plan and incident to the case, has been approved by or is subject to the approval of, the Court as reasonable;

e)      The Debtors have disclosed, to the extent known, the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting trustee of the Debtors, affiliates of the Debtors participating in a joint plan, or a successor to the Debtors under the Plan; and the appointment to, or continuance in, such office of such individual is consistent with the interests of holders of Claims and Interests and with public policy; and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors, and the nature of any compensation for such insider;

f)      Any government regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

g)      With respect to each impaired Class or Claims or Interests, either each holder of a Claim or Interest of the Class has accepted the Plan, or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.  If Bankruptcy Code section 1111(b)(2) applies to the Claims of such Class, each holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that holder's interest in the estate's interest in the property that secures such Claim;

h)      Each Class of Claims or Interests has either accepted the Plan, is not impaired under the Plan, or will receive no distribution under the Plan and, thus, are deemed to have rejected the Plan;

i)      Except to the extent that the holder of a particular Administrative Claim or Priority Non-Tax Claim has agreed to a different treatment of its Claim, the Plan provides that Allowed Administrative Claims and Priority Non-Tax Claims shall be paid in full on the Effective Date or on the date such claim is Allowed by Final Order;

j)      If a Class of Claims or Interests is impaired under the Plan, at least one such Class of Claims or Interests has accepted the Plan, determined without including any acceptance of the Plan by any insider;

k)      Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan; and

l)      All fees payable under Section 1930 of Title 28, as determined by the Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

The Debtors believe that the Plan satisfies all of the statutory requirements of the Bankruptcy Code for confirmation and that the Plan was proposed in good faith.  The Debtors believe they have complied, or will have complied, with all the requirements of the Bankruptcy Code governing confirmation of the Plan.

### 4.      Acceptances Necessary to Confirm the Plan

Voting on the Plan by each holder of an impaired Claim or Interest is important.  Chapter 11 of the Bankruptcy Code does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Court to confirm the Plan.  Generally, to be confirmed under the acceptance provisions of Bankruptcy Code section 1126, the Plan must be accepted by each Class of Claims that is impaired under the Plan by parties holding at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class actually voting in connection with the Plan and each Class of Interests (equity securities) by

holders of at least two-thirds of the number of Allowed Interests of such Class actually voting in connection with the Plan.  Even if all Classes of Claims and Interest accept the Plan, the Bankruptcy Court may refuse to confirm the Plan.

### 5.      Liquidation Analysis and "Best Interests" Test

Even if the Plan is accepted by each class of holders of Claims and Interests, the Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the "best interests" of all holders of Claims or Interests that are impaired by the Plan and that have not accepted the Plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member of the class who has not accepted the plan with property of a value, as of the Effective Date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each impaired class of holders of claims or interests if a debtor were liquidated under chapter 7, a Bankruptcy Court must determine the aggregate dollar amount that would be generated from the debtor's assets if its chapter 11 case were converted to a case under chapter 7 of the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the chapter 7 case and the chapter 11 case.  Costs of a liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by the chapter 7 trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in the chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 case, litigation costs, and claims arising from the operations of the Debtors during the pendency of the bankruptcy case.  The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business.  Those priority claims would be paid in full from the sale proceeds before the balance would be made available to pay general unsecured claims or to make any distribution to holders of equity interests.

Once the Bankruptcy Court ascertains the recoveries in liquidation of holders of secured and priority claims, it must then determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation.  If such distribution has a value greater than the distributions to be received by creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

As shown in the Liquidation Analysis annexed as **Exhibit C** to this Disclosure Statement, the Debtors believe that each member of each Class of Claims and Interests will receive at least as much, if not more, under the Plan as they would receive if the Debtors were liquidated in

multiple chapter 7 cases administered by separate chapter 7 trustees.  The Debtors believe that a liquidation of the Debtors in chapter 7 cases would significantly impair recoveries to all stakeholders and clearly is not in the best interests of estate constituencies.  Importantly, if the Plan is not confirmed the AIX/Meridian Settlement will not become effective and Creditors will not obtain the benefits of that agreement, including particularly the $10,000,000 Settlement Payment.  Accordingly, it is clear that holders of Claims and Interests will fare much better under the Plan than in a chapter 7 liquidation.

### 6.      Cramdown

In the event that any impaired Class of Claims or Interests does not accept the Plan, under section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."   A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no Class receives more than it is legally entitled to receive for its Claims or Interests.   "Fair and equitable" has different meanings for holders of Secured and Unsecured Claims and equity Interests.

With respect to a Secured Claim, "fair and equitable" means either (i) the impaired secured creditor retains the liens, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of its allowed Claim and receives deferred Cash payments totaling at least the allowed amount of its Claims with a present value as of the Effective Date of the Plan at least equal to the value of such creditor's interest in the property securing its liens; (ii) property subject to the lien of the impaired secured creditor is sold free and clear of that lien, with that lien attaching to the proceeds of sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or (iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the Plan.

With respect to an Unsecured Claim, "fair and equitable" means either (i) each impaired creditor receives or retains property of a value, as of the Effective Date of the Plan, equal to the amount of its Allowed Claim or (ii) the holders of Claims and equity Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan until the Unsecured Claims are paid in full.

With respect to equity Interests, "fair and equitable" means either (i) each impaired equity Interest receives or retains, on account of that Interest, property of a value, as of the Effective Date, equal to the greatest of the Allowed amount of any fixed liquidation preference to which the holder is entitled, any fixed redemption price to which the holder is entitled, or the value of the equity Interest; or (ii) the holder of any equity Interest that is junior to the equity Interest of that class will not receive or retain under the plan, on account of that junior equity Interest, any property.

In the event at least one Class of impaired Claims rejects or is deemed to have rejected the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired Class of Claims.

The Debtors believe that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired Class of Claims and Interests.

## ARTICLE VIII
## EFFECT OF CONFIRMATION OF THE PLAN, INJUNCTION AGAINST ENFORCEMENT OF PRE-CONFIRMATION DEBT AND EXCULPATION

### A.    Effect of Confirmation of the Plan

Upon confirmation, the provisions of the Plan shall bind all holders of Claims and Interests, whether or not they accept the Plan.  On and after the Effective Date, all holders of Claims and Interests are, thus, precluded from asserting any Claim against the Debtor or its assets or properties based on any transaction or other activity of any kind that occurred prior to the Effective Date, except as permitted under the Plan.

Subject to the terms of the Plan and the Confirmation Order, on the Effective Date, the Assets shall vest in the Reorganized Debtors and shall be transferred to and become the property of the Liquidating Trust, including without limitation all Claims, Causes of Action, alter-ego rights, derivative claims, breach of fiduciary duty claims, veil piercing rights and all other property of the estate as such property is defined by section 541 of the Bankruptcy Code and applicable non-bankruptcy law, except Coverage Claims.

Except as otherwise specifically provided in the Plan or in the Confirmation Order, on the Effective Date all of the assets of the Debtors shall revest in the Reorganized Debtors and shall be free of all liens, claims and encumbrances and shall be transferred by the Reorganized Debtors to the Liquidating Trust.

Following the Effective Date, the Liquidating Trust will include all claims (except Coverage Claims) owned by the Debtors before the Confirmation Date, including all claims recoverable under Chapter 5 of the Bankruptcy Code, including all claims assertable under sections 502, 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code, and all claims owned by the Debtor pursuant to section 541 of the Bankruptcy Code or similar state law, including all claims against third parties on account of any indebtedness, and all other claims owed to or in favor of the Debtors to the extent not specifically compromised and released pursuant to the Plan or an agreement referred to or incorporated herein.  **After the Effective Date, all Causes of Action owned by the Debtors before the Confirmation Date will be preserved and retained for enforcement by the Liquidating Trustee; after the Effective Date, no other party will have the right to assert these claims.**

Except as otherwise provided in this Plan or the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, **the Liquidating Trustee on behalf of the Liquidating Trust, will retain and shall have the exclusive authority to enforce, sue on, pursue, settle or compromise (or decline to do any of the foregoing) all Claims, rights or causes, rights or Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or the Estate may hold against any Person or**

entity, including without limitation, all Claims and Causes of Action preserved by the debtors and the Liquidating Trust in Article IV. D hereof.

**B.**      **Prohibition Against Enforcement of Pre-Confirmation Debt, Exculpation**

On and after the Effective Date, except as provided in the Plan or Confirmation Order, all holders of Claims and Interests will be bound by the terms of the Plan and shall be precluded from asserting against the Debtors, their Estates, the Purchaser, the Reorganized Debtors, the Liquidating Trustee or the Committees, or their employees or agents, any Claims, debts, rights, causes of action, liabilities, or Interests relating to the Debtors based upon any act, omission, transaction, or other activity of any nature that occurred prior to the Effective Date.

The Plan also provides that, notwithstanding any other provision of the Plan, no holder of a Claim or Interest, no Entities who have held, hold, or may hold Claims against or Interests in the Debtors prior to the Effective Date, no other party in interest, none of their respective agents, employees, representatives, financial advisors, attorneys, or affiliates, and no successors or assigns of any of the foregoing, shall have any cause of action or right of action, whether in law or equity, whether for breach of contract, statute, or tort claim, against the Debtors (including their directors, officers and employees), the Reorganized Debtors (including their directors, officers and employees), the Committee (including any present and former members of either thereof and any and all of their professionals), the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Committee, and legal, financial or restructuring advisors of any of the above, their respective successors or assigns, or their Estates, assets, properties, or interests in property, for any post-petition act or omission in connection with, relating to, or arising out of, these Chapter 11 Cases, the good faith solicitation of the Plan in accordance with section 1125(e) of the Bankruptcy Code, the pursuit of Confirmation of the Plan, consummation of the Plan, or the administration of the Debtors, the Plan or the property sold pursuant to the Court-approved sale of the Kenai Loop Assets or to be distributed under the Plan.

**ARTICLE IX**
**CONDITIONS PRECEDENT TO EFFECTIVE DATE**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the Plan:

(a)      the Confirmation Order, in a form and in substance reasonably satisfactory to the Debtors and the Committee, shall have been entered by the Clerk of the Bankruptcy Court;

(b)      the sale of substantially all of the Debtors' assets including the Kenai Loop Assets shall have been closed;

(c)      all of the conditions for the effectiveness of the AIX/Meridian Settlement shall have been fulfilled as stated therein;

(d)      the payment of the Settlement Payment;

(e)      the funding of the Administrative Claims Account;

(f)     the form of all documents necessary or appropriate to give effect to the transactions contemplated under the Plan, if any, have been approved and executed;

(g)     all authorizations, consents and agreements required, if any, in connection with the consummation of the Plan shall have been obtained;

(h)     there shall be no stay of the Confirmation Order in effect;

(i)     all other actions, documents and agreements necessary to implement the Plan shall have been effected or executed; and

(j)     The Debtors shall have filed a Notice of Effective Date on the docket of these jointly administered bankruptcy cases.

## ARTICLE X
## LIQUIDATION ANALYSIS, FEASIBILITY, AND RISK FACTORS

### A.     Liquidation Analysis

Recoveries to Classes 1 through 6 are derived from the Settlement Payment, cash on hand, and cash that may be generated in the future from the liquidation of the Liquidating Trust Assets.

Attached as **Exhibit C** is a Liquidation Analysis.  The Liquidation Analysis, based solely on pro forma numbers, shows estimated Cash available on the Effective Date, and provides an estimate of the possible distribution and uses of the Cash available under the Plan.  It also demonstrates that recoveries to Creditors under the Plan will be greater than they would receive under a liquidation pursuant to chapter 7 of the Bankruptcy Code.

### B.     Feasibility of the Plan

Section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor unless such liquidation is proposed in the Plan.

The Bankruptcy Court has authorized and the Debtors will have, on or before the date of the Confirmation Hearing, consummated the sale of substantially all of the Debtors' assets pursuant to 11 U.S.C. § 363.  The Settlement Payment, the Cash generated by the sale of the remaining Assets transferred to the Liquidating Trust, the liquidation of the other Assets and the prosecution of Causes of Action, as well as the funds already generated by the collection of accounts should be sufficient to fund Distributions under the Plan and to establish a reasonable reserves, including the costs of administering the Liquidating Trust.  The Plan satisfies section 1129(a)(11) of the Bankruptcy Code, because it provides for the liquidation of the Debtors' assets and the distribution of the proceeds of that liquidation by the Reorganized Debtors or the Liquidating Trust to holders of Allowed Claims.

C.        **Risks Associated with the Plan**

Both the confirmation and consummation of the Plan are subject to a number of risks. There are certain risks inherent in the confirmation process under the Bankruptcy Code.  If certain standards set forth in the Bankruptcy Code are not met, the Bankruptcy Court will not confirm the Plan even if holders of Allowed Claims vote to accept the Plan.  Although the Debtors believe that the Plan meets such standards, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If the Bankruptcy Court were to determine that such requirements were not met, it could require the Debtors to re-solicit acceptances, which could delay and/or jeopardize confirmation of the Plan.  The Debtors believe that the solicitation of votes on the Plan will comply with section 1126(b) and that the Bankruptcy Court will confirm the Plan.  The Debtors, however, can provide no assurance that modifications of the Plan will not be required to obtain confirmation of the Plan, or that such modifications will not require a re-solicitation of acceptances.

In addition, there is also a risk that holders of Allowed Claims in Classes 3 and 4 will not be paid one hundred percent (100%) of their claims, in which case, holders of Allowed Class 5 and Class 6 Interests would receive no distributions under the Plan.

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS THAT ARE IMPAIRED SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES, THE PLAN OR THE IMPLEMENTATION OF THE PLAN.**

1.        **Parties in Interest May Object to the Debtors' Classification of Claims and Equity Interests.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.        **The Debtors May Fail to Satisfy the Vote Requirement**.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to accomplish an alternative chapter 11 plan of reorganization.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

3. **The Debtors May Not Be Able to Secure Confirmation of the Plan.**

As discussed above, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the bankruptcy court that: (a) such plan does not "unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determined that the Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation were not met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.  Section 1129(b)(1) of the Bankruptcy Code provides that, in the event an impaired class does not vote in favor of a plan, but all other requirements of section 1129(a) are satisfied, the Bankruptcy Court may only confirm such a plan if it "does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan."  There can be no assurance, however, that the Bankruptcy Court will find that the Plan satisfies the requirements of section 1129(b)(1) of the Bankruptcy Code.

Confirmation of the Plan is also subject to certain conditions as described in Article XI of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims would receive with respect to their Allowed Claims.  The Debtors, subject to the terms and conditions of the Plan, may seek to modify the terms and conditions of the Plan as necessary for confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.

4. **Non-Consensual Confirmation of the Plan May Be Necessary.**

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements and the Debtors may request such non-consensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, in

the event that the Voting Class does not accept the Plan, there can be no assurance that the Bankruptcy Court will reach this conclusion.

**5.      The Debtors May Object to Amount or Classification of a Claim.**

Except as otherwise provided in the Plan, the Debtors and the Liquidating Trustee reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is or may become subject to an objection.  Any Holder of a Claim that is or may become subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**6.      The Effective Date May Not Occur.**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**7.      The Proposed Sale, and the Transactions Contemplated Thereby, May Not Be Consummated.**

There can be no assurance as to such timing or as to whether the proposed sale of the Debtors' assets, and the transactions contemplated as part of such sale, will become effective. As discussed in Article IX hereof, there are certain material conditions to the occurrence of the Effective Date contemplated by the Plan, including the condition that the sale close, that may not be satisfied if the sale does not close.

*CIRI has requested that the following be included in the Disclosure Statement:*

The Plan presents material risk factors that creditors should understand before voting on the Plan, including without limitation the following matters:

- **The Debtors have not determined at the time of this Disclosure Statement how the sale of their most valuable asset (their interests in the Kenai Loop area of Alaska) will be affected by the termination of their lease with CIRI.**

- **The Plan provides for substantive consolidation of all of the Debtors' bankruptcy estates based in part on the Debtors' assumption that Ezion has valid claims against all of the Debtors, even though the Debtors have not completed an analysis of whether such claims may be subject to avoidance against some or all of the Debtors.**

- **If approved, the substantive consolidation feature of the Plan will almost invariably redistribute assets and liabilities among the various Debtors and their respective creditors, without a substantial explanation as to how creditors of different Debtors are benefited or prejudiced thereby.**

- **If the Bankruptcy Court denies the Debtors' request for substantive consolidation, the Plan will need to be withdrawn and creditors will be required to vote on a new plan.**

- **The Debtors have not determined how they propose to resolve the pending litigations with CIRI in Alaska, whether the outcome of the litigations may require the Litigation Trust to indemnify or otherwise compensate the purchaser of the Debtors' assets, or whether the costs of the litigations will be borne by the Liquidating Trust.**

The Debtors do not necessarily agree with all of the alleged risk factors described by CIRI, but agreed to present them in this Disclosure Statement for creditors' consideration.  The Debtors believe that acceptance of the Plan at this time is in the best interest of creditors, notwithstanding the alleged risks summarized above, considering the Debtors' circumstances and available alternatives.  The Committee also supports confirmation of the Plan, and urges all unsecured creditors to vote in favor of and to support confirmation of the Plan.

## ARTICLE XI
## ALTERNATIVES TO PLAN AND LIQUIDATION ANALYSIS

There are three possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan:  (a) the Bankruptcy Court could consider an alternative plan of reorganization proposed by the Debtors (or another party after the Exclusive Period); (b) the Debtors' chapter 11 bankruptcy case could be converted to liquidation cases under chapter 7 of the Bankruptcy Code; or (c) the Bankruptcy Court could dismiss the Debtors' chapter 11 bankruptcy cases.

### A.    Alternative Plans

The Debtors have the exclusive right to propose a plan of reorganization for the first 120 days of their Chapter 11 Cases, which time may be extended by the Court for cause, up to a maximum of (18) eighteen months from the Petition Date.

Once the Debtors' exclusivity period expires, any party in interest may file its own plan and seek its confirmation.

### B.    Chapter 7 Liquidation

If the Plan is not confirmed, it is possible that the Debtors' chapter 11 cases will be converted to cases under chapter 7 of the Bankruptcy Code, in which case a trustee would be elected or appointed to liquidate the assets of the individual Debtors for distribution to holders of Claims and Interests in accordance with the priorities established by the Bankruptcy Code.  Whether a bankruptcy case is one under chapter 7 or chapter 11, secured creditors, Administrative Claims and Priority Claims are entitled to be paid in cash and in full before unsecured creditors receive any funds.

Chapter 7 liquidations will often yield depressed values because the sale is conducted under more or less "fire sale" conditions and, ordinarily, an additional layer of advisors and experts would need to be retained by the chapter 7 trustee or trustees, giving rise to additional administrative expenses that would be entitled to priority.

Most importantly, if any of the chapter 11 cases were to be converted, the AIX/Meridian Settlement which provides for the funding of the Settlement Payment and Committee Professional Fund, would be null and void and each party to that agreement would return to its respective position in effect immediately prior to the settlement. Thus, holders of Claims and Interests would not receive the benefit of the Settlement Payment currently contemplated. Further, the Debtors will have already sold substantially all of their assets to the Purchaser in a Bankruptcy Court-approved sale. The Closing of that transaction will have occurred prior to the Confirmation Date. After the Closing, the assets of the Debtors consist of the unsold Assets.

The Debtors, therefore, believe that the Distributions under the Plan to holders of Allowed Claims and Interests will be greater than any Distributions that such holders would receive in a hypothetical chapter 7 liquidation of the Debtor's estate and, accordingly, the Plan meets the requirements of Section 1129(a)(7) of the Bankruptcy Code.

### C.    Dismissal

If the Debtors' bankruptcy cases were to be dismissed, they would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code, including the automatic stay, the AIX/Meridian Settlement which provides for the funding of the Settlement Payment and Committee Professional Fund, would be null and void, and each party to that agreement would return to its respective position in effect immediately prior to the settlement.. Without such fundamental protections preventing holders of Claims from taking actions against the Debtors, holders of Claims would be allowed to pursue their Claims against the Debtors outside of the bankruptcy proceeding. In particular, holders of Secured Claims would be allowed to exercise their state law remedies with respect to their collateral, including possible foreclosure. Moreover, in the event that the Settlement were to be null and void, holders of Claims and Interests would not receive the benefit of the Settlement Payment currently contemplated. Accordingly, the Debtors believe that dismissal of the Debtors' bankruptcy cases, which would likely result in a piecemeal dismemberment of the Debtors and their assets, would not serve the best interests of holders of Claims and Interests. Rather, the Plan will result in greater certainty and a greater potential recovery to creditors.

### ARTICLE XII
### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

This section summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to U.S. holders (as defined below) of Claims or Interests. This summary is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various U.S. federal income tax consequences of the Plan as discussed herein. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service (the "IRS") or other tax authorities have been sought or obtained with

respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or any other tax authority. A substantial amount of time may elapse between the date of this Disclosure Statement and the Effective Date, and events occurring after the date of this Disclosure Statement (including after the Effective Date), including changes in law and changes in administrative positions, could affect the U.S. federal income tax consequences of the Plan discussed below. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holder of Claims or Interests. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. **HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE THEREFORE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.**

### A.    U.S. Federal Income Tax Consequences to the Debtors

#### 1.    Cancellation of Indebtedness

Buccaneer Energy Limited is the common parent of a consolidated group (the Debtors) that files a consolidated U.S. federal income tax return, which takes into account the income and losses of all of the Debtors. As discussed below and in connection with the implementation of the Plan, the Debtors are expected to be able to exclude any COD income (as defined below) for purposes of determining their gross income for U.S. federal income tax purposes, but certain of their tax attributes, including net operating loss ("NOL") carryforwards, may be reduced or eliminated.

In general, the discharge of indebtedness in exchange for an amount of consideration that is less than the amount of the indebtedness that is discharged (in the case of indebtedness that constitutes a "debt instrument" for U.S. federal income tax purposes, the amount of such indebtedness considered to be discharged should equal the "adjusted issue price" of such indebtedness), or the discharge of indebtedness without providing any consideration for such discharge, gives rise to discharge of indebtedness income ("COD income") to the debtor. The amount of consideration paid to a creditor generally equals the amount of cash and the fair market value of other property paid to such creditor.

However, if the debt discharge is granted by the court or pursuant to a plan approved by the court in a case under title 11 of the United States Bankruptcy Code, the COD income realized from such discharge is excluded from the debtor's gross income. In such a situation, the debtor is required to reduce its tax attributes up to the amount of the excluded COD income in generally the following order: (i) NOL from the year of the discharge and NOL carryforwards, (ii) general business credit carryforwards, (iii) minimum tax credit carryforwards, (iv) capital loss carryforwards, (v) tax basis in the debtor's property (but not below the amount of its liabilities immediately after the discharge), (vi) passive activity loss and credit carryforwards, and (vii) foreign tax credit carryforwards.

In the case of debtors that are members of a consolidated group that files a consolidated U.S. federal income tax return, the tax attributes of each debtor are reduced first (including its

tax basis in its assets and the stock of its subsidiaries).  In this regard, the Treasury regulations adopt a "look through" rule such that, if the debtor reduces its tax basis in its stock in a member of the consolidated group, corresponding reductions must be made to that member's tax attributes, including such member's tax basis in its assets.  To the extent that the amount of excluded COD income exceeds the tax attributes of the debtor member, the Treasury regulations generally require the reduction of certain consolidated tax attributes of all other members of the consolidated group, but do not require the reduction of the tax basis in their assets.  The reduction in tax attributes occurs only after the tax for the year in which the discharge of indebtedness occurred has been determined.  To the extent that the amount of excluded COD income exceeds the tax attributes available for reduction, the remaining COD income is nevertheless excluded from gross income.

Under the terms of the Plan, all Claims are to be discharged.  If the amount of the Claims that will be discharged pursuant to the Plan (in the case of a Claim that constitutes a "debt instrument" for U.S. federal income tax purposes, the amount of such Claim considered to be discharged pursuant to the Plan should equal such Claim's "adjusted issue price") exceeds the cash that will be received in exchange therefor, the Debtors will realize COD income equal to such excess, which would generally be required to be included in the gross income of the Debtors.  However, since any such discharge will occur in a case under title 11 of the United States Bankruptcy Code, the Debtors expect to be able to exclude any such realized COD Income from gross income, but the Debtors may be required to reduce certain tax attributes, such as NOL carryovers.  Since the amount of any realized COD income depends on the amount of the Claims that will be discharged pursuant to the Plan and the amount of the cash received in exchange therefor, the amount of any such COD income and the corresponding reduction in tax attributes cannot be known with certainty until after the Effective Date.

### B.      U.S. Federal Income Tax Consequences to U.S. Holders of Claims or Interests

The following discussion summarizes certain U.S. federal income tax consequences of the transactions contemplated by the Plan to U.S. holders of Claims or Interests who or that hold such Claims or Interests as capital assets within the meaning of Section 1221 of the Internal Revenue Code (generally, assets held for investment purposes).  Non-U.S. holders of Claims or Interests should consult their own tax advisors for information that may be relevant based on their particular situations and circumstances regarding the particular tax consequences to them of the transactions contemplated by the Plan.  The following discussion is written on the basis that the U.S. holder of a Claim has not taken a bad debt deduction with respect to its indebtedness (or any portion thereof) in the current or any prior taxable year and such indebtedness did not become completely or partially worthless in a prior taxable year.

For purposes of the following discussion, a "U.S. holder" is a holder of a Claim or Interest who or that is for U.S. federal income tax purposes (i) a citizen or individual resident of the United States, (ii) a corporation, or an entity taxable as a corporation, created or organized in the United States or under the laws of the United States or any political subdivision thereof, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source, or (iv) a trust if (a) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons within the meaning of

Section 7701(a)(30) of the Internal Revenue Code have the authority to control all substantial decisions of the trust or (b) the trust has a valid election in effect under applicable Treasury regulations to be treated as a United States person.

### 1.    U.S. Federal Income Tax Consequences to U.S. Holders of Claims

As explained below, the U.S. federal income tax consequences to U.S. holders of Claims arising from the receipt of cash pursuant to the Plan will vary depending upon, among other things, if a Claim constitutes a "security" for U.S. federal income tax purposes. Neither the Internal Revenue Code nor the Treasury regulations promulgated thereunder define the term "security." The determination of whether indebtedness constitutes a "security" for U.S. federal income tax purposes depends upon an evaluation of the nature of the indebtedness, but most authorities have held that the length of the term of the indebtedness is an important factor in determining whether such indebtedness is a "security" for U.S. federal income tax purposes. These authorities have indicated that indebtedness with maturities when issued of less than five years are not considered "securities," while indebtedness with maturities when issued of ten years or more are considered "securities." There are numerous other factors that could be taken into account in determining whether indebtedness is a "security," including the security for payment, the creditworthiness of the debtor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the debtor, convertibility of the instrument into an equity interest of the debtor, whether payments of interest are fixed, variable, or contingent, and whether such payment are made on a current basis or accrued. Due to the inherently factual nature of the determination, each U.S. holder of a Claim is urged to consult its own tax advisor regarding whether its Claim is a "security" for U.S. federal income tax purposes.

### C.    Information Reporting and Backup Withholding

Information returns may be filed with the IRS in connection with the transactions contemplated by the Plan. A U.S. holder may be subject to U.S. backup withholding tax on payments made pursuant to the Plan if the U.S. holder fails to provide its taxpayer identification number to the paying agent and comply with certification procedures, or to otherwise establish an exemption from U.S. backup withholding tax.

U.S. backup withholding tax is not an additional tax. The amount of any U.S. backup withholding tax from a payment will generally be allowed as a credit against the U.S. holder's U.S. federal income tax liability and may entitle the U.S. holder to a refund, provided that the required information is timely furnished to the IRS.

U.S. holders should consult their tax advisors regarding the application of backup withholding and information reporting.

### D.    Importance of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO U.S. HOLDERS OF CLAIMS OR INTERESTS AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR

INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.   THE TAX CONSEQUENCES SUMMARIZED HEREIN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON EACH U.S. HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

## ARTICLE XIII
## CONCLUSION

This Disclosure Statement has attempted to provide information regarding the Debtors' bankruptcy estates and the potential benefits that might accrue to holders of Claims against and Interests in the Debtors under the Plan.  The Plan is the result of efforts of the Debtors' and their advisors, working in connection with the Committee and its advisors, to provide the holders of Allowed Claims and Interests with the highest and best recovery.  The Debtors and Committee believe that the Plan is feasible and will provide each holder of an Allowed Claim against and Interest in the Debtors with an opportunity to receive greater benefits than those that would be received by termination of the Debtors' businesses and the liquidation of their assets by a chapter 7 trustee(s).

Dated:  November 5, 2014

Respectfully submitted,

**Buccaneer Resources, LLC**

By: _/s/John T. Young Jr._____
John T. Young, Jr., Chief Restructuring Officer

**Buccaneer Energy Limited**

By: _/s/John T. Young Jr._____
John T. Young, Jr., Chief Restructuring Officer

**Buccaneer Energy Holdings, Inc.**

By: _/s/John T. Young Jr._____
John T. Young, Jr., Chief Restructuring Officer

**Buccaneer Alaska Operations, LLC**

By: _/s/John T. Young Jr._____
John T. Young, Jr., Chief Restructuring Officer

**Buccaneer Alaska, LLC**

By: */s/John T. Young Jr.*
John T. Young, Jr., Chief Restructuring Officer

**Kenai Land Ventures, LLC**

By: */s/John T. Young Jr.*
John T. Young, Jr., Chief Restructuring Officer

**Buccaneer Alaska Drilling, LLC**

By: */s/John T. Young Jr.*
John T. Young, Jr., Chief Restructuring Officer

**Buccaneer Royalties, LLC**

By: */s/John T. Young Jr.*
John T. Young, Jr., Chief Restructuring Officer

**Kenai Drilling, LLC**

By: */s/John T. Young Jr.*
John T. Young, Jr., Chief Restructuring Officer

FULBRIGHT & JAWORSKI LLP
WILLIAM R. GREENDYKE
JASON L. BOLAND
R. ANDREW BLACK
1301 MCKINNEY, SUITE 5100
HOUSTON, TX 77010
TELEPHONE: (713) 651-5151
FACSIMILE: (713) 651-5246

**ATTORNEYS FOR THE DEBTORS
AND DEBTORS-IN-POSSESSION**

**Exhibit A**

**First Amended Joint Plan of Reorganization of the Debtors and Debtors-in-Possession Under Chapter 11 of the United States Bankruptcy Code**

**Exhibit B**

**Order Approving Disclosure Statement (without exhibits) [Dkt. No.   ]**

**Exhibit C**

**Liquidation Analysis**

Buccaneer Resources, LLC et al

**Buccaneer Resources, LLC et al**
**Liquidation Analysis**
**In $ 000's**

| | LOW | HIGH | LOW | HIGH |
|---|---|---|---|---|
| | **PLAN** | | **CHAPTER 7** | |
| **Assets** | | | | |
| **Current Assets** | | | | |
| Cash and Cash Equivalents | $ 10,000 | $ 10,000 | $ - | $ - |
| Trade - AR - Net | - | - | - | - |
| Net ACES Receivable | - | - | - | - |
| **Total Current Assets** | **$ 10,000** | **$ 10,000** | **$ -** | **$ -** |
| **Total Non-Current Assets** | **$ -** | **$ -** | **$ -** | **$ -** |
| Causes of Action | 500 | 10,000 | 500 | 10,000 |
| **Total Sources of Recovery** | **$ 10,500** | **$ 20,000** | **$ 500** | **$ 10,000** |
| | | | | |
| **General & Administrative Costs** | | | | |
| Trustee Fees | 182 | 260 | - | 159 |
| Contingency Legal Fees | 225 | 4,500 | 225 | 4,500 |
| Professional Fees | 291 | 356 | 416 | 509 |
| SG&A | 77 | 94 | 49 | 59 |
| **Total Administrative Costs** | **$ 775** | **$ 5,210** | **$ 690** | **$ 5,227** |
| | | | | |
| **Net Value Available for Recovery** | **$ 9,725** | **$ 14,790** | **$ (190)** | **$ 4,773** |
| | | | | |
| Face Value Debt | | | | |
| Chapter 11 Administrative Claims | N/A | N/A | $ 3,500 | $ 4,500 |
| Secured Debt | N/A | N/A | N/A | N/A |
| Unsecured | $ 216,520 | $ 206,520 | $ 216,520 | $ 206,520 |
| Recovery | | | | |
| Chapter 11 Administrative Claims - $ | N/A | N/A | $ - | $ 4,500 |
| % | N/A | N/A | 0.0% | 100.0% |
| Secured Debt $ | N/A | N/A | N/A | N/A |
| % | N/A | N/A | N/A | N/A |
| Unsecured - $ | $ 9,725 | $ 14,790 | $ - | $ 273 |
| % | 4.5% | 7.2% | 0.0% | 0.1% |

**Notes & Assumptions**

- Assumes an effective date of December 1, 2014.

- Chapter 11 case assumes the proposed Plan in the Buccaneer Resources, LLC case is confirmed.
    - Assumes Chapter 11 expenses are paid from the lender's cash collateral
    - Assumes existing cash balances go to secured lender with $10 million carve out contributed to liquidating trust pursuant to the Plan

- Assumes trade A/R and net ACES receivable are included in AIX's collateral.  Essentially the same treatment is assumed for these assets in the Chapter 7 alternative with the secured lender assumed to successfully seek and receive lift of stay and undertake a foreclosure against collateral.


- The only non-current assets are the statewide statewide surety bonds held in favor of State of AK. Pursuant to the Plan, AIX's lien attaches to any proceeds released.

- Trustee fees in the Plan assume approximately 50% of the Liquidating Trustee's time at rate of between $175 - $250 / hr. Trustee fees in the Chapter 7 reflect reasonable compensation as per section 330 of the bankruptcy code not to exceed 25% on the first $5,000, 10% on amounts between $5,000 and $50,000, 5% amounts between $50,000 and $1,000,000, 3% for moneys in excess of $1,000,000.  SG&A costs are estimated at approximately $34,000 per month over 12 months.  SG&A costs are estimate as approximately $34,000 per month for 12 months.


- It is assumed under the Plan that 100% of administrative costs related to the Chapter 11 proceeding are paid through cash collateral prior to Plan implementation but that the Chapter 7 alternative would include between $3.5 - $4.5 million in unpaid chapter 11 administrative costs which would be at the top of the recovery waterfall

- A wide range of gross recovery from causes of action including avoidance actions under the bankruptcy code (e.g. litigation, insurance claims, preferences, fraudulent transfers, etc.) is presented.  The recoveries are assumed to be the same under the confirmed Plan or Chapter 7.  Recoveries could vary significantly upon the liquidating trustee's success in pursuing these actions.  Legal fees related to these activities are assumed to be exclusively on a contingency basis at 45%